IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| 3G LICENSING, S.A., KONINKLIJKE KPN N.V., and ORANGE S.A, | ) ) ) | |
| Plaintiffs, | ) ) | **Redacted – Public Version** |
| v. | ) ) | C.A. No. 17-083-GBW |
| HTC CORPORATION, | ) ) | |
| Defendant. | ) ) ) | ▮▮▮▮▮▮▮ |

**DEFENDANT HTC CORPORATION'S ANSWERING BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ENHANCED DAMAGES**

OF COUNSEL:
Yar R. Chaikovsky
Philip Ou
Bruce Yen
Radhesh Devendran
Shashank Chitti
Jake Gold
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306-2109
(650) 213-0300

Dan L. Bagatell
PERKINS COIE LLP
3 Weatherby Road
Hanover, NH 03755
(602) 351-8250

Dated: January 23, 2024

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant HTC Corporation*

# **TABLE OF CONTENTS**

INTRODUCTION AND NATURE AND STAGE OF PROCEEDINGS ................................... 1

ARGUMENT ....................................................................................................................... 2

A.   *Read* Factor 1—3G Concedes HTC Did Not Copy ......................................... 2

B.   *Read* Factor 2—HTC Investigated the Scope of the Patents and Developed a
     Reasonable Belief in Non-Infringement and Invalidity .................................. 3

C.   *Read* Factor 3—HTC's Conduct During the Litigation Was Reasonable ....... 6

D.   *Read* Factor 4—HTC's Commercial Success Does Not Favor Enhancement ... 9

E.   *Read* Factor 5—This Case Was Close ............................................................. 9

F.   *Read* Factor 6—Any Willful Infringement Spanned Less Than Two Years and
     Does Not Support Enhancement ..................................................................... 11

G.   *Read* Factor 7—The Only Meaningful Remedial Action Possible Was Exiting the
     Handset Market, Which HTC Did ................................................................... 12

H.   *Read* Factor 8—HTC Had No Motivation to Harm Plaintiffs ....................... 13

I.   *Read* Factor 9—HTC Did Not Conceal Its Actions ...................................... 13

CONCLUSION .................................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Diabetes Care Inc. v. Dexcom, Inc.*,
C.A. No. 21-977-KAJ, D.I. 602 (D. Del. Jan. 17, 2024) .......................................... 10

*ArcherDX, Inc., QIAGEN Scis., LLC*, C.A. No. 18-1019,
2022 U.S. Dist. LEXIS 178509 (D. Del. Sept. 30, 2022) ...................................... 1

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
C.A. No. 15-152-RGA, 2019 U.S. Dist. LEXIS 122912 (D. Del. July 24, 2019)............... 3, 13

*CAP-XX, Ltd. V. Ioxus, Inc.*,
C.A. No. 18-849, D.I. 89 (Aug. 5, 2020) ........................................................ 1

*Cirba, Inc. v. VMWare, Inc.*, C.A. No. 19-742-LPS,
2020 U.S. Dist. LEXIS 239744 (D. Del. Dec. 21, 2020).......................................... 1

*Dasso Int'l, Inc. v. MOSO N. Am., Inc.*, C.A. 17-1574,
2023 U.S. Dist. 145805 (D. Del. Aug. 21, 2023) ................................................ 1, 14

*Dynamic Data Techs. v. Google LLC*, C.A. No. 19-1529-CFC,
2020 U.S. Dist. LEXIS 46285 (D. Del. Mar. 18, 2020) .......................................... 5

*Endobotics, LLC v. Medrobotics Corp.*, C.A. 19-381-CFC,
2020 U.S. Dist. LEXIS 224636 (D. Del. Dec. 1, 2020)............................................ 1

*Evolved Wireless, LLC v. Samsung Elecs. Co.*, C.A. No. 15-545-SLR-SRF,
2016 U.S. Dist. LEXIS 32794 (D. Del. Mar. 15, 2016) .......................................... 5

*Evolved Wireless, LLC v. Samsung Elecs. Co.*, C.A. No. 15-545-SLR-SRF,
2016 U.S. Dist. LEXIS 46849 (D. Del. Apr. 6, 2016)............................................ 6

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
616 F.3d 1357 (Fed. Cir. 2010) ................................................................ 5

*Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*, C.A. No. 15-634-JFB,
2019 U.S. Dist. LEXIS 70752 (D. Del. Apr. 26, 2019).......................................... 1

*Greatbatch Ltd. v. AVX Corp.*, C.A. No. 13-723-LPS,
2018 U.S. Dist. LEXIS 53812 (D. Del. Mar. 30, 2018) .......................................... 8

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 5
79 U.S. 93 (2016) ................................................................................ 1

*Hologic, Inc. v. Minerva Surgical, Inc.*, C.A. No. 15-1031,
2019 U.S. Dist. LEXIS 74204 (D. Del. May 1, 2019)............................................ 1

*Idenix Pharms. LLC v. Gilead Scis., Inc.*,
271 F. Supp. 3d 694 (D. Del. 2017) ............................................................ 13

*Jiaxing Super Lighting Elec. Appliance Co. v. CH Lighting Tech. Co.*, C.A. No. 20-18-
ADA, 2022 U.S. Dist. LEXIS 146033 (W.D. Tex. Aug. 16, 2022) .......................................... 11

*Koninklijke KPN NV v. Sierra Wireless, Inc.*,
C.A. No. 17-90, D.I. 75 (D. Del. Mar. 22, 2018) ...................................................................... 2

*Liqwd, Inc. v. L'Oreal USA, Inc.*, C.A. 17-14-JFB-SRF,
2019 U.S. Dist. 215668 (D. Del. Dec. 16, 2019) .................................................................. 1, 14

*MHL Custom, Inc. v. Waydoo USA, Inc.*, C.A. 21-91-RGA,
2023 U.S. Dist. LEXIS 158243 (D. Del. Sept. 7, 2023) ........................................................ 1, 14

*Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
C.A. No. 17-1390-RGA,
2022 U.S. Dist. LEXIS 156988 (D. Del. Aug. 31, 2022) ......................................................... 11

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, C.A. No. 14-1352-JLS-KES,
2019 U.S. Dist. LEXIS 160197 (C.D. Cal. June 26, 2019) ........................................................ 7

*Pierce Mfg. v. E-One, Inc.*, C.A. No. 18-617-TPB-TGW,
2022 U.S. Dist. LEXIS 28120 (M.D. Fla. Feb. 16, 2022) ........................................................ 11

*Power Integrations Inc. v. Fairchild Semiconductor Int'l Inc.*, C.A. No. 8-309-LPS,
2019 U.S. Dist. LEXIS 121675 (D. Del. July 22, 2019) ......................................................... 1, 9

*PureWick Corp. v. Sage Products LLC*, C.A. No. 19-1508-MN,
2023 U.S. Dist. LEXIS 56193 (D. Del. Mar. 31, 2023) ................................................. 1, 3, 7, 8

*Rain Dance Techs., Inc. v. 10X Genomics, Inc.*,
C.A. No. 15-152-RGA, D.I. 568 (D. Del. July 24, 2019) ........................................................... 1

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992) ...................................................................................................... 1

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*,
503 F. Supp. 3d 156 (D. Del. 2020) .............................................................................. 1, 11, 12

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284-LPS,
2019 U.S. Dist. LEXIS 119674 (D. Del. July 18, 2019) ........................................................ 1, 3

*Spectralytics, Inc. v. Cordis Corp.*, C.A. No. 5-1464-PJS-LIB,
834 F. Supp. 2d 920 (D. Minn. 2011) ....................................................................................... 11

*Sprint Commc'ns Co. L.P. v. Time Warner Cable, Inc.*, C.A. No. 11-2686-JWL,
2017 U.S. Dist. LEXIS 37191 (D. Kan. Mar. 14, 2017) ............................................................. 7

*SRI Int'l Inc. v. Cisco Sys. Inc.*, C.A. 13-1534-RGA,
2020 U.S. Dist. LEXIS 46775 (D. Del. Mar 18, 2020) ............................................................... 1

*SRI Int'l, Inc. v. Cisco Sys., Inc.*, C.A. No. 13-1534,
254 F. Supp. 3d 680, 722 (D. Del. 2017) .................................................................................... 7

*Sunoco Partners Mktg. & Terminals LP v. Powder Springs Logistics, LLC*,
  C.A. 17-1390-RGA,
  2022 U.S. Dist. LEXIS 156988 (D. Del. Aug. 31, 2022) ..................................................... 1, 10

*Vectura Ltd. v. GlaxoSmithKline LLC*, C.A. 16-638-RGA,
  2019 U.S. Dist. LEXIS 155768 (D. Del. Sept. 12, 2019) ................................................... 1, 13

**Statutes**

35 U.S.C. § 101 ................................................................................................................. 2, 4

## INTRODUCTION AND NATURE AND STAGE OF PROCEEDINGS

Enhanced damages should not be awarded in a normal case. The Supreme Court has instructed that they are reserved for special instances where a defendant's actions were "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-04 (2016). This Court has faithfully adhered to that directive. In the last five years, this Court has adjudicated eighteen requests for enhanced damages.[1] Of those, only four were granted. Two of those four involved default judgments.[2] In both remaining cases, this Court found that the defendant had copied the inventions with the purpose of harming a direct competitor,[3] supporting enhancement under *Read* factors 1 and 8.[4] Plaintiffs Orange S.A. ("Orange") and 3G Licensing ("3G")

---

[1] *MHL Custom, Inc. v. Waydoo USA, Inc.*, C.A. 21-91-RGA, 2023 U.S. Dist. LEXIS 158243, at *28 (D. Del. Sept. 7, 2023) ; *PureWick Corp. v. Sage Products LLC*, C.A. No. 19-1508-MN, 2023 U.S. Dist. LEXIS 56193, at *59 (D. Del. Mar. 31, 2023); *ArcherDX, Inc., QIAGEN Scis., LLC*, C.A. No. 18-1019, 2022 U.S. Dist. LEXIS 178509, at *57 (D. Del. Sept. 30, 2022); *Sunoco Partners Mktg. & Terminals LP v. Powder Springs Logistics, LLC*, C.A. 17-1390-RGA, 2022 U.S. Dist. LEXIS 156988, at *16 (D. Del. Aug. 31, 2022) ; *Cirba, Inc. v. VMWare, Inc.*, C.A. No. 19-742-LPS, 2020 U.S. Dist. LEXIS 239744, at *23 (D. Del. Dec. 21, 2020); *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 503 F. Supp. 3d 156, 183 (D. Del. 2020) ; *SRI Int'l Inc. v. Cisco Sys. Inc.*, C.A. 13-1534-RGA, 2020 U.S. Dist. LEXIS 46775, at *11 (D. Del. Mar 18, 2020); *Vectura Ltd. v. GlaxoSmithKline LLC*, C.A. 16-638-RGA, 2019 U.S. Dist. LEXIS 155768, at *20 (D. Del. Sept. 12, 2019); *Rain Dance Techs., Inc. v. 10X Genomics, Inc.*, C.A. No. 15-152-RGA, D.I. 568 (D. Del. July 24, 2019) (attached as Ex. 6); *Power Integrations Inc. v. Fairchild Semiconductor Int'l Inc.*, C.A. No. 8-309-LPS, 2019 U.S. Dist. LEXIS 121675, at *25 (D. Del. July 22, 2019); *Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284-LPS, 2019 U.S. Dist. LEXIS 119674, at *28-29 (D. Del. July 18, 2019); *Hologic, Inc. v. Minerva Surgical, Inc.*, C.A. No. 15-1031, 2019 U.S. Dist. LEXIS 74204, at *30 (D. Del. May 1, 2019); *Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*, C.A. No. 15-634-JFB, 2019 U.S. Dist. LEXIS 70752, at *20 (D. Del. Apr. 26, 2019).

[2] *Endobotics, LLC v. Medrobotics Corp.*, C.A. 19-381-CFC, 2020 U.S. Dist. LEXIS 224636, at *4 (D. Del. Dec. 1, 2020); *CAP-XX, Ltd. V. Ioxus, Inc.*, C.A. No. 18-849, D.I. 89 (Aug. 5, 2020) (attached as Ex. 7).

[3] *Dasso Int'l, Inc. v. MOSO N. Am., Inc.*, C.A. 17-1574, 2023 U.S. Dist. 145805, at *80-81 (D. Del. Aug. 21, 2023); *Liqwd, Inc. v. L'Oreal USA, Inc.*, C.A. 17-14-JFB-SRF, 2019 U.S. Dist. 215668, at *18-19, 22 (D. Del. Dec. 16, 2019).

[4] *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992).

concede that neither factor is present here. And no other factor makes this case egregious.

Plaintiffs primarily rely on unsupportable allegations of vexatious conduct and on puffery about the strength of their case. In reality, this has been a long, hard-fought case where HTC prevailed as often as not. Seven years ago, 3G, Orange and KPN sued almost every manufacturer of Android phones in the world for patent infringement as part of an "LTE Pool Enforcement Action." *See* D.I. 486 at 1; D.I. 641 at 6. They initially asserted five patents against HTC Corporation and its U.S.-based affiliate, HTC America, Inc ("HTC America"). HTC America successfully had all claims against it dismissed. Three of the patents, unmentioned in 3G's motion despite taking up the bulk of the parties' efforts over the past years, disappeared from the case without any plausible allegation of wanton or egregious conduct by HTC. One was invalidated by the PTAB.[5] One was initially found invalid under 35 U.S.C. § 101.[6] One was dropped by Plaintiffs on the eve of trial following HTC's successful motion for summary judgment of non-infringement of one of the two asserted claims.[7]

Only two patents remained for a trial on the merits, at which the jury awarded 3G some, but not all, of the relief it sought. Moreover, HTC maintains strong defenses in its JMOL and new-trial motions and, if necessary, will have a strong appeal. If this is piracy, the seas are safe.

## ARGUMENT

Each of the *Read* Factors is neutral or favors HTC.

### A. *Read* Factor 1—3G Concedes HTC Did Not Copy

Plaintiffs did not allege at trial and do not allege in their motion that HTC copied the

---

[5] IPR2018-00558 (invalidating U.S. 9,014,667) (attached as Ex. 8)

[6] *See Koninklijke KPN NV v. Sierra Wireless, Inc.*, C.A. No. 17-90, D.I. 75 (D. Del. Mar. 22, 2018) (the court ruled the '662 Patent invalid) (attached as Ex. 9).

[7] D.I. 486 at 14-15 (Sept. 29, 2020) (granting summary judgment of non-infringement for the only asserted independent apparatus claim, leaving only independent method claim 5) (redacted at D.I. 489).

putative inventions of the '091 or '818 patents. Indeed, neither 3G nor Orange competed with HTC in the mobile handset field. Plaintiffs' theory at trial was that HTC first learned of the patents-in-suit in 2015 when HTC received a letter from Sisvel stating that *existing* HTC products might infringe a bevy of patents that Sisvel alleged to be essential to LTE standards. *See* JTX-070 (attached as Ex. 1). But Plaintiffs presented no evidence that HTC learned of the '091 or '818 patents from those Sisvel letters. Moreover, the letters alleged that HTC infringed—not as a result of any copying—but merely by practicing the LTE standard. *See* JTX-070 at 2 ("[A]ny LTE capable product conforming to these standard specifications, inevitably uses the technical teachings of the LTE Patents. . . . Therefore, as HTC's LTE capable products . . . require a license under the LTE Patents . . . .").

Rather than being neutral, as Plaintiffs suggest, this factor weighs strongly ***against*** enhancement. *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, C.A. No. 15-152-RGA, 2019 U.S. Dist. LEXIS 122912, at *28 (D. Del. July 24, 2019) ("[I]t is clear that Plaintiffs have not identified any evidence of copying. . . . Thus, I find both factors one and nine ***weigh against enhanced damages***.") (emphasis added).[8]

B. *Read* **Factor 2—HTC Investigated the Scope of the Patents and Developed a Reasonable Belief in Non-Infringement and Invalidity**

HTC developed a reasonable belief that the '818 and '091 patents were invalid and not infringed as soon as it was served with the Complaint in 2017.

As to invalidity, HTC served hundreds of pages of invalidity contentions relating to the

---

[8] This factor is neutral only when there exists some evidence of copying that was not "particularly egregious." *Purewick Corp. v. Sage Prods., LLC*, C.A. No. 19-1508-MN, 2023 U.S. Dist. LEXIS 56193, at *40-41 (D. Del. Mar. 31, 2023) (quoting *Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284-LPS, 2019 U.S. Dist. LEXIS 119680, at *8 (D. Del. July 18, 2019)). It is not neutral when, as here, there was no evidence of any copying.

'091 and '818 patent in this case along with two invalidity expert reports covering several prior art combinations. *See* D.I. 85; D.I. 309 (Notice of service of Expert Reports regarding validity of '818 and '091 patents). 3G does not even allege otherwise. [9] Apart from challenging the prior art status of a single reference and treatment of multiple GSM standards as one reference, 3G did not challenge any of the remaining invalidity grounds on summary judgment, confirming that even 3G recognized that HTC had reasonable invalidity defenses. *See* D.I. 348. The Court also denied one of 3G's summary judgment motions as to certain prior art references. D.I. 486 at 5-6. HTC maintains its belief that the '818 and '091 patents are invalid today. Based on 3G's broad claim interpretation presented at trial, HTC has filed a petition for *ex parte* re-examination of the '091 patent. Ex. 2. And for the reasons explained in HTC's post-trial motions, HTC maintains that the claims of the '818 patent are invalid under 35 U.S.C. § 101. D.I. 773 at 17-20.

HTC developed (and maintains) strong non-infringement defenses as well, as demonstrated by the fact that HTC moved for JMOL of non-infringement for both patents. *Id.* at 1-10. 3G even told the jury that HTC had non-infringement defenses leading up to trial that HTC supposedly "lost" on the eve of trial during the supplemental claim construction proceedings. [10] Trial Tr. 1211:15-22. [11] If 3G truly believed that HTC had no reasonable non-infringement defenses, it could have moved for JMOL of infringement—it did not.

The fact that HTC developed these defenses after it was sued in 2017, rather than after receiving Sisvel's letter in 2015, is irrelevant because the 2015 letter was not "sufficiently specific to support an objective understanding that the recipient may be an infringer." *Funai*

---

[9] Any such allegation would apply equally to the other defendants in the five patent cases which joined in those invalidity contentions.
[10] As explained in HTC's JMOL motion, it was 3G, not HTC, who lost on the "initiate a second call" claim term.  D.I. 773 at 2-8.
[11] Excerpted trial transcripts ("Trial Tr.") are attached as Ex. 10.

*Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1373 (Fed. Cir. 2010). Instead, it merely stated

that "HTC's LTE capable products" required a license under "the LTE patents." JTX-070 at 2. It

did not specifically identify either the '818 or '091 patent; it merely provided a web link to an

undifferentiated list of several hundred patents, with no explanation of which claims were

allegedly infringed or how. Trial Tr. 251:24-252:1; *see also id.* 252:9-253:3. Such a letter is

legally insufficient to provide notice of infringement for willfulness purposes. *See*; *Dynamic

Data Techs. v. Google LLC*, C.A. No. 19-1529-CFC, 2020 U.S. Dist. LEXIS 46285, at *5 (D.

Del. Mar. 18, 2020) (recommending a motion to dismiss allegations of pre-suit induced

infringement and willful infringement be granted, observing that plaintiffs did "not articulate

why, in the absence of having received a pre-suit notice letter explaining why the accused

products infringed the patents-in-suit, Google would have nevertheless understood (prior to

being served with the Complaint) that such infringement had been occurring").

The 2015 letter was almost identical to the one found wanting in *Evolved Wireless, LLC

v. Samsung Elecs. Co.*, C.A. No. 15-545-SLR-SRF, 2016 U.S. Dist. LEXIS 32794, at *8 (D. Del.

Mar. 15, 2016). There, as here, the defendant received a letter from a telecommunications

licensing entity stating that "the use of one or more patent claims in the portfolio is required to

practice or otherwise comply with LTE standards or technical specifications" which listed

eighty-five patents and patent applications. *Id.* This Court determined that this letter was

"insufficient to establish . . . pre-suit knowledge of the patents-in-suit" and noted that "[c]ourts

facing analogous circumstances to the facts presented in the instant case have determined that a

patent included in an appendix containing dozens of patents does not place a defendant on notice

of the patents-in-suit. *Id.* This Court thus dismissed the claims of willful infringement. *Id.* at 19;

*Evolved Wireless, LLC v. Samsung Elecs. Co.*, C.A. No. 15-545-SLR-SRF, 2016 U.S. Dist.

LEXIS 46849 (D. Del. Apr. 6, 2016) (adopting the report and recommendation). The only significant difference between the *Evolved* letter and the 2015 letter from Sisvel, is that the 2015 Sisvel letter contained a much longer list of patents.

On re-direct of Mr. Ye, the jury also saw deposition testimony from HTC's Lynn Yu in which Ms. Yu provided a detailed explanation for why HTC does not typically review long lists of patents identified in notice letters: "for the two sides to conduct negotiations, there needs to be a focus. So the rights owners would tell us which patents they would like to go into further discussion, that's very important." Trial Tr. 1002:13-1004:6.

The jury never indicated when HTC started willfully infringing either patent. For the '818 patent, 3G alleged only that infringement began as of the filing of the complaint, so the jury could not have found willful infringement before then.  As for the '091 patent, because the law is clear that the Sisvel 2015 letter was insufficient notice, the Court should similarly find that any willful infringement did not begin until after service of the complaint. The jury was not asked when HTC became aware of potential infringement of the '091 patent. *See* D.I. 740.

Accordingly, this factor weighs also against enhancement.

### C.  *Read* Factor 3—HTC's Conduct During the Litigation Was Reasonable

HTC has acted reasonably throughout this case. Plaintiffs' allegations to the contrary are baseless.

Plaintiffs primarily rely on the fact that HTC did not present an invalidity case at trial, but that was due to time constraints. During the week of trial, all of HTC's invalidity experts were in Wilmington preparing to give testimony. HTC introduced them to the jury in opening statements. Trial Tr. 130:9-25 (Dr. Wicker); *id.* 135:11-136:3 (Dr. Kakaes). Had the trial progressed differently, HTC certainly would have called these witnesses, but it ultimately lacked the time to

do so.[12] *See* D.I. 686 at 15-16. "[S]uch a decision to focus on the strongest arguments . . . is not improper." *Sprint Commc'ns Co. L.P. v. Time Warner Cable, Inc.*, C.A. No. 11-2686-JWL, 2017 U.S. Dist. LEXIS 37191, at \*43-44 (D. Kan. Mar. 14, 2017); *Purewick Corp. v. Sage Prod., LLC*, C.A. No. 19-1508-MN, 2023 U.S. Dist. LEXIS 56193, at \*40 (D. Del. Mar. 31, 2023) (finding that withdrawal of a defense is not sufficient to rise to "the level of 'malicious' behavior required to support an award of enhanced damages"). Plaintiffs' bald assertion that HTC was "not actually intending" to present its invalidity case is utterly baseless.[13]

Plaintiffs' other arguments fare no better. HTC's marking defense was not frivolous. Although the Court previously denied HTC's motion for summary judgment on the marking defense, D.I. 486, Judge Stark was not presented with, and certainly did not grant, any motion to strike that defense. To the contrary, in denying HTC's motion, the Court cited *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, C.A. No. 14-1352-JLS-KES, 2019 U.S. Dist. LEXIS 160197, at \*3 (C.D. Cal. June 26, 2019), a case in which the Court ultimately allowed the defendant to present a marking defense at trial. *See Pavo,* D.I. 332 at 3 (C.D. Cal. Feb. 19, 2020) (Ex. 3). The quotation from Plaintiffs' brief regarding the "elimination" of the marking defense came from a

---

[12] These time constraints were due in no small part to Plaintiffs' witnesses' equivocations and lengthy answers to simple "yes" or "no" questions resulting in re-questioning to obtain proper answers; the Court repeatedly admonished Plaintiffs' witnesses for this evasive testimony. *See, e.g.,* Trial Tr. 514:17-20; 518:14-16; 554:24-25; 555:2-3.  Further, 3G instigated an inordinately large number of lengthy sidebars. Of the 20 sidebars in this case, three were initiated by the Court for logistical questions and 11 were requested by 3G or necessary to resolve their many objections.

[13] *SRI Int'l, Inc. v. Cisco Sys., Inc.*, C.A. No. 13-1534, 254 F. Supp. 3d 680, 722 (D. Del. 2017), is distinguishable in several respects. In addition to dropping significantly more invalidity theories at trial, the Court noted that the defendant "pursu[ed non-infringement] defenses to trial that were contrary to the court's rulings or [defendant's] internal documents" and "designated 53 separate transcripts consisting of nearly 48,000 lines of testimony . . .  [but only] presented 22 lines of testimony from a single transcript at trial." *Cisco*, 254 F. Supp. 3d at 722-23. HTC did no such thing.

different action, in response to a motion for reargument made by a different defendant (not HTC) based on different facts. *See* D.I. 771 at 5, citing C.A. No. 17-82, D.I. 347. Although the Court ultimately ruled that the defense was barred in this action as well, D.I. 698 at 1-2, HTC's argument to the contrary was made in good faith.

In any event, courts consider both sides' conduct in evaluating this factor. *See Greatbatch Ltd. v. AVX Corp.*, C.A. No. 13-723-LPS, 2018 U.S. Dist. LEXIS 53812, at *17 (D. Del. Mar. 30, 2018) (finding this factor neutral after balancing both parties' extensive litigation efforts, including an excessive number of discovery disputes and sanctionable actions on both sides); *Purewick*, 2023 U.S. Dist. LEXIS 56193, at *40 (recognizing that the "case was fiercely fought, with both sides' conduct contributing to the occasionally heated nature of the proceedings").

In this case, Plaintiffs blame HTC for dropping certain defenses, but Plaintiffs belatedly dropped the '564 patent on the eve of trial, several years after HTC prevailed on several key claim constructions and summary judgment of non-infringement on the asserted apparatus claim. D.I. 165 at 34-36; D.I. 486 at 14-15. Plaintiffs were well aware that they had no basis to continue to assert the method claim against HTC, but Plaintiffs waited until the week before trial to withdraw the patent.  Similarly, although Plaintiffs accuse HTC of flouting discovery obligations, Plaintiffs produced two agreements on the eve of trial that upended HTC's understanding of Orange's role in the trial and whether they would be entitled to any portion of recovery from the lawsuit. HTC promptly raised the late disclosure and prejudice, D.I. 697, but counsel represented at the pre-trial conference that Orange had rights in the patents and was a necessary party. PTC Tr. 13:16-18 (Oct. 4, 2023) (excerpt attached as Ex. 4); *see also* D.I. 745 at 2 n. 1. The Court declined to dismiss Orange but ordered the parties to confer on how to instruct the jury about Orange. Plaintiffs ultimately agreed that the Court should instruct the jury that

Orange "does not have any rights to sue or to recover for any infringements at issue in this case" and "[t]o avoid confusion, the parties and the Court will refer to the entities by name . . . instead of 'Plaintiff' o[r] 'Plaintiffs.'" D.I. 718. Yet despite that agreement, Plaintiffs turned the trial into one between Orange and HTC. *See* Trial Tr. at 1205:9-20; D.I. 773 at 20.

Plaintiffs' actions thus embody the very vexatious conduct they assert against HTC. *See also* D.I. 773 at 1-8 (showing how Plaintiffs presented an infringement theory at trial that ignored and contradicted the Court's claim construction of "initiating a second call", as confirmed by the Court's post-trial memorandum and opinion on claim construction).

This factor also weighs against enhancement.

### D.  *Read* Factor 4—HTC's Commercial Success Does Not Favor Enhancement

Although HTC never had the market share of, say, Apple or Samsung, HTC was successful in the smartphone business for many years, and it is now a leading designer of virtual-reality devices. Party size and commercial success, however, are not determinative, or even persuasive in determining enhanced damages. The factor is neutral when, as here, the defendant's size does not make it particularly unable to pay an enhanced damages award. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, C.A. No. 8-309-LPS, 2019 U.S. Dist. LEXIS 121675, at *22 (D. Del. July 22, 2019) ("As [Defendant] is a large, financially successful company, this factor does not disfavor enhanced damages against [Defendant]. This factor is neutral.").

### E.  *Read* Factor 5—This Case Was Close

This case has been close throughout, and its ultimate resolution remains to be seen. After almost seven years of litigation, this case has gone from five patents to two. HTC prevailed on a motion to dismiss (D.I. 74), on claim construction early in the case (D.I. 165 at 34-36; D.I. 147 at 167-169), on its motion for summary judgment of non-infringement (D.I. 486 at 14-15), and on a

9

vigorously disputed motion to sever KPN (D.I. 641 at 11). Moreover, contrary to Plaintiffs' gloss

on the issue, Plaintiffs did not prevail on several important claim construction arguments just

before trial. In particular, Plaintiffs argued at the hearing that the signaling that answered a call

could constitute "initiating" the call as the phrase is used in the '091 patent.

> **THE COURT**: You're not arguing that initiating includes answering, is what you're telling
> me?
> **MR. HEALY**: No, we are. We are arguing . . . [t]he patent specifically says steps A through
> D equal initiating. . . .
> **THE COURT**: Well, initiating can't require that the call actually be answered.
> **MR. HEALY**: No, no –
> **THE COURT**: That doesn't make sense.

Claim Construction Hearing Tr. at 61:22-62:9 (Oct. 6, 2023) (excerpt attached as Ex. 5). The

Court then confirmed its rejection of 3G's position by narrowing 3G's proposed construction to

exclude answering the call:

| 3G's Proposed Construction | Court's Construction |
|---|---|
| "sending signaling to establish a second call" | "sending signaling *sufficient* to establish a second call, *if answered*" |

Plaintiffs did win a verdict with a legally-unwarranted damages award, but HTC

continues to contest both liability and the damages award. Plaintiffs' excessive damages demand

failed to apportion the value between what is and is not patented, as required by Federal Circuit

law.  Last week, Circuit Judge Jordan, sitting by designation in this district, excluded the opinions

of a damages expert for failing to properly apportion like 3G's expert did in this case. *Abbott*

*Diabetes Care Inc. v. Dexcom, Inc.*, C.A. No. 21-977-KAJ, D.I. 602 (D. Del. Jan. 17, 2024) (Ex.

11).  In any event, the jury awarded Plaintiffs significantly less than the 49¢/unit they sought in

closing. Indeed, Plaintiffs' counsel argued that anything less than what Plaintiffs demanded would

constitute "a victory for [HTC]." Trial. Tr. 1259:17-24.

The length of jury deliberations is not persuasive in analyzing the closeness of a case.

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, C.A. No. 17-1390-

RGA, 2022 U.S. Dist. LEXIS 156988, at *7 n. 3 (D. Del. Aug. 31, 2022) (holding that a finding

of willful infringement across the board following a four-hour deliberation did not necessarily

mean the case was not close); *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, C.A.

No. 17-189-LPS, 503 F. Supp. 3d 156, 180 (D. Del. 2020) ("This factor weighs heavily in

[Defendant's] favor . . . . [Plaintiff's] contention that the speed of the jury deliberation (just two

hours) means this was not a close case and, hence, supports willfulness is unpersuasive.").

 Accordingly, this factor does not support enhancement.

### F. *Read* Factor 6—Any Willful Infringement Spanned Less Than Two Years and Does Not Support Enhancement

 As discussed above regarding *Read* factor 2, the 2015 letter cannot legally serve as notice

for willful infringement, so the earliest that willful infringement could have begun in this case

was the filing and service of the complaint in 2017. HTC exited the U.S. phone market years

before trial, and the allegedly infringing sales after the Complaint comprised only a small

fraction of the total number of allegedly infringing units. *See* JTX-011, JTX-018, JTX-027, JTX-

034 (summary sales spreadsheets from 2011-2018). Numerous courts have found that similar

facts weighed against enhancement. *See Spectralytics, Inc. v. Cordis Corp.*, C.A. No. 5-1464-

PJS-LIB, 834 F. Supp. 2d 920, 928 (D. Minn. 2011) ("The overall infringement period was

relatively long, but the period of willful infringement [of 12 months] was relatively short.");

*Pierce Mfg. v. E-One, Inc.*, C.A. No. 18-617-TPB-TGW, 2022 U.S. Dist. LEXIS 28120, at *12

(M.D. Fla. Feb. 16, 2022) (finding that a period of eighteen months did not favor enhancement of

damages); *Jiaxing Super Lighting Elec. Appliance Co. v. CH Lighting Tech. Co.*, C.A. No. 20-

18-ADA, 2022 U.S. Dist. LEXIS 146033, at *27 (W.D. Tex. Aug. 16, 2022) ("Nevertheless, this

factor does not weigh heavily in favor of enhancement because [the Plaintiff] likely only knew

for less than 18 months, if that.").

Moreover, this factor does not support enhancement when, as here, "construction of unclear or ambiguous terms [wa]s necessary before an infringement determination c[ould] be made." *Roche*, 503 F. Supp. 3d at 180.

### G. *Read* Factor 7—The Only Meaningful Remedial Action Possible Was Exiting the Handset Market, Which HTC Did

The infringement theories Plaintiffs presented at trial precluded any meaningful remedial action other than leaving the market. At trial, Plaintiffs alleged that all phones using certain Qualcomm chipsets would necessarily infringe. Their infringement expert, Dr. Madisetti, claimed that he did not even need to examine any HmTC phones to determine infringement:

> Q. . . . [Y]ou can't tell whether something infringes just based on the Qualcomm processor alone, true?
> A. No, I can. Because they all infringe except that exception.

Trial Tr. 559:10-14.



Trial Tr. 779:7-14 (Dr. Madisetti on redirect).

 Trial Tr. 471:3-15; 499:25-500:10; 503:24-504:7; *see also* 946:6-13 (deposition testimony from HTC's Howard Chen played to the jury regarding Google's requirements).

Given Plaintiffs' position that any phone complying with the major carrier

requirements, or incorporating a chipset that did so, necessarily infringed, the only

meaningful option to avoid infringement was to exit the mobile handset market. And

HTC did so less than two years after the filing of the complaint. Moreover, this factor is

neutral when, as here, the case was close and Plaintiffs have been adequately—indeed,

excessively—compensated already, via the compensatory damages award. *Vectura Ltd. v.

GlaxoSmithKline LLC*, C.A. No. 16-638-RGA, 2019 U.S. Dist. LEXIS 155768, at *11

(D. Del. Sep. 12, 2019).

### H. *Read* Factor 8—HTC Had No Motivation to Harm Plaintiffs

Plaintiffs concede that HTC, which did not compete with them, had no motivation to

harm them.[14] The sale of accused products as part of normal business operations is no different

from non-willful infringement and weighs against enhancement. *Bio-Rad Labs., Inc. v. 10X

Genomics, Inc.*, C.A. No. 15-152-RGA, 2019 U.S. Dist. LEXIS 122912, at *28 (D. Del. July 24,

2019) ("[T]he fact that the infringer acted pursuant to a financial motive does not distinguish this

case from the garden-variety infringement case.") (alteration in original) (quoting *Idenix Pharms.

LLC v. Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 702 (D. Del. 2017)).

Accordingly, this factor weighs against enhancement.

### I. *Read* Factor 9—HTC Did Not Conceal Its Actions

Plaintiffs concede, as they must, that HTC did not conceal its manufacture or sale of

products. Such open sale weighs against enhancement. *Bio-Rad Labs.,*2019 U.S. Dist. LEXIS

122912, at *28 ("For factor nine, it is undisputed that the accused products were freely available

for purchase. . . . I find both factors one and nine weigh against enhanced damages."); *MHL*

---

[14] In fact, HTC and Orange "generally have a very good relationship" – HTC used to be a
supplier for Orange and the two currently have active projects together in the VR space. Trial Tr.
1004:22-1005:11.

*Custom, Inc. v. Waydoo USA, Inc.*, C.A. No. 21-91-RGA, 2023 U.S. Dist. LEXIS 158243 (D. Del. Sept. 7, 2023) (finding that this factor weighed against enhancement because the defendant operated in the open).

## CONCLUSION

In concluding, it is helpful to return to the two cases in recent history where this Court has awarded enhanced damages. In the first, *Liqwd, Inc. v. L'Oréal USA, Inc*., C.A. No. 17-14-JFB-SRF, 2019 U.S. Dist. LEXIS 215668, at *18 (D. Del. Dec. 16, 2019), the defendants "met with plaintiffs to discuss a possible sale of plaintiff. Defendants were permitted to see formulas, books and other proprietary information. Defendants then withdrew from negotiations. Shortly thereafter, the plaintiffs' technology was being used." *Id.* at *18-19. The plaintiff obtained a preliminary injunction. *Id.* at *19-20. The defendants were competitors with the plaintiffs in a two-player market and the Court found that the defendants "intended to under-cut plaintiffs' pricing and market share." *Id.* at *20-21. Under those egregious facts, the Court awarded the same 100% enhancement Plaintiffs request here. *Id.* at 22.

In *Dasso Int'l, Inc. v. MOSO N. Am., Inc.*, C.A. No. 17-1574, 2023 U.S. Dist. LEXIS 145805, at *80-81 (D. Del. Aug. 21, 2023), the defendant had the infringing product produced in the same factory as the plaintiffs' product. *Id.* The Court noted that the products were "for all intents and purposes identical." *Id.* The parties were also competitors, and the defendant expressed a desire to "squash" the plaintiffs' business. *Id.* at *81. Yet in that case, the Court ordered only half of the enhancement plaintiffs request here. *Id.* at *81-82.

In this case, all the evidence showed the HTC had no ill feelings towards Plaintiffs and no knowledge of the claims asserted at trial prior to the complaint. HTC and Plaintiffs were not competitors in any sense, and HTC merely made phones compliant with carrier requirements

14

using Qualcomm's off-the-shelf chipsets, as did every other major manufacturer. Moreover,

HTC exited the phone market not long after this case began, and it maintained strong defenses

through trial even though the jury ultimately found infringement. The cases could not be more

dissimilar, and no enhancement in any amount is warranted here.

Respectfully submitted,

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant HTC Corporation*

OF COUNSEL:
Yar R. Chaikovsky
Philip Ou
Bruce Yen
Radhesh Devendran
Shashank Chitti
Jake Gold
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306-2109
(650) 213-0300

Dan L. Bagatell
PERKINS COIE LLP
3 Weatherby Road
Hanover, NH 03755
(602) 351-8250

Dated: January 23, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2024, this document was served on the persons listed

below in the manner indicated:

**BY EMAIL**

Brian E. Farnan
Michael J. Farnan
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Andres Healy
Jenna G. Farleigh
SUSMAN GODFREY, L.L.P.
Suite 3800
1201 Third Avenue
Seattle, WA 98101
(206) 505-3843
ahealy@susmangodfrey.com
jfarleigh@susmangodfrey.com

Lexie G. White
Hunter Vance
Alejandra C. Salina
SUSMAN GODFREY, L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
(713) 651-9366
lwhite@susmangodfrey.com
hvance@susmangodfrey.com
asalinas@susmangodfrey.com

/s/ Nathan R. Hoeschen
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant HTC Corporation*

# Exhibit 1
# Redacted in its Entirety

Exhibit 2

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| In re *Ex Parte* Reexamination of: | ) | |
| | ) | |
| U. S. Patent No. 7,995,091 | ) | Control No.: *To be assigned* |
| | ) | |
| Issue Date: Aug. 9, 2011 | ) | Group Art Unit: *To be assigned* |
| | ) | |
| Inventors: Michael David Stanmore Crook | ) | Examiner: *To be assigned* |
| | ) | |
| Appl. No. 11/325,115 | ) | Confirmation No.: *To be assigned* |
| | ) | |
| Filing Date: Jan. 3, 2006 | ) | |
| | ) | |
| For: MIXED MEDIA | ) | |
| TELECOMMUNICATION CALL | ) | |
| MANAGER | ) | |

Mail Stop *Ex Parte* Reexam
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

## REQUEST FOR *EX PARTE* REEXAMINATION OF U.S. PATENT NO. 7,995,091

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

## TABLE OF CONTENTS

I.    Introduction ........................................................................................... 1

II.   Identification of Claims and Citation of Prior Art Presented ............................. 2

III.  Overview of the '091 Patent .......................................................................... 2

   A.   Specification and Drawings of the '091 Patent ......................................... 2

   B.   Claims of the '091 Patent ...................................................................... 4

   C.   Patent Prosecution History of the '091 Patent ........................................ 5

   D.   Effective Priority Date of Claims 2-4 of the '091 Patent ........................... 7

IV.   Claim Construction ..................................................................................... 8

V.    Level of Ordinary Skill in the Art ................................................................ 10

VI.   Statement of Substantial New Questions of Patentability ............................... 10

   A.   SNQ1: *RFC 2543* in view of *Sen* ...................................................... 11

   1.   3GL's Infringement Position in District Court ........................................ 11

   2.   Overview of *RFC 2543* ..................................................................... 11

   3.   Overview of *Sen* ............................................................................. 13

   4.   Motivation to combine *RFC 2543* and *Sen* ........................................ 15

   5.   Claim 1 ........................................................................................... 17

      a.   [1.a] A videophone responsive to the discontinuation of an in progress mixed media telecommunications call, the videophone comprising: ................................................................. 17

      b.   [1.b] a radio frequency (RF) interface configured to communicate via a radio telecommunications network; ........................................ 17

      c.   [1.c] a transmitter configured to transmit data carrying at least a first and second media to a remote videophone during a first call; ................ 18

      d.   [1.d] "a processor in communication with the RF interface configured to receive an indication, via the RF interface, that the transmission of data to the remote videophone in the first call is being discontinued," ................................................................ 20

      e.   [1.e] "the processor further being configured to, in response to the indication, initiate a second call to the remote videophone, the second call not supporting the second media." ............................... 23

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

6.    Claim 2 ................................................................................ 24

    a.    A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the videophone is configured to initiate the release of the first call in response to receiving the indication ........................................ 24

7.    Claim 7 ................................................................................ 25

    a.    A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first and second media correspond to audio and video image media respectively. .................................................. 25

B.    SNQ2: *RFC 2543* in view of *Sen* and *Motorola* .................................. 25

*1.*    Overview of *Motorola* ............................................................ 25

*2.*    Motivation to combine *RFC 2543*, *Sen*, and *Motorola* ........................ 26

3.    Claim 6 ................................................................................ 28

    a.    A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first call uses a data channel and the second call uses a voice channel. ........................................................ 28

C.    SNQ3: *3GPP-972* in view of *3GPP-008* and *Sen* .............................. 29

1.    3GL's Infringement Position in District Court ................................ 30

2.    Overview of *3GPP-972* .......................................................... 30

*3.*    Overview of *3GPP-008* .......................................................... 31

4.    Motivation to combine *3GPP-972*, *3GPP-008*, and *Sen* ..................... 32

5.    Claim 1 ................................................................................ 36

    a.    [1.a] A videophone responsive to the discontinuation of an in progress mixed media telecommunications call, the videophone comprising: ......................................................... 36

    a.    [1.b] a radio frequency (RF) interface configured to communicate via a radio telecommunications network; ................................ 36

    b.    [1.c] a transmitter configured to transmit data carrying at least a first and second media to a remote videophone during a first call; ................ 38

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

c.   [1.d] "a processor in communication with the RF interface configured to receive an indication, via the RF interface, that the transmission of data to the remote videophone in the first call is being discontinued," .......................................................... 40

d.   [1.e] "the processor further being configured to, in response to the indication, initiate a second call to the remote videophone, the second call not supporting the second media." ........................................ 42

6.   Claim 2 ...................................................................................................... 44

a.   A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the videophone is configured to initiate the release of the first call in response to receiving the indication ........................................................ 44

7.   Claim 6 ...................................................................................................... 44

a.   A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first call uses a data channel and the second call uses a voice channel. ............................................................................................... 44

8.   Claim 7 ...................................................................................................... 45

a.   A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first and second media correspond to audio and video image media respectively. ........................................................................... 45

D.   SNQ4: *Motorola* ................................................................................................ 45

9.   Claim 1 ...................................................................................................... 45

a.   [1.a] A videophone responsive to the discontinuation of an in progress mixed media telecommunications call, the videophone comprising: .................................................................................... 45

b.   [1.b] a radio frequency (RF) interface configured to communicate via a radio telecommunications network; .................................................. 47

c.   [1.c] a transmitter configured to transmit data carrying at least a first and second media to a remote videophone during a first call; ................ 48

d.   [1.d] "a processor in communication with the RF interface configured to receive an indication, via the RF interface, that the transmission of data to the remote videophone in the first call is being discontinued," .......................................................................... 49

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

     e.    [1.e] "the processor further being configured to, in response to the indication, initiate a second call to the remote videophone, the second call not supporting the second media." .......................................... 51

  10.    Claim 2 ............................................................................................ 53

     a.    A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the videophone is configured to initiate the release of the first call in response to receiving the indication .......................................... 53

  11.    Claim 6 ............................................................................................ 54

     a.    A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first call uses a data channel and the second call uses a voice channel. .......................................................................................... 54

  12.    Claim 7 ............................................................................................ 54

     a.    A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first and second media correspond to audio and video image media respectively. ................................................................................ 54

VII.  Detailed Explanation of the Pertinence and Manner of Applying the Prior Art to the Claims ....................................................................................................................... 55

  A.    Bases for Proposed Rejections of the Claims ....................................... 55

  B.    Proposed Rejections ................................................................................ 57

  1.    Proposed Rejection #1 ............................................................................ 57

  2.    Proposed Rejection #2 ............................................................................ 57

  3.    Proposed Rejection #3 ............................................................................ 57

  4.    Proposed Rejection #4 ............................................................................ 58

VIII.  Conclusion ................................................................................................................ 58

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

**LIST OF EXHIBITS:**

| | |
|---|---|
| Ex. PAT-A | U.S. Patent No 7,995,091 ("the '091 patent") |
| Ex. PAT-B | Prosecution History of the '091 patent |
| Ex. PA-DEC | Declaration of Stephen B. Wicker, Ph.D. |
| Ex. PA-DEC CV | Curriculum vitae of Stephen B. Wicker, Ph.D. |
| Ex. PA-1 | M. Handley *et al.*, Network Working Group, Request for Comments 2543, "SIP: Session Initiation Protocol" (March 1999) ("*RFC 2543*") |
| Ex. PA-2 | U.S. Patent No. 7,532,613 to Sen *et al.* ("*Sen*") |
| Ex. PA-3 | United Kingdom Patent App. No. GB 2313258 to Whinnett *et al.* ("*Motorola*") |
| Ex. PA-4 | ETSI TR 123 972 v3.0.0 ("*3GPP-972*") |
| Ex. PA-5 | ETSI TS 124 008 v3.4.1 ("*3GPP-008*") |
| Ex. PA-6 | M. Handley et al., Network Working Group, Request for Comments 2327, "SDP: Session Description Protocol" (Apr 1998) ("RFC 2327") |
| Ex. PA-7 | The Bell System Technical Journal, Volume 58, Number 1, January 1979 |
| Ex. PA-8 | Michel Mouly and Marie-Bernadette Pautet, The GSM System for Mobile Communications, 1992 |

| | |
|---|---|
| Ex. PUB-1 | S. Bradner, Network Working Group, Request for Comments 2026, "The Internet Standards Process -- Revision 3" (October 1996) ("RFC 2026") |
| Ex. PUB-2 | SIP: Session Initiation Protocol RFC 2543: History (https://datatracker.ietf.org/doc/rfc2543/history/) |
| Ex. PUB-3 | Original specification for U.S. Patent Application 09/605,800 (June 28, 2000) |
| Ex. PUB-4 | 3GPP TR 21.900 V3.2.0 |
| Ex. PUB-5 | ETSI: Details of 'DTR/TSGN-0123972' Work Item (https://portal.etsi.org/webapp/workprogram/Report_WorkItem.asp?WKI_ID=9807) |
| Ex. PUB-6 | ETSI: Details of 'DTR/TSGN-0123972' Work Item Schedule (https://portal.etsi.org/eWPM/index.html#/schedule?WKI_ID=9807) |
| Ex. PUB-7 | ETSI: Details of 'RTS/TSGN-0124008UR2' Work Item (https://portal.etsi.org/webapp/workprogram/Report_WorkItem.asp?WKI_ID=11392) |
| Ex. PUB-8 | ETSI: Details of 'RTS/TSGN-0124008UR2' Work Item Schedule (https://portal.etsi.org/eWPM/index.html#/schedule?WKI_ID=11392) |
| Ex. COMPLAINT-1 | Third Amended Complaint (Dkt. 75) in *3G Licensing, S.A. v. HTC Corp.*, Case No. 1-17-cv-00083 (D. Del. Dec. 27, 2017) |

| Ex. CC-1 | Claim Construction Memorandum Opinion (Dkt. 165) in *3G Licensing, S.A. v. HTC Corp.*, Case No. 1-17-cv-00083 (D. Del. Sept. 13, 2018) |
| Ex. CC-2 | Claim Construction Memorandum Opinion (Dkt. 743) in *3G Licensing, S.A. v. HTC Corp.*, Case No. 1-17-cv-00083 (D. Del. Oct. 23, 2023) |
| Ex. CC-3 | Final Jury Instructions (Dkt. 737) in *3G Licensing, S.A. v. HTC Corp.*, Case No. 1-17-cv-00083 (D. Del. Oct. 16, 2023) |
| Ex. INF-1 | Trial Transcript in *3G Licensing, S.A. v. HTC Corp.*, Case No. 1-17-cv-00083 (D. Del. Oct. 10, 2023 through Oct. 16, 2023) |
| Ex. IPR-1 | Institution Decision from *LG Elecs., Inc. v. 3G Licensing S.A.*, IPR2018-00559 |

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

## I.      Introduction

An *ex parte* reexamination is requested on claims 1-2 and 6-7 ("the challenged claims") of U.S. Patent No. 7,995,091 that issued on Aug. 9, 2011 to Crook ("the '091 patent," Ex. PAT-A), for which the U.S. Patent and Trademark Office ("Office") files identify 3G Licensing, S.A. ("3GL") as the assignee.  In accordance with 37 C.F.R. § 1.510(b)(6), Requester HTC Corporation ("Requester") hereby certifies that the statutory estoppel provisions of 35 U.S.C. § 315(e)(1) and 35 U.S.C. § 325(e)(1) do not prohibit it from filing this *ex parte* reexamination request.

This request raises substantial new questions of patentability based on prior art that the Office did not have before it or did not fully consider during the prosecution of the '091 patent, and which discloses the features recited in the challenged claims.  In October 2023, 3GL argued to the jury in a district court case involving Requester that technology disclosed in this prior art infringes the challenged claims under the district court's claim constructions.  The jury ultimately found the claims infringed based on 3GL's statements.  In view of 3GL's positions and the district court's constructions, the Office should find the claims unpatentable over this art.

Patent Owner ("PO") asserted infringement of the '091 patent across four different cases: *3G Licensing, S.A. v. BlackBerry Limited*, Case No. 1-17-cv-00082 (DDE); *3G Licensing, S.A. v. HTC Corp.*, Case No. 1-17-cv-00083 (DDE); *3G Licensing, S.A. v. Lenovo Group Ltd.*, Case No. 1-17-cv-00084 (DDE); *3G Licensing, S.A. v. LG Elecs., Inc.*, Case No. 1-17-cv-00085 (DDE). Requester respectfully urges that this Request be granted and that reexamination be conducted with "special dispatch" pursuant to 35 U.S.C. § 305.

At the time of filing of this Request, there has been one *inter partes* review:

| Case | Date Filed | Status |
|------|-----------|--------|
| *LG Elecs. Inc. v. 3G Licensing S.A.*, IPR2018-00559 | Feb. 1, 2018 | Institution denied |

Section VI, *infra*, discusses the overlapping prior art addressed in this request and in these previous IPR proceedings.

In accordance with 37 C.F.R. § 1.20(c), the fee for *ex parte* reexamination (non-streamlined) is submitted herewith.  If this fee is missing or defective, please charge the fee as well as any additional fees that may be required to Deposit Account No. 50-3672.

1

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

## II.     Identification of Claims and Citation of Prior Art Presented

Requester respectfully requests reexamination of claims 1-2 and 6-7 of the '091 patent in view of the following prior art references, which are also listed on the attached PTO Form SB/08 (Ex. PA-SB08).

| Ex. PA-1 | M. Handley *et al.*, Network Working Group, Request for Comments 2543, "SIP: Session Initiation Protocol" (March 1999) ("*RFC 2543*") |
| --- | --- |
| Ex. PA-2 | U.S. Patent No. 7,532,613 to Sen *et al.* ("*Sen*") |
| Ex. PA-3 | United Kingdom Patent App. No. GB 2313258 to Whinnett *et al.* ("*Motorola*") |
| Ex. PA-4 | ETSI TR 123 972 v3.0.0 ("*3GPP-972*") |
| Ex. PA-5 | ETSI TS 124 008 v3.4.1 ("*3GPP-008*") |

A copy of each of the above-listed references is attached to this request pursuant to 37 C.F.R. § 1.510(b)(3).  A copy of the '091 patent is also attached to this request as Exhibit PAT-A pursuant to 37 C.F.R. § 1.510(b)(4).

## III.    Overview of the '091 Patent

### A.     Specification and Drawings of the '091 Patent

The '091 patent, entitled "Mixed media telecommunication call manager" describes "a method of setting up a mixed media telecommunications call between mobile stations capable of video telephony." (PAT-A at 2:8-10.)   The '091 patent acknowledges, "[d]evices such as videophones, video conferencing systems and mixed media data transmission/communication systems are known in the art." (*Id.* at 1:29-31). Furthermore, the '091 patent acknowledges "the main functional elements which are common to the various embodiments of a videophone … are each individually known." (*Id. at* 2:66-3:3.)

The '091 patent explains its alleged invention may be implemented on the known Groupe Special Mobile (GSM) network.  (*Id.* at 1:66-2:2.)  The patent admits that the procedure for setting up and handling a multimedia call includes using the known capability of GSM for voice and data

communications, such as using a voice channel of up to 9.6 kbps and a data channel using a High Speed Circuit Switched Data (HSCSD) connection rate of up to 56 kbps.  (*Id.* at 4:28-35.)  The '091 patent uses a data channel with an HSCSD rate of 28 kbps for its video calls.  (*Id.* at FIG. 1 ("Basic Service = 28 kB"), 7:57-58 ("At step e) the caller switches to video mode, which uses a HSCSD connection.").)  The '091 patent also uses "a variant of the known H323, H324 and H340 bitstream controlled protocols for multimedia data transmission," where "the variant operates essentially in accordance with the standards noted above."  (*Id.* at 7:32-36.)

With mixed media calls being known, and components of videophones being known, the '091 patent's alleged novelty stems from "responding to the discontinuation of an in-progress mixed-media call that transmits data using a first and second media by initiating a second call not supporting the second media," where the indication the mixed-media call is being discontinued is received via an RF interface. (*Id.* at Abstract, claim 1.)

An embodiment of the '091 patent for initiating a voice call in response to the discontinuation of a video call is described with respect to Figure 2.  In Figure 2, "the caller selects voice mode" and "the calling videophone releases the video call and makes a new (voice) call to the same number as the original call."  (*Id.* at FIG. 2, 8:8-23.)



The '091 patent also describes an embodiment in Figure 4 in which a voice call is put on hold while a video call is initiated.  (*Id.* at 9:4-8.)  The D. Del. court and 3GL interpreted this embodiment as showing that the first and second calls do not need to be "separate calls," but only need to "contain different media."  (Ex. CC-2 at 7.)  The D. Del. court thus construed the term "second call" as "a separate call or a call that includes different media than the first call."  3GL applied that construction at trial to require only that the video media is removed from the first call, *i.e.*, modification of the first call to remove video constitutes initiation of a second call according to 3GL.

### B.    Claims of the '091 Patent

The '091 patent includes 12 claims total.  (Ex. PAT-A at 11:50-12:61.)  The challenged independent claim of the patent (claim 1) recites a videophone that comprises, among other features, a radio frequency interface configured to communicate via a radio telecommunications network, a transmitter configured to transmit data carrying at least a first and second media to a remote videophone during a first call, and a processor configured to receive an indication via the

4

RF interface indicating that the transmission of data to the remote videophone in the first call is being discontinued, and in response, initiate a second call to the remote videophone that does not support the second media. (*Id.* at 11:51-12:2.) The challenged dependent claims of the '091 patent further require that the videophone be configured to initiate the release of the first call in response to receiving the indication (claim 2); that the first call uses a data channel and the second call uses a voice channel (claim 6); and that the first and second media correspond to audio and video image media respectively (claim 7). (*Id.* at 12:3-6, 12:21-28.)

### C.    Patent Prosecution History of the '091 Patent

The application for the '091 Patent was filed on January 3, 2006 and assigned U.S. Patent Application No. 11/325,115 ("the '115 Application"). The '115 Application is a continuation of U.S. Patent Application No. 10/428,166 filed on April 30, 2003, which claims priority to PCT International Application Number PCT/GB01/04603, filed on October 16, 2001, and claims priority to United Kingdom Patent Application Number 0026700.5 filed on November 1, 2000.

The '115 Application was filed with 28 claims. The Examiner issued an Office Action on March 30, 2010 requiring restriction to one of two inventions: (I) Claims 1-14, drawn to switching between media calls, and (II) Claims 15-28, drawn to establishing calls using different bandwidth channels. (Ex. PAT-B at HTC3G00447683.) In response, Applicant elected to pursue claims 1-14. (*Id.* at HTC3G00447699.)

The Examiner issued a non-final Office Action on August 12, 2010, rejecting claims 1-14. The Examiner rejected claims 1-3, 5-6, 8-9, and 10-13 under 35 U.S.C § 103 as obvious over U.S. Patent 5,909,239 to Lee ("Lee") in view of U.S. Patent 6,148,072 to Huang ("Huang"); claims 7 and 14 under 35 U.S.C § 103.as obvious over Lee in view of U.S. Patent 5,717,857 to Burkman ("Burkman"); and claim 4 under 35 U.S.C § 103 as obvious over Lee in view of U.S. Patent 6,687,515 to Kosaka ("Kosaka"). (Ex. PAT-B at HTC3G00447699 – HTC3G00447703). According to the Examiner, although Lee does not specifically disclose certain claim elements including "initiate a second call not supporting the second media" and "videophone is configured to initiate the release of the first call in response to an indication," it would have been obvious to one of skill in the art to modify Lee's system to include those elements based on Huang's teachings. (*Id.* at HTC3G00447701.) The Examiner also stated that prior art U.S. Patent 5,371,534 to Dagdeviren et al. was not relied upon, but is pertinent to applicant's disclosure. (*Id.* at HTC3G00447703.)

Applicant filed a response on January 12, 2011, amending claims 1 and 10 and canceling claims 2 and 3. (*Id.* at 80.) Claims 1 and 10 were amended to incorporate the features of claim 3, and claim 1 was further amended "to clarify that the claimed videophone includes an RF interface providing for communication via a radio telecommunications network." (*Id.* at HTC3G00447712.) Applicant argued that the Office Action did not present any basis for rejecting claim 3 and that neither Lee nor Huang teaches or suggests this feature. (*Id.* at HTC3G00447713.)

In addition, applicant asserted that Huang does not disclose the limitation requiring "the second call not supporting the second media," which the Examiner contended was missing from Lee, because "both digital links in Huang support the same media." (*Id. at* HTC3G00447713.) Further, applicant argued that the combination is improper because "each of the claimed embodiments recites the initiation of a second call" and "[m]odifying Lee's system to include this type of second call would require a fundamental change in its principle of operation, as it is intended to only generate a single call at a time and does not appear to have the capability to initiate a simultaneous second call." (*Id.* at HTC3G00447713 – HTC3G00447714.)

The USPTO issued a Notice of Allowability on March 18, 2011, allowing claims 1 and 4-14 of the '115 Application, which were renumbered 1-12. (*Id.* at HTC3G00447728.) The Examiner did not provide any reasons for the allowances. The '115 Application issued as the '091 Patent on August 9, 2011.

A petition for inter partes review of the '091 Patent was filed on February 1, 2018. (Ex. IPR-1.) The petition challenged claims 1-12 based on two proposed rounds: (1) claims 1-4 and 6-11 are obvious over In-Call Modification Procedures; H.324M transport efficiency (Tdoc N1-99637) to Ericsson ("Ericsson"), 3rd Generation Partnership Project, Technical Specification Group CH; Multimedia Telephony (3G TR 23.972 version 0.0.2) ("3GPP-927"), and International PCT Published Application WO 99/59312 to Priestman et al. ("Priestman"); and (2) claims 5 and 12 are obvious over Ericsson, 3GPP-972, Priestman, and 3rd Generation Partnership Project, Technical Specification Group Services and System Aspects; Multicall; Service description; Stage 1 (3G TS 22.135 version 3.0.0) ("3GPP-135"). (Ex. IPR-1 at 6) The Patent Trial and Appeal Board did not institute an inter partes review. (*Id.* at 18.)  The PTAB found the petitioner failed to show that the identified disclosure in Ericsson "teaches or suggests an indication that the transmission of data to the remote videophone (i.e., terminal B) in the first call is being discontinued," or that Ericsson in combination with the other two references "teaches or suggests the videophone

processor (i.e., terminal A ) is configured to receive, via an RF interface, the terminal A call control application's request to modify the bit rate (i.e., the indication), and to initiate a second call to a remote videophone (i.e., terminal B)." (*Id.* at 14.)  And the PTAB further found the petitioner's positions applying the teachings of the prior art to 'the processor further being configured to, in response to the indication, initiate a second call to the remote videophone' are inconsistent with Petitioner's arguments applying the teachings of the prior art to the related limitation 'a processor . . . configured to receive an indication . . . that the transmission of data to the remote videophone in the first call is being discontinued.'" (*Id.* at 15-17.)

**D.    Effective Priority Date of Claims 2-4 of the '091 Patent**

For purposes of this reexamination only, Requester assumes that claims 1-2 and 6-7 are entitled to the filing date of United Kingdom Patent Application No. 0026700.5 to which it claims priority, which is November 1, 2000.  (Ex. PAT-A, 1:12-14.)

35 U.S.C. § 102(b), however, requires only that "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent *in the United States*."  And 35 U.S.C. § 119, which provides for priority claims to foreign applications, confirms that "no patent shall be granted on any application for patent for an invention which had been patented or described in a printed publication in any country more than one year before the date of *the actual filing of the application in this country*, or which had been in public use or on sale in this country more than one year prior to such filing."  For purposes of § 102(b), the earliest claimed priority to an application actually filed *in the United States* is to PCT International Application Number PCT/GB01/04603 filed on October 16, 2001.  (Ex. PAT-A, 1:9-11.)

As discussed below in Section VI.A.2, *RFC 2543* was published in March 1999.  Thus, *RFC 2543* qualifies as prior art at least under pre-AIA 35 U.S.C. §§ 102(a) and 102(b).

*Sen* issued on May 12, 2009 from U.S. Patent Application No. 09/605,800 filed June 28, 2000.  Thus, *Sen* qualifies as prior art at least under pre-AIA 35 U.S.C. § 102(e).

*Motorola* is a UK patent application that published on November 19, 1997.  Thus, *Motorola* qualifies as prior art at least under pre-AIA 35 U.S.C. §§ 102(a) and 102(b).

As discussed below in Section VI.C.2, *3GPP-972* was published no later than May 17, 2000.  (Ex. PA-4, p. 17.)  Thus, *3GPP-972* qualifies as prior art at least under pre-AIA 35 U.S.C. §§ 102(a) and 102(b).

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

As discussed below in Section VI.C.3, *3GPP-008* was published no later than August 22, 2000.  (Ex. PA-5, p. 1.)  Thus, *3GPP-008* qualifies as prior art at least under pre-AIA 35 U.S.C. §§ 102(a) and 102(b).

## IV.  Claim Construction

In a reexamination proceeding of an unexpired patent, "claims are given the broadest reasonable interpretation consistent with the specification and limitations in the specification are not read into the claims."  MPEP § 2258 I.(G) (citing *In re Yamamoto*, 740 F.2d 1569, 222 USPQ 934 (Fed. Cir. 1984)).  The '091 patent, which lists October 16, 2001 as the date of the earliest related U.S. application and identifies a term extension of 1531 days under 35 U.S.C. § 154(b), does not expire until December 25, 2025.  (See Ex. PAT-A, Cover.)  Therefore, the claim interpretations submitted or implied herein for the purpose of this reexamination adhere to the broadest reasonable interpretation standard.  *See In re CSB-System Int'l, Inc.*, 832 F.3d 1335, 1340-41 (Fed. Cir. 2016).

Several terms recited in the claims of the '091 patent have been construed under the *Phillips* standard in the District of Delaware cases, one of which Requester was a party (the "D. Del. case").  A summary of these constructions/interpretations is listed in the following table, and is followed by a discussion of the constructions and those proposed by PO and Requester in the D. Del. case.

| '091 Patent Terms | D. Delaware Construction |
| --- | --- |
| "the release of the first call" | "the termination of the first call" |
| "the processor further being configured to, in response to the indication, initiate a second call to the remote videophone, the second call not supporting the second media" | This element does not need construction under § 112 ¶ 6 |
| "call" | "communication of audio and/or video data between mobile stations" |
| "second call" | "a separate call or a call that includes different media than the first call" |
| "initiate a second call" | "send signaling sufficient to establish a second call, if answered" |

(Ex. CC-1 at 11-15; Ex. CC-2.)

The court in the D. Del. case further found that the claims of the '091 patent cover both manual and automatic embodiments.  (Ex. CC-2 at 9-11.)

The parties also agreed to the following constructions in the D. Del. case.

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

| '091 Patent Terms | Agreed Constructions |
|---|---|
| Claim 1 Preamble | The preamble is limiting |
| "first call" | "in progress mixed media telecommunications call" |
| "the processor further being configured to, in response to the indication, initiate a second call to the remote videophone" | The recited "processor" is part of the claim 1 "the videophone," not "the remote videophone," and it is the videophone that initiates the second call. |
| "the release of the first call" | "the termination of the first call" |

(Ex. CC-3 at 19.)

As explained above in Section III.A, the D. Del. court and 3GL interpreted "second call" to not require a "separate call," but as also encompassing "a call that includes different media than the first call." 3GL interpreted this construction to mean that modifying the first call to remove video constitutes initiating a second call within the context of the '091 patent.

3GL also interpreted the Court's construction of "initiate a second call" as covering the sending of a message that accepts a request to modify the first call to remove video. Specifically, 3GL argued that a SIP 200 OK message that accepts a SIP re-INVITE request to modify a video call to remove the video media initiates a second call where the SIP 200 OK receives an ACK message in response. (Ex. INF-1 at 746:11-22.)

While a district court's construction is not binding in a reexamination, the Patent Office "ha[s] an obligation . . . to evaluate that construction and to determine whether it [is] consistent with the broadest reasonable construction of the term" in circumstances where a party's argument relies upon those constructions. *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326-27 (Fed. Cir. 2015).

The Patent Office may also consider the positions taken by 3GL on the scope of the claims, including the statements it made to the district court and jury in the D. Del. case. *See* 35 U.S.C. § 301(a)(2) ("Any person at any time may cite to the Office in writing . . . statements of the patent owner filed in a proceeding before a Federal court or the Office in which the patent owner took a position on the scope of any claim of a particular patent.").

The prior art mappings found in Section VI of this Request explain how the claims of the '091 patent are unpatentable under the constructions of the district court in the D. Del. case, including 3GL's interpretations of those constructions that it advocated to the jury in that case. For any claim term for which a construction is not provided, this Request applies the term's plain meaning.

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

## V.      Level of Ordinary Skill in the Art

A person of ordinary skill in the art ("POSITA") for the '091 patent would have at least a bachelor's degree in electrical engineering, computer engineering, computer science, or equivalent coursework, and approximately two years of professional experience or graduate studies involving wireless telecommunications.  (Ex. PA-DEC, ¶ 27.)  Superior experience in one of these areas could compensate for lesser experience in the other.  (*Id.*)

## VI.     Statement of Substantial New Questions of Patentability

As mentioned above, *RFC 2543*, *Sen*, *3GPP-008*, and *Motorola* were never made of record or considered by the Office during original prosecution of the '091 patent.

*3GPP-972* was raised in *LG Elecs. Inc. v. 3G Licensing S.A.*, IPR2018-00559 as a secondary reference in combination with references not raised in this Request (publications by Ericsson and Priestman).  (Ex. IPR-1.)  *3GPP-008* and *Sen* were never previously presented to the Office, let alone in combination with *3GPP-972*.  Instead, the petitioner in the LG IPR relied upon *3GPP-972* as a secondary reference in combination with an Ericsson reference and a Priestman reference that are not at issue here.  The Office did not consider the combination of *3GPP-972* in view of *3GPP-008* and *Sen*.  Further, LG relied on an in-call modification message generated by the videophone at the behest of the user as one of the many alternatives mapped to the claimed "indication" (Ex. IPR-1 at 16), whereas this Request relies on the network handover disclosures of *3GPP-972*—not the user-based call modification disclosures—where the indication is a message from the network, and thus received via the RF interface of the videophone, unlike the user indication relied upon by LG in its IPR generated by the videophone itself (and thus not received by the videophone).  Thus, *3GPP-972* in view of *3GPP-008* and *Sen* present a substantial new question of patentability.

The references raised in this Request (as discussed below) disclose or suggest all of the features of claims 1-2 and 6-7 of the '091 patent.

**SNQ1**: *RFC 2543* and *Sen* raise a substantial new question of patentability (SNQ1) with respect to claims 1-2 and 7 of the '091 patent.

**SNQ2**: *RFC 2543*, *Sen*, and *Motorola* raise a substantial new question of patentability (SNQ2) with respect to claim 6 of the '091 patent.

**SNQ3**: *3GPP-972*, *3GPP-008*, and *Sen* raise a substantial new question of patentability (SNQ3) with respect to claims 1-2 and 6-7 of the '091 patent.

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

**SNQ4**: *Motorola* raises a substantial new question of patentability (SNQ4) with respect to claims 1-2 and 6-7 of the '091 patent.

Thus, for these reasons and the reasons discussed below and in the accompanying declaration of Stephen B. Wicker, Ph.D. (Ex. PA-DEC), *RFC 2543* and *Sen* raise a substantial new question of patentability (SNQ1) with respect to claims 1-2 and 7 of the '091 patent; *RFC 2543*, *Sen*, and *Motorola* raise a substantial new question of patentability (SNQ2) with respect to claim 6 of the '091 patent; *3GPP-972*, *3GPP-008*, and *Sen* raise a substantial new question of patentability (SNQ3) with respect to claims 1-2 and 6-7 of the '091 patent; and *Motorola* raises a substantial new question of patentability (SNQ4) with respect to claims 1-2 and 6-7 of the '091 patent.

**A.    SNQ1: *RFC 2543* in view of *Sen***

As explained below and in the attached declaration of Stephen B. Wicker, Ph.D. (Ex. PA-DEC), *RFC 2543* in combination with *Sen* discloses or suggests the limitations of claims 1-2 and 7 of the '091 patent.  (Ex. PA-DEC, ¶¶ 113-48.)

**1.    3GL's Infringement Position in District Court**

At trial in the D. Del. case, 3GL argued that a mobile phone that implements SIP messaging infringes the challenged claims of the '091 patent.  Specifically, 3GL argued that a phone that sends a SIP 200 OK message in response to a SIP Re-INVITE message to accept removal of video from an ongoing video call to downgrade the call to voice-only practices the challenged claims.  (Ex. INF-1 at 746:11-22 (3GL's expert testifying at trial that 200 OK message in response to a re-INVITE "initiates the second call").)  But as discussed in more detail in the following sections, such functionality was disclosed prior to the '091 patent in *RFC 2543* (March 1999), the first standard that defined SIP.  Therefore, for the same reasons that the claims were found to be infringed by such prior art functionality, they are necessarily invalid.

**2.    Overview of *RFC 2543***

*RFC 2543* was published in March 1999 as explained in detail by Dr. Wicker in his declaration.  (Ex. PA-1, p. 1; Ex. PA-DEC, ¶¶ 64-78; *see also* Ex. PA-2, 7:35-37.)  In fact, the Patent Trial and Appeal Board explicitly found that "RFC 2401 (dated November 1998) and RFC 2543 (dated March 1999) were made available to persons of ordinary skill interested in computer networking and security sufficiently to be deemed "publicly accessible" at the relevant time" (i.e. as of March 1999, before the February 15, 2000 effective filing date of the challenged patent)

based on expert testimony like described in Dr. Wicker's declaration.[1]  *See Apple Inc. v. VirnetX Inc.*, IPR2016-00332, Paper 29 at 48-52 (PTAB Jun. 22, 2017); Ex. PA-DEC, ¶¶ 64-78.  On appeal, VirnetX challenged only the PTAB's finding that RFC 2401 was a printed publication.  The Federal Circuit affirmed the PTAB's decision, finding that even if VirnetX were not collaterally estopped based on a prior appeal, the Federal Circuit "would affirm the Board's conclusion that RFC 2401 was a printed publication as of November 1998"—the date in the top-right corner of the document—based on the record.  *VirnetX Inc. v. Apple, Inc.*, 909 F.3d 1375, 1378 (Fed. Cir. 2018).  The PTAB's reasoning for finding RFC 2401 a printed publication was the same as for RFC 2543.  IPR2016-00332, Paper 29 at 48-52.  This Request uses the copy of RFC 2543 that was filed with the PTAB on December 28, 2015 in the *Apple v. VirnetX* case that the PTAB found to be a printed publication as of March 1999.  IPR2016-00332, Ex. 1013.  Thus, *RFC 2543* was published in March 1999 and thereby qualifies as prior art at least under pre-AIA 35 U.S.C. §§ 102(a) and 102(b).

The Session Initiation Protocol (SIP) that 3GL relied upon for infringement was first defined in *RFC 2543*.  As disclosed in *RFC 2543*, SIP is "an application-layer control protocol that can establish, modify and terminate multimedia sessions or calls" and can be implemented on "mobile and home phones."  (Ex. PA-1 at pp. 7, 67.)  SIP can modify a call by adding or deleting media from the call.  (*Id.* at 28.)  These media include audio and video.  (*Id.* at p. 137.)  A call may be modified through a "re-invitation" that occurs when a SIP INVITE message (referred to as a "re-INVITE" in this scenario) is sent within an existing call.  (*Id.* at pp. 18, 52, 139.)  The other phone receives the re-INVITE and responds with a 200 OK to accept the request.  (*Id.* at p. 76.)  The phone that sent the re-INVITE sends back an ACK to acknowledge the receipt of the 200 OK message.  (*Id.* at pp. 16-17, 29.)  In other words, the very same functionality that 3GL accused of infringement was known since before the '091 patent, as described in further detail below.

---

[1] The issue of whether RFC 2543 was a printed publication was appealed to the Federal Circuit in *VirnetX Inc. v. Apple, Inc.*, 909 F.3d 1375 (Fed. Cir. 2018) whereby the Federal Circuit held that VirnetX was collaterally estopped from raising this issue since VirnetX brought the same arguments about RFC 2401 in a related matter, but "[e]ven if VirnetX were not collaterally estopped, we would affirm the Board's conclusion that RFC 2401 was a printed publication." *Id.* at 1378.

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

### 3.     Overview of *Sen*

*Sen* issued on May 12, 2009 from U.S. Patent Application No. 09/605,800 filed June 28, 2000.  Thus, *Sen* qualifies as prior art at least under pre-AIA 35 U.S.C. § 102(e).

The industry had been designing and patenting mobile phones that implemented SIP from RFC 2543 since before the '091 patent.  *Sen* is one example.  *Sen* discloses a communications system for a packet-based wireless network such as GPRS linked to mobile units and to a circuit-switched network such as a public-switched telephone network (PSTN).  (Ex. PA-2 at Abstract, FIG. 1, 1:11-50.)  With the increased capacity and available of packet-based data networks, new types of services were becoming available, such as "audio and video communication (e.g. voice communications, video conferencing, multicast of multimedia data)."  (*Id.* at 1:51-58.)  But unlike conventional PSTN networks, which provided dedicated end-to-end circuit connections, voice and other forms of streaming data sent over a packet-based data network had to share network bandwidth with non-streaming data.  (*Id.* at 1:59-65.)  To "enhance communications that involve streaming data (such as voice or video conferencing) over data networks," a Resource Reservation Protocol (RSVP) had been proposed, which could reserve resources along the communication path to provide some level of quality of service (QoS).  (*Id.* at 2:9-20.)  *Sen* sought to provide a system to provide for QoS in communications sessions between mobile units on a packet-switched network and terminals connected to a circuit-switched network.  (*Id.* at 2:37-50.)  *Sen* uses SIP messaging as "described in RFC 2543" for performing call control functions such as setting up a call.  (*Id.* at 7:34-38.)  One such example is illustrated in Figure 5, where call setup is performed at step 402, which "may be performed using SIP messaging."  (*Id.* at 10:39-42.)

13

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091



**FIG. 5**

As shown in Figure 5, mobile phone includes an RSVP agent 106 that processes the SIP messages. (Ex. PA-2 at 10:34-39.) *Sen* discloses that software modules such as the RSVP agent 106 may be executed by a microprocessor. (*Id*. at 11:56-60.) *Sen* further discloses that the messages processed by the RSVP agent 106 are received or transmitted via a radio interface 108 in the phone that utilizes an antenna 110 to communicate over the radio telecommunications network, as illustrated in Figure 2.



FIG. 2

(*Id.* at FIG. 2, 6:26-31.)

### 4.    Motivation to combine *RFC 2543* and *Sen*

While *RFC* 2543 discloses the use of a mobile phone, it does not disclose the physical configuration details of the phone.  A POSITA would have understood that a mobile phone needs to include a transmitter, an RF interface, and a processor as they are basic and fundamental components of a mobile phone that are necessary for it to communicate with a telecommunications network.  (Ex. PA-DEC, ¶ 114.)

This is consistent with what is disclosed in references that a POSITA would have looked to for the configuration of a mobile phone.  (Ex. PA-DEC, ¶ 115.)  One such reference would have been *Sen*, which discloses the configuration of a mobile phone that implements RFC 2543:

> In one example, a call session may be established using messaging according to a Session Initiation Protocol (SIP).  One version of SIP is described in RFC 2543, entitled "SIP: Session Initiation Protocol," dated 1999.

(Ex. PA-2 at 7:34-38; Ex. PA-DEC, ¶ 115.)  In view of *Sen*'s express teachings that its mobile phone can utilize SIP as described in RFC 2543, a POSITA would have been motivated to look to *Sen* in designing a mobile phone that implemented the RFC 2543 standard.  (Ex. PA-DEC, ¶ 115.)  Indeed, *Sen* further discloses that its mobile phone operates on a GPRS network, which "complements existing GSM (Global System for Mobile) communications systems" that are

15

supported by the mobile phone disclosed in *RFC 2543*  (*Id.* at 1:37-39; Ex. PA-1 at pp. 123, 132.) A POSITA would have thus understood *Sen*'s mobile phone to be compatible with the technology disclosed in *RFC 2543* and would have had a reasonable expectation of success in implementing the call modification procedures described in *RFC 2543* using a mobile phone like *Sen*'s as described below.  (Ex. PA-DEC, ¶ 115.)

 *Sen* discloses that its mobile phone includes an antenna (transmitter) and a radio interface (RF interface).  (Ex. PA-2 at FIG. 2, 6:26-31.)  The radio interface, through which messages are received and transmitted, is coupled to an antenna that can communicate such messages through a radio telecommunications network such as GPRS.  (*Id.* at FIG. 2, 3:51-56, 6:26-31.)  *Sen*'s mobile phone also includes an RSVP agent that can be executed on a microprocessor for receiving, processing, and transmitting such messages.   (*Id.* at FIG. 2, 6:26-31, 10:34-39, 11:56-60.)

 A POSITA who was looking to design a mobile phone that implements the RFC 2543 standard would have, in view of *Sen*, included an RF interface, transmitter, and processor in the phone.  (Ex. PA-DEC, ¶ 117.)  *RFC 2543* discloses the transmission of messages (*e.g.*, INVITE) used to create and modify calls, as well as the transmission of data carrying media, such as audio and video.  (Ex. PA-1 at pp. 15, 18, 28, 52, 139.)  It would have been necessary for a mobile phone to include components that would allow for such transmission.  (Ex. PA-DEC, ¶ 117.)  An RF interface, transmitter, and processor were ubiquitous components of mobile phones necessary for processing and transmitting such messages and data, such that a POSITA would have been motivated to include them in a videophone that transmitted SIP messages according to *RFC 2543*.  (*Id.*)

 A POSITA would have had a reasonable expectation of success in implementing a transmitter, RF interface, and processor in a mobile phone that implemented SIP per *RFC 2543* as described above.  (Ex. PA-DEC, ¶ 118.)  Such components are basic and fundamental components of a mobile phone necessary for it to communicate with a telecommunications network.  (*Id.*)  Such components in the combination of *RFC 2543* and *Sen* would have performed their ordinary and basic functions of transmitting data to and receiving data from a telecommunications network for purposes of a call, and a POSITA would have readily understood how to implement such components as part of a mobile phone that utilizes *RFC 2543*.  (*Id.*)

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

5.      **Claim 1**

   a.   **[1.a] A videophone responsive to the discontinuation of an in progress mixed media telecommunications call, the videophone comprising:**

*RFC 2543* discloses a videophone responsive to the discontinuation of an in progress mixed media telecommunications call.  (Ex. PA-DEC, ¶¶ 119-20.)

*RFC 2543* discloses that it is for implementation in "mobile and home phones" for "Internet multimedia conferences, Internet telephone calls, and multimedia distribution."  (Ex. PA-1 at pp. 1, 67.)  These phones are videophones that are capable of mixed media telecommunications calls, such as a call that includes "an audio stream and two bidirectional video streams."  (*Id.* at p. 137.)  As discussed below with respect claim limitations [1.d] and [1.e], the videophone disclosed in *RFC 2543* is responsive to discontinuation of an in progress mixed media telecommunications call.

   b.   **[1.b] a radio frequency (RF) interface configured to communicate via a radio telecommunications network;**

*RFC 2543* discloses that its videophone communicates via a radio telecommunications network, but it does not expressly discloses a radio frequency interface for doing so.  But *RFC 2543* in view of *Sen* renders obvious that the videophone comprises an RF interface configured to communicate via a radio telecommunications network.  (Ex. PA-DEC, ¶¶ 121-25.)

*RFC 2543* discloses that the videophone can be a mobile phone: "As proxies can fork requests, the same request can reach multiple instances of a user (***mobile*** and home ***phones***, for example)."  (Ex. PA-1 at p. 67 (emphasis added).).  *RFC 2543* further confirms that the phone is capable of communicating on a GSM radio telecommunications network and are capable of receiving GSM-encoded audio.  (*Id.* at pp. 123 ("Bell indicates that he can receive RTP audio codings 0 (PCMU), 3 (***GSM***), 4 (G.723) and 5 (DVI4)."), 132 ("Bob returns a description indicating that he is capable of receiving audio encodings . . . ***GSM*** (payload type 3) . . .").)   A radio interface is a basic component of a mobile phone necessary for the phone to communicate over a telecommunications network.  (Ex. PA-DEC, ¶ 122.)

Indeed, for purposes of infringement, 3GL did not point to any particular hardware component in HTC's phones, but instead presumed that because HTC's devices can communicate over a particular radio telecommunications network (LTE), that it must have a radio frequency interface.  Similarly, that the mobile phone in *RFC 2543* can communicate over a 2G GSM radio telecommunications network means it necessarily has an RF interface.  (Ex. PA-DEC, ¶ 122.)

17

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

Further, *Sen* discloses a mobile phone that includes a "radio interface 108" (*i.e.*, an RF interface) that is used by the mobile phone to send and receive messages over a radio telecommunications network such as GPRS.  (Ex. PA-2 at FIG. 2 (annotated below), 3:46-58, 6:26-31.)



**FIG. 2**

*Sen* explains that such messages include SIP messages as disclosed in *RFC 2543*.  (*Id.* at 7:34-38.)

As explained above in Section VI.A.4, it would have been obvious in view of these disclosures in *RFC 2543* and *Sen* for the videophone to include an RF interface configured to communicate via a radio telecommunications network such as GSM and GPRS.  (Ex. PA-DEC, ¶ 125.)

### c.   [1.c] a transmitter configured to transmit data carrying at least a first and second media to a remote videophone during a first call;

*RFC 2543* discloses that the videophone is configured to transmit a first and second media to a remote videophone during a first call, but does not expressly disclose a transmitter for doing so.  But *RFC 2543* in view of *Sen* renders obvious that the videophone comprises a transmitter

configured to transmit data carrying at least a first and second media to a remote videophone during a first call.  (Ex. PA-DEC, ¶¶ 126-30.)

*RFC 2543* discloses that the videophone can transmit data carrying at least audio (first media) and video (second media) during a first call.  For example, RFC 2543 discloses that the videophone can send an INVITE request to start a video call ("first call") that "includes an audio stream and two bidirectional video streams," which demonstrates that the caller's videophone is capable of transmitting audio and video during a first call.  (Ex. PA-1 at p. 137; *see also id.* at p. 132.)  A transmitter would have been necessary for the mobile phone to transmit such media to the other phone over a telecommunications network.  (Ex. PA-DEC, ¶ 127.)

Indeed, for purposes of infringement, 3GL did not point to any particular hardware component in HTC's phones, but instead presumed that because HTC's devices can communicate over a particular radio telecommunications network (LTE), that it must have a transmitter configured to transmit data.  Similarly, that the mobile phone in *RFC 2543* can communicate over a 2G GSM radio telecommunications network means it necessarily has a transmitter for transmitting the first and second media over the network during a first call.  (Ex. PA-DEC, ¶ 127.)

Further, *Sen* discloses a mobile phone that includes an "antenna 16" (transmitter) that is used to communicate between the mobile phone and the telecommunications network.  (Ex. PA-2 at FIG. 2 (annotated below), 6:26-31.)



**FIG. 2**

*Sen* discloses that the phone is capable of "audio, video or multi-media" telephony and that it implements RFC 2543 (a standard that enables multimedia calls), such that the antenna—the only component in *Sen*'s mobile phone that can transmit data—would have been configured to transmit data carrying at least a first media (audio) and a second media (video) to a remote videophone during a multimedia call (first call).  (*Id.* at 7:34-38, 9:60-62; Ex. PA-1 at p. 7; Ex. PA-DEC, ¶ 129.)

For the reasons explained above in Section VI.A.4, it would have been obvious in view of these disclosures in *RFC 2543* and *Sen* for the videophone to include an antenna (transmitter) configured to transmit data carrying audio (first media) and video (second media) to a remote videophone during a first call.  (Ex. PA-DEC, ¶ 130.)

d. **[1.d] "a processor in communication with the RF interface configured to receive an indication, via the RF interface, that the transmission of data to the remote videophone in the first call is being discontinued,"**

20

*RFC 2543* discloses that the videophone receives an indication from the other phone across the radio telecommunications network that the transmission of data to the remote videophone in the first call is being discontinued, but does not disclose that the videophone includes a processor for doing so. But *RFC 2543* in view of *Sen* renders obvious that the videophone comprises a processor in communication with the RF interface configured to receive an indication, via the RF interface, that the transmission of data to the remote videophone in the first call is being discontinued. (Ex. PA-DEC, ¶¶ 131-36.)

*RFC 2543* discloses that the videophone receives an indication that transmission of data to the remote videophone in the first call (the video call) is being discontinued. Specifically, *RFC 2543* discloses that one videophone (the remote videophone) sends an INVITE message within an existing call in order to modify the call, such as by deleting media. (Ex. PA-1 at pp. 28 (INVITE request for existing call leg can be used to "delete media"), 97 ("Once the call has been established, either the caller or callee MAY generate INVITE or BYE requests to change or terminate the call.").) Such a message is also referred to as a SIP "re-INVITE." (*Id.* at pp. 52 (such INVITEs are referred to as a "re-invitation"), 139 (caller may update session description in a "re-INVITE").) )

For purposes of infringement in the D. Del. case, 3GL took the position that a SIP re-INVITE is "an indication . . . that the transmission of data to the remote videophone in the first call is being discontinued":

> Q: Is this one acceptable?
>
> A. Yes. So what happens is that you – when you receive the re-INVITE, it signals to the UE-B, which is the HTC video phone, to discontinue that first call. . . .

(Ex. INF-1 at 746:10-747:1.) 3GL argued that under the Court's construction of "second call" as "a separate call or a call that includes different media than the first call," removal of the video media from the ongoing video call results in a second call—a voice-only call—which in turn means that the first call (the video call) is discontinued.

*RFC 2543* discloses the same re-INVITE message that 3GL relied upon for infringement as the claimed "indication." And it would have been obvious from *RFC 2543* to use that re-INVITE to delete the video media from the ongoing video call (first call) discussed in claim limitation [1.c]. (Ex. PA-DEC, ¶ 134.) Since the video call as discussed in limitation [1.c] includes only video and audio media, deleting video media would have been one of only two options, such

that it would have been obvious to try removing the video media. (*Id.*) Further, removing audio instead of video would have resulted in a call with no audio and only video, which would have been more difficult for the parties to communicate than through voice only. (*Id.*)

    *Sen* discloses that its mobile phone includes an RSVP agent 106 that sends and receives messages to and from the telecommunications network when performing call control functions such as call setup. (Ex. PA-2 at FIG. 5 step 402, 6:16-22, 7:30-41, 10:39-42, 11:56-62.) Per *Sen*, such call control functions may be implemented using SIP as disclosed in RFC 2543. (*Id.* at 7:34-38.) And *Sen* discloses that the RSVP agent software module can be executed on a microprocessor—*i.e.*, the phone includes a microprocessor configured to execute software to receive SIP messages. (*Id.* at 11:56-60.) *Sen* further discloses that its mobile phone receives such messages through the radio interface 108. (*Id.* at 6:26-28.) In other words, the mobile phone in *Sen* includes a processor configured with software (RSVP agent 106) to receive SIP messages via the radio interface (RF interface). (*Id.* at FIG. 2 (annotated below).)



**FIG. 2**

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

For the reasons explained above in Section VI.A.4, it would have been obvious in view of these disclosures in *RFC 2543* and *Sen* for the videophone to include a processor that receives the SIP re-INVITE message for deleting the video media from the first call (the "indication . . . that the transmission of data to the remote videophone in the first call is being discontinued") via the RF interface.  (Ex. PA-DEC, ¶ 136.)

> **e. [1.e] "the processor further being configured to, in response to the indication, initiate a second call to the remote videophone, the second call not supporting the second media."**

*RFC 2543* discloses that the videophone initiates a second call to the remote videophone in response to the indication, the second call not supporting the second media, but does not expressly disclose a processor for doing so.  But *RFC 2543* in view of *Sen* renders obvious that the processor is further configured to, in response to the indication, initiate a second call to the remote videophone, the second call not supporting the second media.  (Ex. PA-DEC, ¶¶ 137-43.)

*RFC 2543* discloses that in response to the SIP re-INVITE ("the indication"), the videophone sends a SIP 200 OK to accept the call modification.  (Ex. PA-1 at p. 76.)  The remote videophone responds to the 200 OK with an ACK.  (*Id.* at pp. 16-17 (disclosing ACK sent in response to 200 OK), 29 ("The ACK request confirms that the client has received a final response to an INVITE request. . . . 2xx responses are acknowledged by client user agents . . . The Via is always initialized to the host that originates the ACK request, i.e., the client user agent after a 2xx response . . .").)

3GL and its expert Dr. Madisetti argued at trial that the 200 OK message initiates a second call to the remote videophone because removing video media from a video call results in a second call under the district court's claim construction of "second call" ("a separate call *or a call that includes different media than the first call*") because the resulting voice-only call includes different media (*i.e.*, no video media) from the video call (the first call):

> Q. Now, I'm going to move to a slightly different subject.  Dr. Madisetti, you point to a SIP 200 OK as initiating a second call, true?
>
> A. Yes.

(Ex. INF-1 at 587:19-22; *see also id.* at 746:14-17 ("and when it receives the re-INVITE . . . there's a response to it, that's the 200 OK.  And that's [*sic*] essentially initiates the second call.")

And according to 3GL, a 200 OK is signaling sufficient to establish a second call, if answered by an ACK such that sending a 200 OK message meets the D. Del. district court's construction of "initiate a second call" ("send signaling sufficient to establish a second call, if answered").  (*Id.* at 746:18-22 ("And only as construed by the Court, it said 'signaling sufficient to establish a second call if answered,' I showed that the signal goes all the way to the other phone, and only when that ACK, A-C-K, then the second call is established.").)

Therefore, under 3GL's interpretation of the claims, the *RFC 2543*'s disclosure of responding to a re-INVITE with a 200 OK message, which in turn receives an ACK response, constitutes initiating a second call.  Indeed, it is the same functionality that 3GL accused of infringement at trial.

As discussed above for claim limitation [1.d], it would have been obvious to include a processor in the videophone for sending and receiving these SIP messages.  (Ex. PA-DEC, ¶ 142.)

For the reasons explained above in Section VI.A.4, it would have been obvious in view of these disclosures in *RFC 2543* and in view of *Sen* for the processor to initiate the second call in response to receiving the SIP re-INVITE ("the indication") by sending a SIP 200 OK message, where the second call is a voice-only call that does not support the video media ("second media") from the first call.  (Ex. PA-DEC, ¶ 143.)

> 6.    **Claim 2**
>
>> a.   **A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the videophone is configured to initiate the release of the first call in response to receiving the indication.**

As discussed above, claim 1 is obvious over *RFC 2543* in view of *Sen*.  *RFC 2543* further discloses that the videophone is configured to initiate the release of the first call in response to receiving the indication.  (Ex. PA-DEC, ¶¶ 144-47.)

As discussed above with respect to claim limitation [1.e], *RFC 2543* discloses that the videophone is configured to send a 200 OK message in response to receiving a re-INVITE ("the indication"), and it would have been obvious for the videophone to send the 200 OK to accept removal of video media from a video call.  (Ex. PA-DEC, ¶ 145.)

3GL argued at trial that a 200 OK message not only initiates a second call, but it also initiates termination of the first call because when the video media is removed, this ends the video call (first call) and starts the voice-only call (second call).

For the same reasons 3GL argued at trial, the sending of the 200 OK message by the videophone in the combination of *RFC 2543* and *Sen* to accept removal of video from the video call therefore initiates the release of the video call. Thus, claim 2 is obvious over *RFC 2543* in view of *Sen*. (Ex. PA-DEC, ¶ 147.)

### 7.   Claim 7

#### a. A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first and second media correspond to audio and video image media respectively.

As discussed above, claim 1 is obvious over *RFC 2543* in view of *Sen*. And as discussed above with respect to claim limitation [1.c], *RFC 2543* discloses that the first and second media correspond to audio and video image media respectively in that the first call is a video call that includes audio media (first media) and video image media (second media). (Ex. PA-DEC, ¶ 148.)

### B.   SNQ2: *RFC 2543* in view of *Sen* and *Motorola*

As explained below and in the attached declaration of Stephen B. Wicker, Ph.D. (Ex. PA-DEC), *RFC 2543* in combination with *Sen* and *Motorola* discloses or suggests the limitations of claim 6 of the '091 patent. (Ex. PA-DEC, ¶¶ 149-60.)

### 1.   Overview of *Motorola*

Motorola is a U.K. patent application that was published on November 19, 1997, and therefore qualifies as prior art under at least 35 U.S.C. §§ 102(a) and (b).

Motorola addresses problems that arise during handover of multimedia communications between videophones (also referred to as "terminals"). As background, Motorola describes the benefits of using multimedia communication to help convey information during conference communications. (Ex. PA-3 at 1:27-2:2.) According to Motorola, this "led to multimedia type conferencing communications using integrated service digital networks (ISDN) where voice and video can be presented at the same time." (*Id.* at 2:3-5.) Motorola explains that for ISDN systems, "a problem often occurs during a multimedia conference between two or more stations, when a station's movement is required, within the multimedia cellular network, while a multimedia

conference call is in progress." (*Id.* at 2:13-16.) Thus, Motorola addresses multimedia solutions in a wireless network.

Motorola describes continuing communications from an ongoing call in a different cell by starting a new call with different media as a "handover." Motorola explains that "for a full and proper handover to occur, the cell to which the communications media is to be handed over must have the capability of handling the appropriate conferencing modes as well as the bandwidth requirements for providing communication for these modes." (*Id.* at 2:18-22.) If the target cell does not have the capability or sufficient bandwidth to support all of the conferencing modes in use, several modes will have to be dropped or temporarily discontinued during handover. (*Id.* at 2:22-25.) Thus, *Motorola* discloses "[a] multimedia conference terminal for use with a cellular multimedia network utilizing a plurality of multimedia modes of transmission" that "will select the best cell for multimedia cell handover as well as scheduling handover of multiple media during a conference call." (*Id.* at 3:33-34.) The media in the original call and the call after handover could be any combination of communication media including "audio, video, textual, graphical or data information." (*Id.* at 5:10-11.)

### 2. Motivation to combine *RFC 2543*, *Sen*, and *Motorola*

As discussed above in Section VI.A.4, a POSITA looking to implement a mobile phone that implements SIP as disclosed in *RFC 2543* would have been motivated to include an RF interface, transmitter, and processor in the phone as these were basic and fundamental components necessary for a mobile phone to operate on a telecommunications network. (Ex. PA-DEC, ¶ 150.)

Mobile phones access a telecommunications network by communicating with a base station in a particular cell. (Ex. PA-DEC, ¶ 151.) When a mobile phone moves outside of that cell during an ongoing call, a handover of that call to a new cell is required to maintain the call. (*Id.*) Handovers were well-known at the time. (*Id.*) Even the '091 patent acknowledges that the known GSM network was capable of handovers. '091 patent at 4:65-5:2, 5:36-39, 5:41-43 (referencing handovers in known GSM network).

A POSITA would have recognized that a user using a videophone for a multimedia call as in the combination of *RFC 2543* and *Sen* may move outside the range of the cell and thus require a handover. (Ex. PA-DEC, ¶ 152.) In the event that the call is handed over to a network that is unable to support the call, an issue arises as to what to do with the multimedia call. (*Id.*)

*Motorola* specifically addresses this type of problem: "A problem often occurs during a multimedia conference between two or more stations, when a station's movement is required, within the multimedia cellular network, while a multimedia conference call is in progress." (Ex. PA-3 at 2:13-16.) *Motorola* notes that "for a full and proper handover to occur, the cell to which the communications media is to be handed over must have the capability of handling the appropriate conferencing modes as well as the bandwidth requirements for providing communications for these modes." (*Id.* at 2:18-22.) "When the target cell does not have the capability or bandwidth for providing all these conferencing modes, several modes must be dropped or temporarily discontinued during the conference before handover to an adjacent cell is completed." (*Id.* at 2:22-25.) *Motorola* teaches that this may occur when the target cell does not have available bandwidth to support the multimedia call, or because the cell "may not be able to deliver high bit rate services because they have not been upgraded from an older less capable technology." (*Id.* at 10:7-20.)

A POSITA implementing a videophone as described in *Sen* to perform a multimedia call using SIP as described in *RFC 2543* would have been motivated to look to *Motorola* to solve the problem of handovers to a cell that is unable to support the ongoing multimedia call. (Ex. PA-DEC, ¶ 154.) A POSITA would have understood that such a situation may occur when a multimedia call occurs on a GPRS packet-switched network as disclosed in *Sen*, and is then handed over to a cell on a GSM circuit-switched network that was either still using legacy technology and unable to support a multimedia call, or did not have sufficient bandwidth to support a multimedia call. (*Id.*) *Motorola* discloses that in such instances, low priority media such as "any data media" may be dropped during the handover. (Ex. PA-3 at 10:30-32.) A POSITA would have understood from *Motorola* that when a video call is handed over to a cell that is not able "to deliver high bit rate services," the data media (i.e. the video) should be dropped to allow the call to continue. (Ex. PA-DEC, ¶ 154.) This would have required nothing more than use of a known technique to improve a known device in the same way. (*Id.*) For example, the 3GPP organization responsible for developing the standards for GSM and GPRS networks disclosed in a technical report that during handover to a congested area where there is insufficient bandwidth for a multimedia call, the call should be downgraded to speech-only. (Ex. PA-4 at 14.) Thus, it was already known in the industry, as described by *Motorola* and *3GPP-972* for example, that a multimedia call should be modified to speech-only after a handover to a congested cell or a cell unable to support

multimedia calls.  And as described with respect to claim 1, *RFC 2543* discloses a process for removing video from a multimedia call to downgrade to voice-only.  A POSITA would have understood that using the re-INVITE process described in *RFC 2543* would have allowed the multimedia call to be handed over to the candidate cell, *e.g.* on a GSM network, as a voice-only call by removing the video media.  (Ex. PA-DEC, ¶ 154.)

Since the candidate cell to which the call is handed over does not have sufficient bandwidth to support a multimedia call or otherwise cannot support high bit rate services, a POSITA would have understood that the voice-only call (second call) would have necessarily been established on a voice channel as the candidate cell would have not have had the bandwidth or infrastructure to support a data channel.  (Ex. PA-DEC, ¶ 155.)

A POSITA would have had a reasonable expectation of success in applying the re-INVITE process disclosed in *RFC 2543* to downgrade a multimedia call to voice-only in the event that the call was handed over to candidate cell that did not support video, such that a video call on a data channel in the initial cell is discontinued in order to initiate a voice-only call on a voice channel in the candidate cell, as disclosed in *Motorola*.  (Ex. PA-DEC, ¶ 156.)  As disclosed in *Motorola*, it was already known that media could be dropped as part of a handover.  (Ex. PA-3 at 10:7-35.)  A POSITA would have understood that the re-INVITE process of *RFC 2543* as one method in which the media could have been removed as part of the handover.  (Ex. PA-DEC, ¶ 156.)  And as discussed above with respect to claim 1, the process of *RFC 2543* was compatible with radio telecommunications networks.  Thus, it would have been well within the capacity of a POSITA to apply the re-INVITE process of *RFC 2543* in the event of a handover to downgrade a call from video to voice in view of *Motorola*.  (Ex. PA-DEC, ¶ 156.)

### 3.   Claim 6

#### a. A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first call uses a data channel and the second call uses a voice channel.

As discussed above, claim 1 is obvious over *RFC 2543* in view of *Sen*.  *RFC 2543* and *Sen* do not expressly disclose using a data channel for the first call and a voice channel for the second call.  But *RFC 2543* in view of *Sen* and *Motorola* renders obvious that the first call uses a data channel and the second call uses a voice channel.  (Ex. PA-DEC, ¶¶ 157-60.)

3GL and its expert Dr. Madisetti argued at trial in the D. Del. case that where a video call is downgraded to a voice-only call during a handover from an LTE packet-switched network to a 3G circuit-switched network, the video call occurs over a data channel and the voice-only call occurs over a voice channel.

*Motorola* discloses performing a handover from one cell to another, including from a cell that supports multimedia calls to another cell that may not support multimedia calls because it has not been upgraded from older technology or because there are insufficient resources to support multimedia.   (Ex. PA-3 at 10:14-20 ("Although preferably all multimedia cells would have capability to accommodate all communication media, at times the multimedia resources will be at high capacity and handover of all media may not be possible.  In addition, some cells may not be capable of offering some media at all.  For example, some cells may not be able to deliver high bit rate services because they have not been upgraded from an older less capable technology.").) *Motorola* discloses that in such instances, low priority media such as "any data media" may be dropped during the handover. (*Id.* at 10:30-32.)  A POSITA would have understood from *Motorola* that when a video call is handed over to a cell that is not able "to deliver high bit rate services," the data media (i.e. the video) should be dropped to allow the call to continue.  (Ex. PA-DEC, ¶ 159.)  And such a call would have occurred over a voice channel, as the cell is "not [] able to deliver high bit rate services" and thus does not support data channels, or otherwise has insufficient resources to allocate a data channel.  (*Id.*)

For the reasons explained above in Section VI.A.4, it would have been obvious in view of *RFC 2543*, *Sen*, and these disclosures from *Motorola* for the videophone to use a data channel on a packet-switched GPRS network for the video call (first call) and a voice channel on a circuit-switched GSM network for the voice-only call (second call) when a handover occurs during a video call from a GPRS network to a cell on a GSM network that is unable to support the video call.  (Ex. PA-DEC, ¶ 160.)

**C.      SNQ3:  *3GPP-972* in view of *3GPP-008* and *Sen***

As explained below and in the attached declaration of Stephen B. Wicker, Ph.D. (Ex. PA-DEC), *3GPP-972* in combination with *3GPP-008* and *Sen* discloses or suggests the limitations of claims 1-2 and 6-7 of the '091 patent.  (Ex. PA-DEC, ¶¶ 161-203.)

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

### 1.  3GL's Infringement Position in District Court

At trial in the D. Del. case, 3GL put forward a second infringement theory, arguing that a downgrade that occurs as a result of a handover infringes the challenged claims of the '091 patent. Specifically, 3GL argued that when a network sends a modification request to a phone to remove video from an ongoing video call during a handover from a packet-switched network to a circuit-switched network, and the phone accepts the modification request, the phone practices the challenged claims.  3GL also argued that the '091 patent's "solution" to the problem of a video call requiring more bandwidth than the cellular connection could sustain was to initiate a second call that would be voice-only, where a "second call" can be initiated simply by removing the video from the first call.  (Ex. INF-1 at 356:10-358:19.)

But as discussed in more detail in the following sections, such functionality was disclosed prior to the '091 patent in the 3GPP standards available at the time, such as in *3GPP-972* which discloses downgrading a call from video to voice-only due to bandwidth constraints after handover to a congested area.  Therefore, for the same reasons that the claims were found to be infringed by such prior art functionality, they are necessarily invalid.

### 2.  Overview of *3GPP-972*

*3GPP-972* was published no later than May 17, 2000 as explained in detail by Dr. Wicker in his declaration.  (Ex. PA-4, p. 17; Ex. PA-DEC, ¶¶ 86-105.)  *3GPP-972* is a 3GPP technical report published by ETSI, and in *Kyocera Wireless Corp. v. International Trade Com'n*, 545 F.3d 1340 (2008), the Federal Circuit found ETSI standards to be printed publications based on ETSI publication procedures like those described in Dr. Wicker's declaration.  (Ex. PA-DEC, ¶¶ 86-105.)  Thus, *3GPP-972* qualifies as prior art at least under pre-AIA 35 U.S.C. §§ 102(a) and 102(b).

As described above in Section III.A, the '091 patent uses a GSM network and its call handling procedures to implement its purported invention.  (Ex. PAT-A at 1:66-2:2 ("For the purposes of describing the following preferred embodiments of the invention, following description will be given in the context of the Groupe Special Mobile (GSM) model."), 4:28-54, 11:42-45.)  The '091 patent acknowledges that data communications were already available over GSM networks.  (*Id.* at 4:32-40.)  In conjunction with the known GSM network, the patent utilizes a variant of the known H.324 standard for multimedia calls.  (*Id.* at 7:32-34.)  As the '091 patent acknowledges, the standards governing GSM networks were developed by the European Telecommunications Standard Institute (ETSI).  (*Id.* at 4:49-54.)  Before the '091 patent, the 3rd

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

Generation Partnership Project (3GPP) was formed from ETSI and other standards organizations to develop specifications for 3G mobile systems.  (Ex. PA-DEC, ¶ 106.)  This 3G mobile system included various multimedia telephony services.  (*Id*.)

Some of these multimedia telephony services were described in *3GPP-972*, a technical report produced by 3GPP that describes technical specifications for "multimedia telephony" for "UMTS as well as GSM" networks.  (Ex. PA-4 at pp. 1, 4.)  The report describes multimedia calling specifications and requirements for mobile phones, such as for setting up a multimedia call between two mobile phones.  (*Id*. at p. 7 ("3.3 Mobile to Mobile Call").)  The multimedia call service is based on a H.324 terminal, and more specifically a 3G-variant called 3G-324M.  (*Id*. at p. 5.)  A multimedia call is supported over channels with bitrates of 64, 56, 33.6, 32, and 28.8 kbps.  (Ex. PA-4 at p. 6.)  *3GPP-972* discloses an in-call modification feature wherein a user may switch between an H.324 call and a speech-only call.  (Ex. PA-4 at p. 14.)  The document further discloses a feature where a multimedia (video/speech) call is downgraded to speech-only when "the available bandwidth decreases (e.g. due to Handover to a congested area)" such that the available data rate is below 28.8 kbps.  (*Id*.)  The video stream may be added back "once enough bandwidth is available again."  (*Id*.)

### 3.    Overview of *3GPP-008*

*3GPP-008* was published no later than August 22, 2000 as explained in detail by Dr. Wicker in his declaration.  (Ex. PA-5, p. 425; Ex. PA-DEC, ¶¶ 86-104, 108.)  *3GPP-008* is a 3GPP technical specification published by ETSI, and in *Kyocera Wireless Corp. v. International Trade Com'n*, 545 F.3d 1340 (2008), the Federal Circuit found ETSI standards to be printed publications based on ETSI publication procedures like those described in Dr. Wicker's declaration.  (Ex. PA-DEC, ¶¶ 86-104, 108.)  Thus, *3GPP-008* qualifies as prior art at least under pre-AIA 35 U.S.C. §§ 102(a) and 102(b).

*3GPP-972* cites to various other 3GPP standards that required changes in order to support a multimedia call, one of which is TS 24.008.  (Ex. PA-4 at pp. 5, 7, 10, 13.)  TS 24.008 is a technical specification for the mobile radio interface layer within a 3G mobile telecommunications system as well as GSM, including call control procedures such as in-call modification for switching between call modes.  (Ex. PA-5 at pp. 1, 20-21, 159.)  *3GPP-972* applied such in-call modification procedures to multimedia telephony, allowing for switching between a multimedia call and a speech-only call.  (Ex. PA-4 at pp. 7 (describing use of "24.008 MODIFY procedure"),

31

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

14 ("in-call modification" procedure for multimedia calls).) *3GPP-972* discloses that one of the changes necessary to support such services were changes to TS 24.008 "to support circuit switched multimedia call[s]" and to allow for multimedia call type (3G-324M) to be specified in the bearer capability information element (BCIE) sent by a mobile phone when setting up a multimedia call (*Id.* at p. 13.) With the publication of *3GPP-972*, TS 24.008 was updated to include the requisite support for multimedia calls, thereby standardizing in-call modification procedures for switching between a multimedia call and a speech-only call. (Ex. PA-5 at p. 162; Ex. PA-DEC, ¶ 109.) This Request uses TS 24.008 v3.4.1, which was published by ETSI as TS 124 008 v3.4.1, and is referred to herein as *3GPP-008*.

Among the call control procedures defined in *3GPP-008* are procedures for multimedia calls such as those described in Section 5.3.6 "Support of multimedia calls." (Ex. PA-5 at p. 162.) When a multimedia call is being established, the phone sends a SETUP message with a "*bearer capability information element* parameter Other Rate Adaptation set to 'H.223 and H.245'" and if supporting fallback to speech, "including also a *bearer capability information element 2 with speech indication* in the SETUP message." (*Id.* at p. 163.) *3GPP-008* also provides requirements for an in-call modification procedure to change the call mode between the modes that were negotiated "during establishment phase of the call," such as the aforementioned multimedia mode and speech mode described in Section 5.3.6.2. (*Id.* at pp. 159, 163.)

In other words, the mobile phone is able to switch from a multimedia call to a speech-only call and vice versa using this modification procedure. First, the requesting side (e.g. network or mobile station) sends a MODIFY message with the new mode to change to. (*Id.* at p. 159.) The receiving side (e.g. mobile station or network) then will change the channel configuration as necessary and send a MODIFY COMPLETE message. (*Id.* at p. 160.) Upon the requesting side's receipt of the MODIFY COMPLETE message, it "initiate[s] alternation to those resources necessary to support the next call mode." (*Id.*)

### 4.     Motivation to combine *3GPP-972*, *3GPP-008*, and *Sen*

A POSITA would have been motivated to look to *3GPP-008* for implementing the in-call modification procedures described in *3GPP-972* to switch from a multimedia call (video and voice) to a speech-only call. (Ex. PA-DEC, ¶ 162.) 3GPP TS 24.008 is one of the standards identified by *3GPP-972* as required for support of multimedia calling. (Ex. PA-4 at p. 13.) And *3GPP-972* explicitly references TS 24.008 for its MODIFY procedure. (*Id.* at p. 7 ("Change of

user rate can be requested by the subscriber by invoking a 24.008 MODIFY procedure (with a new user rate).").)  Thus, the express teachings of *3GPP-972* would have led a POSITA to consider TS 24.008 (*3GPP-008*) in implementing a mobile system in which mobile phones support multimedia calling and the ability to switch between a multimedia call and a speech-only call.  (Ex. PA-DEC, ¶ 162.)

More specifically, a POSITA would have been motivated to apply the in-call modification procedure disclosed in *3GPP-008* to implement the handover downgrade functionality disclosed in *3GPP-972* section 6.1.2.1.  (Ex. PA-DEC, ¶ 163.)  As discussed above, *3GPP-972* explicitly references *3GPP-008*, which discloses procedures for in-call modification, and further calls out the MODIFY procedure from *3GPP-008*.  One looking to implement the "call modification" procedure in section 6.1.2.1 in *3GPP-972* would thus naturally look to the in-call modification (i.e. MODIFY) procedure disclosed in *3GPP-008* at section 5.3.4.3.  (*Id.*)

*3GPP-972* teaches that "if available data rate is below 28.8 kbps," such as after a handover to a congested area, "the network should initiate a modification downgrading the call to speech." (Ex. PA-4 at p. 14.)  *3GPP-008* discloses that the network ("the requesting originating side") can initiate such a modification by "send[ing] a MODIFY message including the new mode to be change to," where the new mode "shall be one of those already negotiated and agreed during the establishment phase of the call."  (Ex. PA-5 at p. 159.)  *3GPP-008* discloses that during establishment of a multimedia call, the mobile phone can indicate in the SETUP message both a "3G-324M" (multimedia) mode in addition to a speech mode to support possible fallback to speech.  (*Id.* at p. 163.)  Thus, a POSITA would have understood that the network could have sent a MODIFY message specifying speech mode to the mobile phone.  (Ex. PA-DEC, ¶ 164.)  As disclosed in *3GPP-008* at section 5.3.4.3.2, the mobile phone responds to the MODIFY message with a MODIFY COMPLETE message.  (Ex. PA-5 at p. 160.)

*3GPP-008* further explains that the in-call modification procedure may require changing the channel configuration by allocating a new channel, a change that is determined by the network such as in the case of a handover.  (Ex. PA-5 at pp. 157-58.)  A POSITA would have thus understood from *3GPP-008* that a new channel would be set up in the case of a handover to a congested area as disclosed in *3GPP-972*.  (Ex. PA-DEC, ¶ 165.)  And because the available data rate is below 28.8 kbps as required for a multimedia H.324 call which requires the downgrade, a POSITA would have understood that the new channel would have to be a voice channel (under

28.8 kbps) as opposed to the data channel (28.8 kbps to 64 kbps) used for the multimedia call. (Ex. PA-4 at pp. 6, 14; Ex. PA-DEC, ¶ 165.)

It would have been further obvious for the network to send back an acknowledgement message to the mobile phone to confirm receipt of the MODIFY COMPLETE. (Ex. PA-DEC, ¶ 166.)   A POSITA would have been motivated to configure the network to send such an acknowledgement signal because otherwise the mobile phone would not know whether the network received the MODIFY COMPLETE message. (*Id.*)   This could cause disruption in the synchronization between the mobile phone and the network and cause the call to be dropped, which would be undesirable. (*Id.*)   An acknowledgement message from the network would have increased the reliability of the downgrade procedure, a benefit which would have greatly outweighed the miniscule amount of bandwidth consumed by sending an extra message. (*Id.*) Such three-way handshakes were common in the art, and have the benefit of confirming receipt of the final message in the process so that the mobile station knows its MODIFY COMPLETE message made it to the network and does not require retransmission. (*See*, *e.g.*, Ex. PA-1 at pp. 15 ("the caller confirms that it has received that response by sending an ACK"), 29, 92 ("Response retransmissions cease when any one of the following occurs: 1. An ACK request for the same transmission is received . . ."); Ex. PA-DEC, ¶ 166.)

A POSITA would have been also been motivated to design the mobile phone to include an RF interface, transmitter, and processor as these are necessary components for a mobile phone to operate on a telecommunications network. (Ex. PA-DEC, ¶ 167.)   This is consistent with what a POSITA would have found in references that describe the hardware configuration of a mobile phone. (*Id.*)   For example, *Sen* discloses a phone that implements the GPRS protocol that complements GSM communication systems. (Ex. PA-2 at 1:37-44.)   *3GPP-972* and *3GPP-008* provide technical requirements for mobile phones that operate on GPRS and GSM networks. (Ex. PA-5 at 21 ("The procedures currently described in this TS are for the call control of circuit-switched connections, session management for GPRS services, mobility management and radio resource management for circuit-switched and GPRS services."); Ex. PA-4 at p. 4 ("The target release for the Multimedia specifications is (in general) R99, and the specifications apply to UMTS as well as GSM.").)   Thus, *Sen* is a reference that a POSITA would have considered in designing a mobile phone that operates on GPRS and GSM networks as described in *3GPP-972* and *3GPP-008*, and similarly a POSITA would have looked to the *3GPP-972* and *3GPP-008* in implementing

*Sen*'s mobile phone to ensure it complied with the standards necessary to operate on the GPRS and GSM networks.   (Ex. PA-DEC, ¶ 167.)

*Sen* discloses that its mobile phone includes an antenna (transmitter) and a radio interface (RF interface).  (Ex. PA-2 at FIG. 2, 6:26-31.)  The radio interface, through which messages are received and transmitted, is coupled to an antenna that can communicate such messages through a radio telecommunications network such as GPRS.  (*Id.* at FIG. 2, 3:51-56, 6:26-31.)  *Sen*'s mobile phone also includes an RSVP agent that can be executed on a microprocessor for receiving, processing, and transmitting such messages.  (*Id.* at FIG. 2, 6:26-31, 10:34-39, 11:56-60.)

A POSITA who was looking to design a mobile phone that implements the *3GPP-972* and *3GPP-008* standards would have, in view of *Sen*, included an RF interface, transmitter, and processor in the phone.  (Ex. PA-DEC, ¶ 169.)  *3GPP-008* discloses the transmission of messages (*e.g.*, MODIFY) used to modify calls, as well as the transmission of data carrying more than one media.  (Ex. PA-5 at pp. 159-60, 162-64.)  It would have been necessary for a mobile phone to include components that would allow for such transmission.  (Ex. PA-DEC, ¶ 169.)  An RF interface, transmitter, and processor were ubiquitous components of mobile phones necessary for processing and transmitting such messages and data, such that a POSITA would have been motivated to include them in a videophone that transmitted messages according to *3GPP-008* in implementing the downgrade procedure described in *3GPP-972*.  (Ex. PA-DEC, ¶ 169.)

A POSITA would have had a reasonable expectation of success in utilizing the in-call modification process described in *3GPP-008* to implement the handover downgrade as described in *3GPP-972*.  (Ex. PA-DEC, ¶ 170.)  *3GPP-972* itself suggests using this modification procedure, such that a POSITA would have understood the in-call modification procedure of *3GPP-008* to be compatible with the handover downgrade of *3GPP-972*, and moreover that the handover downgrade was intended to be implemented using such modification procedure especially where *3GPP-972*'s downgrade is referred to as an "in-call modification" just like the procedure described in *3GPP-008*.  (Ex. PA-4 at pp. 7, 14; Ex. PA-DEC, ¶ 170.)    And systems for dropping media such as video during handover of a multimedia call were already known.  (Ex. PA-3 at 10:21-35; Ex. PA-DEC, ¶ 170.)  Thus, it would have been well within the capacity of a POSITA to implement the handover downgrade in *3GPP-972* using the in-call modification procedure in *3GPP-008*.  (Ex. PA-DEC, ¶ 170.)

A POSITA also would have had a reasonable expectation of success in implementing a transmitter, RF interface, and processor in a mobile phone that complied with *3GPP-972* and *3GPP-008* as described above.   (Ex. PA-DEC, ¶ 171.)   Such components are basic and fundamental components of a mobile phone necessary for it to communicate with a telecommunications network.   (*Id.*)  Such components in the combination of *3GPP-972*, *3GPP-008*, and *Sen* would have performed their ordinary and basic functions of transmitting data to and receiving data from a telecommunications network for purposes of a call, and a POSITA would have readily understood how to implement such components as part of a mobile phone that utilizes *3GPP-972* and *3GPP-008*.   (*Id.*)

### 5.   Claim 1

#### a.   [1.a] A videophone responsive to the discontinuation of an in progress mixed media telecommunications call, the videophone comprising:

*3GPP-972* discloses a videophone responsive to the discontinuation of an in progress mixed media telecommunications call.  (Ex. PA-DEC, ¶¶ 172-94.)

*3GPP-972* discloses technical specifications for multimedia telephony—such as video calling—for a mobile phone ("videophone"), where the videophone is responsive to the discontinuation of an in progress multimedia call due to bandwidth decrease from, e.g., handover to a congested area.   (Ex. PA-4 at pp. 7 ("3.3 Mobile to Mobile Call"), 14 ("When during a multimedia call the available bandwidth decreases (e.g. due to Handover to a congested area) there may be a need for modification of call type.  H.324 can cope with change of transmission speed, but if available data rate is below 28.8 kbps, the network should initiate a modification downgrading the call to speech," and after multimedia call is downgraded to speech-only, the call can later be upgraded back to a multimedia call by "add[ing] a video stream once enough bandwidth is available again.").)

#### a.   [1.b] a radio frequency (RF) interface configured to communicate via a radio telecommunications network;

*3GPP-972* discloses that the videophone communicates via a radio telecommunications network, but it does not expressly disclose a radio frequency interface for doing so.  But *3GPP-972* in view of *Sen* renders obvious that the videophone comprises an RF interface configured to communicate via a radio telecommunications network.  (Ex. PA-DEC, ¶¶ 174-77.)

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

*3GPP-972* is for mobile phones communicating over UMTS and GSM, which are radio telecommunications networks.  (Ex. PA-4 at pp. 1 ("Universal Mobile Telecommunications System (UMTS); Circuit Switched Multimedia Telephony"), 4 ("The target release for the Multimedia specification is (in general) R99, and the specifications apply to UMTS as well as GSM."), 7 ("3.3 Mobile to Mobile Call").)  *3GPP-972* discloses that the described multimedia telephony functionality occurs at the radio frequency interface layer (i.e. a "radio frequency (RF) interface") in a manner compliant with the *3GPP-008* specification for communicating over a digital cellular telecommunications system ("radio telecommunications network").  (Ex. PA-4 at p. 6 ("This is following the existing principles in [9]," which is listed at pg. 5 as "3GPP 24.008: 'Digital cellular telecommunications system (Phase 2+): Mobile radio interface layer 3 specification.'").)  A POSITA would have understood that such RF interface functionality would require an RF interface in the mobile phone in order to receive and transmit the messages at that layer.  (Ex. PA-DEC, ¶ 175.)

Indeed, for purposes of infringement, 3GL did not point to any particular hardware component in HTC's phones, but instead presumed that because HTC's devices can communicate over a particular radio telecommunications network (LTE), that it must have a radio frequency interface.  Similarly, that the mobile phone in *3GPP-972* can communicate over 2G GSM and 3G UMTS radio telecommunications networks means it necessarily has an RF interface.  (Ex. PA-DEC, ¶ 175.)

Further, *Sen* discloses a mobile phone that includes a "radio interface 108" (i.e., an RF interface) that is used by the mobile phone to send and receive messages over a radio telecommunications network such as GPRS.  (Ex. PA-2 at FIG. 2 (annotated below), 3:46-58, 6:26-31.)

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091



**FIG. 2**

As explained above in Section VI.C.4, it would have been obvious in view of these disclosures in *3GPP-972* and *Sen* for the videophone to include an RF interface configured to communicate via a radio telecommunications network such as GSM and GPRS. (Ex. PA-DEC, ¶ 177.)

<div style="text-align:center">

**b. [1.c] a transmitter configured to transmit data carrying at least a first and second media to a remote videophone during a first call;**

</div>

*3GPP-972* discloses that the videophone is configured to transmit a first and second media to a remote videophone during a first call, but does not expressly disclose a transmitter for doing so. But *3GPP-972* in view of *Sen* renders obvious that the videophone comprises a transmitter configured to transmit data carrying at least a first and second media to a remote videophone during a first call. (Ex. PA-DEC, ¶¶ 178-82.)

*3GPP-972* discloses that the mobile phone is capable of a multimedia call, *i.e.* a call that includes a first media and a second media. (Ex. PA-4 at p. 14 ("When during a multimedia call the available bandwidth decreases (e.g. due to Handover to a congested area) there may be a need

38

for modification of call type.  H.324 can cope with change of transmission speed, but if available data rate is below 28.8 kbps, the network should initiate a modification downgrading the call to speech," and after multimedia call is downgraded to speech-only, the call can later be upgraded back to a multimedia call by "add[ing] a video stream once enough bandwidth is available again").) *3GPP-972* discloses or suggests that the multimedia call comprises audio (first media) and video (second media) by stating that the call is downgraded to speech-only—meaning the multimedia call included audio—and that the video stream can be added back "once enough bandwidth is available again"—meaning the multimedia call also included video.  (*Id.*; Ex. PA-DEC, ¶ 179.) Indeed, 3GL's expert testified at trial in the D. Del. case that *3GPP-972* discloses modifying a multimedia video call to a voice call in section 6.1.2.1:

> Q.  I'm not asking you that, I'm asking this disclosure of this paragraph, sir, that disclosure, which occurred in 1999, before the '091 patent, yes or no, sir, is disclosing that due to bandwidth concerns, you can modify a multimedia call from video to a voice call, true?
>
> A.  Yes, as stated.

(Ex. INF-1 at 533:12-17.)  A POSITA would have understood that a transmitter is necessary to transmit media for the multimedia call over a telecommunications network as disclosed in *3GPP-972*.  (Ex. PA-DEC, ¶ 179.)

Indeed, for purposes of infringement, 3GL did not point to any particular hardware component in HTC's phones, but instead presumed that because HTC's devices can communicate over a particular radio telecommunications network (LTE), that it must have a transmitter configured to transmit data.  Similarly, that the mobile phone in *3GPP-972* can communicate over 2G GSM and 3G UMTS radio telecommunications networks means it necessarily has a transmitter for transmitting the first and second media over those networks during a first call.  (Ex. PA-DEC, ¶ 179.)

*Sen* discloses a mobile phone that includes an "antenna 10" (transmitter) that is used to communicate between the mobile phone and the telecommunications network.  (Ex. PA-2 at FIG. 2 (annotated below), 6:26-31.)

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091



**FIG. 2**

*Sen* discloses that the phone is capable of "audio, video or multi-media" telephony, such that the antenna—the only component in *Sen*'s mobile phone that can transmit data—would have been configured to transmit data carrying at least a first media (audio) and a second media (video) to a remote videophone during a multimedia call (first call). (*Id.* at 7:34-38, 9:60-62; Ex. PA-1 at p. 7; Ex. PA-DEC, ¶ 181.)

For the reasons explained above in Section VI.C.4, it would have been obvious in view of these disclosures in *3GPP-972* and *Sen* for the videophone to include an antenna (transmitter) configured to transmit data carrying audio (first media) and video (second media) to a remote videophone during a first call. (Ex. PA-DEC, ¶ 182.)

### c. [1.d] "a processor in communication with the RF interface configured to receive an indication, via the RF interface, that the transmission of data to the remote videophone in the first call is being discontinued,"

*3GPP-972* discloses that the transmission of data to the remote videophone in the first call is discontinued, but it does not disclose a processor that receives an indication via the RF interface

that the transmission of data to the remote videophone in the first call is being discontinued.  *3GPP-008* discloses the claimed indication, and *Sen* discloses a videophone that includes a processor which receives messages via an RF interface.  *3GPP-972* in view of *3GPP-008* and *Sen* renders obvious that the videophone comprises a processor in communication with the RF interface configured to receive an indication, via the RF interface, that the transmission of data to the remote videophone in the first call is being discontinued.  (Ex. PA-DEC, ¶¶ 183-88.)

3GPP-972 discloses downgrading a multimedia call to voice-only when the call is handed over to a congested area and, as a result, available bandwidth decreases.  (Ex. PA-4 at p. 14 ("When during a multimedia call the available bandwidth decreases (e.g. due to Handover to a congested area) there may be a need for modification of call type.  H.324 can cope with change of transmission speed, but if available data rate is below 28.8 kbps, the network should initiate a modification downgrading the call to speech").)

3GPP-008 discloses that a network may request the mobile phone to modify the call mode from multimedia to speech-only by sending a MODIFY message to the mobile phone.  (Ex. PA-5 at p. 159; *see also* p. 164 ("MSC requests the mobile station to modify the traffic channel characteristics" to modify call mode to speech via procedure in "section 5.3.4.3").)  The MODIFY message is akin to the SIP Re-INVITE message 3GL relies upon for infringement for modifying a call from video to voice-only, and thus for the same reasons 3GL argued at trial meets the requirements of the claimed "indication" as it indicates that data transmission to the remote videophone in the video call (first call) is being discontinued as the phone is initiating a voice-only call (second call).  *See* Section VI.A.5.d.

As discussed above in Section VI.C.4, it would have been obvious in view of *3GPP-008* for the network to send a MODIFY message (i.e. "an indication . . . that the transmission of data to the remote videophone is being discontinued") to the mobile phone informing the mobile phone that a downgrade to voice-only must be performed.  (Ex. PA-DEC, ¶ 186.)

Sen discloses that its mobile phone includes an RSVP agent 106 that sends and receives messages to and from the telecommunications network when performing call control functions such as call setup.  (Ex. PA-2 at FIG. 5 step 402, 6:16-22, 7:30-41, 10:39-42, 11:56-62.)  And *Sen* discloses that the RSVP agent software module can be executed on a microprocessor—*i.e.*, the phone includes a microprocessor configured to execute software to receive messages for performing call control functions.  (*Id.* at 11:56-60.)  *Sen* further discloses that its mobile phone

receives such messages through the radio interface 108.  (*Id.* at 6:26-28.)  In other words, the

mobile phone in *Sen* includes a processor configured with software (RSVP agent 106) to receive

call control messages via the radio interface (RF interface).  (*Id.* at FIG. 2 (annotated below).)



**FIG. 2**

For the reasons explained above in Section VI.C.4, it would have been obvious in view of

these disclosures in *3GPP-972*, *3GPP-008*, and *Sen* for the videophone to include a processor that

receives the MODIFY message for deleting the video media from the first call (the "indication . .

. that the transmission of data to the remote videophone in the first call is being discontinued") via

the RF interface.  (Ex. PA-DEC, ¶ 188.)

> **d.  [1.e] "the processor further being configured to, in
> response to the indication, initiate a second call to the
> remote videophone, the second call not supporting the
> second media."**

*3GPP-972* discloses initiating a second call that does not support the second media, but

does not disclose a processor configured to do so in response to the indication.  *3GPP-008*

discloses initiating a second call in response to receiving the indication, and *Sen* discloses a

42

videophone that includes a processor for sending messages (e.g. to initiate a call) in response to receiving messages over an RF interface. *3GPP-972* in view of *3GPP-008* and *Sen* renders obvious that the processor is further configured to, in response to the indication, initiate a second call to the remote videophone, the second call not supporting the second media. (Ex. PA-DEC, ¶¶ 189-94.)

*3GPP-972* discloses downgrading a multimedia call to voice-only when the call is handed over to a congested area and as a result available bandwidth decreases. (Ex. PA-4 at p. 14 ("When during a multimedia call the available bandwidth decreases (e.g. due to Handover to a congested area) there may be a need for modification of call type. H.324 can cope with change of transmission speed, but if available data rate is below 28.8 kbps, the network should initiate a modification downgrading the call to speech").)

As discussed above, *3GPP-008* discloses one way to implement such downgrading by sending a MODIFY message from the network to the mobile phone ("the indication"). (Ex. PA-5 at p. 159.) The mobile phone responds to this indication by sending a MODIFY COMPLETE message to accept the call modification. (*Id.* at p. 160.)

As discussed above in Section VI.C.4, it would have been obvious for the network to send an acknowledgment back to the mobile phone to confirm it received the MODIFY COMPLETE message. (Ex. PA-DEC, ¶¶ 192.) This acknowledgement message would satisfy the "if answered" part of the Court's construction of "initiate a second call" ("send signaling sufficient to establish a second call, if answered"), where the MODIFY COMPLETE message is the signal sufficient to establish a second call (speech-only call) if answered by the acknowledgement from the network.

Indeed, 3GL argued in the D. Del. case that such functionality (i.e. sending a message to accept a call modification request to remove video from an ongoing video call, where the signal receives an acknowledgement message in response) constitutes initiation of a second call. *See* Section VI.A.5.e. Thus, transmission of the MODIFY COMPLETE message in the combination of *3GPP-972* and *3GPP-008* similarly results in initiation of a second call.

And for the reasons set forth in Section VI.C.4, it would have been obvious in further view of *Sen* for the processor in the mobile phone to send the MODIFY COMPLETE message, and thus the processor in the videophone would have been configured to initiate a second call to the remote videophone in response to the indication, wherein the second call is a speech-only call that does not support the second media (video). (Ex. PA-DEC, ¶ 194.)

6. **Claim 2**

   a. **A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the videophone is configured to initiate the release of the first call in response to receiving the indication.**

As discussed above, *3GPP-972* in view of *3GPP-008* and *Sen* renders claim 1 obvious. Further, *3GPP-972* in view of *3GPP-008* renders obvious that the videophone is configured to initiate the release of the first call in response to receiving the indication.  (Ex. PA-DEC, ¶¶ 195-98.)

As discussed above with respect to claim limitation [1.e], it was obvious from *3GPP-972* in view of *3GPP-008* for the videophone to send a MODIFY COMPLETE message in response to receiving a MODIFY message ("the indication") to accept removal of video media from a video call.  (Ex. PA-DEC, ¶ 196.)

3GL argued at trial that sending a message to accept removal of video media from a video call not only initiates a second call, but it also initiates termination of the first call because when the video media is removed, this ends the video call (first call) and starts the voice-only call (second call).

The sending of the MODIFY COMPLETE message to accept removal of video from the video call therefore initiates the release of the video call.  Thus, claim 2 is obvious over *3GPP-972* in view of *3GPP-008* and *Sen.*  (Ex. PA-DEC, ¶ 198.)

7. **Claim 6**

   a. **A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first call uses a data channel and the second call uses a voice channel.**

As discussed above, *3GPP-972* in view of *3GPP-008* and *Sen* renders claim 1 obvious. Further, *3GPP-972* in view of *3GPP-008* renders obvious that the first call uses a data channel and the second call uses a voice channel.  (Ex. PA-DEC, ¶¶ 199-202.)

*3GPP-972* discloses that the downgrade from a multimedia call to voice-only occurs when the call is handed over to a congested area and as a result available bandwidth decreases such that the available data rate is below 28.8 kbps.  (Ex. PA-4 at p. 14 ("When during a multimedia call the available bandwidth decreases (e.g. due to Handover to a congested area) there may be a need for

modification of call type.  H.324 can cope with change of transmission speed, but if available data rate is below 28.8 kbps, the network should initiate a modification downgrading the call to speech").)

*3GPP-008* discloses that an in-call modification procedure may require changing the channel configuration by allocating a new channel, a change that is determined by the network such as in the case of a handover.  (Ex. PA-5 at pp. 157-58.)

For the reasons discussed above in Section VI.C.4, a POSITA would have understood from *3GPP-008* that a new channel would be set up in the case of a handover to a congested area as disclosed in *3GPP-972*.  (Ex. PA-DEC, ¶ 202.)  Because the available data rate is below 28.8 kbps as required for a multimedia H.324 call which requires the downgrade, a POSITA would have understood that the new channel would have had to be a voice channel (under 28.8 kbps) as opposed to the data channel (28.8 kbps to 64 kbps) used for the multimedia call.  (Ex. PA-4 at pp. 6, 14; Ex. PA-DEC, ¶ 202.)

      **8.**     **Claim 7**

          **a.**     **A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first and second media correspond to audio and video image media respectively.**

As discussed above, *3GPP-972* in view of *3GPP-008* and *Sen* renders claim 1 obvious.  And as discussed above with respect to claim limitation [1.c], *3GPP-972* renders obvious that the first and second media correspond to audio and video image media respectively in that the first call is a video call that includes audio media (first media) and video image media (second media).  (Ex. PA-DEC, ¶ 203.)

      **D.**     **SNQ4: *Motorola***

As explained below and in the attached declaration of Stephen B. Wicker, Ph.D. (Ex. PA-DEC), *Motorola* discloses or suggests the limitations of claims 1-2 and 6-7 of the '091 patent.  (Ex. PA-DEC, ¶¶ 204-30.)

      **9.**     **Claim 1**

          **a.**     **[1.a] A videophone responsive to the discontinuation of an in progress mixed media telecommunications call, the videophone comprising:**

*Motorola* discloses a videophone responsive to the discontinuation of an in progress mixed media telecommunications call.  (Ex. PA-DEC, ¶¶ 205-09.)

For example, *Motorola* discloses "[a] multimedia conferencing terminal for use with a cellular multimedia network utilizing a plurality of multimedia modes of transmission…" (Ex. PA-3 at 3:1-5.)  Figure 5 illustrates an embodiment "of a typical multimedia terminal" that is shown as "for use with three services or media," although "the multimedia terminal 300 can include any number of media capabilities."  (*Id.* at 3:27-28, 6:10-13.)



*Motorola* explains that "except for the transceiver 315, all the elements shown in FIG. 5 may be implemented in the package 31 and message receiver and storage device 40 of FIG. 2," where FIG. 2 shows the "circuitry" of "an exemplary wireless communication device." (*Id.* at FIG. 2, 4:31-32, 7:33-35.)

Figure 3 illustrates such wireless communication devices in communication with a multimedia conferencing network.  (*Id.* at FIG. 3, 4:34-5:3.)

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091



(*Id.* at FIG. 3 (Annotated).)

As discussed below with respect to claim limitations [1.d] and [1.e], the multimedia terminal 300 is a videophone that is responsive to discontinuation of an in progress mixed media telecommunications call.

### b. [1.b] a radio frequency (RF) interface configured to communicate via a radio telecommunications network;

*Motorola* discloses the videophone comprising an RF interface configured to communicate via a radio telecommunications network. (Ex. PA-DEC, ¶¶ 210-11.)

Figure 5 illustrates a typical videophone "in accordance with the preferred embodiment of the invention." (Ex. PA-3 at 3:27-28.) Motorola explains that "transceiver 315 [is used] for transmission and reception to a multimedia network having appropriate multimedia infrastructure." *Motorola* also refers to the multimedia network in Figure 5 as a "multimedia cellular infrastructure" and "cellular network infrastructure," and one example of such a multimedia cellular network disclosed by *Motorola* is Universal Mobile Telecommunications System ("UMTS"), a radio telecommunications network. (*Id.* at 2:5-7, 6:27-32, 6:35-7:2.) A POSITA would have understood this transceiver includes circuitry to convert any data to be transmitted into signals for driving the RF transmitter and converts signals from the RF receiver into data in order to enable communication with the cellular network. (Ex. PA-DEC, ¶ 211.) Thus, the receiver/transmitter (315) comprises an RF interface.

47



(Ex. PA-3 at FIG. 5 (Annotated).)

### c.   [1.c] a transmitter configured to transmit data carrying at least a first and second media to a remote videophone during a first call;

*Motorola* discloses the videophone comprising a transmitter configured to transmit data carrying at least a first and second media to a remote videophone during a first call.  (Ex. PA-DEC, ¶¶ 212-13.)

*Motorola* discloses the videophone having "a transceiver for transmitting and receiving a multimedia communications signal" to and from a remote videophone during a call (Ex. PA-3 at 3:1-5.) In Figure 5, *Motorola* explicitly illustrates the "transceiver 315" having a "transmitter." The illustrated videophone is configured to transmit "three services or media," however, "the

multimedia terminal 300 can include any number of media capabilities. During a multimedia communication, information is input or output to/from [the three media]." (*Id.* at 6:10-13.)



(*Id.* at FIG. 5 (Annotated).)  Thus, the transmitter in the transceiver 315 is configured to transmit data carrying at least a first and second media to a remote videophone during a first call.  (Ex. PA-DEC, ¶ 213.)

### d. [1.d] "a processor in communication with the RF interface configured to receive an indication, via the RF interface, that the transmission of data to the remote videophone in the first call is being discontinued,"

*Motorola* discloses the videophone comprising a processor in communication with the RF interface configured to receive an indication, via the RF interface, that the transmission of data to the remote videophone in the first call is being discontinued.  (Ex. PA-DEC, ¶¶ 214-16.)

In Figure 5, *Motorola* illustrates a radio controller 333 (i.e. "a processor") in communication with the transceiver 315 (i.e. "RF interface"). Specifically, *Motorola* discloses that "[a] handover decision is made by either the cell selection processor 325 or the cellular network infrastructure or both" and "[w]hen a decision has been taken, the cell selection processor 325 informs the radio controller 333 of the frequencies and schedule for the handover of the various media," including "information on any media that are temporarily or permanently suspended." (Ex. PA-3 at 7:19-24.)  The handover decision that is received by the radio controller 333 and includes "information on any media that are temporarily or permanently suspended" is the claimed "indication . . . that the transmission of data to the remote videophone in the first call is being discontinued." (*Id.* at 7:19-24.)

A POSITA would have understood that in the scenario where the cellular network infrastructure makes the handover decision, that decision is received by the radio controller 333 via the transceiver 315.  (Ex. PA-DEC, ¶ 216.)  *Motorola* discloses that "communication exchange between the cell selection processor 325 and the cellular network infrastructure" is facilitated through the control channel processor 327.  (Ex. PA-3 at 6:36-7:2.)  The information provided by the control channel processor 327 to the cell selection processor 325 "includes identity of candidate cells and capability and resource information concerning candidate cells." (*Id.* at 7:2-4.)  "The other information exchanged depends upon whether handover decisions are made in the terminal 300 or in the cellular network infrastructure." (*See Id.* at 7:4-6.)  A POSITA would have understood from the disclosure about "other information" that in the event a handover decision is made in the cellular network infrastructure, that decision and related information is part of the information provided by the control channel processor 327 to the cell selection processor 325, which in turn provides the information to the radio controller 333 as discussed above.  (Ex. PA-DEC, ¶ 216.)  The control channel processor 327 would have received the decision from the cellular network infrastructure via the transceiver 315, which is the component responsible for sending and receiving information to and from the cellular network infrastructure as discussed above with respect to claim limitation [1.b].  (*Id.*)  Therefore, when the cellular network infrastructure makes a handover decision, radio controller 333 ("processor") must necessarily be communication with the transceiver 315 ("the RF interface) and must receive the handover decision ("the indication") via the transceiver 315 before it can execute the handover.  (*Id.*)

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

The path of the indication is shown below with a red arrow.



(*Id.* at FIG. 5 (Annotated).)

> e. **[1.e] "the processor further being configured to, in response to the indication, initiate a second call to the remote videophone, the second call not supporting the second media."**

*Motorola* renders obvious that the videophone comprising the processor further being configured to, in response to the indication, initiate a second call to the remote videophone, the second call not supporting the second media. (Ex. PA-DEC, ¶¶ 217-22.)

*Motorola* explains that during a handover, "a candidate cell may not have enough bandwidth and resources available to accommodate a media that would require high bandwidth." (Ex. PA-3 at 10:7-9.) "Thus, if both audio and video were required to be handed over to an

51

candidate cell, it may not be possible to handover the video portion of the multimedia communication due to the video's high bandwidth requirements." (*Id.* at 10:9-11.) *Motorola* thus discloses dropping video during a handover of a call comprising both audio and video.

*Motorola* describes that "[a] handover decision is made by … the cellular network infrastructure" and "[w]hen a [handover] decision has been taken, the cell selection processor 325 informs the radio controller 333 of the frequencies and schedule for the handover of the various media," including "information on any media that are temporarily or permanently suspended." (Ex. PA-3 at 7:19-25.) As discussed above for claim limitation [1.d], this handover decision that comprises information on media that are temporarily or permanently suspended is the claimed "indication." After receiving the indication, "[t]he radio controller 333 then acts to electronically control the operation of the radio components and software within the multimedia terminal 300 to execute the cell handover." ((Ex. PA-3 at 7:25-28.)

A POSITA would have understood that the radio controller 333 in executing the cell handover would have involved initiating a second call by sending signaling sufficient to establish a call that includes different media than the first call (i.e. a call that includes only audio as opposed to the first call which included both video and audio), if answered. (Ex. PA-DEC, ¶ 220.) A POSITA would have understood that as part of "control[ling] the operation of the radio components . . . to execute the cell handover," the radio controller 333 would have had to send a signal to the network to inform the network that it received the handover decision and is able to execute the handover. (Ex. PA-3 at 7:25-28; Ex. PA-DEC, ¶ 220.) Without the signal, the network would not know whether the videophone is able to execute the handover and would thus not be able to proceed with the handover. (Ex. PA-DEC, ¶ 220.) A POSITA would have further understood that the network would have had to answer the radio controller's signal so that the videophone knows that the network received its signal and is proceeding with the handover so that the videophone itself may proceed with executing the handover on its end. (*Id.*) Without receiving such a response, the videophone would not know if the network received its signal and thus could not proceed with the handover lest it risk the call being dropped due to disruption in the synchronization between the phone and the network, which would have been undesirable. (*Id.*) Such three-way handshakes were common in the art, and would have had the benefit of both the network and phone knowing that they may safely proceed with executing the handover. (*See, e.g.,* Ex. PA-1 at pp. 15 ("the caller confirms that it has received that response by sending an ACK"),

29, 92 ("Response retransmissions cease when any one of the following occurs: 1. An ACK request for the same transmission is received . . ."); Ex. PA-DEC, ¶ 220.)

Thus, it would have been obvious in view of *Motorola* for the radio controller 333 to send signaling sufficient to establish a second call, if answered by the network sending back an acknowledgement signal, thus satisfying the D. Del. court's construction of "initiate a second call" ("send signaling sufficient to establish a second call, if answered"). (Ex. PA-DEC, ¶ 221.) The "second call" here is a call that includes different media than the first call, namely a call that includes only voice media unlike the first call which includes both video and voice media. This satisfies the D. Del. court's construction of "second call" ("a separate call *or a call that includes different media than the first call*"). Indeed, 3GL argued for purposes of infringement in the D. Del. case that removing video media from the first call results in initiation of a second call.

Therefore, *Motorola* renders obvious "the processor further being configured to, in response to the indication, initiate a second call to the remote videophone, the second call not supporting the second media." (Ex. PA-DEC, ¶ 222.)

### 10. Claim 2

        a. **A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the videophone is configured to initiate the release of the first call in response to receiving the indication.**

*Motorola* renders obvious that the videophone is configured to initiate the release of the first call in response to receiving the indication. (Ex. PA-DEC, ¶¶ 223-26.)

As discussed above with respect to claim limitation [1.e], it would have been obvious for the videophone to inform the radio controller 333 to execute a handover in response to receiving an indication from the cellular network infrastructure via the transceiver 315. (Ex. PA-DEC, ¶ 224.)

3GL argued at trial that sending a message to accept removal of video media from a video call not only initiates a second call, but it also initiates termination of the first call because when the video media is removed, this ends the video call (first call) and starts the voice-only call (second call).

As discussed above with respect to claim limitation [1.d], a cell handover may result in media being "permanently suspended," in which case the signal sent by the radio controller to

execute the handover not only initiates a second call, but also initiates the release of the first call. Thus, claim 2 is obvious over *Motorola*.  (Ex. PA-DEC, ¶ 226.)

### 11. Claim 6

**a. A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first call uses a data channel and the second call uses a voice channel.**

*Motorola* renders obvious that the first call uses a data channel and the second call uses a voice channel. (Ex. PA-DEC, ¶¶ 227-28.)

As explained in above in Section VI.B.3, *Motorola* discloses performing a handover from one cell to another, including from a cell that supports multimedia calls to another cell that may not support multimedia calls because it has not been upgraded from older technology or because there are insufficient resources to support multimedia. (citing Ex. PA-3 at 10:14-20.) *Motorola* discloses that in such instances, low priority media such as "any data media" may be dropped during the handover.  (*Id.* at 10:30-32.)  A POSITA would have understood from *Motorola* that when a video call is handed over to a cell that is not able "to deliver high bit rate services," the data media (i.e. the video) should be dropped to allow the call to continue.  (Ex. PA-DEC, ¶ 228.) And such a call would have occurred over a voice channel, as the cell is "not [] able to deliver high bit rate services" and thus does not support data channels, or otherwise has insufficient resources to allocate a data channel.  (*Id.*)

Thus, claim 6 is obvious over *Motorola*.  (*Id.*)

### 12. Claim 7

**a. A videophone responsive to the discontinuation of an in progress mixed media telecommunications call according to claim 1, wherein the first and second media correspond to audio and video image media respectively.**

*Motorola* discloses that the first and second media correspond to audio and video image media respectively. (Ex. PA-DEC, ¶¶ 229-30.)

As discussed above with respect to claim limitation [1.a], the videophone is capable of transmitting and receiving "any number of multimedia services" including "audio, video, textual, graphical or data information."  (Ex. PA-3 at 5:10-11.)  And as discussed above with respect to limitation [1.e], *Motorola* discloses an audio and video call where "if both audio and video were required to be handed over to an candidate cell, it may not be possible to handover the video portion

of the multimedia communication due to the video's high bandwidth requirements." (*Id.* at 10:9-11.)  Therefore, a POSITA would have understood Motorola as disclosing the first media being audio media and the second media being video image media, where the video media is not supported by the second call.  (Ex. PA-DEC, ¶ 231.)

Thus, claim 7 is obvious over *Motorola.*  (*Id.*)

## VII. Detailed Explanation of the Pertinence and Manner of Applying the Prior Art to the Claims

### A. Bases for Proposed Rejections of the Claims

The following is a quotation of pre-AIA 35 U.S.C. § 102 that forms the basis for all of the identified prior art:

> A person shall be entitled to a patent unless...
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States, or . . .
>
> (e) the invention was described in — (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for the purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language . . . .

The following is a quotation of pre-AIA 35 U.S.C. § 103(a) that forms the basis of all of the following obviousness rejections:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negative by the manner in which the invention was made.

The question under 35 U.S.C. § 103 is whether the claimed invention would have been obvious to one of ordinary skill in the art at the time of the invention.  In *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), the Court mandated that an obviousness analysis allow for "common sense" and "ordinary creativity," while at the same time not requiring "precise teachings directed to the specific subject matter of the challenged claim[s]."  *KSR Int'l Co.*, 550 U.S. at 418, 420-421.  According to the Court, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.*, 416. In particular, the Court emphasized "the need for caution in granting a patent based on the combination of elements found in the prior art."  *Id.*, 401.  The Court also stated that "when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.*, 417.

The Office has provided further guidance regarding the application of *KSR* to obviousness questions before the Office.

> If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

MPEP § 2141(I) (quoting *KSR* at 417.)

The MPEP identifies many exemplary rationales from *KSR* that may support a conclusion of obviousness. Some examples that may apply to this reexamination include:

- Combining prior art elements according to known methods to yield predictable results;

- Simple substitution of one known element for another to obtain predictable results;

- Use of a known technique to improve similar devices in the same way;

- Applying a known technique to improve devices in the same way;

- Choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success ("obvious to try");

- Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art

MPEP § 2141(III).

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

In addition, the Office has published *Post-KSR* Examination Guideline Updates. *See* Fed. Reg. Vol. 75, 53464 (the "Guideline Updates".) The Guideline Updates discuss developments after *KSR* and provide teaching points from recent Federal Circuit decisions on obviousness. Some examples are listed below:

> A claimed invention is likely to be obvious if it is a combination of known prior art elements that would reasonably have been expected to maintain their respective properties or functions after they have been combined.

*Id.,* 53646.

> A combination of known elements would have been prima facie obvious if an ordinary skilled artisan would have recognized an apparent reason to combine those elements and would have known how to do so.

*Id.,* 53648.

> Common sense may be used to support a legal conclusion of obviousness so long as it is explained with sufficient reasoning.

*Id.*

### B.    Proposed Rejections

Pursuant to 37 C.F.R. § 1.510(b)(2), Requester identifies claims 1-2 and 6-7 as the claims for which reexamination is requested. The proposed rejections below, in conjunction with the analysis in Sections IV-VI above and the attached declaration of Stephen B. Wicker, Ph.D. (Ex. PA-DEC), provide a detailed explanation of the pertinence and manner of applying the prior art to each of claims 1-2 and 6-7.

#### 1.    Proposed Rejection #1

Claims 1-2 and 7 are obvious over *RFC 2543* in view of *Sen* under 35 U.S.C. § 103(a), as shown above in Section VI.A and the declaration of Stephen B. Wicker, Ph.D. provided in Exhibit PA-DEC.

#### 2.    Proposed Rejection #2

Claim 6 is obvious over *RFC 2543* in view of *Sen* and *Motorola* under 35 U.S.C. § 103(a), as shown above in Section VI.B and the declaration of Stephen B. Wicker, Ph.D. provided in Exhibit PA-DEC.

#### 3.    Proposed Rejection #3

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

Claims 1-2 and 6-7 are obvious over *3GPP-972* in view of *3GPP-008* and *Sen* under 35 U.S.C. § 103(a), as shown above in Section VI.C and the declaration of Stephen B. Wicker, Ph.D. provided in Exhibit PA-DEC.

### 4.      Proposed Rejection #4

Claims 1-2 and 6-7 are obvious over *Motorola* under 35 U.S.C. § 103(a), as shown above in Section VI.D and the declaration of Stephen B. Wicker, Ph.D. provided in Exhibit PA-DEC.

## VIII.   Conclusion

For the reasons set forth above, the Requester has established at least one substantial new question of patentability with respect to claims 1-2 and 6-7 of the '091 patent. The analysis provided in this Request and in the declaration of Stephen B. Wicker, Ph.D. (Ex. PA-DEC) demonstrates the invalidity of claims 1-2 and 6-7 in view of prior art that was not substantively considered by the Patent Office. Therefore, it is requested that this request for reexamination be granted and claims 1-2 and 6-7 be cancelled.

As identified in the attached Certificate of Service and in accordance with 37 C.F.R. §§ 1.33(c) and 1.510(b)(5), a copy of this Request has been served, in its entirety, to the address of the attorney of record.

Respectfully submitted,

WHITE & CASE LLP

Dated: December 13, 2023

By:   /John Scheibeler/
John Scheibeler
Reg. No. 35,346
White & Case LLP
1221 Ave of the Americas
New York, NY 10020-1095
(212) 819-8830
jscheibeler@whitecase.com

58

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,995,091

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 1.510(b)(5), I hereby certify that a copy of the foregoing

"REQUEST FOR *EX PARTE* REEXAMINATION OF U.S. PATENT NO. 7,995,091" in its

entirety with all exhibits referenced therein has been served by USPS certified mail on the patent

owner at the address as provided for in 37 C.F.R. § 1.33(c) as follows:

> 22913 - Workman Nydegger
> 60 East South Temple
> Suite 1000
> Salt Lake City, UT 84111
> UNITED STATES

Dated: December 13, 2023                          Name:  /John Scheibeler/
                                                               John Scheibeler
                                                               Reg. No. 35,346

Exhibit 3

1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

9
10
11

| | |
|---|---|
| PAVO SOLUTIONS, LLC<br><br>      *Plaintiff*,<br><br>   v.<br><br>KINGSTON TECHNOLOGY<br>COMPANY, INC.,<br><br>      *Defendant*. | Case No. 8:14-cv-01352-JLS-KES<br>Honorable Josephine L. Staton<br><br>**FINAL PRETRIAL CONFERENCE ORDER**<br><br>Jury Trial Date: March 3, 2020, 9:00 a.m.<br>Exhibit Conference: February 26, 2020, 9:00 a.m. |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Following pretrial proceedings, pursuant to F. R. Civ. P. 16 and L.R. 16, IT IS ORDERED:

1.     The parties are: Plaintiff Pavo Solutions, LLC, and Kingston Technology Company, Inc.  Kingston has been served and each party has appeared. The pleadings are Plaintiff's Complaint for Patent Infringement (Doc. 1), and Kingston's Answer and Affirmative Defenses (Doc. 23).

2.     Federal jurisdiction for this patent infringement action arises under 28 U.S.C. §§ 1331, 1338(a).  Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c), 1400(b).  Kingston is subject to personal jurisdiction in this District, and is accused of committing acts of infringement in this District.

3.     The Court has ordered a 5-day jury trial, scheduled to commence on March 3, 2020.  The trial will be timed, and the parties' time will be divided evenly and tracked by the Court.  The 5-day period includes all aspects of the trial, including voir dire, opening statements, evidence presentation, closing arguments and jury instruction.  The Court reserves the right to allot less time if the parties are not efficient in presenting the case to the jury or the Court determines that this amount of time is not otherwise warranted.

4.     The trial will be by jury.  In light of the Court's order granting Pavo's motion for partial summary judgment (Doc. 97), all non-jury issues have been dismissed.

Per Section III.C, E. of the Court's Civil Trial Order, the Parties have filed (a) their proposed jury instructions (Doc. 295) as required by L.R. 51-1,  (b)  special questions requested to be asked on voir dire (Doc. 284), and (c) special verdict forms (Docs 297, 297-1, 297-1).

5.   The following facts are admitted and require no proof:

a) The '544 patent was filed on January 17, 2003.

b) The '544 patent claims priority to Korean Patent Application No. 20-2002-0016582, filed on May 30, 2002.

c) The DT101G2 is a flash memory apparatus.

d) The DT101G2 has flash memory.

e) The DT101G2 has a main body.

f) The DT101G2 includes a memory element.

g) The DT101G2 includes a USB terminal.

h) The DT101G2 has a USB terminal piece installed at the front end of the DT101G2's case.

i) The DT101G2 has a USB terminal piece projecting from the front end of the DT101G2's case.

j) There is a hinge protuberance formed on at least one side of the DT101G2 case.

k) The DT101G2's cover has an open front end.

l) The DT101G2's cover pivots with respect to the DT101G2's main body.

m) The DT101G2 includes a cover.

n) Kingston marketed the DT101G2's swivel design.

o) Kingston marketed the DT101G2 as having a swivel design for added functionality.

p) On June 27, 2014 IPMedia Holdings, Inc. ("IPMedia") and CATR entered into a License and Settlement Agreement with respect to the '544 patent (the "IPMedia License").

q) USB flash drives were sold prior to 2002.

r) The Trek Thumbdrive is a USB drive.

s) The Trek Thumbdrive has flash memory.

t)  The M-System's DiskOnKey is a USB drive.

u)  The M-System's DiskOnKey has flash memory.

v)  Kingston filed an inter partes review petition related to the '544 patent on October 24, 2014.

w)  Kingston filed a second inter partes review petition related to the '544 patent on January 14, 2015.

x)  The Kingston DTSE9 USB drive has no cover.

6.  Claims and defenses to be presented at trial:

**Note on Marking Defense**: The Court's Summary Judgement Order (Doc. 199), does not operate to bar Kingston from presenting a defense at trial under the patent marking statute, 35 U.S.C. § 287(a). In that Order, the Court determined that Kingston had not carried its burden of coming forward with admissible evidence that products produced under a license of the '544 Patent were sold or offered for sale in the United States. (*See* Summary Judgment Order at 2-6.) Accordingly, the Court denied Kingston's motion for summary judgment on its affirmative defense of marking, meaning that, at that stage and based on the admissible evidence before it, the Court could not determine as a matter of law that Kingston prevails on the marking defense. (*Id*. at 6.) Pavo did not move for summary judgment on Kingston's marking defense and thus, the Court had no occasion to rule definitively on that affirmative defense.

Kingston may raise its affirmative defense of marking at trial, so long as the defense is supported with admissible evidence. Relatedly, as Kingston disclosed in its initial disclosure that Mr. Ewing would provide testimony in the designated area of "general marketing, promotion and sales of Kingston's flash products," Mr. Ewing may testify on the sale and marking of competing products, which the Court finds subsumed within that designated area. Any such testimony is subject to objection on grounds ordinarily applicable at trial.

**Plaintiff:**

a)    Pavo plans to pursue the following claims against Kingston:

- Claim 1: Kingston's DT101G2 directly infringes claims 1, 4, 7, 11-13, and 24 of the '544 patent in violation of 35 U.S.C. §271(a) and 35 U.S.C. §284; and

- Claim 2: Kingston willfully infringes claims 1, 4, 7, 11-13, and 24 of the '544 patent in violation of 35 U.S.C. §271(a) and 35 U.S.C. §284.

b)    The elements required to establish Pavo's claims are:

- Claim 1: Direct Infringement
  - A patent is literally infringed if all of the limitations of a claim, as construed by the Court, are met by a product that is sold, offered for sale, imported into, or manufactured in the United States.
  - A claim element may be infringed under the doctrine of equivalents if either:
    - a person of ordinary skill in the field would think the difference between the claim limitation and the limitation present in the accused device was not substantial as of the time of the alleged infringement; or
    - the accused structure or element, when compared to an element of a claim, is found to perform substantially the same function in substantially the same way to achieve substantially the same result as does the element in the claim.

4

1    o   If infringement is established, Plaintiff is entitled under 35

2        U.S.C. §284 to no less than a reasonable royalty for each

3        act of infringement.

4    •   Claim 2:  Willful infringement

5        The parties disagree on the elements for establishing willful

6        infringement. What follows is Pavo's understanding of the

7        required elements:

8    o   A patent is willfully infringed if the infringement was

9        intentional or knowing, *i.e.*, that Kingston undertook its

10       infringing actions despite a risk of infringement that was

11       either known to Kingston or so obvious that it should have

12       been known to Kingston.

13   o   Factors to consider include but are not limited to:

14       ▪ whether Kingston had pre-suit knowledge of the

15         patent-in-suit and was aware of its infringement;

16       ▪ whether Kingston knew or should have known that

17         its conduct involved an unreasonable risk of

18         infringement; and

19       ▪ whether Kingston had a reasonable basis to believe

20         it did not infringe or had a reasonable defense to

21         infringement.

22   c)  In brief, the key evidence Plaintiff relies on for each of the claims is:

23   •   The '544 patent

24   •   The Accused Device, the DT101G2

25   •   Kingston documents related to the Accused Device, including

26       schematics, datasheets and marketing materials.

27   •   Records of the sales and importation of the Accused Device.

28

- Kingston Documents related to the cost and profits of the Accused Device.

- Comparable licenses to the patent-in-suit and related patents, and documents related thereto.

- Testimony of Pavo's witness Jake Lee, and of Kingston's witnesses Stephen Chien, Andrew Ewing, Calvin Leong, and John Terpening.

- Testimony of Pavo's expert witnesses Steven Visser, Miguel Gomez and Jim Bergman, and of Kingston's expert witnesses David Choi, Lance Rake, Shelly Irvine, and Bruce Voyles.

d) Pavo proposes the following as the elements required for Kingston's defense of marking:

- Failure to Comply with Marking Statute
  - o To demonstrate non-compliance with 35 U.S.C. § 287(a), Kingston bears an initial burden of production to articulate the products it believes are unmarked patented articles subject to §287, and to produce evidence that the identified products were sold or offered for sale in the U.S.
  - o If and only if Kingston carries its burden, the burden then shifts to the Pavo to show that its predecessor complied with § 287(a)'s marking requirement.

**Defendant:**

a) Defendant plans to pursue the following counterclaims and affirmative defenses:

- Invalidity:  Claims 1, 4, 7, 11-13, and 24 of the '544 patent are invalid as obvious under 35 U.S.C. § 103.

6

- Failure to Comply with Marking Statute: Pavo is not entitled to recover damages due to the failure of its predecessors-in-interest and/or their licensees to mark products made by or for them or sold by or for them, or to otherwise provide notice in accordance with the provisions of 35 U.S.C. § 287(a).

   b)  The elements required to establish Defendant's counterclaims and affirmative defenses are:

- Invalidity
   - Kingston may establish that a patent claim is invalid by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art in the field at the time the invention was made.
- Failure to Comply with Marking Statute
   - To demonstrate non-compliance with 35 U.S.C. § 287(a), Kingston bears an initial burden of articulating products made or licensed under the patent.
   - At this point, the burden shifts to Pavo to plead and prove that its predecessors and/or licensees complied with § 287(a)'s marking requirement.

   c)  In brief, the key evidence Defendant may rely on for each counterclaim and affirmative defense is:

- Invalidity
   - The '544 patent
   - The prosecution history of the '544 patent
   - Gerber PAUL folding knife
   - Kershaw Rotary Lock knife model 2100

- Documents relating to prior art USB devices including the M-Systems DiskOnKey, Trek ThumbDrive, and JMTek USBDrive
- U.S. Patent No. 6,522,534 ("Wu")
- U.S. Patent No. 4,854,045 ("Schaub")
- U.S. Patent No. 6,648,715 ("Wiens")
- Korean Utility Model No 20-0271791 ("Park") and the certified translation thereof
- Chinese Utility Model No. 2,421,254 ("Lin") and the certified translation thereof
- U.S. Patent No. 6,464,403 ("Koch")
- Testimony of Pavo's expert witnesses Steven Visser and Miguel Gomez, and of Kingston's expert witnesses David Choi, Lance Rake, and Bruce Voyles
- Testimony of Kingston's witnesses Andrew Ewing and John Terpening and Testimony of Pavo's witness Jongkeun Lee
- Additional technical documentation and witness testimony concerning the state of the art at the time of the alleged invention, rationales for combining the prior art, and secondary considerations of obviousness.

- Failure to Comply with Marking Statute
  - Licenses to the patent-in-suit and related patents, and documents related thereto.
  - Documents related to the Staples Swivel Relay Drives and Hana Micron Axis Swivel Drives.
  - Testimony of Pavo's witness Jongkeun Lee

           ○      Testimony of Kingston's witness Andrew Ewing about competing products.

           ○      Testimony of Pavo's expert witnesses Steven Visser, Miguel Gomez and Jim Bergman, and of Kingston's expert witnesses David Choi, Lance Rake, and Shelly Irvine.

d) The parties dispute the standard for willful infringement. Kingston asserts the correct standard, in line with Pavo's cited Model Jury instructions and case law, is below:

- A patent is willfully infringed if the infringement was deliberate, wanton, malicious or in bad faith.
- Factors to consider include but are not limited to:
  - ○ whether the accused infringer had pre-suit knowledge of the patent-in-suit and was aware of its infringement; and
  - ○ whether the accused infringer had a reasonable basis to believe it did not infringe or had a reasonable defense to infringement.
- Evidence that the accused infringer had knowledge of the patent at the time of infringement by itself is not sufficient to show willfulness.

*See* Federal Circuit Bar Association Model Patent Jury Instruction 3.10; *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).


7.    In view of the admitted facts and the elements required to establish the claims, counterclaims and affirmative defenses, the following issues remain to be tried:

- Whether at least one claim of the '544 patent is infringed;
- Whether the infringed claim of the '544 patent is valid;

- Whether the infringed claim of the '544 patent was willfully infringed;
- Whether Pavo's predecessor-in-interest to the '544 patent and/or their licensees have complied with the marking statute; and,
- The amount of damages, if any, owed by Kingston to Pavo.

8.      All discovery is complete.

9.      All disclosures under F. R. Civ. P. 26(a)(3) have been made.  The joint exhibit list of the parties has been filed under separate cover as required by L.R. 16-6.1.  Unless all parties agree that an exhibit shall be withdrawn, all exhibits will be admitted without objection at trial, except those exhibits to which objections have been noted on the parties' Joint Exhibit List (Doc. 294-1).

10.     Witness lists of the parties have been filed with the Court.  Only the witnesses identified in the lists will be permitted to testify (other than solely for impeachment).  Each party intending to present evidence by way of deposition testimony has marked such depositions in accordance with L.R. 16-2.7.  For this purpose, the following depositions shall be lodged with the Clerk as required by L.R. 32-1:

- Russell Chatskis, taken on January 8, 2019
- Steven Hansen, taken on February 18, 2019
- Stephen Chien, taken on February 26, 2019
- Calvin Leong, taken on February 26, 2019
- Christopher Butler, taken on April 3, 2019

Defendant objects to the presentation of testimony by deposition of the following witnesses:

- Stephen Chien, taken on February 26, 2019

- Calvin Leong, taken on February 26, 2019
- Steven Hansen, taken on February 18, 2019[1]

11.  There are no pending law and motion matters or motions *in limine*.

12.  Bifurcation of the following issues for trial is ordered:  None.

- In light of the Court's order granting Pavo's motion for partial summary judgment (Doc. 97), no defenses to be tried to the bench remain.
- However, if the jury finds the patent-in-suit valid and infringed, Pavo will request that the Court award costs, and both pre-verdict and post-verdict interest on any damages award; that the Court order an accounting, if necessary, to determine any infringement not covered by the jury's verdict; that the Court award supplemental damages for any pre-judgment infringement not covered by the jury's verdict; that the Court award injunctive relief in the form of an ongoing royalty, if necessary, to compensate Pavo for any post-judgment infringement.  Pavo will also seek attorneys' fees pursuant to 35 U.S.C. § 285.
- Moreover, if the jury finds Kingston's infringement was willful, Pavo will seek enhanced damages pursuant to 35 U.S.C. § 284.
- If the jury finds the patent-in-suit invalid or not infringed, Kingston will request that the Court award costs, and/or attorneys' fees pursuant to 35 U.S.C. § 285.

---

[1] To the extent that Pavo elects to present the deposition testimony of Mr. Hansen, Kingston reserves the right to ask this witness to appear for live testimony in lieu of designations.

13.    The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues remaining to be litigated, this Final Pretrial Conference Order shall supersede the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

Dated:  February 19, 2020

_____
HONORABLE JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE

# Exhibit 4
# Redacted in its Entirety

Exhibit 5

1

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3
    3G LICENSING, S.A., KONINKLIJKE        )
4   KPN N.V., and ORANGE S.A,              )
                                           )
5            Plaintiffs,                   )   C.A. No.
    v.                                     )   17-083-GBW
6                                          )
    HTC CORPORATION,                       )
7                                          )
             Defendant.
8

9
                              - - - -
10
                         Wilmington, Delaware
11                       Friday, October 6, 2023
                         *Markman Hearing*
12
                              - - - -
13

14
    BEFORE:  HONORABLE GREGORY B. WILLIAMS
15           UNITED STATES DISTRICT COURT JUDGE

16
                              - - - -
17

18

19

20

21

22

23

24

25                          Michele L. Rolfe, RPR, CRR

**2**

APPEARANCES:

    FARNAN LLP
    BY: MICHAEL J. FARNAN, ESQ.

      -and-
    SUSMAN GODFREY
    BY:  ANDRES HEALY, ESQ.
      LEXIE WHITE, ESQ.
      HUNTER VANCE, ESQ.
      For Plaintiff

    SHAW KELLER LLP
    BY: KAREN KELLER, ESQ.
      NATHAN R. HOESCHEN, ESQ.

      -and-

    WHITE & CASE
    BY: YAR R. CHAIKOVSKY, ESQ.
      PHILIP OU, ESQ.
      RADHESH DEVENDRAN, ESQ.
      SHASHANK CHITTI, ESQ.
      For Defendant

**3**

- - - - -

P R O C E E D I N G S

(REPORTER'S NOTE:  The following hearing was held in Courtroom 6B beginning at 11:00 a.m.)

THE COURT:  Good morning.  You may be seated.

All right.  We're here for the supplemental claim construction in 3G versus HTC.  Civil Action No. 17-83.

We've allocated an hour for this supplemental claim construction, each side being allocated 30 minutes for its presentation with respect to the claims, the terms at issue.

So let's start by having counsel put appearances on the record.  And let's get started.

MR. FARNAN:  Good morning, Your Honor.  Brian Farnan on behalf of the plaintiffs.  And with me is Andres Healy, Hunter Vance, Lexie White, all from Susman Godfrey.

THE COURT:  All right.

MS. KELLER:  Good morning, Your Honor.  Karen Keller from Shaw Keller on behalf of HTC.  With me today Yar Chaikovsky, Phillip Ou, Radhesh Devendran and Shashank Chitti.

THE COURT:  Good morning.

All right.  So we have the terms "second call," "initiating a second call," and then whether the patent

**4**

covers both manual and automatic or is just limited to automatic embodiments.  And then also there's now a dispute about the term "call."

Let's get started with the first, I guess, term, first term "call."  Let's hear from the parties on it.  We'll do term-by-term.  We'll go term-by-term.

So let me hear from plaintiff on the term "call."

MR. HEALY:  Good morning, Your Honor.  I want to be respectful, I can keep the mask on given the e-mail or I can take it off, whatever Your Honor prefers.

THE COURT:  It's up to you.  I mean, whatever your preference is.

MR. HEALY:  Thank you, Your Honor.

Your Honor, our -- obviously, we had a brief discussion about the term "call" on Wednesday.  I will tell you, as we've noted in our brief, we didn't have an opportunity to even check with our experts.  We did -- went back and had that conversation, and it did flag a specific issue.

Generally speaking, again, we don't have an issue with "communication between mobile stations," we don't -- we actually think that's too broad.  They argue we are trying to make this term too broad.  We think that their construction actually is too broad.

**5**

The issue is -- well, circle back to that.  This is what the patent says about what the word "communications" means, it says it includes a mix of audio, video, data, but also control signals.  And so I think, number one, that's what the patent says what the word "communications" means.

The patent also makes very clear -- this is in the claim -- that the call qualify as a call, at least the first call has to include media.  The first call has first and second media at a minimum.  The second call has at minimum first media, but no second media.  So we know there has to be media for something to qualify as a call for purpose of the patent in the claims.

We also have in the specification it duplicates this, it tells us that there has to be a voice call, that's a version of the media, audio or video.  So the specification also basically repeats and discloses and teaches what is in the claims.

We've got the figures themselves.  This is figure 1, as you can see here, this is a voice call, it has voice media.  Figure 1 transitions to a video call.  Its now got the 28 kilobytes, which represents both voice and video media.  At least arguably.

And so, again, we have these consistent disclosures:  You have to have the call.  Communication is a broader term.  Call is something more specific.  You have to

46

1    that would be, that would be intended or resulting.  And,
2    again, how you finesse it is really not something we're
3    super concerned with.
4            All we wanted to make sure is that it doesn't
5    mean establishing, it's referring to this pre-call
6    establishment signaling that results in the call being
7    established.
8            On the last point, Your Honor, really it's a
9    simple one -- I just wanted to address this and I'm sure
10   we'll hear about it.  This is, I think, the only or one of
11   the only main portions that that they point to with any
12   support for its, they point to our expert's statement
13   during his deposition.  And what they don't emphasis, of
14   course, because it's very unhelpful to their cause is what
15   he said in his very first words:  Outside the context of the
16   claims of the '091.  So it really has nothing at all -- it
17   lends no support to their position when what we're really
18   talking about here is the '091.
19           Again, they are not satisfied with plain and
20   ordinary meaning, so they necessarily have to understand
21   that the patent has a very specific and different meaning.
22   And we've looked at that and it obviously shows that
23   "making" is not the right word, it just -- it -- it's not
24   the right word.
25           On the last point, Your Honor, about this

47

1    automated solution portion.  So let's start with the claims,
2    where you should start.  It requires a processor further
3    being configured to, in response to the indication, initiate
4    a second call to the remote videophone.  So it has an
5    expressed "configured to" requirement, which I'm sure Your
6    Honor appreciates, has some pretty specific requirements in
7    the rules under the case law.  And if we just had this, I
8    think it would be enough, but we've got more.
9            So, again, I would be brief because we mentioned
10   this on Wednesday, during claim construction, we had this
11   fight and during claim construction they thought we were
12   going to try and argue it was something other than the
13   processor and the videophone that was doing this, and we
14   said we're not arguing that.  So they are arguing the exact
15   opposite position they are arguing today and they said we
16   want to make clear that for both claims it is the
17   videophone, the first videophone I'll call it that must
18   initiate the second call, the remote videophone, not to
19   remote videophone itself, not something on the network, not
20   something somewhere else.
21           So the exact opposite of what we're going to
22   hear today.  And we said, okay, sounds good to us, that's
23   how we understand it too.  And this is one thing I didn't
24   show yesterday because I just saw it yesterday or reminded
25   of it yesterday, the Court accepted that.  He said:  I

48

1    accept that agreement by the parties about what this term
2    means, and as a result I'm not going to construe these two
3    claims.  I'm going to provide them their plain and ordinary
4    meaning.  And so now we're hearing yet again another
5    argument contrary to what they argued before and what this
6    court has already held.
7            And, again, at the claim language we could stop,
8    because that's enough.  At their statements at *Markman* and
9    the Court's adoption of them, we could stop.  They have
10   repeatedly relied on this principle to try and -- and from
11   this example -- invalidate the patent throughout the lengthy
12   history of the case.  This is their brief, their opening 101
13   brief.  Unprompted by us, nothing -- just demonstrating
14   their understanding of what the Court had already held and
15   what they had agreed.  The patent relates to call setup
16   techniques for mixed-media calls.  The patent attempts to
17   solve a bandwidth problem by providing a software solution
18   that automates, automates, the conventional manual process
19   of terminating and initiating calls, what we're talking
20   about now.  That would be enough as well, but we got more.
21   They then say claim 1 simply recites a conventional
22   processor -- again, the Court found conventional part was
23   not true -- to automatically perform the steps for switching
24   the mode of communication by initiating a new call.
25           So they said exactly what we are saying today

49

1    and the exact opposite of what you're going to hear them say
2    in a few moments from now, I assume.
3            And they -- you know, the old phrase:  A patent
4    is not a nose of wax.  You can't argue one thing when it's
5    convenient, argue the exact opposite when it's no longer
6    convenient.  And, unfortunately, that's what we're hearing
7    now and that's what we're going to hear today.
8            I just want to briefly touch on the Court's
9    construction.  So they then -- as part of that briefing we
10   just saw, they moved for 101 invalidation, the Court denied
11   it.
12           But this is what the Court said:  At step one
13   defendants argue that the asserted claims are directed to
14   the abstract idea of users switching between modes of
15   communication because they do not require automation.
16           The Court then points out that their own expert,
17   Dr. Wicker, said that they do contemplate automatic
18   initiation of a second call.
19           And then he said:  Defendants have failed to
20   meet their burden at step one.  So --
21           THE COURT:  So now they are going back to what
22   they said what the Court found their own expert testified
23   that they require -- it requires both automation and manual.
24           MR. HEALY:  Correct.
25           THE COURT:  Not limited to automation.

50

1    MR. HEALY:  Correct.  They're going back to what
2    their expert said.  But, again, they argued -- this was the
3    entirety of their brief -- frankly, we filed the 101 -- they
4    filed the 101 motion, they filed their statements about
5    automatic, and we said exactly, it's automatic, that's why
6    it doesn't fail under 101.  And then they said oh, we never
7    said automatic, ignore that, we never said that.  And this
8    is the -- that's what the Court recognized.  The first
9    sentence -- their argument was it fails, it's directed to an
10   abstract idea.  Again, because they do not require
11   automation.
12   THE COURT:  All right.  I understand.
13   All right.  Let me hear from...
14   MR. CHAIKOVSKY:  Go to slide 43.  It might not
15   be 43, I think --
16   (Discussion held off the record between
17   counsel.)
18   MR. CHAIKOVSKY:  So we just heard in the
19   beginning was addressed by counsel with respect to "call,"
20   "second call," just -- you know, I think finishing up that,
21   again, everybody agrees that it's two separate calls, and
22   that's everybody -- you see on this slide 45, Your Honor,
23   that will be lodged.
24   The only disagreement is from Dr. Madisetti that
25   it's not a separate call.  And that's the distinction, they

51

1    want to wipe out the need for a separate call, despite every
2    embodiment, figure 4 has separate calls, despite the --
3    sure, there's a video call with two components, audio and
4    video, but the patent when it's referring to its claims,
5    it's referring to the two distinct calls.  And just like
6    figure 1 put a call on hold, figure 4 tells you can put a
7    call on hold.  You can put any on hold, you can put the
8    video call on hold -- I showed you the freeze -- you can put
9    audio call on hold.  I'm not sure what they're talking
10   about.
11   With respect to the initiating, which is really
12   troubling listening to that again.  Your Honor asked all the
13   right questions again.  Initiating is all that's needed.
14   They want to put the word "establish" in the
15   word "initiate:" that's the answering of a call.  That's
16   again, really important to them that initiating a call --
17   this gets to the whole issue of call, not a separate call.
18   Initiating call has got to be established means answering a
19   call, because the only thing that Dr. Madisetti is going to
20   point to is to initiate this, quote, second call.
21   Remember, a second call to them is one call.
22   It's just I went from audio/video to audio only.  So because
23   there's no initiating, no separate second call made, like
24   the claims require, they just want to say you answered it,
25   right, you're receiving it, it's established.  And so that's

52

1    why, despite what we'll see what the patent describes, Your
2    Honor, they want to insert this word he said oh, we're not
3    doing established.  They absolutely are.  They've got it in
4    their construction.  And we know from the intrinsic evidence
5    that that's improper.
6    In fact, this is the priority applicant date --
7    application from which they rely on the priority date of
8    this patent.  What did the applicant tell you?  The
9    applicant said, hey, a caller, claim 7, can initiate a first
10   media call.  And then there's a recipient can answer the
11   first media call.  Okay, that's not initiating, that's
12   answering.
13   It's only after that, after it's answered that
14   the recipient consented thereby causes the mixed-media call
15   to be established.  So they're changing "initiating" to
16   "establish," despite this patentee recognizing an
17   establishment of a call only happens after you initiate it
18   and answer it.  And, again, the reason they want to change
19   that word improperly -- and the Federal Circuit, I know,
20   won't agree with this given this patent.  The reason that's
21   happening is because they don't have initiation of a second
22   call.  Doesn't exist.
23   Same thing if we go to claim 8, because claim 8
24   depends from claim 7.  Claim 7 told you the recipient can
25   consent, as underlined in red.  We go down to claim 8, what

53

1    happens?  Either party can initiate the mixed-media call;
2    that's the mixed-media call with audio and voice.  They can
3    initiate it.  I have already initiated the first media call
4    and the party can initiate the mixed-media call after this
5    consent.  And it's only after initiating again, as we see in
6    claim 8, the corresponding to answer, separate word --
7    that's why answering is in blue on this slide, initiating is
8    in yellow.  In green we thus cause the mixed-media call to
9    be established.  It's only established after it's answered;
10   ergo, let's shove established into initiating.  Not so.
11   And we'll go more.  If we look at the spec,
12   specification beyond the priority claims.  And that's,
13   again, Your Honor, it's not just litigation at 5:30 a.m. in
14   the morning, it is -- this is -- I mean, challenging to read
15   what they wrote and it's challenging again to hear what they
16   said Wednesday.
17   Here again in the specification, figure 1, the
18   caller's videophone initiates a second call.  Separately in
19   blue, same color coding, answer.  Answer is not initiating.
20   Figure 2, we walked through that, we're talking
21   about a call.  The videophone releases the video call, makes
22   a new voice call.  All right.  That's figure 2, initiates a
23   new call: that's why we use the word "make."  We can live
24   with the word "initiate," but what I tell you is -- and
25   we're talking to the team, the one thing we know it's not

54

1    establishing.  You can have a negative limitation,
2    initiating a second call is not establishing a second call,
3    it is making a second call, it's sending it out.  It's
4    definitely not establishing it: that's after you've answered
5    it.
6            Figure 4 -- the grandiose figure 4, the calling
7    party initiates or requests a video call.  The patent then
8    says the recipient may accept the video call; that's
9    different than initiating.  Initiating and accepting are not
10   the same.  They would have you establishing being a second
11   call as being after -- that's every, every embodiment,
12   initiating does not include establishing.
13           In fact, we've got their expert, Dr. Cohen -- so
14   initiating and discontinuing calls was known.  Outside the
15   context of the claims of the '091, plain and ordinary
16   meaning, what everyone would know, people initiate calls and
17   discontinued calls.  Those are word we use for making calls:
18   used the word "making calls."
19           In fact -- and this will come up with respect to
20   automatic, Your Honor, they keep pointing to this.  No one
21   was -- no one was actually saying -- the videophone, of
22   course, can operate on its own.  There's user involvement,
23   as Your Honor even already recognized, so I'm not going to
24   belabor that one.  It can be automatic or user involved
25   manual intervention, because there's got -- with everything

55

1    we've shown you today, you can accept video calls or not,
2    user operates with these videophones.  But of course things
3    can happen automatically in the phone too, it's both.  And
4    that's what Judge Stark recognized.  And the fact that I
5    keep have to hear that's about it's automatic only, I mean,
6    again, it's a stretch, it's a bad stretch.
7            But here we go with respect to initiating, the
8    first videophone must initiate a second call, not the remote
9    videophone itself.  So, again, we're talking about the first
10   videophone, right.  The claims talking about the first
11   videophone initiating the second call, not the remote
12   videophone, not answering.  And that's what they are going
13   to want to say that their remote phone answers, establishes
14   the call: that's where they're going.
15           THE COURT:  But the patent shows that initiating
16   call is sending signals, right?
17           MR. CHAIKOVSKY:  Initiating call would, as you
18   see like in figure 2, you do set up signal, that's true.
19           THE COURT:  Sending signals, right?
20           MR. CHAIKOVSKY:  Yeah.
21           THE COURT:  I get the point that it's not
22   answered, right, but it's sending signals to establish a
23   second call if answered.
24           MR. CHAIKOVSKY:  Yeah.
25           THE COURT:  If answered.

56

1            MR. CHAIKOVSKY:  That's right.
2            THE COURT:  Okay.  All right.
3            MR. CHAIKOVSKY:  Yeah, you got it.  I mean, so I
4    won't belabor this in terms of you got it, it's -- as I
5    showed you here in the red X, it doesn't -- you have to
6    include the answer, which is what they would want you to
7    have to believe is that answering can somehow be the
8    initiating, it's not.  It's sending the signals -- it's
9    making the call, right.  It doesn't have to be -- that's why
10   I said it could be just initiating.  But one thing we know
11   initiating it's not establishing or answering, drop a call,
12   that's what they are using for establishment.  And as we
13   know --
14           THE COURT:  I got your point.
15           MR. CHAIKOVSKY:  -- a call is established after
16   an answer.
17           THE COURT:  I got your point.  I understand.
18           Let's move on to your argument about whether the
19   patent is limited to automatic embodiments or includes
20   manual and automatic embodiment.
21           MR. CHAIKOVSKY:  You know, so as -- Your Honor
22   you recognized -- you know, as they, you know, highlighted,
23   you know, on their slide 33, they didn't want to highlight
24   the most important sentence, right, which you noted.
25   Defendant's own expert testified that the '091 contemplates

57

1    both automatic and manual, that's why the Court denied the
2    motion.  It's both, right.  The Court never said automatic
3    alone, which is what they want.  They want automatic alone.
4    Why do they want automatic alone?  Again, because we just
5    have -- they have one call, mixed-media, drop a video,
6    happens automatically, that's what they want accused of
7    infringement, which is all in the prior art and isn't what
8    the claims cover.  And so it's not automatic alone.  We see
9    this in -- frankly, in the Wicker report, right, the '091
10   contemplates both automatic and manual initiation.  This is
11   what Cohen cites, frankly, right here with respect to the
12   Wicker report, right.
13           So we see from the spec, right, Court's summary
14   judgment order, defendant's own expert testified that it
15   contemplates automatic and manual.  Citing Wicker's report,
16   that's D.I. 296, Exhibit 67, 134 that Judge Stark, in this
17   court, cited to.  But what is that at paragraph 134?  Let's
18   take a look.  The '091 contemplates both automatic and
19   manual initiation, just like the Court found.
20           And in that description, from the specification,
21   column 8, lines 8-23, as bolded, if the caller selects voice
22   mode, the caller selects, right, that's manual intervention.
23   The call -- a videophone releases the videophone and makes a
24   new call to the same number as the original call, this will
25   incur a delay.

58

1       The method described above may be modified
2 depending on the type of network; however, such variations
3 are considered within the full scope.  That's what Wicker
4 cited.
5       Now, you see what he says in paragraph 135, the
6 next paragraph of his report, when he's talking about the
7 '091's patent disclosure of the caller selecting voice mode
8 and the phone making a new voice call.  As you can see, the
9 last sentence, the most important, the specification is not
10 limited to automatic, which is what they keep saying, this
11 is Dr. Wicker, and the Court had this entire -- you know,
12 everything you see here, 134, 135 contemplates manual,
13 automatic or any other variations of initiating a call.
14 It's not limited to automatic.  It's not limited to manual.
15 They could be anything.  That's what Judge Stark cited and
16 that's the Exhibit 67 is the Wicker report.
17       And so that's why I said the misrepresentations
18 here is disingenuous, this isn't just righteous advocacy.  I
19 have seen good advocacy before.
20       THE COURT:  All right.
21       MR. CHAIKOVSKY:  I think, Your Honor, the last
22 comment here on the summary of the patent, you can the
23 summary of the invention is user selection, user interface
24 with user input, and there's no way you could stop and go
25 hey, the invention is all automatic.

59

1       THE COURT:  I hear you.
2       With this point, Mr. Healy, I'd like you to --
3 it seems as though the patent says -- when I look at column
4 8, starting at line 31:  For this reason, a key issue in
5 relation to the combined voice and video call handling
6 procedures described above is that of user control.  This is
7 important in terms of initiating/negotiating a combined
8 video and audio calls, as well as the ongoing handling of a
9 videophone call.  So that to me, you know, gives support
10 that this patent can't be just limited to automatic
11 embodiments.
12       MR. HEALY:  I'm happy to briefly address it,
13 Your Honor.
14       Okay.  So this patent is a continuation.
15 There's a predecessor parent patent different from the one
16 we saw that counsel showed you, which is a European
17 counterpart, but there's a predecessor to this in the United
18 States:  that patent focuses very much so on the user
19 control, the user aspects of the specification.
20       This continuation patent, as they do, narrows --
21 and if we could bring up the claim language.  So 100 percent
22 agree with Your Honor the specification talks a lot about
23 user control and user actions -- the claim language, please.
24 Thank you.
25       Well, the claim language we looked at earlier,

60

1 again, narrows it to being a processor configured -- thank
2 you.  Configured to do these actions.  And so the claims
3 narrow down to a very specific thing.  And, again, it would
4 be one thing if we didn't have the context of already have
5 an agreement on this point that we looked at, already having
6 their statements, which I know counsel didn't even attempt
7 to explain, where they say that what the Court held and what
8 we did at *Markman* and what the patent says, citing to this
9 specific language and other language in the specification,
10 required automatic initiation of the second call.
11       Realistically there's a lot of bombs that have
12 been thrown today at me and the team in general, but -- you
13 know, frankly, I don't understand, we're arguing for
14 something that's narrower.  I don't understand how we're
15 trying to grandiose our case or make it broader by saying it
16 can't be --
17       THE COURT:  I'm just engaging in claim
18 construction --
19       MR. HEALY:  Understood.  Again, I understand
20 Your Honor's point 100 percent.  We would again point Your
21 Honor to the language which, you know, which they didn't
22 highlight, where they -- you know, where Judge Stark
23 recognized in his order, they are arguing it's invalid,
24 quote, because it does not require automatic initiation, and
25 then the Court said I disagree and denied their motion, and

61

1 subsequently granted judgment in our favor on this point.
2       One final point, Your Honor, then I'm happy to
3 answer any questions or I can sit down.
4       If we could bring up my slide deck.  Again, I
5 think -- I thought I was very clear, but I'll be even
6 clearer if I need to be, we are not arguing that initiating
7 equals establishing.  Those are different things.  We walked
8 through why that is --
9       THE COURT:  I got the arguments on this.
10       MR. HEALY:  Okay.  The only --
11       THE COURT:  Let's --
12       MR. HEALY:  Understood.
13       THE COURT:  I got it.
14       MR. HEALY:  The only --
15       THE COURT:  I got all the arguments on that.
16       MR. HEALY:  I appreciate it.
17       The only point I want to make, Your Honor, in
18 their slide deck they cross out "answer" and they -- I've
19 ask -- again, A through D is what the patent says is
20 initiating and includes answering.
21       But --
22       THE COURT:  You're not arguing that initiating
23 includes answering, is what you're telling me?
24       MR. HEALY:  No, we are.  We are arguing -- this
25 is A through D, this is the specification.  The patent

62

1 specifically says steps A through D equal initiating.

2              If we could go back two slides.  Right here.

3 Referring to figure 1:  Caller initiates a standard voice

4 call, steps A to D in figure 1.

5              If we go forward two slides --

6              THE COURT:  Well, initiating can't require that

7 the call actually be answered.

8              MR. HEALY:  No, no --

9              THE COURT:  That doesn't make sense.

10             MR. HEALY:  I'm talking about the answering

11 message.  As you can see in that red, the highlighted text

12 it says "answer."  So -- and what we're alleging the call

13 mobile on the right would be the HTC device, it sends an

14 answer message.  Once that completes, the process, all the

15 signaling is done, then the call is established.

16             So to Your Honor's point we're not arguing

17 that --

18             THE COURT:  You're arguing -- your proposed

19 construction is sending signaling to establish a second

20 call?

21             MR. HEALY:  Correct.

22             THE COURT:  All right.

23             MR. HEALY:  But I want to be very clear is I'm

24 not arguing that establishing equals initiating.  I'm saying

25 it's a signaling that will result.

63

1              THE COURT:  Got it.

2              MR. HEALY:  Understood.  Thank you, Your Honor.

3              THE COURT:  All right.

4              MR. CHAIKOVSKY:  Final comment?

5              THE COURT:  I got everything I need.

6              In terms of what I'm going to do is we're going

7 to give you the Court's construction of these terms sooner

8 rather than later today.

9              And then we may -- then we may follow up later

10 with a little more in terms of analysis for those

11 constructions, but -- so that both sides have them and, you

12 know, can adjust your trial preparations in whatever way or

13 whatever else you decide to do.  You'll have those and then,

14 like I said, we'll likely follow up with some sort of

15 further analysis.

16             All right.  So...

17             MR. CHAIKOVSKY:  One question, Your Honor?

18             THE COURT:  Yes.

19             MR. CHAIKOVSKY:  Do you want the paper copy of

20 the slides because there was slightly different

21 modifications here in terms of the slides?

22             THE COURT:  Yes, if you have them.

23             And also with regard to the dispute resolution

24 process, in addition to, you know, e-mailing the joint

25 e-mail by 6:00 a.m. with the electronic versions of any

64

1 slides or documents that are at issue, make sure there's a

2 paper copy put on the podium by 8:15 a.m. every day.  All

3 right.

4              MS. KELLER:  Your Honor, I had three small

5 housekeeping issues.

6              One is the parties had talked with Mr. Looby

7 about possibly putting a monitor on the floor in front of

8 the jury that would only be visible to counsel so that

9 counsel would not have to continually turn to the large

10 screen.

11             THE COURT:  So the jurors can't see it?

12             MS. KELLER:  The jurors cannot see it.

13             THE COURT:  That's fine.

14             MS. KELLER:  I just wanted to get the Court's

15 okay.

16             And as this may be more to Mr. Looby, the

17 parties were to set up before this hearing, is okay now that

18 they come shortly after to do the setup?  Okay.

19             And then lastly, I know Your Honor is aware they

20 have a witness that's tested positive for COVID, they have

21 not identified that witness to us.  And we're sensitive to

22 that, but we do need to know if that's a witness that's not

23 going to appear or will appear for purposes of trial for our

24 planning purposes and time, etc.

25             THE COURT:  With respect to that witness that

65

1 tested positive for COVID, we've had that in the past and

2 the witness has testified via video, so that's an option.

3 Just to --

4              MR. HEALY:  I didn't mean to interrupt, Your

5 Honor.  I was just going to say we're happy to disclose it.

6 If we could do it off the record just for privacy reasons.

7              THE COURT:  Okay.  Yes.  Let's go off the

8 record.

9              (Whereupon, discussion held off the record.)

10             THE COURT:  All right.  We're adjourned.

11             (Whereupon, the following proceeding concluded

12 at 12:47 p.m.)

13             I hereby certify the foregoing is a true

14 and accurate transcript from my stenographic notes in the

15 proceeding.

16             /s/ Michele L. Rolfe, RPR, CRR

                  U.S. District Court

17

18

19

20

21

22

23

24

25

Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BIO-RAD LABORATORIES INC. and THE
UNIVERSITY OF CHICAGO,

Plaintiffs,

v.                                                            No. 15-cv-152-RGA

10X GENOMICS, INC.,

Defendant.

MEMORANDUM OPINION

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE; Edward R. Reines, Derek
C. Walter, Amanda Branch, Christopher S. Lavin, WEIL, GOTSHAL & MANGES LLP,
Redwood Shores, CA; Robert T. Vlasis III, WEIL, GOTSHAL & MANGES LLP, Washington,
DC.

   Attorneys for Plaintiffs.

Frederick L. Cottrell, III, Jason J. Rawnsley, Alexandra M. Ewing, RICHARDS, LAYTON &
FINGER, P.A., Wilmington, DE; E. Joshua Rosenkranz, Melanie L. Bostwick, Elizabeth R.
Moulton, ORRICK HERRINGTON & SUTCLIFFE LLP, New York, NY; Matthew Powers,
Azra Hadzimehmedovic, Robert Gerrity, TENSEGRITY LAW GROUP LLP, Redwood Shores,
CA; David I. Gindler, Alan J. Heinrich, Lauren N. Drake, Elizabeth C. Tuan, IRELL &
MANELLA LLP, Los Angeles, CA.

   Attorneys for Defendant.

July 24, 2019



**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court is Plaintiffs' post-trial motion (D.I. 512). Plaintiffs seek a permanent injunction, attorneys' fees, enhanced damages, supplemental damages, and pre- and post-judgment interest. (*Id.*). I have reviewed the parties' briefing and the related *amicus curiae* submission from the Broad Institute, Inc. (D.I. 513, 524, 536, 522). For the following reasons, Plaintiffs' motion is **GRANTED** with respect to the permanent injunction, supplemental damages, and pre- and post-judgment interest, and **DENIED** with respect to the attorneys' fees and enhanced damages.

## I.   BACKGROUND

On February 12, 2015, RainDance Technologies, Inc. and the University of Chicago filed suit against 10X Genomics, Inc. alleging infringement of several patents. On May 30, 2017, Bio-Rad Laboratories Inc. substituted for RainDance. (D.I. 180). I held a jury trial from November 5 to 13, 2018.[1] Only three patents remained at issue—U.S. Patent Nos. 8,889,083 ("the '083 patent"), 8,304,193 ("the '193 patent"), and 8,329,407 ("the '407 patent"). (*See* D.I. 499). The jury found all three patents valid and infringed, that the infringement was willful, and that Plaintiffs were entitled to $23,930,718 in damages. (D.I. 476).

## II.   PERMANENT INJUNCTION

Courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "A plaintiff must demonstrate: (1) that it

---

[1] I cite to the trial transcript as "Tr."

has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* "The essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent." *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008).

For the following reasons, I find that Plaintiffs have satisfied the *eBay* factors in support of their proposed permanent injunction.  (D.I. 513, Ex. A).

### A.  Irreparable Injury

Direct competition strongly suggests the potential for irreparable harm absent an injunction. *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) (vacating denial of a permanent injunction based on finding no irreparable injury because the record showed "direct and substantial competition between the parties"); *see also Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.").  A patentee may establish irreparable harm by showing "that [the parties] were competitors and that [the patentee] lost market share while [the infringer] gained it." *See Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013) (upholding the district court's grant of a permanent injunction).

Plaintiffs argue that Bio-Rad and 10X are competitors in "the market for products that perform genetic analysis on a droplet platform," and within that market, they are "undisputedly head-to-head competitors with their single-cell droplet products."  (D.I. 513 at 6-7).  At trial,

3

10X's counsel stated that Bio-Rad's ddSEQ product competes directly with 10X's single cell product. Tr. at 92:3-7, 1519:4-6. Ms. Tumolo, Bio-Rad's President of Life Sciences, agreed. *Id.* at 168:4-8.

10X argues that Bio-Rad is not a direct competitor. 10X has five accused product lines,[2] each of which allegedly "profiles different aspects of a sample and provides fundamentally different biological information, using different chemistries, data analysis, and visualization software." (D.I. 524 at 7). Of those five, 10X argues that the only one that may compete with Bio-Rad is the single cell product, but that customers view Bio-Rad's product as inferior. (*Id.* at 5, 7-8).

I find that 10X and Bio-Rad are direct competitors in the market for products that perform genetic analysis on a droplet platform. 10X admitted at trial that its single cell product competes directly with Bio-Rad's ddSEQ. Tr. at 92:3-7. Each of 10X's products are variants of the same infringing droplet process. (*See* D.I. 536 at 4; D.I. 476). Regardless, 10X's single cell product accounts for over 80% of 10X's sales. (*See* D.I. 536 at 4; PTX 1255). The fact that customers may prefer 10X's single cell product to ddSEQ does not negate the fact that the products are competing.

Plaintiffs argue that, as direct competitors, 10X is causing Bio-Rad lasting competitive harm by using infringing technology to gain a lead in the emerging droplet market and derail Bio-Rad's product roadmap. (D.I. 513 at 7). Ms. Tumolo testified that Bio-Rad "felt a lot of pressure to get [its single cell] product on the market because 10X had a really, really big head start, frankly we felt using our technology." Tr. at 130:3-6. Plaintiffs assert that the same head

---

[2] There are six accused products: Chromium Genome/Exome, Chromium Genome/Exome with Kynar, GemCode Long Read, Chromium Single Cell 3', Chromium Single Cell 3' with Kynar, and Chromium Single Cell V(D)J with Kynar. (D.I. 476). 10X does not state which products belong to which product line. (D.I. 524 at 7).

start has allowed 10X to collaborate with early adopters and key opinion leaders and develop "sticky" customer relationships. (D.I. 513 at 7-8). As a result, 10X has cultivated a market bias towards its single cell product and Bio-Rad has been forced to increase its marketing costs. (*Id.* at 8).

Plaintiffs have shown that they will suffer irreparable competitive harm absent an injunction. Plaintiffs are being forced to compete with 10X's products that incorporate and infringe their own patented inventions. *See Douglas Dynamics*, 717 F.3d at 1345. Based on those infringing products, 10X has established a strong market lead over Bio-Rad—10X has sold over 1000 of its single cell units, while Bio-Rad has sold less than 100. (D.I. 398, Ex. Z, at K-2, J-3, J-4). It seems likely that, absent an injunction, Bio-Rad will struggle to regain its lost market share and will continue to suffer associated harms such as increased marketing costs.

The party seeking an injunction must also show a causal nexus between the infringement and the harm. The infringing features do not need to be the "exclusive or predominant reason" that consumers buy the accused products, but there must be "'some connection' between the patented features and the demand for [the accused] products." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 642 (Fed. Cir. 2015). That is, "the patented features impact consumers' decisions to purchase the accused devices." *Id.*

10X argues that Plaintiffs have failed to show a causal nexus because they have not proven that "simply using droplets—as opposed to other, non-patented features—drives demand for, or contributes to the success of, any 10X products." (D.I. 524 at 5). 10X applies the wrong standard. Plaintiffs need not show that the patented features drive demand, but just that they "impact consumers' decisions to purchase the accused devices." *Apple*, 809 F.3d at 642; *Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1384-85 (Fed. Cir. 2017). The

patented droplet technology is the foundation of 10X's droplet products. In fact, 10X tried and

failed with other methods of partitioning such as capsules and wells before moving to droplets.

Tr. at 953:1-954:13; (D.I. 513 at 10). There is clearly "some connection" between the patented

technology and the demand for 10X's products. Therefore, Plaintiffs have shown that they will

suffer irreparable harm from 10X's infringement absent injunctive relief.

### B. Remedies Available at Law

Damages are inadequate to compensate for loss of market share. *Douglas Dynamics*, 717

F.3d at 1345 ("[M]ere damages will not compensate for a competitor's increasing share of the

market, a market which Douglas competes in, and a market that Douglas has in part created with

its investment in patented technology."); *E.I. DuPont de Nemours & Co. v. Unifrax I LLC*, 2017

WL 4004419, at *5 (D. Del. Sept. 12, 2017) ("Monetary damages are inadequate to compensate

Plaintiff here because Plaintiff would be forced to compete against a rival gaining market share

with Plaintiff's technology."), *aff'd*, 921 F.3d 1060 (Fed. Cir. 2019). The underlying concerns

are particularly strong here because 10X's infringement coincided with the emergence of the

droplet market, thus allowing 10X to capture and define the market with its infringing

technology. *See Illumina, Inc. v. Qiagen, N.V.*, 207 F. Supp. 3d 1081, 1093 (N.D. Cal. 2016)

(finding the patentee would suffer irreparable harm in part because, being at a "crucial inflection

point in the development of the market," the infringer would be allowed to "capture and define

the market with pirated technology").

10X argues that damages are adequate based on quantifiable licensing fees derived from

Bio-Rad's internal documents. (D.I. 524 at 13). I disagree. Although Bio-Rad seems to have

had some interest in licensing the asserted patents (DTX 1481 at 26), they were never actually

licensed. *Cf. Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1343 (Fed. Cir. 2017)

("[T]he fact of the grant of previous licenses, the identity of the past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer all may affect the district court's discretionary decision concerning whether a reasonable royalty from an infringer constitutes damages adequate to compensate for the infringement.") (quoting *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008)).

Therefore, I find damages inadequate to compensate for 10X's infringement.

### C. Balance of Hardships

When assessing the balance of hardships, it is appropriate for courts to consider "the parties' sizes, products, and revenue sources." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862-63 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). Not relevant, however, are the expenses incurred in creating the infringing products and the consequences to the infringer of its infringement, such as the cost of redesigning the infringing products. *Id.* at 863.

An injunction would prevent 10X from selling any of its current products. (D.I. 524 at 14). 10X thus argues that an injunction would devastate the company, possibly causing it to go out of business. It is clear, however, that 10X has been pursuing a design-around for some time. At the September 5, 2018 discovery conference, 10X's counsel represented that the components of the new design were complete but the "full commercialized product" was not. (D.I. 365 at 20:25-21:11). In January 2019, 10X's Dr. Schnall-Levin testified that 10X intended to have its redesign on sale in April 2019 and that 10X was "confident that the chip will work as well" as the existing product. (D.I. 537, Ex. 4 at 19:19-22, 25:17-25). His only caveat about an April launch was that 10X might not have "all the training materials" and "quite as much rigor around having naive users try [the product] out." (*Id.* at 25:25-26:7). Thus, it now being July 2019, I would expect 10X to be nearly ready, if not ready, to bring its design-around to market.

On the other hand, Bio-Rad is undoubtedly a much larger operation.  Bio-Rad is a

multibillion-dollar company with over 9,000 products.  (D.I. 524 at 14 (citing Bio-Rad 10-Q at

29)).  Bio-Rad's ddSEQ product accounted for only 0.2% of its $2 billion in sales in 2017.  (*Id.*

(citing D.I. 398, Ex. Z at J-2)).  Those revenues, however, are greatly outstripped by Bio-Rad's

investments in its droplet business.  Ms. Tumolo testified that Bio-Rad has spent over half a

billion dollars to develop its droplet products, including acquisitions and $20 to $25 million a

year on research and development.  Tr. at 121:6-22, 125:23-126:5.

"[O]ne who elects to build a business on a product found to infringe cannot be heard to

complain if an injunction against continuing infringement destroys the business so elected."

*Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 (Fed. Cir. 1986).  The fact that 10X has

gained commercial success from its infringing products and thus risks losing that success does

not shield 10X from injunctive relief.  *See i4i*, 598 F.3d at 863 (finding the defendant "not

entitled to continue infringing simply because it successfully exploited its infringement");

*Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (same).  Regardless,

given that 10X has a design-around that is complete or very close to complete, I do not think

10X is likely to be "devastated" if enjoined from selling its existing products.  On the other hand,

although Bio-Rad's ddSEQ currently accounts for only a fraction of Bio-Rad's revenues, Bio-

Rad has invested substantial resources in developing its droplet business.  Therefore, I find the

balance of hardships weighs in favor of granting injunctive relief, or, at minimum, is neutral.

**D.  Public Interest**

It is generally in the public interest to uphold patent rights.  *Broadcom*, 543 F.3d at 704

(citing *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995)).  However, "[i]f a

patentee's failure to practice a patented invention frustrates an important public need for the

8

invention, a court need not enjoin infringement of the patent.  Accordingly, courts have in rare instances exercised their discretion to deny injunctive relief in order to protect the public interest." *Rite-Hite*, 56 F.3d at 1547 (internal citations omitted).

10X's main argument is that its customers, many of whom are in the middle of long-term studies, would lose valuable data and funding if forced to stop using their 10X systems and switch to new systems mid-study.  (D.I. 524 at 15-17); *see also* D.I. 522, Ex. 1.  That argument would be compelling if it were true.  Plaintiffs have made clear that 10X's current customers will not be enjoined from using their installed systems so long as 10X pays the appropriate damages.  (D.I. 536 at 1, 8-9).  "By excluding users who purchased or licensed infringing [10X] products before the injunction's effective date, the injunction greatly minimizes adverse effects on the public." *See i4i*, 598 F.3d at 863 (upholding the district court's finding that the public interest favored injunctive relief).  To extent that the public may be harmed because there are no current alternatives to 10X's products, both 10X and Bio-Rad have indicated that they will be releasing new products soon.  As discussed, 10X's design-around is largely complete and expected to work as well as its existing products. *See supra* Section II.C.  Bio-Rad has also asserted that it expects to release a new system this year "to leap-frog 10X in performance."  (D.I. 513 at 8).  Therefore, I find the public interest weighs in favor of granting injunctive relief.

### E.  Scope of the Permanent Injunction

#### 1.  Enjoined Products and Notice of Injunction

Plaintiffs request that 10X be enjoined from making, selling, offering to sell, using and importing the accused products and "those no more than colorably different," and from otherwise infringing the '083, '193, and '407 patents. (D.I. 513 at 12 & Ex. A).  As discussed, Plaintiffs agree that 10X may continue to sell consumables, at a 15% royalty, for use with already sold

systems. (D.I. 536 at 9). Plaintiffs also include a notice provision requiring 10X to provide a copy of the injunction to all affiliates, including customers and "any company to which 10X intends in the future to directly or indirectly sell" the enjoined products. (D.I. 513, Ex. A § III).

10X asserts that Plaintiffs' proposed injunction is overbroad. First, 10X argues that its existing instruments and reagents, when combined with its new redesigned chips, will not infringe the asserted patents. Therefore, 10X should not be enjoined from making, using, or selling its existing instruments and reagents for use with the new chips. (D.I. 524 at 17-18). 10X essentially asks the Court to find that its new redesigned product does not infringe the asserted patents. An injunction has satisfactory scope if it prohibits infringement by the accused products and those that are not "colorably different." *United Constr. Prod., Inc. v. Tile Tech, Inc.*, 843 F.3d 1363, 1371 (Fed. Cir. 2016) (discussing Federal Rule of Civil Procedure 65(d)). Whether 10X's new product is "colorably different" is a separate legal issue that has yet to be addressed and which may never need to be addressed.

Second, 10X argues that it should be able to sell its products that do not compete against Bio-Rad's ddSEQ product. (D.I. 524 at 18). I do not think that is an appropriate distinction for purposes of the injunction. The parties are competitors in the droplet market, *see supra* Section II.A, and each of 10X's accused products uses the same infringing droplet system.

Third, 10X argues that Bio-Rad's notice provision is unduly burdensome and unnecessary. 10X argues that it should not be required to give notice to "its thousand customers" and companies to which it intends to sell enjoined products, because customers will not be able to practice the asserted patents once 10X stops selling its consumables (reagents and chips). (D.I. 524 at 18). 10X will not be enjoined, however, from continuing to sell consumables to customers with existing systems. Given that 10X almost certainly maintains customer lists, I do

10

not think it will be unduly burdensome for 10X to make reasonable efforts to provide its existing

customers with notice. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2008

WL 5210843, at *2 (D. Del. Dec. 12, 2008) (upholding the notice provision of a permanent

injunction). However, I do not see why 10X should be required to provide notice to customers to

which it "intends in the future" to sell the accused products. 10X will be enjoined from making

any sales to new customers regardless of whether 10X had intended to make those sales or not.

### 2. Start Date

10X requests that if an injunction is entered, it be stayed pending appeal. (D.I. 524 at 19-

20). Four factors guide the stay analysis: "(1) whether the stay applicant has made a strong

showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably

injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties

interested in the proceeding; and (4) where the public interest lies." *Standard Havens Prod., Inc.

v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990) (quoting *Hilton v. Braunskill*, 481

U.S. 770, 776 (1987)). As discussed, Plaintiffs have shown that they will be irreparably injured

absent an injunction and that the public interest lies in their favor. *See supra* Sections II.A, II.D.

10X argues that it is likely to succeed on the merits on appeal. (D.I. 524 at 19-20). I disagree.

10X merely repeats two arguments from its Rule 50(b) motion for judgment as a matter of law.

(D.I. 510 at 1-9). I addressed those arguments in my opinion denying 10X's motion. (D.I. 559

at 7-10, 13-15).[3] Therefore, I find the factors weigh against a stay.

At minimum, 10X requests a nine-month sunset period to allow it to finish its design-

around and for researchers to complete their ongoing experiments and transition to the new

system. (D.I. 524 at 20-22). Again, because customers with existing systems will be allowed to

---

[3] Although 10X raises a reasonable argument under the doctrine of equivalents, *see infra* p. 17, I do not think it has made a "strong showing" of likely success on appeal.

continue to use those systems, the injunction does not need to account for ongoing experiments. As for the design-around, 10X stated in September 2018 that the design was complete, and in January 2019 that it intended for the new product to be on sale in April 2019.  It is now July 2019.  It would follow that 10X is ready, or nearly ready, to sell its design-around.  *See supra* Section II.C.  To allow 10X an additional nine months would be a windfall.  Therefore, I do not think a sunset period is warranted.

Thus, I will deny the request for stay pending appeal.  However, I will delay the effective date of the permanent injunction by two weeks from its entry in order to give the Court of Appeals an opportunity to consider any expedited appeal relating to the denial of the stay.

## III.   ATTORNEYS' FEES AND ENHANCED DAMAGES

### A.  Attorneys' Fees

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  In assessing the totality of the circumstances, the Court may consider "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.* at 554 n.6.  The party seeking fees must show that a case is exceptional by a preponderance of the evidence.  *Id.* at 557-58.

12

Plaintiffs argue that this is an exceptional case because 10X willfully infringed, had unusually weak defenses, and engaged in substantial litigation misconduct. (D.I. 513 at 13-22). For the following reasons, I do not find this case to be exceptional.

### 1. Willful Infringement

Plaintiffs argue that the jury's willfulness finding favors awarding fees, particularly given 10X's "contrived and baseless" attempts to rebut willfulness. (D.I. 513 at 13-14).

Although willfulness is a factor relevant to an exceptional case determination, it is not dispositive. *See Octane Fitness*, 572 U.S. at 554 ("[T]here is no precise rule or formula for making [exceptional case] determinations, but instead equitable discretion should be exercised") (internal citation and quotation marks omitted); *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1307 (Fed. Cir. 2018) (citing case law from 1986 requiring "an explanation of why the case was not exceptional in the face of an express finding of willful infringement").

Plaintiffs focus on testimony from Dr. Ness, co-founder and former Chief Technology Officer of 10X, which 10X presented as part of its rebuttal to willfulness. (D.I. 513 at 13-14). Dr. Ness initially stated that he formed the personal view that 10X's products, because of their high number of partitions, did not infringe the asserted patents. Tr. at 930:8-18. He later admitted that he did not have any belief as to whether the products infringed while at 10X. *Id.* at 934:22-935:5. Therefore, he could not testify as to 10X's state of mind to rebut Plaintiffs' allegation of willful infringement. Dr. Ness's testimony does not support awarding fees. At most, Plaintiffs have shown that the testimony was irrelevant to willfulness, an issue for which Plaintiffs bore the burden of proof. That does not make this an exceptional case.

### 2. Strength of Defenses

Plaintiffs assert that 10X relied on unsupportable invalidity and non-infringement defenses. Plaintiffs take a "kitchen sink" approach, arguing that none of the following invalidity theories were viable: (1) the '193 and '407 patents are anticipated by, or obvious in view of, the Quake reference, (2) the '193 and '407 patents are not enabled, and (3) the '083 patent is indefinite. Plaintiffs, however, did not move for summary judgment on any of 10X's invalidity positions presented at trial, which suggests that Plaintiffs did not always view those positions as frivolous. (D.I. 524 at 13); *see also Stragent, LLC v. Intel Corp.*, 2014 WL 6756304, at *5 (E.D. Tex. Aug. 6, 2014). Plaintiffs further assert that 10X did not have any legally cognizable non-infringement theories. I do not think Plaintiffs have shown that 10X's theories were frivolous, unreasonable, or brought in bad faith.

First, Plaintiffs address 10X's theory that the '193 and '407 patents are invalid in view of the Quake reference. Plaintiffs assert that the same theory was previously rejected by the Patent Office, which declined to institute an IPR on either patent and upheld the validity of both on *ex parte* reexamination. (D.I. 513 at 15; D.I. 26 at 2; D.I. 378). Although the Patent Office did consider invalidity arguments based on Quake, 10X asserts that its theories at trial relied on Quake in combination with other references not considered by the Patent Office. (D.I. 524 at 23). It was not unreasonable for 10X to argue invalidity based on those different combinations.

Plaintiffs also argue that 10X's expert, Dr. Chang, presented "half-baked" invalidity arguments and made no effort to show reasonable expectation of success in combining the prior art references. (D.I. 513 at 15). I disagree. Dr. Chang provided reasonable explanations for his theories and gave testimony relating to reasonable expectation of success. Tr. at 968:20-1017:8; *id.* at 983:20-984:14, 998:6-23, 999:1-20.

14

Second, Plaintiffs address 10X's argument that Dr. Ismagilov, an inventor of the asserted patents, copied portions of those patents from Quake. (D.I. 513 at 15-16). The Court allowed 10X to proceed with its copying theory for the limited purpose of impeaching Dr. Ismagilov's credibility as witness. (D.I. 429). Plaintiffs argue that 10X blatantly ignored the Court's order and attempted to use the copying as direct evidence of invalidity. During openings, 10X stated that the language in the asserted patents was "copied essentially verbatim" from Quake. Tr. 99:24-101:23. 10X failed to mention that the copying only related to Dr. Ismagilov's credibility, despite representing that it would be "very explicit." *Id.* at 7:20-24, 108:20-24. While questioning Dr. Ismagilov, however, 10X did make clear that it was addressing "the issue of credibility." *Id.* at 306:18-327:3, 328:6-330:4. The Court also followed 10X's questioning with a limiting instruction. *Id.* at 327:4-328:5 ("[A]ll this testimony has been for a very limited purpose and it has only to do with . . . evaluating Professor Ismagilov's credibility in his testimony."). Therefore, although close, I do not think 10X crossed the line with respect to its copying theory.

Third, Plaintiffs address 10X's enablement and indefiniteness theories. (D.I. 513 at 16-17). 10X argued that the '193 and '407 patents are not enabled because they fail to teach reactions outside the microfluidic chip and the necessary surfactants, and that the '083 patent is indefinite because the claimed surface tension relationship is impossible to measure. Plaintiffs rely on select citations from the trial record to argue that 10X's positions were frivolous or unreasonable. (D.I. 513 at 16-17). I do not find Plaintiffs' arguments persuasive. Regarding enablement, Plaintiffs also imply that 10X acted in bad faith by presenting evidence that the claimed inventions required "bushy" surfactants. (*Id.* at 16). Plaintiffs assert that the "bushy" language was not presented during discovery and that 10X used new images at trial depicting its

15

surfactants as "bushier" than in internal documents prepared before litigation. (D.I. 513 at 16). Plaintiffs do not argue that 10X failed to disclose their legal theory of lack of enablement of the necessary surfactants. (*Id.* at 16-17). I do not think the use of the term "bushy" and related demonstratives at trial indicates bad faith.

Fourth, Plaintiffs argue that 10X had no non-infringement defenses. (D.I. 513 at 17-18). 10X presented non-infringement arguments for every accused product and asserted patent. Tr. at 1526:24-1536:7.[4] Regardless, if true, the fact that 10X did not have a non-infringement theory for each of the twelve pairings between asserted patents and accused products does not make this an exceptional case.[5] 10X's primary defense was invalidity.

The theories that 10X did present were not unreasonable. I denied summary judgment of infringement of the '407 patent because there was a material dispute of fact as to "whether the thermal cycler is part of the 'microfluidic system.'" (D.I. 351 at 4). I reiterated that finding in my *Daubert* opinion (D.I. 361 at 5), and later denied Plaintiffs' Rule 50(a) motion, Tr. at 1338:6-24. I do not think an argument that survived multiple challenges should be considered meritless.

For the '193 patent, 10X argued that the Chromium Genome/Exome product did not meet the "autocatalytic reaction" limitation because the Landlord reaction was not "autocatalytic." Tr. at 1120:25-1121:3; (D.I. 510 at 9-10). Despite having found that 10X relied on an incorrect reading of my claim construction, I do not think 10X's view was unreasonable. (D.I. 559 at 12-13).

---

[4] Plaintiffs assert, without citation, that 10X had no defense for infringement of the '193 patent by the GemCode Long Read product. (D.I. 513 at 18). That does not appear to be true. *See* Tr. at 1533:2-1534:12 (arguing the accused products do not meet the microfluidic system limitation in the '193 patent).

[5] Six products were accused of infringing the '083 patent, two products were accused of infringing the '193 patent, and four products were accused of infringing the '407 patent. (D.I. 476).

For the '083 patent, 10X applied its indefiniteness theory to argue that the accused products did not meet the claimed surface tension relationship because that relationship could not be measured. Although I disagree, I do not think that argument was unreasonable. (*See* D.I. 559 at 10-11, 27). 10X also argued that the products with Kynar did not meet the "non-fluorinated microchannel" limitation. That theory, at least regarding literal infringement, clearly had merit as the jury found no literal infringement. (D.I. 476 at 3). Further, although 10X lost under the doctrine of equivalents, I noted on several occasions that 10X had raised legitimate concerns regarding vitiation of the "non-fluorinated" limitation. Tr. at 379:3-8, 438:1-11; (D.I. 559 at 7-10).

### 3. Litigation Misconduct

"[L]itigation misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285." *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1366 (Fed. Cir. 2013). "[M]any forms of misconduct can support a district court's exceptional case finding, including . . . litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit; or willful infringement." *Id.* Plaintiffs argue that 10X engaged in a pattern of misconduct including, violation of the protective order, pursuit of "baseless positions," and misrepresentations during trial. (D.I. 513 at 18-22).

It is undisputed that 10X violated the protective order. (D.I. 524 at 26). I already addressed the issue and determined that the violation was not done in bad faith. (D.I. 350 at 33:24-34:11).[6]

---

[6] Plaintiffs make much of the fact that at the hearing over four months before trial, 10X represented that the violating attorney played a key role in its damages case. (D.I. 350 at 20:24-21:9). As Plaintiffs note, that attorney did not visibly participate in the trial. What Plaintiffs do not mention is that 10X switched lead trial counsel between the hearing and the trial. Regardless, 10X asserts that the attorney remained involved in preparing damages arguments. (D.I. 524 at 26).

17

As for the "baseless positions," Plaintiffs cite to several instances where the Court ruled against 10X. (D.I. 513 at 21). I do not think those instances rise to the level of litigation misconduct. Both parties, in the name of zealous advocacy, made innumerable arguments over the course of this litigation, some which were undoubtedly weak. The fact that Plaintiffs were able to identify a handful of 10X's weaker arguments does not show that 10X engaged in a pattern of misconduct.

Lastly, Plaintiffs point to several statements made by 10X's counsel during trial that allegedly mispresented key facts. (D.I. 513 at 21-22). Only two statements, both during closing, could possibly be significant—(1) "there's evidence in the record specifically from PTX 333 at Page 66 that the [10X] chips come in from Germany," Tr. at 1532:4-6, and (2) "Quake expressly says the fluids used in the invention may contain additive or surfactants such as fluorinated oil," *id.* at 1541:3-6.

I already addressed the Germany statement at length. *Id.* at 1572:2-1587:20. Plaintiffs argue that page 66 of PTX 333 was not discussed at trial or in evidence and was excluded by the Court's order on motions *in limine*. (D.I. 513 at 21). PTX 333 appears to be a document from other unrelated actions, which was likely within the scope of my order granting Plaintiffs' motion *in limine* to exclude reference to those actions. Tr. at 1577:2-10, 1587:16-18; (D.I. 371 at 1). However, there seemed to be a great deal of confusion over whether page 66 specifically had been admitted into evidence and I determined that neither party had acted improperly. Tr. at 1572:2-1587:20.

Regarding the Quake statement, Plaintiffs argue that 10X mischaracterized the evidence because Quake never uses fluorinated oil as a carrier fluid, "which is a crucial distinction from the invention." (D.I. 513 at 21). 10X's expert, Dr. Chang, testified that Quake "mentions

18

fluorinated oil," but does not disclose its use as a carrier fluid.  He opined, however, that it would have been obvious to a person of ordinary skill in the art to use it as a carrier fluid.  Tr. at 981:12-18.  I do not think 10X's statements in closing are inconsistent with the testimony from Dr. Chang or an intentional misrepresentation of the record.

Therefore, considering the totality of the circumstances, Plaintiffs have failed to meet their burden of showing that this is an exceptional case warranting attorneys' fees.

## B.  Enhanced Damages

"[T]he court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.  Section 284 "provid[es] that punitive or increased damages could be recovered in a case of willful or bad-faith infringement."  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1930 (2016) (quotation marks omitted).  "The *Halo* test merely requires the district court to consider the particular circumstances of the case to determine whether it is egregious." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017).

Although not required, the court may consider the *Read* factors as part of its analysis. *Presidio*, 875 F.3d at 1382 (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992)).  The *Read* factors include: (1) whether the infringer deliberately copied the ideas or design of another, (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct.  970 F.2d at 827.

Plaintiffs do not address *Read* factors one or nine. (*See* D.I. 513 at 23). For factor one, 10X argues that testimony from Drs. Ness and Hindson[7] shows that 10X did not rely on the asserted patents to develop its products. (D.I. 524 at 28). In view of the jury's willful infringement verdict, which I upheld on JMOL, it is not clear to what extent 10X considered the asserted patents while developing its accused products. (*See* D.I. 559 at 22). However, it is clear that Plaintiffs have not identified any evidence of copying. For factor nine, it is undisputed that the accused products were freely available for purchase. (*Id.*). Thus, I find both factors one and nine weigh against enhanced damages.

For *Read* factor two, Plaintiffs argue that the jury found willful infringement and that 10X had no good-faith belief of non-infringement. (D.I. 513 at 23). I agree that, in view of the willful infringement verdict, 10X did not have a good-faith belief of non-infringement. (*See* D.I. 559 at 22). Thus, I find factor two weighs in favor of enhanced damages.

For *Read* factor three, Plaintiffs argue that 10X engaged in extensive litigation misconduct. (D.I. 513 at 23). As discussed, I do not think 10X's behavior rose to the level of misconduct. *See supra* Section III.A.3. Thus, I find factor three weighs against enhanced damages.

For *Read* factor four, Plaintiffs argue that 10X is the market leader and has made significant revenues from its infringing products. (D.I. 513 at 23). 10X admits that it has made tens of millions of dollars in yearly revenue but asserts that it has yet to turn a profit. (D.I. 524 at 29 (citing D.I. 246, Ex. 10 at C-1 (10X quarterly financials from 2015-2017))). Thus, I find factor four is neutral.

---

[7] Dr. Hindson is co-founder and Chief Scientific Officer of 10X. (D.I. 559 at 18).

For *Read* factor five, Plaintiffs argue that 10X presented weak defenses and that the jury quickly ruled in their favor.[7]  (D.I. 513 at 23).  As discussed, I do not think 10X's defenses were so weak as to be meritless.  *See supra* Section III.A.2.  In fact, the jury found in 10X's favor on literal infringement of the '083 patent for the products with Kynar.  *Id.*  Thus, I find factor five weighs against enhanced damages.

For *Read* factor six, Plaintiffs again argue that 10X engaged in litigation misconduct, which persisted throughout the case.  (D.I. 513 at 23).  Thus, for the same reasons as for factor three, I find factor six weighs against enhanced damages.

For *Read* factor seven, Plaintiffs argue that 10X has taken no post-trial remedial actions. (*Id.*).  It is undisputed that 10X is actively working on a design-around product.  *See supra* Section II.C.  On the other hand, despite 10X's representations, nothing has been launched. Thus, I find factor seven is neutral.

For *Read* factor eight, Plaintiffs argue that the market for droplets is rapidly expanding and has the potential to be worth up to a billion dollars.  (D.I. 513 at 23).  I do not think evidence of market incentives is probative of motivation for harm warranting enhanced damages.  "[T]he fact that the infringer acted pursuant to a financial motive does not distinguish this case from the garden-variety infringement case."  *Idenix Pharm. LLC v. Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 702 (D. Del. 2017), *appeal pending*, No. 18-1691 (Fed. Cir.) (citing *Sprint Commc'ns Co. L.P. v. Time Warner Cable, Inc.*, 2017 WL 978107, at *14 (D. Kan. Mar. 14, 2017)); *see also Nox Med. Ehf v. Natus Neurology Inc.*, 2018 WL 6427686, at *4 (D. Del. Dec. 7, 2018) (finding evidence of "harm incidental to direct business competition" did not show "motivation for harm").  Thus, I find factor eight is neutral.

---

[7] I do not think the length of jury deliberation is a meaningful metric.

On balance, the *Read* factors weigh against enhanced damages.  Plaintiffs essentially repeat the arguments they made under § 285.  Just as those arguments did not persuade me that this case is exceptional, they do not persuade me that the facts of this case are egregious.[8] Therefore, despite the jury's finding of willful infringement, I do not think enhanced damages are warranted.

## IV.    SUPPLEMENTAL DAMAGES AND INTEREST

Plaintiffs seek prejudgment supplemental damages and pre- and post-judgment interest. (D.I. 513 at 23-29).  10X only objects as to the interest rates that should apply.  (D.I. 524 at 30).

The jury's damages award covered 10X sales through July 1, 2018.  (*Id.* at 23).  The supplemental damages account for the sales made from July 1, 2018 through the date of the judgment, November 13, 2018.  (*Id.* at 24).  The supplemental damages shall be calculated based on the jury's implied 15% royalty rate.[9]  (D.I. 513 at 25; D.I. 515 ¶ 11).

Plaintiffs also seek interest on their damages.  Prejudgment interest should be awarded "absent some justification for withholding such an award."  *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983).  The only dispute is over the interest rate and compounding period that should apply.  Plaintiffs argue for the prime rate, compounded quarterly.  (D.I. 513 at 25-28).  10X argues for the 1-year Treasury constant maturity rate, compounded annually.  (D.I. 524 at 30; D.I. 527 ¶ 3).  "A trial court is afforded wide latitude in the selection of interest rates and may award interest at or above the prime rate."  *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991) (citations omitted).  The decision to award compound interest is also within the trial court's discretion.  *Rite-Hite Corp*, 56 F.3d at 1555 ("It has been recognized that

---

[8] I gave the jury a willfulness instruction that did not require any finding of "egregiousness" or the equivalent.  (D.I. 470 at 29).
[9] The jury's lump sum damages award is based on Plaintiffs' proposed 15% rate.  (D.I. 476); Tr. at 611:20-613:2.

22

an award of compound rather than simple interest assures that the patent owner is fully compensated.") (citation and quotation marks omitted).

This Court has noted that "the prime rate best compensate[s] a patentee for lost revenues during the period of infringement because the prime rate represents the cost of borrowing money, which is a better measure of the harm suffered as a result of the loss of the use of money over time." *Finjan Software, Ltd. v. Secure Computing Corp.*, 2009 WL 2524495, at *13 (D. Del. Aug. 18, 2009), *aff'd in part*, *rev'd in part on other grounds*, 626 F.3d 1197 (Fed. Cir. 2010) (citations and quotation marks omitted).  As for the compounding period, the prior license agreements relied on by the parties' experts specify quarterly payments with interest compounded quarterly.  (D.I. 513 at 28).  Therefore, I find prejudgment interest should be calculated based on the prime rate, compounded quarterly.

Post-judgment interest is governed by 28 U.S.C. § 1961.  Section 1961(a) provides, "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."

Accordingly, the Court will award Plaintiffs: (1) prejudgment supplemental damages for the period from July 1 to November 13, 2018, based on a 15% royalty, (2) prejudgment interest at the prime rate, compounded quarterly, and (3) post-judgment interest at the Treasury bill rate as defined in § 1961(a), compounded annually.  The prejudgment interest applies to the total prejudgment damages, including supplemental damages.  The post-judgment interest applies to the total prejudgment damages plus prejudgment interest.

## V.   CONCLUSION

A separate order will be entered.

23

Exhibit 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CAP-XX, LTD.,                    )
                                 )
       Plaintiff,         )
                                 )
                                 )   C.A. No. 18-849 (CFC)
      v.                     )
                                 )
IOXUS, INC.,                     )
                                 )
       Defendant.        )

## ORDER

At Wilmington this __5ᵗʰ__ day of __August__ 2020:

WHEREAS, on June 5, 2018, Plaintiff CAP-XX, Ltd. ("Plaintiff") filed the present action, alleging that Defendant Ioxus, Inc. ("Defendant") infringes U.S. Patent Nos. 6,920,034 and 7,382,600 (see D.I. 1);

WHEREAS, Defendant retained the law firms of Cooley LLP and Morris Nichols Arsht & Tunnell, LLP (collectively "Counsel for Defendant") as counsel in this action, and on July 26, 2018, Defendant answered the Complaint (D.I. 7) and thereafter engaged in discovery after entry of the Scheduling Order;

WHEREAS, on March 13, 2020, the Court granted Counsel for Defendant's motion to withdraw as counsel and ordered Defendant to retain new counsel on or before April 17, 2020 (see D.I. 79) as Defendant is a corporation that cannot appear in this action pro se;

WHEREAS, Defendant failed to retain new counsel and make a subsequent appearance since the Court granted Counsel for Defendant's motion to withdraw;

WHEREAS, on May 8, 2020, Plaintiff filed a motion seeking an entry of default and an order granting Plaintiff a reasonable amount of time after entry of default to provide the Court with the amount of damages to be adjudged in favor of Plaintiff, as well as the supporting evidence (D.I. 80);

WHEREAS, entry of default judgment under Federal Rule of Civil Procedure 55 is a two-step process that first requires entry of default by the Clerk of Court against a party that "has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise" (FED. R. CIV. P. 55(a)), followed by entry of default judgment by the Clerk if Plaintiff's claim is for a sum certain or can be made certain by computation or otherwise by the Court upon application (see FED. R. CIV. P. 55(b)); and

WHEREAS, on May 14, 2020, Plaintiff's motion (D.I. 80) was granted (D.I. 82); the Clerk entered Entry of Default in Appearance Pursuant to Federal Rule Of Civil Procedure 55(a) as to Ioxus, Inc. (D.I. 83); and copies of the Order to Enter Default and Entry of Default were mailed to Defendant's registered agent;

THEREFORE, IT IS HEREBY ORDERED that Plaintiff's Rule 55 Motion for Entry of Default Judgment is GRANTED.  Default Judgment is hereby entered in favor of Plaintiff and against Defendant, the Court:

a. finding that Defendant is liable for infringing the patents-in-suit;

b. awarding Plaintiff compensatory damages in the amount of $1,237,717.37  based on a reasonable royalty under 35 U.S.C. § 284;

c. awarding Plaintiff enhanced damages in the amount of $3,713,152.11 based on the trebling of Plaintiff's actual damages under 35 U.S.C. § 284 for Defendant's willful infringement;

d. finding that this case is "exceptional" and award Plaintiff its attorney fees under 35 U.S.C. § 285;

e. granting Plaintiff leave to submit a motion for attorney fees under Rule 54(d)(2) of the Federal Rules of Civil Procedure within fourteen (14) days of the Court's Entry of Default Judgment.

_____
The Honorable Colm F. Connolly
United States District Judge

6775622

3

Exhibit 8

Trials@uspto.gov                                                        Paper 34
571.272.7822                                              Entered: August 1, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

LG ELECTRONICS, INC., HTC AMERICA, INC., and
LENOVO (UNITED STATES) INC.,
Petitioner,

v.

KONINKLIJKE KPN N.V.,
Patent Owner.
_____

Case IPR2018-00558[1]
Patent 9,014,667 B2
_____

Before KEVIN F. TURNER, JONI Y. CHANG, and
MICHELLE N. WORMMEESTER, *Administrative Patent Judges*.

WORMMEESTER, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

---

[1] Cases IPR2018-01639 and IPR2018-01645 have been joined with this
proceeding.

IPR2018-00558
Patent 9,014,667 B2

## I.  INTRODUCTION

LG Electronics, Inc. filed a Petition requesting *inter partes* review of claims 31, 33, and 35 of U.S. Patent No. 9,014,667 B2 (Ex. 1001, "the '667 patent").  Paper 2 ("Pet.").  Koninklijke KPN N.V. ("Patent Owner") filed a Preliminary Response.  Paper 5.  Pursuant to 35 U.S.C. § 314, we instituted an *inter partes* review of all challenged claims 31, 33, and 35 and all grounds presented in the Petition.  Paper 6 ("Inst. Dec.").  Patent Owner filed a Patent Owner Response (Paper 17, "PO Resp."), and Petitioner filed a Reply (Paper 22, "Pet. Reply").

Following institution, HTC America, Inc. and Lenovo (United States) Inc. timely filed motions for joinder in Cases IPR2018-01639 and IPR2018-01645, respectively, challenging the same claims of the '667 patent on the same grounds on which we instituted review in this proceeding.  *See* Paper 18, 2, 5; Paper 23, 2, 5.  To administer the proceedings more efficiently, we granted both motions, joining Cases IPR2018-01639 and IPR2018-01645 with the instant proceeding.  Paper 18, 6; Paper 23, 6.  For purposes of this Decision, we refer to LG Electronics, Inc., HTC America, Inc., and Lenovo (United States) Inc., jointly, as "Petitioner."

On April 11, 2019, we conducted an oral hearing.  A copy of the transcript (Paper 30, "Tr.") is included in the record.

We have jurisdiction under 35 U.S.C. § 6(b).  For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 31, 33, and 35 of the '667 patent are unpatentable.  This final written decision is issued pursuant to 35 U.S.C. § 318(a).

2

IPR2018-00558
Patent 9,014,667 B2

## II.  BACKGROUND

### A.  Related Proceedings

The parties identify several related district court cases.  Pet. 66; Paper 4, 2–3.  The parties also identify a related petition for *inter partes* review, which the parties represent has been terminated due to a settlement agreement.  Pet. 66; Paper 4, 3.

### B.  The '667 Patent

The '667 patent describes a method for regulating access to a telecommunications network.  Ex. 1001, 1:16–19, 1:38–40.  Figure 1, which is reproduced below, illustrates an example of a telecommunications network according to the '667 patent.  *Id.* at 3:44–46.



**FIG. 1**

In particular, Figure 1 shows packet service telecommunications network 1 along with terminals A, B, C, D, which may access network 1 for data communication.  *Id.* at 3:56–59.  Network 1 includes radio access network 2, which is connected to a mobile core network that comprises serving

3

IPR2018-00558
Patent 9,014,667 B2

controller entity 5, register 6, and gateway 7 and provides access to network 8. *Id.* at 3:60–65. Serving controller entity 5 may be a serving General Packet Radio Service (GPRS) support node (SGSN) that controls the connection between network 1 and the terminals. *Id.* at 3:66–4:2. Register 6 may be a home location register (HLR) that stores a unique identifier associated with the subscription for each terminal, such as the identifier of a SIM that is available in each terminal, as well as the time interval during which access to network 1 will be granted for each terminal. *See id.* at 1:47–49, 4:7, 4:54–59. Gateway 7 may be a GPRS gateway support node (GGSN) providing access to the internet. *Id.* at 4:9–10.

Access to network 1 involves a number of phases, including an attach phase during which authentication steps are taken and a phase during which a packet data protocol (PDP) context is established to carry traffic flows over network 1. *Id.* at 4:13–30.

To illustrate how network 1 operates, Figure 3A is reproduced below.



**FIG. 3A**

IPR2018-00558
Patent 9,014,667 B2

Figure 3A shows a time diagram of a method for using a telecommunications system according to the '667 patent. *Id.* at 3:49–50. In this scenario, the time interval during which access to network 1 will be granted for terminal A is 8–11 pm. *Id.* at 4:60–61, Fig. 2. At step 30, terminal A sends an attach request with its IMSI to SGSN 5 at 7 pm (which is outside the grant access time interval). *Id.* at 5:50–55. SGSN 5 sends the IMSI to HLR 6 to obtain the grant access time interval (i.e., 8–11 pm). *Id.* at 5:63–65. There are different ways in which HLR 6 may send the grant access time interval to SGSN 5. *Id.* at 5:66–67. For example, step 31 involves an authentication check during which an authentication triplet or quintet is exchanged. *Id.* at 6:1–4. HLR 6 may send the grant access time interval to SGSN 5 during the authentication check. *Id.* at 6:2–4. Alternatively, HLR 6 may send the grant access time interval to SGSN 5 during a subsequent location update procedure. *Id.* at 6:5–10. During this procedure, SGSN 5 sends an update location request to HLR 6 at step 32. *Id.* at 6:5–8. At step 33, HLR 6 sends its response to SGSN 5, which may include the grant access time interval if it was not sent during the authentication check. *Id.* at 6:8–10. At step 34, the attach phase is finalized with an attach accept message to terminal A. *Id.* at 6:10–12.

After receiving the attach accept message, terminal A sends an activate PDP context request to SGSN 5 at step 35. *Id.* at 6:13–17. Because SGSN 5 has determined that terminal A's access request was received outside the grant access time interval, however, a PDP context is not established. *Id.* at 6:18–22. This is indicated by the "X" shown at step 36. *Id.* At step 37, SGSN 5 informs terminal A of the denial. *Id.* at 6:22–23.

IPR2018-00558
Patent 9,014,667 B2

SGSN 5 maintains the data of the failed access request so that any subsequent access request from terminal A at a time outside the window 8–11 pm (step 38) may be denied directly (step 39).  *Id.* at 6:34–35, 6:39–41.

## C. Illustrative Claim

Petitioner challenges claims 31, 33, and 35 of the '667 patent.  Each of these claims is independent.  Claim 31 is illustrative of the claims under challenge:

31.  A telecommunications network configured for providing access to a plurality of terminals, each terminal associated with a unique identifier for accessing the telecommunications network, wherein the telecommunications network comprises:

a register configured to store the unique identifier of at least one terminal in combination with identification of at least one associated deny access time interval, the at least one associated deny access time interval being a time period during which telecommunications network access for the terminal is denied;

one or more processors;

memory storing processor instructions that, when executed by the one or more processors, cause the one or more processors to carry out operations including:

an access request operation to receive an access request from the terminal and to receive or determine the unique identifier associated with the terminal;

an access operation to deny access for the terminal if the access request is received within the time period, wherein the telecommunications network is further configured to monitor a network load of the telecommunications network,

wherein the telecommunications network is further configured to adapt the time period depending on the monitored network load, and

IPR2018-00558
Patent 9,014,667 B2

> wherein machine-to-machine applications are executed,
> and wherein the plurality of terminals for the machine-
> to-machine applications are denied access to the
> telecommunications network during peak load time
> intervals, the time period being within peak load time
> intervals.

### D. The Instituted Grounds

Petitioner asserts in its Petition two grounds based on obviousness under 35 U.S.C. § 103. Pet. 22–65. We instituted *inter partes* review of both grounds presented in the Petition. Inst. Dec. 44. The instituted grounds are as follows.

| References | Basis | Claim(s) Challenged |
|---|---|---|
| Obhan,[2] Shatzkamer,[3] and Budka[4] | § 103 | 31 and 33 |
| Obhan, Taniguchi,[5] and Budka | § 103 | 35 |

In support of the instituted grounds, Petitioner proffers a declaration of Craig Bishop (Ex. 1003). With its Response, Patent Owner submits a declaration of Regis Bates (Ex. 2006). The transcripts of the depositions of Mr. Bishop and Mr. Bates are entered in the record as Exhibits 1019[6] and 1020, respectively.

---

[2] Obhan, U.S. Patent No. 6,275,695 B1, issued Aug. 14, 2001 (Ex. 1005).

[3] Shatzkamer, U.S. Publ'n No. 2008/0220740 A1, published Sept. 11, 2008 (Ex. 1006).

[4] Budka, European Publ'n No. EP 1009176 A2, published June 14, 2000 (Ex. 1007).

[5] Taniguchi, U.S. Patent No. 7,505,755 B2, issued Mar. 17, 2009 (Ex. 1008).

[6] The same transcript of the deposition of Mr. Bishop also is entered in the record as Exhibit 2008.

IPR2018-00558
Patent 9,014,667 B2

## III. DISCUSSION

### A. *Claim Construction*

The claim construction standard applicable to this *inter partes* review proceeding is the broadest reasonable interpretation in light of the patent specification. *See* 37 C.F.R. § 42.100(b) (2017); *Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard).[7] Under this standard, claim terms are generally given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

Petitioner provides proposed interpretations of the claim terms "register," "deny access time interval," and "machine-to-machine applications." Pet. 18–21. Patent Owner responds. PO Resp. 22–23. In light of the parties' arguments, we determine that no claim term requires express interpretation to resolve any controversy in this proceeding. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'")

---

[7] The revised claim construction standard for interpreting claims in *inter partes* review proceedings as set forth in the final rule published October 11, 2018, does not apply to this proceeding because the new "rule is effective on November 13, 2018 and applies to all IPR, PGR and CBM petitions filed on or after the effective date." Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (to be codified at 37 C.F.R. pt. 42). The instant Petition was filed on February 1, 2018.

IPR2018-00558
Patent 9,014,667 B2

(quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803
(Fed. Cir. 1999)).

### B. Obviousness over Obhan, Shatzkamer, and Budka

Petitioner argues that claims 31 and 33 of the '667 patent would have
been obvious over Obhan, Shatzkamer, and Budka.  Pet. 22–51.  Patent
Owner traverses this ground.  PO Resp. 23–52.  For the reasons explained
below, we determine that Petitioner has demonstrated by a preponderance of
the evidence that claims 31 and 33 would have been obvious over Obhan,
Shatzkamer, and Budka.

### 1. Obhan

Obhan relates to network resource management.  Ex. 1005, at [57].  In
particular, Obhan describes a spectrum yield management (SYM) system
that manages available spectrum within a wireless communication system.
*Id.*  The SYM system divides a service coverage area into corridors and
monitors the spectrum for each corridor as well as the subscribers in each
corridor.  *Id.* at 2:62–63, 3:1–3.  When the loading within a corridor falls
below a loading threshold, the system sends a service option signal that acts
as a positive incentive for use to subscribers in the underutilized corridor.
*Id.* at 6:28–31.  For example, the signal may apprise some subscribers that
they may make reduced rate calls or complete calls at no cost.  *Id.* at 6:33–
35.  The signal also may instruct machine users, such as vending machines
and billboards, to transfer data during idle times.  *Id.* at 6:36–38.  When the
loading within a corridor exceeds the loading threshold, however, the system
sends a service option signal that is a disincentive for use.  *Id.* at 6:40–43.

IPR2018-00558
Patent 9,014,667 B2

For example, the signal may apprise some subscribers that subsequent use will be billed at a premium.  *Id.* at 6:43–46.

The SYM system also divides subscribers into a plurality of classes that may be treated differently with respect to services provided.  *Id.* at 3:10–12.  The system may provide some classes with reduced rate offerings to increase system usage while increasing customer satisfaction.  *Id.* at 3:13–15.  The system may additionally reserve spectrum within corridors for premium subscribers, precluding access to the reserved spectrum except for members of a particular class.  *Id.* at 3:15–19.  Further, the system may limit access to reduced loading periods for machine users that do not require access at a particular time.  *Id.* at 3:26–31.

In managing spectrum resources, the SYM system uses an admission control block (ACB).  *Id.* at 15:45–59.  The ACB is a memory in the modules that make channel allocation decisions, and the SYM system is responsible for updating the ACB in real-time.  *Id.* at 15:51–55.  Figure 9B, which is reproduced below, illustrates an example of how the SYM system operates using an ACB.

| CORRID. NO. | MINIMUM ACC. CLASS | GOOD TILL | |
|:---:|:---:|:---:|:---|
| | | | ⌐ 950 |
| 1 | 9 | 12:22:24 | ⌐ 952 |
| 2 | 7 | 12:22:00 | ⌐ 954 |
| 3 | 5 | 12:22:00 | ⌐ 956 |

**FIG. 9B**

10

IPR2018-00558
Patent 9,014,667 B2

In particular, Figure 9B illustrates ACB 950 for corridors 1, 2, 3. *Id.* at 16:14–15. For each corridor, the ACB includes an access class indicating the lowest priority class for which the corridor will provide service. *Id.* at 16:15–17. The ACB also includes a time through which the ACB is valid for each corridor. *Id.* at 16:17–19. If the loading within a corridor exceeds a threshold value, the system may update the ACB so that access is limited. *Id.* at 17:31–33, 21:23–28. For example, only a premium class of subscribers may be allowed access to services, time indifferent data calls may be terminated, or some classes may be precluded from accessing services. *Id.* at 17:33–40, 21:28–30. The system also may provide service option signals to subscribers operating within the corridor. *Id.* at 11:41–47.

### 2. *Shatzkamer*

Shatzkamer relates to network security. Ex. 1006 ¶ 1. According to Shatzkamer, it may be determined that a device is misbehaving (e.g., due to a worm or a virus) and creating a security issue while connected to a network. *Id.* ¶¶ 12, 23. To address this, Shatzkamer provides a blacklist that the network system may use to deny service for the device when it attempts to connect. *Id.* ¶ 12. The device may be associated with identification information, such as an international mobile subscriber identity (IMSI), which is a unique number. *Id.* ¶ 15. The system adds this information to the blacklist. *Id.* ¶ 24. The system also may add information on how long the device is to be denied service to the blacklist. *Id.* ¶ 12. Thus, the device is disconnected from the network and denied service if it attempts to reconnect to the network. *Id.*

11

IPR2018-00558
Patent 9,014,667 B2

### 3. Budka

Budka relates to route optimization in General Packet Radio Service (GPRS) networks. Ex. 1007, at [57], ¶ 42. In its discussion of an attach procedure in the context of a conventional GPRS mobile registration, Budka explains that a mobile station initiates the attach procedure by sending to the serving GPRS support node (SGSN) its international mobile subscriber identity (IMSI). *Id.* ¶ 62. Budka further explains that the IMSI is unique to each subscriber. *Id.*

### 4. Analysis

#### a. Petitioner's Arguments

Petitioner presents arguments regarding claims 31 and 33 separately. We address these claims in turn.

##### i. Claim 31

The preamble of claim 31 recites a "telecommunications network configured for providing access to a plurality of terminals." Petitioner identifies Obhan's global standard for mobile communications (GSM) system as a "telecommunications network." Pet. 22 (citing Ex. 1005, 9:16–21). Petitioner also identifies Obhan's subscriber units as "terminals." *Id.* (citing Ex. 1005, 9:45–56). Obhan states that "[t]he wireless communication system provides wireless service within a service coverage area" in which "a plurality of subscriber units" operate. Ex. 1005, 9:45–47. Based on the entire trial record before us, we find that Petitioner has shown sufficiently that Obhan teaches the recited "telecommunications network."

12

IPR2018-00558
Patent 9,014,667 B2

Claim 31 further recites a "register configured to store [a] unique identifier of at least one terminal in combination with identification of at least one associated deny access time interval," where the "deny access time interval" is "a time period during which telecommunications network access for the terminal is denied." That is, claim 31 requires a "register" that stores both a "unique identifier" and a "deny access time interval." For this limitation, Petitioner relies on both Obhan and Shatzkamer.

In particular, Petitioner relies on Obhan for teaching a "register" that stores a "deny access time interval." Petitioner identifies Obhan's admission control block (ACB) as a "register." Pet. 26. Petitioner further directs us to where Obhan teaches that the ACB stores both access class identifiers and a good till time, which Petitioner identifies as a "deny access time interval." *Id.* (citing Ex. 1005, 16:14–19, Fig. 9B). Petitioner contends that an ordinarily skilled artisan "would have recognized that, although the 'good till' time period indicates the time interval during which access for the terminals having access classes equal [to] or above the minimum access class is granted, it equivalently and implicitly indicates the time interval during which access for the terminals having access classes below the minimum access class is denied." *Id.* at 27. Referring to Figure 9B of Obhan, Petitioner further contends that, "[i]n one example, corridor 1 (representing a portion) of a network will deny access to terminals having an access class below access class 9 in a time slot that starts from the time the record was updated and ends at a specific ending time 12:22:24." *Id.* at 26 (citing Ex. 1005, Fig. 9B). As support, Petitioner points us to Obhan's teaching that "access to the base station may be reduced by altering an ACB for the base station," such that "one or more classes may be precluded from

13

IPR2018-00558
Patent 9,014,667 B2

initiating calls from/to the base station." *Id.* at 27 (citing Ex. 1005, 21:22–29); Ex. 1005, 21:22–29; *see also* Ex. 1005, 18:56–59 (teaching in Obhan that "the network infrastructure may simply block [a subscriber unit's] attempted call if the subscriber unit does not have access to the system (as may be determined upon access of an ACB)") (cited by Pet. 27); *id.* at 18:4–11 (teaching in Obhan that the SYM system waits for a triggering event to perform an ACB corridor update, where such triggering event may be the expiration of a periodic timer or notification that the loading has exceeded a threshold value) (cited by Pet. 30). Petitioner also points us to the teaching in the '667 patent that "an equivalent of the grant access time interval includes a deny access time interval identifying a time interval during which an access request for access to the telecommunications network is to be denied." Pet. 28 (citing Ex. 1001, 2:17–20).

According to Petitioner, however, Obhan does not teach a "register" that also stores a "unique identifier." *See id.* at 31 ("Obhan's access class identifiers are not unique."). For this aspect of the limitation, Petitioner relies on Shatzkamer. *Id.* Petitioner identifies Shatzkamer's international mobile subscriber identity (IMSI) as a "unique identifier." *Id.* at 32. Petitioner further directs us to where Shatzkamer teaches checking "to see if the IMSI for mobile node 104 is included" on a blacklist and, if it is so included, "deny[ing] access to network 110." *Id.* (citing Ex. 1006 ¶ 25). Petitioner also directs us to where Shatzkamer teaches that "the period of time for which the device is denied service [may be] included in the blacklist." *Id.* (citing Ex. 1006 ¶ 12). Relying on the declaration testimony of Mr. Bishop, Petitioner contends that an ordinarily skilled artisan would have modified Obhan's system by either replacing Obhan's access class

14

IPR2018-00558
Patent 9,014,667 B2

identifiers with Shatzkamer's IMSIs or including the IMSIs in addition to
Obhan's access class identifiers in order to increase granularity.  *Id.* at 31
(citing Ex. 1003 ¶ 87); *id.* at 33 (citing Ex. 1003 ¶ 91).  Mr. Bishop explains
that increasing granularity "could provide finer and more specific access
control."  Ex. 1003 ¶ 47 (cited by Pet. 13); *see also* Ex. 1009 ¶ 33 ("[T]he
Access Control Class concept in UTRAN cannot be used for fine-grained
Access Control. . . . With such a limited number of Access Control Classes,
it is impossible to build any logic for access control."); *id.* ¶ 63 ("[F]emto
access control database 44 is formatted to list . . . identifications of the user
equipment units which have allowed access status to the respective femto
radio base station. . . . [F]emto access control database 44 is consulted and
used to determine if a candidate user equipment unit attempting to use the
femto radio base station for access to the radio access network is to be given
access.") (cited by Ex. 1003 ¶ 48).

Based on the entire trial record before us, we find that Petitioner has
demonstrated sufficiently that the combination of Obhan and Shatzkamer
teaches the recited "register."  We also find that Petitioner's proffered
reasoning for modifying the teachings of Obhan to include Shatzkamer's
IMSIs, namely, to increase granularity, is sufficient to support the legal
conclusion of obviousness.[8]  *See In re Kahn*, 441 F.3d 977, 988 (Fed. Cir.
2006) ("[T]here must be some articulated reasoning with some rational
underpinning to support the legal conclusion of obviousness.").

---

[8] Although Petitioner discusses increasing granularity in the context of
modifying Obhan to replace the access class identifiers with Shatzkamer's
IMSIs, we find that increasing granularity also supports modifying Obhan to
include Shatzkamer's IMSIs in addition to the access class identifiers.

Claim 31 further recites "one or more processors" as well as a "memory storing processor instructions that, when executed by the one or more processors, cause the one or more processors to carry out operations." For these limitations, Petitioner directs us to where Obhan teaches that its system, which includes a database, "may be implemented by a separate computing device or a plurality of computing devices," each of which "has sufficient computing capacity to perform [] operations." Pet. 34 (citing Ex. 1005, 4:48–57); Ex. 1005, 4:48–57. Petitioner contends that "[i]t was well-known to a [person of ordinary skill in the art] that a computer includes one or more processors and memory storing processor instructions to carry out operations." Pet. 34. As support, Petitioner relies on the declaration testimony of Mr. Bishop. *Id.* (citing Ex. 1003 ¶ 93). Petitioner additionally relies on other references, including Budka, which describes a network system, where "[e]ach network element includes a processor 100 for controlling operations associated therewith, in cooperation with its associated memory 102." *Id.* (citing Ex. 1007 ¶ 57); Ex. 1007 ¶ 57. Based on the entire trial record before us, we find that Petitioner has shown sufficiently that Obhan teaches the recited "processors" and "memory."

Claim 31 further recites an "access request operation to receive an access request from the terminal and to receive or determine the unique identifier associated with the terminal." For this limitation, Petitioner directs us to where Obhan teaches that "the network infrastructure may simply block [a subscriber unit's] attempted call if the subscriber unit does not have access to the system." Pet. 36 (citing Ex. 1005, 18:56–59). Relying on the declaration testimony of Mr. Bishop, Petitioner further contends that "[i]t was well-known to a [person of ordinary skill in the art] that a call

IPR2018-00558
Patent 9,014,667 B2

origination in a GSM network includes receiving an access request and a unique identifier associated with the terminal, such as the IMSI of the terminal." *Id.* (quoting Ex. 1003 ¶ 99). Mr. Bishop supports his testimony with other references including Budka, which states that a mobile station "initiates the attach procedure by sending to the SGSN its International Mobile Subscriber Identity (IMSI) which is unique to each GPRS/GSM subscriber." Ex. 1003 ¶ 99 (citing Ex. 1007 ¶ 62); Ex. 1007 ¶ 62; *see also* Ex. 1010 ¶ 49 ("The mobile station initiates an 'attach' procedure by transmitting an Attach Request message that provides among other things its IMSI (or other suitable identifier) to the SGSN.") (cited by Ex. 1003 ¶ 99). According to Petitioner, an ordinarily skilled artisan "seeking to implement the access control operation in a GSM network in Obhan would have found it obvious, in light of the teaching in Budka regarding the access procedures specified in GSM standards, to receive an access request that includes a unique identifier of the terminal, in order for the terminal to originate a data call." Pet. 38.

We find that the attempted call of Obhan's subscriber unit corresponds to the recited "access request." We also find that Budka's attach procedure (which includes receiving the IMSI) provides details for implementing an attempted call in Obhan. Accordingly, based on the entire trial record before us, we find that Petitioner has established sufficiently that the combination of Obhan and Budka teaches the recited "access request operation." We are additionally persuaded that Petitioner's proffered reasoning for modifying Obhan to incorporate Budka's attach procedure, namely, to provide a way to carry out a call, is sufficient to support the legal conclusion of obviousness.

17

IPR2018-00558
Patent 9,014,667 B2

Claim 31 further recites "an access operation to deny access for the terminal if the access request is received within the time period." For this limitation, Petitioner describes what it alleges to be "[a]n example operation of the access control system of Obhan as modified by Shatzkamer and Budka." Pet. 39. Specifically, Petitioner states:

> For "calls originating" from a terminal in Obhan's GSM network, the terminal sends an access request to the GSM network by implementing Budka's "attach procedure," which involves sending the terminal's International Mobile Subscriber Identity (IMSI) to the GSM network. When Obhan's GSM network receives the access request containing the IMSI, the GSM network accesses the ACB modified by Shatzkamer's teachings using the received IMSI. The modified ACB stores information of time slot during which accesses from a list of terminals are denied, in association with IMSI of the list of terminals. If the IMSI is found in the modified ACB, indicating that the terminal is one of the listed terminals, and if the access request is received within the time slot that is associated with the terminal as stored in the modified ACB, the access request is denied and the call origination is blocked.

*Id.* (internal citations omitted). Petitioner relies on the declaration testimony of Mr. Bishop. *Id.* (citing Ex. 1003 ¶¶ 104–105). Based on the entire trial record before us, we find that Petitioner has shown sufficiently that its proposed combination of Obhan, Shatzkamer, and Budka discussed above teaches the recited "access operation."

Claim 31 further recites that the telecommunications network "monitor[s] a network load of the telecommunications network" and "adapt[s] the time period depending on the monitored network load." For these limitations, Petitioner directs us to where Obhan teaches "collect[ing] real-time and potential loading information for the wireless communication

IPR2018-00558
Patent 9,014,667 B2

system."  *Id.* at 40 (citing Ex. 1005, 15:47–51).[9]  Petitioner also directs us to
where Obhan further teaches that, when the actual loading exceeds a
threshold value, "ACBs may be updated so that access to the base station is
limited."  *Id.* at 41 (citing Ex. 1005, 17:31–33); Ex. 1005, 17:31–33.
Petitioner contends that an ordinarily skilled artisan "would have found it
obvious that updating the ACB based on the current loading includes
updating the 'good till' time period in the ACB, updating the 'minimum
access class,' or updating both."  Pet. 41 (quoting Ex. 1003 ¶ 109).  Here,
Petitioner seems to argue that it would have been obvious to try updating the
good till time in order to reduce the loading.  *See also* Ex. 1003 ¶ 109.
According to Petitioner, "updating of the time period during which access is
denied based on the current network load is a well-known, routine practice
in the art."  Pet. 42–43 (citing Ex. 1008, 4:31–36).

Based on the entire trial record before us, we find that Petitioner has
shown sufficiently that Obhan teaches the recited feature of "monitor[ing] a
network load."  We also are persuaded that an ordinarily skilled artisan
would have had a reason to modify Obhan to provide the recited feature of
"adapt[ing] the time period depending on the monitored network load."
Petitioner's proffered reasoning for modifying Obhan to include updating
the good till time, namely, because it would have been obvious to try, is
sufficient to support the conclusion of obviousness.  *See KSR Int'l Co. v.
Teleflex Inc.*, 550 U.S. 398, 421 ("When there is a design need or market
pressure to solve a problem and there are a finite number of identified,
predictable solutions, a person of ordinary skill has good reason to pursue

---

[9] Petitioner cites Ex. 1005, 15:47–51, but the quoted language appears at
Ex. 1005, at [57].

19

IPR2018-00558
Patent 9,014,667 B2

the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.").

Claim 31 further recites that "machine-to-machine applications are executed."  For this limitation, Petitioner directs us to where Obhan discusses machine users, such as electronic billboards and vending machines.  Pet. 43 (citing Ex. 1005, 7:18–32).  Obhan teaches that an electronic billboard may communicate with a remote computer through a wireless link serviced by the wireless communication system to receive its updates.  Ex. 1005, 7:26–32.  Based on the entire trial record before us, we find that Petitioner has shown sufficiently that Obhan teaches the recited "machine-to-machine applications."

Lastly, claim 31 recites that the "terminals for the machine-to-machine applications are denied access to the telecommunications network during peak load time intervals, the time period being within peak load time intervals."  For this limitation, Petitioner directs us to where Obhan discusses Base Station Transceiving Subsystem (BTS) watermark profiling and provides an annotated version of Figure 15 of Obhan, which is reproduced below.  Pet. 44 (citing Ex. 1005, 16:30–32, 20:64–21:7).

IPR2018-00558
Patent 9,014,667 B2



**FIG. 15**

Figure 15 of Obhan, as annotated by Petitioner (Pet. 44), shows load serviced by a base station throughout a 24-hour period and its relationship to BTS watermarks. *See* Ex. 1005, 20:64–66. Curve 1502 represents actual loading, curve 1504 represents a high BTS watermark profile, and curve 1506 represents a low BTS watermark profile. *Id.* at 20:66–21:5. Petitioner identifies the time interval during which the network loading is at or near the upper BTS watermark (i.e., 7:30 am to 6:00 pm) as a "peak load time interval." Pet. 44 (citing Ex. 1005, 21:22–29). Obhan teaches that "some classes may be precluded access to the base station" when the actual loading passes the high BTS watermark. *Id.* at 45 (citing Ex. 1005, 17:31–40). Petitioner further directs us to where Obhan teaches that, "[i]n the case of a low priority voice user, or a low priority data user (e.g., a vending machine), . . . the network infrastructure may simply block its attempted call if the subscriber unit does not have access to the system (as may be determined upon access of an ACB)." *Id.* at 47 (citing Ex. 1005, 18:51–59); Ex. 1005, 18:51–59; *see also* Ex. 1005, 3:26–31 ("Machine users of the system . . .

21

IPR2018-00558
Patent 9,014,667 B2

may be managed to access the system during reduced loading periods.")
(cited by Pet. 47).  Based on the entire trial record before us, we find that
Petitioner has shown sufficiently that Obhan teaches that "terminals for the
machine-to-machine applications are denied access to the
telecommunications network during peak load time intervals, the time period
being within peak load time intervals."

### ii.   Claim 33

Claim 33 is directed to a "tangible, non-transitory computer-readable
medium" and recites similar limitations as claim 31.  For example, claim 33
recites receiving an access request and a unique identifier from a terminal;
denying the terminal access to a telecommunications network, where the
access request is received within a deny access time interval, which is a time
period during which access for the terminal is denied; monitoring a network
load of the network; adapting the time period based on the monitored
network load; and denying access to the network to one or more terminals
attempting to engage in machine-to-machine applications during peak load
time intervals.  As to these limitations, Petitioner relies on its arguments
discussed above with respect to claim 31.  Pet. 48–51.  For the reasons
given, we find Petitioner's arguments to be persuasive.  *See supra*
Part III.B.4.a.i.

Claim 33 additionally recites "accessing, using the unique identifier,
an identification of at least one associated deny access time interval."  For
this limitation, Petitioner refers to its argument with respect to claim 31
regarding its proposed combination of Obhan and Shatzkamer, which
provides an ACB that stores both good till times and IMSIs.  Pet. 49–50;

22

IPR2018-00558
Patent 9,014,667 B2

Ex. 1005, 16:14–21, Fig. 9B; Ex. 1006 ¶¶ 12, 25.  As discussed above, Petitioner identifies each good till time of Obhan as a "deny access time interval" and each IMSI of Shatzkamer as a "unique identifier."  *See also* Pet. 49–50.  Petitioner further contends that "Obhan in view of Shatzkamer renders obvious that the network device uses 'unique identifier associated with terminals' that are stored in combination with 'identification of at least one associated deny access time interval' to 'access' the 'identification of at least one associated deny access time interval,' and use at least one associated deny access time interval to perform access control by denying access to terminals based on their unique identifiers."  *Id.* at 50.  Based on the entire trial record before us, we find that Petitioner has shown sufficiently that its proposed combination of Obhan and Shatzkamer discussed above teaches the recited "accessing" step.

## b.  *Patent Owner's Arguments*

Patent Owner makes several arguments.  In particular, Patent Owner argues that Petitioner fails to address certain differences between Obhan and the claimed invention.  PO Resp. 23–34.  Patent Owner further argues that the asserted prior art does not teach or suggest "stor[ing] the unique identifier of at least one terminal in combination with identification of at least one associated deny access time interval," and that an ordinarily skilled artisan would not have considered combining Obhan and Shatzkamer to provide this claim limitation.  *Id.* at 34–43.  In addition, Patent Owner argues that the asserted prior art also does not teach or suggest several other claim limitations:  "access operation"; "adapt[ing] the time period depending on the monitored network load"; "accessing, using the unique identifier, an

IPR2018-00558
Patent 9,014,667 B2

identification of at least one associated deny access time interval"; and "denying the terminal access to the telecommunications network responsive to the access request being received within the . . . deny access time interval." *Id.* at 44–52. We address these arguments in turn.

### i. *Differences Between the Prior Art and the Claims*

As Patent Owner points out, the question of obviousness is resolved on the basis of underlying factual determinations, including any differences between the claimed subject matter and the prior art. PO Resp. 23–24 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)). The question, however, is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed. Cir. 1985); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983). That is, "[c]onsideration of differences . . . is but an aid in reaching the ultimate determination of whether the claimed invention *as a whole* would have been obvious." *Stratoflex*, 713 F.2d at 1537. If the claimed subject matter would have been obvious in light of any differences, "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Kahn*, 441 F.3d at 988.

Patent Owner argues that "[t]he Petition's *Graham* analysis is deficient at least because the Petition fails to identify sufficiently the differences between independent claims 31 and 33 of the '667 patent and the asserted prior art references." PO Resp. 24. Patent Owner refers to three asserted differences, two relating to the recited "deny access time interval" and one relating to the recited "unique identifier" of a terminal.

IPR2018-00558
Patent 9,014,667 B2

In particular, Patent Owner contends that Obhan's system "selectively denies or completes a call to a subscriber unit" based on information about the corridor, not the good till time (which Petitioner identifies as the "deny access time interval"). PO Resp. 29. As support, Patent Owner directs us to where Obhan teaches receiving a call for a subscriber unit, identifying the corridor in which the subscriber was last located, and indicating the class supported by the corridor. *Id.* (citing Ex. 1005, 18:30–37). Patent Owner asserts that "[t]he 'good till' time stamp is never consulted." *Id.* According to Patent Owner, Obhan's "'good till' time stamp only indicates when previously obtained subscriber demand information for a corridor has expired" and does "not affect any determination of telecommunications network access for a particular subscriber." *Id.* at 30. Patent Owner relies on the declaration testimony of Mr. Bates that "the 'good till' time stamp identifies when previously obtained subscriber demand information has become stale such that a determination of the current subscriber demand at a location in Obhan's telecommunications network should be performed," that is, it "identifies the time the next scheduled update to the ACB entry will be triggered." *Id.* at 26–27 (citing Ex. 2006 ¶¶ 50, 78).

Patent Owner's contention does not undermine Petitioner's showing that Obhan's good till time teaches the "deny access time interval." Obhan describes "quer[ying] the ACB for the corridor in which the subscriber appears to be located," and explains that a received call is completed if the corridor supports delivery for the class of the subscriber or denied if the corridor does not support delivery to the subscriber. Ex. 1005, 18:32–46. Based on this disclosure, we agree with Patent Owner that Obhan's system relies on information about the corridor to selectively complete or deny a

25

IPR2018-00558
Patent 9,014,667 B2

call.  Yet we do not agree that the good till time stamp is never consulted.
*See* PO Resp. 29.  For instance, Obhan teaches that "the mobile ACB
includes an Access Class, which indicates the lowest priority class for which
the corridor will provide service," and that "ACB 950 also includes a time
stamp for each corridor through which the respective mobile ACB 950 is
valid." Ex. 1005, 16:15–19 (cited by Pet. 26).  According to these teachings,
information on whether the corridor supports delivery for the subscriber's
access class is valid only for a period lasting through the value of the time
stamp (i.e., the good till time).  *See id.* at Fig. 9B.  That is, the validity of
information on whether the corridor supports delivery for a particular access
class depends on the value of the good till time.  We therefore find that
Obhan's system relies on information about the corridor, the class of the
subscriber, as well as the good till time to selectively complete or deny a
call.

Patent Owner further contends that Obhan's good till time is
associated with a corridor, not a terminal or a class of terminals.  PO
Resp. 30–31.  According to Patent Owner, "[i]t appears that the Petitioner is
relying solely on Obhan's example depiction of an ACB having the 'GOOD
TILL' column next to the 'MINIMUM ACC. CLASS' column," but "just
because the 'good till' time stamp and the minimum access class are each
independently related to a corridor, it does not follow that there is an
association between the two." *Id.* at 31.  As discussed above, however,
Obhan teaches that "the mobile ACB includes an Access Class" and "a time
stamp for each corridor through which the respective mobile ACB 950 is
valid." Ex. 1005, 16:15–19.  This teaching conveys an association between
the Access Class and the good till time, where the value of the Access Class

26

IPR2018-00558
Patent 9,014,667 B2

is valid for a period lasting through the value of the good till time.
Accordingly, Patent Owner's contention in this regard also does not
undermine Petitioner's showing that Obhan's good till time teaches the
"deny access time interval."

Lastly, referring to Petitioner's proposed substitution of Obhan's
access class identifiers with Shatzkamer's unique terminal identifiers, Patent
Owner contends that the proposed substitution "fails to consider the
hierarchically-ordered nature of Obhan's access class identifiers in
comparison with the unique identifiers of Shatzkamer."  PO Resp. 33 (citing
Pet. 12, 13, 33).  As support, Patent Owner asserts that the hierarchically-
ordered class identifiers "form a prioritized hierarchy that allows Obhan's
ACB to store only a single minimum access class in an entry for each
corridor."  *Id.* (citing Ex. 1005, Fig. 9B).  Relying on the declaration
testimony of Mr. Bates, Patent Owner further asserts that the hierarchically-
ordered classes are levels of service, which are not a property of a terminal
or a specific subscriber, and that "substituting Obhan's Access Classes with
unique identifiers for the terminals is not the same as substituting groups of
terminals with individual terminals as Petitioner proposes."  *Id.* (citing
Ex. 2006 ¶ 21).

We disagree.  Petitioner acknowledges that "Obhan's access class
identifiers are not unique" and additionally relies on Shatzkamer to remedy
this deficiency.  Pet. 31 ("Obhan in view of Shatzkamer renders obvious
replacing Obhan's access class identifiers with unique terminal identifiers
disclosed by Shatzkamer or at least including Shatzkamer's unique terminal
identifiers in addition to Obhan's access class identifiers.").  Petitioner
explains that "Shatzkamer discloses associating terminals with unique

27

IPR2018-00558
Patent 9,014,667 B2

identifiers, and denying terminal access to the network based on the unique identifiers." *Id.* at 32 (citing Ex. 1006 ¶ 25). Petitioner further directs us to where Shatzkamer describes "a list that is used to deny service for the device when it attempts to connect" to the network. *Id.* (quoting Ex. 1006 ¶ 12). We find that Shatzkamer's teachings can be applied in the context of Obhan's system. For example, a list of individual terminals that have been assigned to a particular class may be used to deny service to a listed terminal when the terminal attempts to connect to the network. *See also* Pet. 39 (describing "example operation of the access control system of Obhan as modified by Shatzkamer and Budka").

As discussed above, we are persuaded that Petitioner's proffered reasoning for modifying Obhan's system to include Shatzkamer's unique identifiers (IMSIs), namely, to increase granularity, is sufficient to support the legal conclusion of obviousness. Patent Owner's focus on the ability of Obhan's ACB to "store only a single minimum access class in an entry for each corridor" ignores that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *See KSR*, 550 U.S. at 421. In modifying Obhan's system to include Shatzkamer's IMSIs, a person of ordinary skill in the art would have made any necessary modifications to allow Obhan's ACB to store more than one entry for each corridor. *See* Ex. 1005, 22:29–30 (teaching in Obhan that its invention "is susceptible to various modifications and alternative forms"). Patent Owner's contention therefore does not undermine Petitioner's obviousness argument with respect to the "unique identifier" of a terminal.

IPR2018-00558
Patent 9,014,667 B2

ii.  *"stor[ing] the unique identifier of at least one terminal in combination
with identification of at least one associated deny access time interval"*

This limitation is recited in claim 31.  Patent Owner reiterates that
"Obhan's ACB is configured to store an identification of the next scheduled
determination of subscriber demand and does not store an '*identification of
at least one associated deny access time interval*' to identify '*a time period
during which telecommunications network access for the terminal is
denied*.'"  PO Resp. 35.  As discussed above, however, Petitioner explains
that "although the 'good till' time period indicates the time interval during
which access for the terminals having access classes equal [to] or above the
minimum access class is granted, it equivalently and implicitly indicates the
time interval during which access for the terminals having access classes
below the minimum access class is denied."  Pet. 27.  We find Petitioner's
explanation persuasive.  *See* Ex. 1001, 2:17–20 (teaching in the '667 patent
that "an equivalent of the grant access time interval includes a deny access
time interval identifying a time interval during which an access request for
access to the telecommunications network is to be denied") (cited by
Pet. 28); Ex. 1005, 16:15–19 (teaching in Obhan that "the mobile ACB
includes an Access Class" and "a time stamp for each corridor through
which the respective mobile ACB 950 is valid") (cited by Pet. 26).  Thus,
even if Obhan's good till time identifies the next scheduled determination of
subscriber demand, the good till time nevertheless identifies a time period
during which network access for a terminal with an access class below the
minimum access class is denied.  Accordingly, Patent Owner's argument
fails to undermine Petitioner's showing that Obhan's good till time teaches
the "deny access time interval."

Patent Owner also argues that Petitioner's proposed combination of Obhan and Shatzkamer does not arrive at the claimed invention "because the 'good till' time stamps are only associated with a location (*e.g.*, a corridor or a cell) and not a terminal." PO Resp. 36 (citing Ex. 2006 ¶ 87). According to Patent Owner, "if one were to modify the ACB of Obhan to store IMSIs for one or more terminals instead of a minimum access class, each IMSI would not even have a 'good till' time stamp stored next to it, as each corridor only has a single 'good till' time stamp (*i.e.*, the time at which the previous loading information for that corridor is no longer valid and needs to be determined again)." *Id.* at 38.

We disagree. Obhan teaches that "the mobile ACB includes an Access Class" and "a time stamp for each corridor through which the respective mobile ACB 950 is valid." Ex. 1005, 16:15–19. As discussed above, we find that this teaching conveys an association between the Access Class and the good till time, where the value of the Access Class is valid for a period lasting through the value of the good till time. Modifying Obhan's system to include Shatzkamer's unique identifiers would provide an association between the unique identifiers and the good till time, where the list of terminals (identified by their respective unique identifiers) would be valid for a period lasting through the value of the good till time. For these reasons, Patent Owner's argument does not undermine Petitioner's showing that Obhan's good till time teaches the "deny access time interval."

### iii. *Rationale for Combining Obhan and Shatzkamer*

Patent Owner argues that "one of ordinary skill in the art would not have been motivated to modify Obhan's ACB to store an IMSI of a terminal

IPR2018-00558
Patent 9,014,667 B2

. . . in combination with the 'good till' time stamp[] because the 'good till' time stamp is not associated with any access classes and does not identify 'a *time period during which telecommunications network access for the terminal is denied*.'"  PO Resp. 41–42; *see also id.* at 42 ("[I]f one of skill in the art were adding Shatzkamer's blacklist of IMSIs they would not attempt to associate Shatzkamer's IMSI with Obhan's 'good till' time stamp.").  As discussed above, however, we find that Obhan teaches an association between the Access Class and the good till time, where the value of the Access Class is valid for a period lasting through the value of the good till time.  *See* Ex. 1005, 16:15–19 (teaching in Obhan that "the mobile ACB includes an Access Class" and "a time stamp for each corridor through which the respective mobile ACB 950 is valid").  Moreover, modifying Obhan's system to include Shatzkamer's unique identifiers would provide an association between the unique identifiers and the good till time, where the list of terminals (identified by their respective unique identifiers) would be valid for a period lasting through the value of the good till time.  Accordingly, Patent Owner's argument does not undermine Petitioner's obviousness showing.

Patent Owner further argues that "[t]he Petition fails to establish that one of ordinary skill in the art would have been motivated to combine Obhan . . . and Shatzkamer" because Obhan is "specifically limited to managing wireless spectrum (such as maximizing its usage) by location and class of device," while Shatzkamer is "specifically focused on blacklisting (i.e. denying service to) individual devices due to their detected malicious behavior."  PO Resp. 39.  Patent Owner contends that "Obhan and Shatzkamer are trying to solve disparate problems," as "Obhan is attempting

31

IPR2018-00558
Patent 9,014,667 B2

to mitigate over-utilization or under-utilization of spectrum resources by all subscribers in a particular region, while Shatzkamer is attempting to mitigate a security issue of an individual device having a virus or exhibiting malicious behavior regardless of network traffic and regardless of any particular region." *Id.* at 40–41. Patent Owner also contends that "Obhan and Shatzkamer provide their respective access controls for wholly different functions," as "Shatzkamer teaches use of a blacklist to protect the HLR from malicious terminals, while Obhan envisions managing (i.e., prioritizing) use of the available (wireless) spectrum according to operating goals, based on setting a (minimum) access class indicating the services provided in a cell or corridor." *Id.* at 41.

We disagree with Patent Owner's argument. Although Obhan and Shatzkamer may provide solutions to different problems and may use their access controls for different functions, both references relate to network access regulation within telecommunications network systems. For example, Obhan states that it relates to "managing spectrum in a wireless communication system," which includes a "network infrastructure." Ex. 1005, 1:14–19, 1:23–24. Shatzkamer states that it relates to "networking," where a "device may be placed on a blacklist . . . that is used to deny service for the device when it attempts to connect." Ex. 1006 ¶¶ 1, 12. Moreover, we note that the Patent Office classified both references under the same class number 455. Ex. 1005, at [52]; Ex. 1006, at [52]. Accordingly, we find that Obhan and Shatzkamer are from the same field of endeavor, and that the differences on which Patent Owner focuses would not have prevented an ordinarily skilled artisan from combining the references to solve a problem relating to access regulation in a network system.

32

IPR2018-00558
Patent 9,014,667 B2

Patent Owner additionally argues that "the proposed combination would lose the flexibility and granularity of Obhan's system to provide access to subscribers based on the mobile service requested." PO Resp. 42. According to Patent Owner, "[u]sing Obhan's hierarchically-ordered class of service identifiers, the system of Obhan is able to provide access to prioritized services for all subscribers while still managing the network usage in a corridor by denying access to low priority services." *Id.*

We disagree with Patent Owner's argument. As discussed above, an ordinarily skilled artisan would have understood that Obhan's ACB could be modified to include Shatzkamer's unique identifiers by using a list of individual terminals (identified by their respective unique identifiers) that have been assigned to a particular class (e.g., a low priority service) to deny service to a listed terminal when the terminal attempts to connect to the network. *See* Ex. 1005, 3:10–12 (teaching in Obhan that its system "divides the subscribers into a plurality of classes, each of which is treated differently with respect to services provided") (cited by Pet. Reply 13; PO Resp. 11); Ex. 1006 ¶ 12  (teaching in Shatzkamer that a "device may be placed on a blacklist . . . that is used to deny service for the device when it attempts to connect") (cited by Pet. 32); Pet. 39.  An ordinarily skilled artisan also would have understood that Obhan's system, as modified by Shatzkamer, could therefore continue to provide access to prioritized services while denying access to low priority services.

Moreover, Petitioner proposes modifying Obhan's ACB by either "replacing Obhan's access class identifiers with unique terminal identifiers disclosed by Shatzkamer *or at least including Shatzkamer's unique terminal identifiers in addition to Obhan's access class identifiers*." Pet. 31

33

IPR2018-00558
Patent 9,014,667 B2

(emphasis added).  An ordinarily skilled artisan would have understood that modifying Obhan's ACB to include Shatzkamer's unique terminal identifiers in addition to access class identifiers would allow Obhan's system, as modified by Shatzkamer, to continue to use its hierarchically-ordered class of service identifiers.

Next, Patent Owner directs us to where we stated in our Institution Decision that "modifying Obhan's ACB to include unique terminal identifiers in addition to access class identifiers would allow for increased granularity to provide better network security, while still allowing for Obhan's macro-level access control methodology."  PO Resp. 42 (quoting Inst. Dec. 22).  Patent Owner argues that our statement "is not advocated by the Petitioner or supported by expert testimony."  *Id.*

We disagree.  Petitioner contends that an ordinarily skilled artisan would have modified Obhan's system by either "replacing Obhan's access class identifiers with unique terminal identifiers disclosed by Shatzkamer or at least including Shatzkamer's unique terminal identifiers in addition to Obhan's access class identifiers" in order "to increase granularity."  Pet. 31, 33.  As discussed above, we are persuaded that increasing granularity is a sufficient reason to support the legal conclusion of obviousness.  *See supra* Part III.B.4.a.i.  Indeed, Patent Owner's counsel acknowledged during oral argument that there is a "possible motivation in terms of granularity." Tr. 37:21–22; *see also id.* at 37:12 (stating that "increased granularity, it could be beneficial"), 38:21–39:2 (stating that "in some circumstances, [increased granularity] could be beneficial").  Our statement in the Institution Decision with respect to providing better network security was not meant to be representative of Petitioner's argument; rather, it was meant

34

IPR2018-00558
Patent 9,014,667 B2

to supply our reasoning as to why we were persuaded that increased granularity is a sufficient reason to support the legal conclusion of obviousness. *See* Inst. Dec. 22–23 (addressing Patent Owner's argument that modifying Obhan's system "to include unique identifiers for each entry (instead of the entries specifying a minimum access class per cell or corridor) . . . would add hundreds, if not thousands, of additional entries per corridor," which "would be *needlessly* inefficient and duplicative for purposes of network management," and would "creat[e] a processing and traffic burden on the network due to [more] frequent updates [to the ACB]") (emphasis added). Namely, we found that increased granularity could help provide better network security, based on the cited teachings of Shatzkamer. *Id.* at 22–23 (citing Ex. 1006 ¶ 25); Ex. 1006 ¶ 25 (cited by Pet. 32).

Patent Owner further argues that "incorporating the blacklist of Shatzkamer into Obhan's system to increase granularity to provide better network security would ignore other claim requirements, and would not render the claim as a whole obvious." PO Resp. 43. In particular, Patent Owner contends that "if one attempted to associate a blacklisted IMSI with a 'good till' time period to 'provide better network security,' it would not be obvious '*to adapt the time period depending on the monitored network load*' or that '*the time period [be] within peak load time intervals*,'" as "the Petition provides no evidence or reasoning to show that a [person of ordinary skill in the art] would have considered altering network security based on current network load or during peak load times." *Id.* (internal citation omitted).

We disagree. Patent Owner's focus on associating a blacklisted IMSI with a good till time and on whether an ordinarily skilled artisan would have

35

considered altering network security based on current network load or during peak load times disregards the broader teaching in the prior art of providing increased granularity using unique identifiers. Ultimately, "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference." *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981). "Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art." *Id.* For example, as discussed above, we find that the combined teachings of Obhan and Shatzkamer would have suggested that a list of individual terminals (identified by their respective unique identifiers) that have been assigned to a particular class (e.g., a class below the minimum access class) could be used to deny service to a listed terminal when the terminal attempts to connect to the network. *See* Ex. 1005, 3:10–12 (teaching in Obhan that its system "divides the subscribers into a plurality of classes, each of which is treated differently with respect to services provided") (cited by Pet. Reply 13; PO Resp. 11); Ex. 1006 ¶ 12 (teaching in Shatzkamer that a "device may be placed on a blacklist . . . that is used to deny service for the device when it attempts to connect") (cited by Pet. 32). An ordinarily skilled artisan would have understood that, at the same time, another list of individual terminals that have been assigned to another class (e.g., a class equal to or above the minimum access class) could be used to complete service to a listed terminal. *See* Ex. 1005, 3:10–12; Ex. 1006 ¶ 12. In the latter case, should one of the listed terminals trigger a "security issue," the ordinarily skilled artisan would have further understood that the terminal may be included on still another list so that the terminal would be denied service when attempting to connect to the network. *See* Ex. 1006 ¶ 12. This

IPR2018-00558
Patent 9,014,667 B2

example illustrates a benefit of increased granularity, namely, better network security.  It contemplates associating a unique identifier of a terminal assigned to a class with a good till time, but does not require associating a unique identifier of a "blacklisted" terminal with a good till time.  *See* Tr. 39:6–10 (counsel for Patent Owner stating, "[M]y co-counsel and I may both be in a service class 7, right?  But you know, if I do something bad in the computer system and I get blacklisted, I mean, that's specific to me . . . . [I]t doesn't have to do with time, it doesn't have to do with my access class.").  Accordingly, contrary to Patent Owner's position, we find that combining the teachings of Obhan and Shatzkamer does not necessarily ignore other claim requirements.  Further, in light of what the teachings of Obhan and Shatzkamer would have suggested to an ordinarily skilled artisan, we remain persuaded that increasing granularity provides sufficient rationale for why an ordinarily skilled artisan would have considered modifying Obhan's system to include unique identifiers.  *See* Tr. 39:3–4 (counsel for Patent Owner stating, "[I]increased granularity is extremely beneficial to Shatzkamer, right?  Because this is the blacklist, right?").

> iv.  *"an access operation to deny access for the terminal if the access request is received within the time period"*

Patent Owner argues that Petitioner has not met its burden with respect to this limitation, which is recited in claim 31, because Obhan's mobile switching center "is responsible for performing the access operation and only queries the minimum access class of the specific corridor the terminal is located in to determine whether the corridor supports delivery of the call."  PO Resp. 44.  According to Patent Owner, "[n]owhere does

Obhan disclose or suggest that the 'good till' time stamp is somehow involved in this access determination." *Id.* Patent Owner additionally contends that "whether the access request is received before the 'good till' time stamp could not possibly affect the access operation of Obhan because when the [mobile switching center] queries the ACB it is always before the 'good till' time stamp due to the 'good till' time stamp being reset to a time in the future (likely done on a periodic basis) after the ACB is updated." *Id.* at 45.

In its Reply, Petitioner counters that the claim limitation "only requires a condition, i.e., 'if the access request is received within the time period,' for which access is denied.'" Pet. Reply 18. Petitioner explains that "the 'good till' time identifies a time slot during which access to the telecommunications network is denied," and that "an access request for the terminal having an access class below the minimum access class would be denied **if** the request is received with[in] the time slot identified by the 'good till' time." *Id.* at 18–19. In addition, Petitioner reasons that, "[a]ccording to [Patent Owner], Obhan's system would always satisfy the 'if' condition because the 'good till' time would never expire." *Id.* at 19.

We agree with Petitioner. As discussed above, Obhan teaches that "the mobile ACB includes an Access Class, which indicates the lowest priority class for which the corridor will provide service," and that "ACB 950 also includes a time stamp for each corridor through which the respective mobile ACB 950 is valid." Ex. 1005, 16:15–19. According to these teachings, information on whether the corridor supports delivery for the subscriber's access class is valid only for a period lasting through the value of the time stamp (i.e., the good till time). *See also id.* at Fig. 9B.

IPR2018-00558
Patent 9,014,667 B2

Obhan's system therefore relies on information about the corridor, the class of the subscriber, as well as the good till time to selectively complete or deny a call.  Thus, Obhan's system will deny a call that is made prior to the good till time included in the mobile ACB for a terminal with an access class below the Access Class included in the ACB.

### v.   *"the telecommunications network is further configured to adapt the time period depending on the monitored network load"*

This limitation is recited in claim 31.  Claim 33 similarly recites "adapting the time period depending on the monitored network load." Patent Owner relies on the same arguments for both limitations.  PO Resp. 46–48, 52.  Accordingly, our consideration of Patent Owner's arguments applies to both limitations.

Patent Owner argues that "the Petition does not provide any explanation as to why a [person of ordinary skill in the art] would be motivated to extend the 'good till' time period beyond conclusory assertions."  PO Resp. 47.  Referring to Mr. Bishop's declaration testimony, Patent Owner also argues that "extending the 'good till' (update) time stamp to a time further in the future would only [] delay Obhan's determination of the network loading at a location (*e.g.*, corridor or cell), and thus would be the opposite of Obhan's stated goal of adapting admission control based on network loading."  *Id.* at 46–47 (citing Ex. 1003 ¶ 109).  According to Patent Owner, "Obhan's 'good till' time stamp is used to trigger the determination of subscriber demand in a specific corridor," and "[d]elaying the next triggered determination of the current demand or network load would never

39

IPR2018-00558
Patent 9,014,667 B2

be beneficial as it only increases the chance that admission control is not
properly adapted to the current network conditions." *Id.* at 47.

In response, Petitioner counters that "Obhan discusses adapting the
access control information in [the] ACB based on actual loading information
of the wireless network, and a [person of ordinary skill in the art] would
have found it obvious that updating the ACB based on the current loading
includes updating the 'good till' time period in the ACB based on the current
loading." Pet. Reply 19.

We agree with Petitioner. As discussed above, Obhan teaches
"collect[ing] real-time and potential loading information for the wireless
communication system," and updating ACBs when the actual loading
exceeds a threshold value "so that access to the base station is limited."
Ex. 1005, at [57] (Abstract),[10] 17:31–33 (cited by Pet. 40–41); *see also id.* at
Ex. 1005, 18:5–11 (teaching in Obhan that its "system seeks and receives
potential demand information at base stations" in response to "a triggering
event," such as "the expiration of a periodic timer, notification from a base
station that a BTS watermark has been passed or another event which
initiates an update"). Mr. Bishop testifies in his declaration that:

> A [person of ordinary skill in the art] would have found it
> obvious that updating the ACB based on the current loading
> includes updating the 'good till' time period in the ACB,
> updating the "minimum access class," or updating both. For
> example, when the network loading is high, [Obhan's] system
> can update the ACB by increasing the "minimum access class"
> to reduce the number of terminals accessing the system,

---

[10] Petitioner cites column 15, lines 47 through 51, of Obhan, but the
language cited in the Petition appears in the abstract.

IPR2018-00558
Patent 9,014,667 B2

> increasing the "good till" time period to prolong the access
> restriction period, or increasing both entries.

Ex. 1003 ¶ 109.  As explained above, this reasoning—that it would have
been obvious to try updating the good till time in order to reduce the
loading—is sufficient to support the legal conclusion of obviousness.  *See
supra* Part III.B.4.a.i.  Patent Owner does not proffer adequate evidence to
the contrary.  In Mr. Bishop's example, admission control is adapted to
current network conditions by increasing the minimum access class, the
good till time, or both.  Further, determining network load is not necessarily
delayed because Obhan's system may rely on various triggering events,
including notifications from a base station that the actual loading has
exceeded a threshold value, to initiate an update to the ACB.  Accordingly,
Patent Owner's argument does not undermine Petitioner's obviousness
showing.

*vi.  "accessing, using the unique identifier, an identification of at least one
associated deny access time interval"*

This limitation is recited in claim 33.  Patent Owner argues that
Petitioner fails to meet its burden with respect to this limitation because "the
Petition relies solely on its arguments with respect to claim 31" and
"provides no additional explanation."  PO Resp. 48–49.  According to Patent
Owner, "[t]he Petition does not articulate specific reasoning, based on
evidence of record, to support that the claimed '*accessing*' step is taught or
suggested by the combination of references," or to explain why an ordinarily
skilled artisan would have considered combining the references to arrive at
the claimed invention.  *Id.* at 49–50.  In addition, Patent Owner contends that
modifying the ACB of Obhan to store the IMSI of Shatzkamer in

IPR2018-00558
Patent 9,014,667 B2

combination with the good till time stamp would not provide a system that "access[es] the 'good till' time stamp using the IMSI of a terminal, because the 'good till' time stamp is associated with the corridor or cell, and not any terminal or class of terminals." *Id.* at 49–50.

We disagree. With respect to the "accessing" limitation in claim 33, Petitioner directs us to where Obhan teaches that "the mobile ACB includes an Access Class, which indicates the lowest priority class for which the corridor will provide service," and that "ACB 950 also includes a time stamp for each corridor through which the respective mobile ACB 950 is valid." Pet. 50 (citing Ex. 1005, 16:15–19); Ex. 1005, 16:15–19; *see also* Pet. 26 (citing same with respect to claim 31). As discussed above, these teachings indicate that Obhan's system relies on (accesses) information about the corridor, the class of the subscriber, and the good till time (which Petitioner identifies as a "deny access time interval") to selectively complete or deny a call. *See also* Ex. 1005, Fig. 9B. The teachings also convey an association between the Access Class and the good till time, where the value of the Access Class is valid for a period lasting through the value of the good till time. Petitioner acknowledges that "Obhan's class identifiers are not unique" and contends that it would have been obvious to modify Obhan's system to include Shatzkamer's unique terminal identifiers to "increase granularity." Pet. 31, 33 (discussing claim 31). Modifying Obhan's system to include Shatzkamer's unique identifiers would provide an association between the unique identifiers and the good till time, where the list of terminals (identified by their respective unique identifiers) would be valid for a period lasting through the value of the good till time. For the reasons given above, Petitioner's reasoning for combining Obhan and Shatzkamer

42

(i.e., to increase granularity) is sufficient to support a legal conclusion of obviousness. *See supra* Part III.B.4.a.i. Accordingly, Patent Owner's argument does not undermine Petitioner's obviousness showing.

> vii. *"denying the terminal access to the telecommunications network responsive to the access request being received within the time period defined by the accessed identification of at least one associated deny access time interval"*

This limitation also is recited in claim 33. Patent Owner similarly argues that Petitioner fails to meets its burden for this limitation because "the Petition relies solely on its arguments with respect to claim 31" and "provides no additional explanation." PO Resp. 50–51. In addition, Patent Owner argues that "no element of the system of Obhan considers or queries the 'good till' time while determining whether to deny or grant access." *Id.* at 51; *see also id.* ("Nowhere does Obhan disclose or suggest that the 'good till' time stamp is somehow involved in this access determination."). Patent Owner also reiterates its contention that "whether the access request is received before or after the 'good till' time stamp could not possibly affect the access operation of Obhan[] because when the [mobile switching center] queries the ACB it is always before the 'good till' time stamp due to the 'good till' time stamp being reset to a time in the future (*i.e.*, once the 'good till time is reached)." *Id.* at 51. According to Patent Owner, "the denial of access in Obhan cannot be "*responsive*" to the request being received before or after the 'good till' time stamp because . . . Obhan does not query the 'good till' time stamp, and . . . the access request is always received before the 'good till' time period." *Id.* at 52.

IPR2018-00558
Patent 9,014,667 B2

We disagree.  The limitation in claim 33 requires only that the access request be denied if it is received within the time period during which access is denied.  Petitioner contends that "Obhan discloses an access control system that blocks an attempted call o[f] terminals having access classes below the minimum access class in the time period identified by the 'good till' time period."  Pet. 38–39 (cross-referencing Pet. 25–33 ("Ground 1, claim [31.1]")).  This contention is persuasive.  As discussed above, Obhan teaches that "the mobile ACB includes an Access Class, which indicates the lowest priority class for which the corridor will provide service," and that "ACB 950 also includes a time stamp for each corridor through which the respective mobile ACB 950 is valid."  Ex. 1005, 16:15–19 (cited by Pet. 26).  These teachings indicate that Obhan's system cannot rely on the minimum access class value without considering the good till time value because the good till time value indicates whether the minimum access class value is valid.  Obhan's system relies on information about the corridor, the class of the subscriber, and the good till time (which Petitioner identifies as a "deny access time interval") to selectively complete or deny a call.  *See also id.* at Fig. 9B (cited by Pet. 26).  Thus, Obhan's system will deny a call that is made prior to the good till time included in the mobile ACB for a terminal with an access class below the Access Class included in the ACB, thereby satisfying the claim limitation.  For these reasons, we find that Patent Owner's argument does not undermine Petitioner's obviousness showing.

In view of the foregoing, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 31 and 33 would have been obvious over Obhan, Shatzkamer, and Budka.

44

IPR2018-00558
Patent 9,014,667 B2

### C. Obviousness over Obhan, Taniguchi, and Budka

Petitioner argues that claim 35 of the '667 patent would have been obvious over Obhan, Taniguchi, and Budka. Pet. 51–65. Patent Owner traverses this ground. PO Resp. 53–64. For the reasons explained below, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 35 would have been obvious over Obhan, Taniguchi, and Budka.

We discussed Obhan and Budka above.

### 1. Taniguchi

Taniguchi relates to a data communication restriction method. Ex. 1008, at [57]. According to Taniguchi's method, a network monitors the number of access requests from a user's terminal and the amount of data that the terminal uses for communication during a predetermined period. *Id.* at 4:17–21. When the number of access requests or the amount of data communication exceeds a respective predetermined threshold, the network sets the terminal as a communication restricted object. *Id.* at 3:37–40. If the terminal requests access to the network again, the network sends a communication restriction signal to the terminal. *Id.* at 3:40–42. The communication restriction signal includes communication restriction period information. *Id.* at 3:42–43. The network determines the communication restriction period based on the congestion condition of data communication. *Id.* at 4:32–36. Thus, the terminal will not have access to the network during the communication restriction period, and the load of the network can be reduced. *Id.* at 3:47–51.

45

IPR2018-00558
Patent 9,014,667 B2

### 2. Analysis

#### a. Petitioner's Arguments

Claim 35 is directed to a "terminal for use in a telecommunications network," which "is configured for providing access to a plurality of terminals."  Petitioner identifies Obhan's wireless communication system as a "telecommunications network" and Obhan's subscriber units as "terminals."  Pet. 52 (citing Ex. 1005, 9:45–56).  Obhan states that "[t]he wireless communication system provides wireless service within a service coverage area" in which "a plurality of subscriber units" operate.  Ex. 1005, 9:45–47.  Based on the entire trial record before us, we find that Petitioner has shown sufficiently that Obhan teaches the recited "telecommunications network" and "terminals."

Claim 35 further recites that "each terminal [is] associated with a unique identifier for accessing the telecommunications network."  For this feature, Petitioner relies on Budka.  Pet. 52.  Petitioner directs us to where Budka teaches that a "[mobile station] initiates [an] attach procedure by sending to the SGSN its International Mobile Subscriber Identity (IMSI) which is unique to each GPRS/GSM subscriber."  *Id.* (citing Ex. 1007 ¶ 62).  Petitioner identifies Budka's IMSI as a "unique identifier."  *See id.* Referring to its discussion of Budka with respect claim 31, Petitioner contends that "Obhan in view of Budka also renders obvious associating terminals in [] Obhan's system with unique identifiers for accessing the network in Obhan's system."  *Id.* at 53.  Petitioner explains that an ordinarily skilled artisan "seeking to implement the access control operation in a GSM network in Obhan would have found it obvious, in light of the teaching in Budka regarding the access procedures specified in GSM standards, to

46

include an implementation of receiving an access request that includes a unique identifier of the terminal, in order for the terminal to originate a call." *Id.* at 24–25 (discussing claim 31) (citing Ex. 1003 ¶ 76). Regarding the origination of calls, we note that Obhan teaches that, in some cases, "the network infrastructure may simply block [a subscriber unit's] attempted call if the subscriber unit does not have access to the system." Ex. 1005, 18:55–58.

Based on the entire trial record before us, we find that Petitioner has shown sufficiently that Budka teaches the recited "unique identifier." Further, we find that Budka's attach procedure (which includes receiving the IMSI) provides details for implementing an attempted call in Obhan. Accordingly, we also find that Petitioner's proffered reasoning for modifying Obhan to include Budka's attach procedure, namely, to provide a way to carry out a call, is sufficient to support the legal conclusion of obviousness.

Claim 35 further recites that the terminal has "a message receiver configured for receiving a message from [a] telecommunications network." Petitioner does not identify any element in Obhan as a "message receiver," but directs us to where Obhan teaches that its network "transmits [a] new service option signal to subscriber units . . . operating in [a] corridor, altering accessibility in the corridor and attempting to alter subscriber loading in the corridor." *Id.* at 54 (citing Ex. 1005, 18:20–23). Relying on the declaration testimony of Mr. Bishop, Petitioner contends that an ordinarily skilled artisan "seeking to implement the terminal in Obhan would have found it obvious to include a message receiver in the terminal . . . to receive messages, such as the 'service option signals.'" *Id.* (quoting Ex. 1003

IPR2018-00558
Patent 9,014,667 B2

¶ 135).  Here, Petitioner seems to identify Obhan's service option signal as a "message."  Based on the entire trial record before us, we find that an ordinarily skilled artisan would have had a reason to modify Obhan to include the recited "message receiver."  Petitioner's proffered reasoning for modifying Obhan's subscriber unit to include a message receiver, namely, to provide a way for Obhan's subscriber unit to receive the network's service option signal, is sufficient to support the legal conclusion of obviousness.

Claim 35 further recites that the "message" comprises "information relating to a deny access time interval, the deny access time interval being a time period during which telecommunications network access for the terminal is denied."  For this limitation, Petitioner directs us to where Obhan teaches that, in some cases, "the origination of calls will be controlled by the subscriber unit to preclude call initiation when the subscriber unit does not have access" to the network.  *Id.* (citing Ex. 1005, 18:47–61).  Regarding this teaching, Mr. Bishop testifies:

> A [person of ordinary skill in the art] would have found it obvious that the terminal in Obhan would obtain knowledge of whether it has access to the network at a given time in order for the terminal to "preclude call initiation when the terminal does not have access."  The [person of ordinary skill in the art] seeking to implement the access control method discussed in Obhan to provide such knowledge to the terminal would have found it obvious, in light of [] Obhan's teaching of sending service option signals to the terminal to alter access behaviors of the terminals, to include the information related to [the] time period when the terminal does not have access, i.e., the "good till" time period discussed in Obhan, in the "service option signal" that is sent from the network to the terminal.

Ex. 1003 ¶ 138 (internal citation omitted) (cited by Pet. 55); *see also*

Ex. 1005, 18:20–23 ("system transmits the new service option signal to

IPR2018-00558
Patent 9,014,667 B2

subscriber units . . . operating in the corridor, altering accessibility in the corridor"). For the reasons discussed above with respect to claim 31, we find that Obhan's good till time corresponds to the recited "deny access time interval." *See also* Pet. 26–28. Accordingly, based on the entire trial record before us, we are persuaded that an ordinarily skilled artisan would have had a reason to modify Obhan to provide the recited "message." Petitioner's proffered reasoning for modifying Obhan's service option signal to include good till time information, namely, to provide a way to communicate whether the subscriber unit has access to the network, is sufficient to support the legal conclusion of obviousness.

We note that Petitioner relies alternatively on Taniguchi for teaching the recited "message receiver" as well as the recited "message." Pet. 55–56. In this regard, Petitioner directs us to where Taniguchi teaches that a "mobile terminal compris[es] means for receiving a communication restriction signal including communication restriction period information from a base station," where such information relates to "restrict[ing] or inhibit[ing]" the terminal "from getting access to the external network during the designated communication restriction period." *Id.* at 55 (citing Ex. 1008, 2:56–61); *id.* at 56 (citing Ex. 1008, 3:40–46). Petitioner contends that an ordinarily skilled artisan "seeking to implement the terminal in Obhan's system would have found it obvious to incorporate the teachings of Taniguchi and include means for receiving a communication restriction signal (message receiver) in the terminal in Obhan's system in order for the terminal to receive messages from the network." *Id.* at 55–56. Petitioner additionally contends that, "[b]y including Taniguchi's deny access time interval information in notifications, terminals and the wireless

49

IPR2018-00558
Patent 9,014,667 B2

communication network achieve improved performance because they avoid unnecessary access requests in intervals where those access requests will be denied." *Id.* at 56. Petitioner relies on the declaration testimony of Mr. Bishop. *Id.* at 56–57 (citing Ex. 1003 ¶¶ 140–143).

Based on the entire trial record before us, we find that Petitioner has shown sufficiently that Taniguchi teaches the recited "message receiver" and the recited "message." We also find that Petitioner's proffered reasoning for modifying Obhan to include Taniguchi's means for receiving a communication restriction signal (which includes communication restriction period information), namely, to provide a way for Obhan's subscriber unit to receive messages from the network as well as to improve system performance, is sufficient to support the legal conclusion of obviousness.

Claim 35 further recites that "the time period is adapted by the telecommunications network depending on a monitored network load." For this limitation, Petitioner refers to its argument with respect to similar limitations in claim 31 discussed above and states that "the ACB can be updated in real-time based on the monitored network load, and a [person of ordinary skill in the art] would have found it obvious to adapt the access restriction time period in association with the 'good till' time period based on the current loading of the network." Pet. 59; *see also id.* at 40–43 (discussing claim 31). Petitioner explains that an ordinarily skilled artisan "would have found it obvious that updating the ACB based on the current loading includes updating the 'good till' time period in the ACB, updating the 'minimum access class,' or updating both." Pet. 41 (discussing claim 31) (quoting Ex. 1003 ¶ 109); *see also* Ex. 1005, at [57] (teaching in Obhan that its "system collects real-time and potential loading information

IPR2018-00558
Patent 9,014,667 B2

for the wireless communication system"); *id.* at 17:18–33 ("The low BTS watermark 1010 (and the high BTS watermark 1008) may be considered as loading thresholds . . . . [W]hen the actual loading compares unfavorably to the high BTS watermark 1008, ACBs may be updated so that access to the base station is limited.").

      We find that Obhan's collected loading information corresponds to the recited "monitored network load."  We also find that updating Obhan's good till time corresponds to adapting the recited "time period." Additionally, as explained above (*see supra* Part III.B.4.a.i), we find that Petitioner's proffered reasoning for modifying Obhan to include updating the good till time based on the collected loading information, namely, because it would have been obvious to try in order to reduce loading, is sufficient to support the conclusion of obviousness.  *See KSR*, 550 U.S. at 421.  Thus, we find that an ordinarily skilled artisan would have had a reason to modify Obhan to provide a "time period [that] is adapted by the telecommunications network depending on a monitored network load."

      Petitioner also relies alternatively on Taniguchi for teaching this limitation, directing us to where Taniguchi teaches that its network "determines a communication restriction period . . . in accordance with congestion condition of data communication."  Pet. 59 (citing Ex. 1008, 4:32–36).  Relying on the declaration testimony of Mr. Bishop, Petitioner contends that an ordinarily skilled artisan "would have found it obvious to implement Obhan's updating of the ACB by implementing Taniguchi's [teaching]," which "would have produced predictable results without undue experimentation."  *Id.* at 60 (citing Ex. 1003 ¶ 148).  Mr. Bishop explains

IPR2018-00558
Patent 9,014,667 B2

that "Taniguchi updates the communication restriction period to reduce the load on the network."  Ex. 1003 ¶ 148 (citing Ex. 1008, 3:46–51).

Based on the entire trial record before us, we find that Petitioner has shown sufficiently that Taniguchi teaches "the time period is adapted by the telecommunications network depending on a monitored network load."  We also find that Petitioner's proffered reasoning for modifying Obhan to include Taniguchi's feature of determining a communication restriction period (which we find is analogous to Obhan's good till time) based on data congestion (which we find is analogous to Obhan's collected loading information), namely, to reduce load on the network, is sufficient to support the legal conclusion of obviousness.

Claim 35 further recites that the terminal has "one or more processors" as well as "memory storing processor instructions that, when executed by the one or more processors, cause the one or more processors to carry out operations."  For these limitations, Petitioner directs our attention to Budka, which teaches that its mobile station includes "a processor 100 for controlling operations associated therewith, in cooperation with its associated memory 102."  Pet. 61 (citing Ex. 1007 ¶¶ 42, 57).  Relying on the declaration testimony of Mr. Bishop, Petitioner contends that an ordinarily skilled artisan "seeking to implement a terminal in the GSM network in Obhan, would have found it obvious, in light of the GSM/GPRS teaching in Budka, to include the processor and memory in the terminal to perform the terminal procedures."  *Id.* (citing Ex. 1003 ¶ 151).  We note that Obhan's system, which includes a database, "may be implemented by a separate computing device or a plurality of computing devices," each of which "has sufficient computing capacity to perform the operations required

by [Obhan's] invention." Ex. 1005, 4:48–57. Based on the entire trial record before us, we find that Petitioner has shown sufficiently that Budka teaches the recited "one or more processors" and "memory." We also find that Petitioner's proffered reasoning for modifying Obhan to include Budka's processor and memory, namely, to provide a way for Obhan's subscriber unit to carry out operations, is sufficient to support the legal conclusion of obviousness.

Claim 35 further recites that the "operations" include "an access request operation for transmitting an access request to the telecommunications network in accordance with the deny access time interval." For this limitation, Petitioner directs us to where Obhan discusses origination of calls from a terminal in a GSM network. Pet. 62 (citing Ex. 1005, 18:47–61). Obhan teaches that "the origination of calls will be controlled by the subscriber unit to preclude call initiation when the subscriber unit does not have access" to the network, or "the network infrastructure may simply block [the subscriber unit's] attempted call if the subscriber unit does not have access." Ex. 1005, 18:52–58. Relying on the declaration testimony of Mr. Bishop, Petitioner contends that "[i]t was well-known to a [person of ordinary skill in the art] that a call origination in a GSM network includes transmitting an access request from the terminal to the GSM network." Pet. 62 (quoting Ex. 1003 ¶ 153). Mr. Bishop supports his testimony with other references including Budka, which states that a mobile station "initiates the attach procedure by sending to the SGSN its International Mobile Subscriber Identity (IMSI) which is unique to each GPRS/GSM subscriber." Ex. 1003 ¶¶ 153–154 (citing Ex. 1007 ¶ 62); *see also* Ex. 1010 ¶ 49 ("The mobile station initiates an 'attach' procedure by

IPR2018-00558
Patent 9,014,667 B2

transmitting an Attach Request message . . . to the SGSN.") (cited by
Ex. 1003 ¶ 153).  According to Petitioner, an ordinarily skilled artisan
"seeking to implement the access control operation in a GSM network in
Obhan would have found it obvious to, in light of the teaching in Budka
regarding the access procedures specified in GSM standards, to include an
implementation of transmitting an access request . . . in order for the
terminal to originate a data call."  Pet. 63.

We find that the attempted call of Obhan's subscriber unit
corresponds to the recited "access request."  As discussed above, we also
find that Budka's attach procedure provides details for implementing an
attempted call.  Accordingly, based on the entire trial record before us, we
find that Petitioner has shown sufficiently that its proposed combination of
Obhan and Budka discussed above teaches the recited "access request
operation."  We note again that Petitioner's proffered reasoning for
modifying Obhan to include Budka's attach procedure, namely, to provide a
way to carry out a call, is sufficient to support the legal conclusion of
obviousness.

Lastly, claim 35 recites that "machine-to-machine applications are
executed in the telecommunications network" and that "the terminal[s] for
the machine-to-machine applications are denied access to the
telecommunications network during peak load time intervals, the time period
being within peak load time intervals."  For these limitations, Petitioner
relies on its arguments with respect to similar limitations in claim 31
discussed above, where Petitioner directs our attention to Obhan's teachings
about machine users and BTS watermark profiles.  Pet. 43–47, 64–65.  For
the reasons explained above, we find that Petitioner has shown sufficiently

54

that Obhan teaches the recited limitations in claim 35 relating to "machine-to-machine applications." *See supra* Part III.B.4.a.i.

### b. Patent Owner's Arguments

Patent Owner makes several arguments. In particular, Patent Owner argues that Petitioner fails to address certain differences between Obhan and the claimed invention. PO Resp. 53–54. Patent Owner also argues that an ordinarily skilled artisan would not have considered modifying Obhan or combining Obhan and Taniguchi to provide the recited "terminal compris[ing] a message receiver configured for receiving a message from the telecommunications network." *Id.* at 54–59. In addition, Patent Owner argues that the asserted prior art does not teach or suggest the recited "time period [that] is adapted by the telecommunications network depending on a monitored network load" and the recited "access request operation." *Id.* at 59–64. We address these arguments in turn.

### i. Differences Between the Prior Art and the Claims

Patent Owner argues that "[t]he Petition's *Graham* analysis is deficient at least because the Petition fails to identify sufficiently the differences between independent claim 35 of the '667 patent and the asserted prior art references." PO Resp. 53. In this regard, Patent Owner relies on its arguments discussed above with respect to obviousness over Obhan, Shatzkamer, and Budka. *Id.* at 53–54. For the reasons given, we find that Patent Owner's argument also does not undermine Petitioner's obviousness showing based on Obhan, Taniguchi, and Budka. *See supra* Part III.B.4.b.i.

IPR2018-00558
Patent 9,014,667 B2

### ii. *Rationale for Modifying Obhan*

Patent Owner further argues that Petitioner does not articulate sufficient reasoning for modifying Obhan to provide "a message receiver configured for receiving a message from the telecommunications network, the message comprising information relating to a deny access time interval, the deny access time interval being a time period during which telecommunications network access for the terminal is denied." PO Resp. 54–56.  In particular, Patent Owner argues that "the Petition fails to 'articulate specific reasoning, based on evidence of record, to support [a] legal conclusion' that it would have been obvious 'to include the information related to time period when the terminal does not have access, i.e., the "good till" time period discussed in Obhan, in the "service option signal" that is sent from the network to the terminal.'"  PO Resp. 56; *see* Pet. 55 (Petitioner identifying Obhan's good till time as a "deny access time interval"). According to Patent Owner, "Obhan's 'good till' time stamp is used to trigger the determination of subscriber demand in a specific corridor, and Obhan does not disclose use of the 'good till' time as part of its access control operation."  PO Resp. 55.

We disagree.  As discussed above, Obhan teaches that, in some cases, "the origination of calls will be controlled by the subscriber unit to preclude call initiation when the subscriber unit does not have access" to the network. Ex. 1005, 18:47–61 (cited by Pet. 54).  Petitioner's reasoning for modifying Obhan's service option signal (which Petitioner identifies as a "message") to include good till time information is to provide a way to communicate whether the subscriber unit has access to the network.  *See* Ex. 1003 ¶ 138 (cited by Pet. 55); *see also* Ex. 1005, 18:20–23 (teaching in Obhan that its

IPR2018-00558
Patent 9,014,667 B2

"system transmits the new service option signal to subscriber units . . . operating in the corridor, altering accessibility in the corridor").

Petitioner's reasoning is supported by Obhan's teachings.  For example, as noted above in our analysis regarding obviousness over Obhan, Shatzkamer, and Budka (*see, e.g.*, *supra* Part III.B.4.b.i.), Obhan teaches that "the mobile ACB includes an Access Class, which indicates the lowest priority class for which the corridor will provide service" and "a time stamp for each corridor through which the respective mobile ACB 950 is valid" (Ex. 1005, 16:15–19).  This teaching indicates that the value of the Access Class is valid for a period lasting through the value of the good till time, and that Obhan's system therefore relies on information about the corridor, the class of the subscriber, and the good till time to selectively complete or deny a call.  Accordingly, Patent Owner's argument does not undermine Petitioner's obviousness showing.

Patent Owner further argues that Petitioner's proposed modification of Obhan "would not account for the real-time updates triggered by current network loading."  PO Resp. 55–56.  According to Patent Owner, "the system of Obhan is designed so that real-time updates to the ACB to change the minimum access class may be triggered at any time based on network loading in a specific corridor," such that "the knowledge of the 'good till' time would not even inform a terminal of the next time the ACB will be updated."  *Id.*

We disagree.  Obhan teaches that its system "seeks and receives current demand (real-time) at base stations in the corridor" after a triggering event occurs.  Ex. 1005, 18:12–13 (cited at Pet. 54); *see also id.* at 18:5–11, Fig. 11.  Based on that information, Obhan's system "updates the ACB for

57

IPR2018-00558
Patent 9,014,667 B2

the corridor" and "determines a service option signal" that is sent "to subscriber units operating in the [] corridor, altering accessibility in the corridor and attempting to alter subscriber loading in the corridor." *Id.* at 18:12–23 (cited by Pet. 54). Given this disclosure in Obhan, we find that Petitioner's proposed modification of Obhan does indeed account for real-time updates triggered by current network loading. Specifically, we find that the proposed modified service option signal includes good till time information from the *updated* ACB. As discussed above, the value of the minimum access class is valid for a period lasting through the good till time. *See id.* at Ex. 1005, 16:15–19. Patent Owner's argument therefore does not undermine Petitioner's obviousness showing.

### iii.   Rationale for Combining Obhan and Taniguchi

As discussed above, Petitioner relies alternatively on the combination of Obhan and Taniguchi for the recited "message comprising information relating to a deny access time interval," and contends that it would have been obvious to modify Obhan to include Taniguchi's deny access time interval information to improve system performance. Pet. 55–56. In response, Patent Owner argues that the proposed combination of Obhan and Taniguchi "would not improve the efficiency of Obhan's system because a terminal would not be able to determine whether the terminal would be denied access based on the 'good till' time stamp." PO Resp. 57. As we mentioned above, however, we find that that the value of the minimum access class is valid for a period lasting through the good till time, and that Obhan's system therefore relies on information about the corridor, the class of the subscriber, and the good till time to selectively complete or deny a

IPR2018-00558
Patent 9,014,667 B2

call.  *See* Ex. 1005, 16:15–19.  Accordingly, Patent Owner's argument does
not undermine Petitioner's obviousness showing.

Patent Owner further argues that "a person of ordinary skill in the art
would not have been motivated to combine Obhan . . . and Taniguchi"
because Obhan "focus[es] on managing wireless spectrum (such as
maximizing its usage) by location and service supported on that location,"
while Taniguchi "describes how to monitor data usage of a particular mobile
terminal in order to determine whether that terminal has exceeded a
predetermined threshold (e.g., data threshold, etc.), and, if so, restricting
usage when that terminal makes a future access request."  PO Resp. 57–58.
Patent Owner contends that "Obhan and Taniguchi are fundamentally
different in how each chooses to control access in a network," as "Taniguchi
seeks to limit the amount of data individual subscribers us[e] in a given time
period, whereas Obhan seeks to control network access based on a
hierarchically-ordered prioritization of services to subscribers and current
local network conditions."  *Id.* at 58–59.  Patent Owner adds that "Obhan's
stated goal of adapting access control based on network loading is in
opposition to Taniguchi's enforcing of time based individual data limits."
*Id.* at 59.

We disagree with Patent Owner's argument.  Although Obhan and
Taniguchi may have different goals and may control network access
differently, both references relate to network access regulation within
telecommunications network systems.  For example, Obhan states that it
relates to "managing spectrum in a wireless communication system," which
includes a "network infrastructure."  Ex. 1005, 1:14–19, 1:23–24.  Taniguchi
states that it relates to "data communication restriction method, data

IPR2018-00558
Patent 9,014,667 B2

communication restriction system and mobile terminal." Ex. 1008, 1:9–11. Moreover, we note that the Patent Office classified both references under the same class number 455. Ex. 1005, at [52]; Ex. 1008, at [52]. Accordingly, we find that Obhan and Taniguchi are from the same field of endeavor, and that the differences on which Patent Owner focuses would not have prevented an ordinarily skilled artisan from combining the references to solve a problem relating to access regulation in a network system.

iv. *"the time period is adapted by the telecommunications network depending on a monitored network load"*

As discussed above, Petitioner proposes modifying Obhan, or, alternatively, combining Obhan and Taniguchi, to provide this limitation. Pet. 59–60. With respect to Petitioner's proposed modification of Obhan, Patent Owner argues that "the Petition fails to establish that Obhan teaches [this limitation], or that a [person of ordinary skill in the art] would have found it obvious to modify Obhan to provide [this limitation]." PO Resp. 59–60. Patent Owner directs us to its arguments discussed above regarding a similar limitation recited in claim 31: "the telecommunications network is further configured to adapt the time period depending on the monitored network load." *Id.* (cross-referencing PO Resp. 46–48 ("Section V.B.3")). For the reasons given, we disagree with Patent Owner's arguments. *See supra* Part III.B.4.b.v.

With respect to Petitioner's proposed combination of Obhan and Taniguchi, Patent Owner further argues that "[o]ne of skill in the art would not update Obhan's ACB by implementing Taniguchi's determination of a communication restriction time period because doing so would detract from

60

IPR2018-00558
Patent 9,014,667 B2

Obhan's stated goal of basing access control on current network conditions
instead of on time.  PO Resp. 60.  We disagree.

Although Obhan's system relies on current network conditions for
access control, the system also relies on the good till time for access control.
Ex. 1005, 16:15–19, 18:12–17.  As discussed above, Obhan's teaching that
"the mobile ACB includes an Access Class, which indicates the lowest
priority class for which the corridor will provide service," and a "time stamp
for each corridor through which the respective mobile ACB 950 is valid"
indicates that Obhan's system relies on the corridor, the Access Class, and
the time stamp (i.e., the good till time) to selectively provide or deny service.
*See id.* at 16:15–19, Fig. 9B.  Obhan further teaches updating the ACB based
on information about current network conditions.  *Id.* at 18:12–17 ("[T]he
SYM system seeks and receives current demand (real-time) at base stations
in the corridor.  Based upon the information received, the SYM system
determines service levels that can be provided within the corridor . . . . Next,
the SYM system updates the ACB for the corridor . . . . ").  Patent Owner's
argument therefore does not undermine Petitioner's obviousness showing.

    *v.*  *"an access request operation for transmitting an access request to the*
        *telecommunications network in accordance with the deny access time*
        *interval"*

With respect to this limitation, Patent Owner argues that "knowledge
of the 'good till' time of Obhan, which Petitioner identifies as '*the deny
access time interval*,' would not indicate to a terminal whether the terminal
had access to the system."  PO Resp. 61; *see also id.* at 62 ("Only the
minimum access class of that specific corridor is used to determine whether
the corridor supports delivery of the call.  As such, a terminal in Obhan

61

IPR2018-00558
Patent 9,014,667 B2

would not require knowledge of the 'good till' time to prevent call initiation when the terminal does not have access to the network."). We disagree. As discussed above, Obhan's teaching that "the mobile ACB includes an Access Class, which indicates the lowest priority class for which the corridor will provide service," and a "time stamp for each corridor through which the respective mobile ACB 950 is valid" indicates that Obhan's system relies on the corridor, the Access Class, and the time stamp (i.e., the good till time) to selectively provide or deny service. Ex. 1005, 16:15–19, Fig. 9B. The good till time informs the system about whether the value of the Access Class is valid. Accordingly, Patent Owner's argument does not undermine Petitioner's obviousness showing.

Patent Owner further argues that "it is effectively impossible to be outside of the deny access time interval (*i.e.*, after the 'good till' time stamp) because once the 'good till' time is reached it resets to a time in the future." PO Resp. 63. This is unavailing. As discussed above, Obhan's system relies on the corridor, the Access Class (i.e., minimum access class), and the time stamp (i.e., good till time) to selectively provide or deny service. *See* Ex. 1005, 16:15–19, Fig. 9B. Obhan's system cannot rely on the minimum access class value without considering the good till time value because the good till time value informs the system about whether the minimum access class value is valid. Claim 35 recites "transmitting an access request . . . in accordance with the deny access time interval." This language does not require transmitting an access request based solely on the deny access time interval. That is, the claim does not preclude transmitting an access request based on the deny access time interval and some other parameter.

IPR2018-00558
Patent 9,014,667 B2

Lastly, Patent Owner asserts that "the Petition does not argue that one of skill in the art would be motivated to modify the teachings of Obhan to configure the terminals of Obhan to transmit an access request in accordance with its knowledge of a deny access time interval."  PO Resp. 63.

We disagree.  Petitioner contends that it would have been obvious to modify Obhan to include Budka's attach procedure in order to provide a way to carry out a call.  Pet. 24–25, 53, 63.  Additionally, Obhan describes a subscriber unit that has knowledge of whether it has access to the network, and teaches relying on the good till time to selectively complete or deny a call.  Ex. 1005, 16:15–19 (cited by Pet. 57), 18:48–49 (cited by Pet. 64), Fig. 9B.  According to Petitioner, in order to provide such a subscriber unit it would have been obvious to include in the service option signal that is sent to the subscriber unit information related to the time during which the subscriber unit does not have access to the network (i.e., the good till time).  Pet. 55.  As discussed above, Petitioner's proffered reasoning for modifying Obhan's system is sufficient to support the legal conclusion of obviousness. Accordingly, Patent Owner's argument does not undermine Petitioner's obviousness showing.

We note Patent Owner's argument that "the Petition only analyzes Obhan and Budka, never mentioning or citing to the disclosure of Taniguchi."  PO Resp. 63 (citing Pet. 64).  As discussed above, however, we are persuaded by Petitioner's argument with respect to the recited "access request operation" based on Obhan and Budka.  Patent Owner does not explain why Petitioner's argument is deficient for not citing Taniguchi. Accordingly, Patent Owner's argument is not convincing.

63

IPR2018-00558
Patent 9,014,667 B2

In view of the foregoing, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 35 would have been obvious over Obhan, Taniguchi, and Budka.

## IV. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 31 and 33 of the '667 patent are unpatentable under 35 U.S.C. § 103 as obvious over Obhan, Shatzkamer, and Budka, and that claim 35 is unpatentable under 35 U.S.C. § 103 as obvious over Obhan, Taniguchi, and Budka.

## V. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 31, 33, and 35 of the '667 patent are held *unpatentable*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2018-00558
Patent 9,014,667 B2

PETITIONER:

Joseph Palys
josephpalys@paulhastings.com

Jeremy Monaldo
jjm@fr.com

Jun Li
li@fr.com

Walter Renner
Axf-ptab@fr.com

Naveen Modi
naveenmodi@paulhastings.com


PATENT OWNER:

Lawrence Cogswell
Lawrence.cogswell@hbsr.com

Mark Tredinnick
Mark.tredinnick@hbsr.com

Timothy Meagher
Timothy.meagher@hbsr.com

Exhibit 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| 3G LICENSING, S.A., KONINKLIJKE KPN N.V., and ORANGE S.A., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 17-82-LPS-CJB |
| | : | |
| BLACKBERRY LIMITED and BLACKBERRY CORPORATION, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| 3G LICENSING, S.A., KONINKLIJKE KPN N.V., and ORANGE S.A., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 17-84-LPS-CJB |
| | : | |
| LENOVO GROUP LTD., LENOVO HOLDING CO., INC., LENOVO (UNITED STATES) INC. and MOTOROLA MOBILITY LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| 3G LICENSING, S.A., KONINKLIJKE KPN N.V., and ORANGE S.A., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | C.A. No. 17-85-LPS-CJB |
| | : | |
| LG ELECTRONICS INC., LG ELECTRONICS, U.S.A., INC. and LG ELECTRONICS MOBILECOMM U.S.A., INC., | : | |
| | : | |
| Defendants. | : | |

KONINKLIJKE KPN N.V.,                            :
                                                 :
              Plaintiffs,                        :
                                                 :
       v.                                        :     C.A. No. 17-86-LPS-CJB
                                                 :
GEMALTO IOT LLC, GEMALTO M2M GMBH, :
and GEMALTO INC.,                                :
                                                 :
              Defendants.                        :
                                                 :
KONINKLIJKE KPN N.V.,                            :
                                                 :
              Plaintiffs,                        :
                                                 :
       v.                                        :     C.A. No. 17-90-LPS-CJB
                                                 :
SIERRA WIRELESS, INC. and SIERRA                 :
WIRELESS AMERICA, INC.,                          :
                                                 :
              Defendant.                         :
                                                 :
KONINKLIJKE KPN N.V.,                            :
                                                 :
              Plaintiff,                         :
       v.                                        :
                                                 :
TCL COMMUNICATION, INC., TCL                     :     C.A. No. 17-91-LPS-CJB
COMMUNICATION TECHNOLOGY HOLDING :
LIMITED, TCT MOBILE, INC., TCT MOBILE            :
(US) INC., and TCT MOBILE (US) HOLDINGS,         :
INC.,                                            :
                                                 :
              Defendants.                        :
                                                 :
KONINKLIJKE KPN N.V.,                            :
                                                 :
              Plaintiff,                         :
                                                 :
       v.                                        :     C.A. No. 17-92-LPS-CJB
                                                 :
TELIT WIRELESS SOLUTIONS, INC.,                  :
                                                 :
              Defendant.                         :
                                                 :

Joseph J. Farnan, Jr., Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE
Alexandra G. White, Jeffrey S. David, Hunter Vance, Rocco Magni, SUSMAN & GODFREY, Houston, TX
Andres C. Healy, SUSMAN & GODFREY, Seattle, WA

     Attorneys for Plaintiffs 3G Licensing, S.A., Koninklijke KPN N.V., and Orange S.A.

Colm F. Connolly, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, DE
Amy M. Dudash Eric Kraeutler, John V. Gorman, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, PA
Robert C. Bertin, MORGAN, LEWIS & BOCKIUS LLP, Washington, DC

     Attorneys for Defendants Blackberry Limited and Blackberry Corporation.

Jack B. Blumenfeld, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE
Jonathan E. Retsy, Kathleen B. Barry, James Winn, WINSTON & STRAWN LLP, Chicago, IL
Andrew R. Sommer, WINSTON & STRAWN LLP, Washington, DC

     Attorneys for Defendants Lenovo Holding Co. Inc., and Lenovo (United States) Inc.

Roger D. Smith, II, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE
Peter H. Kang, Ashish Nagdev, Jingyung Lee, SIDLEY AUSTIN LLP, Palo Alto, CA
Ryan M. Sandrock, SIDLEY AUSTIN LLP, San Francisco, CA

     Attorneys for Defendants LG Electronics Inc., LG Electronics U.S.A., Inc., and LG Electronics MobileComm U.S.A., Inc.,

David E. Moore, Bindu A. Palapura, Stephanie E. O'Byrne, POTTER ANDERSON & CORROON, LLP, Wilmington, DE
Brian A. Rosenthal, GIBSON, DUNN & CRUTCHER, New York, NY
Colby A. Davis, GIBSON, DUNN & CRUTCHER, Los Angeles, CA
Brian K. Andrea, GIBSON, DUNN & CRUTCHER, Washington, DC

     Attorneys for Defendants Gemalto IOT LLC, Gemalto M2M GMBH and Gemalto Inc.

Jack B. Blumenfeld, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE
Adam Alper, Eric Cheng, Sarah L. Forney, KIRKLAND & ELLIS LLP, San Francisco, CA
Michael W. De Vries, KIRKLAND & ELLIS LLP, Los Angeles, CA

     Attorneys for Defendants Sierra Wireless America, Inc., and Sierra Wireless, Inc.

Jody Barillare, MORGAN LEWIS & BOCKIUS LLP, Wilmington, DE
William P. Quinn, Jr., MORGAN LEWIS & BOCKIUS LLP, Philadelphia, PA
Bradford A. Cangro, Hang Zheng, MORGAN LEWIS & BOCKIUS LLP, Washington, DC

> Attorneys for Defendants TCL Communication Technology Holding Ltd., TCL
> Communication, Inc., TCL Mobile, Inc., TCT Mobile (US) Inc., and TCT Mobile (US)
> Holdings, Inc.

Jack B. Blumenfeld, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE
David A. Loewenstein, Guy Yonay, Clyde A. Shuman, PEARL COHEN ZEDEK LATZER
BARATZ LLP, New York, NY

> Attorneys for Defendant Telit Wireless Solutions, Inc.

---

## MEMORANDUM OPINION

March 22, 2018
Wilmington, Delaware

STARK, U.S. District Judge:

Plaintiff Koninklijke KPN N.V. ("KPN") sued multiple defendants in numerous related actions for alleged infringement of KPN's U.S. Patent No. 6,212,662 ("'662 patent"). Pending before the Court is Defendants' motion under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings that all the claims of the '662 patent are invalid under 35 U.S.C. § 101. (C.A. No. 17-28 D.I. 28)[1] For the reasons below, the Court will grant Defendants' motion.

## I.   BACKGROUND

KPN asserts the '662 patent in a total of eleven cases against Defendants; in seven of those cases it is the only asserted patent, while in the remaining cases it is one of five patents-in-suit.[2] (*See* D.I. 29 at 1) The '662 patent is entitled "Method and Devices for the Transmission of Data with Transmission Error Checking." (D.I. 29-1 Ex. A) As the title suggests, the '662 patent is related to the "detection of errors, in particular transmission errors, in data streams and/or data packets." '662 patent at Abstract; *see also id.* at 1:10-11 ("The invention relates to a method for the transmission of data with transmission error checking.").

The patent explains that errors may occur when data is transmitted, for example, "through electromagnetic radiation, inadequacies in a storage medium (transmission in time), and errors in switching and transmission equipment." *Id.* at 1:31-34. The claimed invention allows for checking such errors by first generating supplementary data at the transmitting and receiving end

---

[1]Unless otherwise noted, all references to the docket index (D.I.) are to C.A. No. 17-82.

[2]The '662 patent is the only asserted patent against Gemalto (C.A. No. 17-86), Kyocera (C.A. No. 17-87), NEC (C.A. No. 17-88), Sierra (C.A. No. 17-90), TCL (C.A. No. 17-91), Telit (C.A. No. 17-92), and OnePlus (C.A. No. 17-89). It is one of five patents asserted against Blackberry (C.A. No. 17-82), HTC (C.A. No. 17-83), Lenovo (C.A. No. 17-84), and LG (C.A. No. 17-85).

of a transmission channel using a first and a second function, respectively. *Id.* at 1:10-20. The supplementary data that is generated at each end is then compared to see if they correspond with each other. *Id.* If they do not, then a transmission error may have occurred and the relevant data can be re-transmitted, if necessary. *Id.* at 1:43-46.

The '662 patent also generally describes the principles of data transmission and error correction in the prior art. *Id.* at Fig. 1; 3:32-56. According to the patent, the concept of generating supplementary data to check for errors in data during transmission was already known. *Id.* at 1:21-22, 34-37. The patent provides examples of prior art methods for generating supplementary data like using parity bits and a cyclic redundancy code (CRC) generator. *Id.* at 1:37-46, 60-67.

However, as the patent explains, these prior art systems and methods were not completely effective because transmission errors were sometimes not detected. The patent provides two specific instances when this occurred. One, referred to as "systematic errors," is when the errors repeat themselves, and the other is when the data is altered, for example, compressed or encoded, during transmission. *Id.* at 1:47-2:15. According to the "object of the invention," the claimed method "allows data to be checked for errors in a better way, and thus considerably increases the probability of transmission errors being detected," is well-suited "for application to compressed data," and can be "applied in a simple manner." *Id.* at 2:18-26.

To achieve this objective, the '662 patent, unlike the prior art methods, ***varies*** the original data to create supplementary data. *See id.* at 2:30-41. By varying the original data, the patent explains, the probability of detecting "systematic errors in particular increases considerably." *Id.* at 2:42-47.

2

The four claims of the '662 patent are reproduced below:

1.   A device for producing error checking based on original data provided in blocks with each block having plural bits in a particular ordered sequence, comprising:

a generating device configured to generate check data; and

a varying device configured to vary original data prior to supplying said original data to the generating device as varied data;

wherein said varying device includes a permutating device configured to perform a permutation of bit position relative to said particular ordered sequence for at least some of the bits in each of said blocks making up said original data without reordering any blocks of original data.

2.   The device according to claim 1, wherein the varying device is further configured to modify the permutation in time.

3.   The device according to claim 2, wherein the varying is further configured to modify the permutation based on the original data.

4.   The device according to claim 3, wherein the permutating device includes a table in which subsequent permutations are stored.

As can be seen, claim 1 claims a device having three components: a generating device, a varying device, and a permutating device. The generating device generates "check data," which the specification also refers to as supplementary data. *See* '662 patent at 3:32-34, 37-39. The varying device varies the original data to create "varied data" and then sends the varied data to the generating device. To vary the data, the varying device uses a permutating device, which permutates the data by changing one or more bit positions in each data block without reordering the blocks. All three dependent claims recite devices that claim additional features of either the varying device or the permutating device. The devices in the dependent claims are designed to modify the permutation based on time (claim 2) and the original data (claim 3) and also include a

3

table in which later permutations can be stored (claim 4).

## II.   RECENT § 101 DECISIONS

The parties completed briefing on the motion on October 4, 2017. (D.I. 29, 37, 45) The Court of Appeals has subsequently issued multiple opinions considering challenges to patentability pursuant to § 101.

On November 3, 2017, Defendants notified the Court of the Federal Circuit's decision in *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017). (D.I. 51) *Two-Way Media* affirmed a decision from Judge Andrews of this Court finding that the claims of the asserted patents were not patent eligible under § 101. *Id.* at 1332. When the Court heard oral argument on December 8, 2017 (*see* D.I. 66 ("Tr.")), the parties were able to address the application of *Two-Way Media* to the pending motion. (*See e.g.,id.* at 11, 32, 46, 65)

On February 20, 2018, KPN notified the Court of the opinion in *Aatrix Software, Inc. v. Green Shades Software*, Inc., 882 F.3d 1121 (Fed. Cir. 2018). (D.I. 77) As KPN noted, *Aatrix* states with respect to the second step of the *Alice/Mayo* test (described further below) that "[w]hether the claim elements or the claimed combination are well-understood, routine [and] conventional is a question of fact." *Id.* at 1128. Defendants, in their response two days later, further advised the Court of the appellate court's decision in *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 2018 WL 935455, at *5-6 (Fed. Cir. Feb. 16, 2018), which affirmed the grant of a motion for judgment on the pleadings finding that the asserted patent claims were ineligible. (D.I. 78)

The Court is also aware of other recent § 101 opinions. *See, e.g.*, *Intellectual Ventures I LLC v. Symantec Corp.*, 2018 WL 1324863 (Fed. Cir. Mar. 15, 2018) (affirming this Court's

4

grant of summary judgment of invalidity due to lack of patentable subject matter); *Exergen Corp. v. Kaz USA, Inc.*, 2018 WL 1193529, *4 (Fed. Cir. Mar. 8, 2018) ("The district court's conclusion that these claim elements were not well-understood, routine, and conventional is a question of fact to which we must give clear error deference.  Like indefiniteness, enablement, or obviousness, whether a claim is directed to patentable subject matter is a question of law based on underlying facts. . . .  [N]ot every § 101 determination contains disputes over the underlying facts.") (internal citations omitted); *Zuilli v. Google LLC*, 2018 WL 798666 (Fed. Cir. Feb. 9, 2018) (affirming PTAB decision that claims were directed to patent-ineligible subject matter); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) (affirming grant of motion for judgment on pleadings while stating, "Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination"); *Move, Inc. v. Real Estate Alliance Ltd.*, 2018 WL 656377 (Fed. Cir. Feb. 1, 2018) (affirming grant of summary judgment finding patent invalid for claiming ineligible subject matter); *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356 (Fed. Cir. 2018) (affirming denial of summary judgment that claims are directed to patent ineligible subject matter); *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299 (Fed. Cir. 2018) (affirming district court's conclusion following bench trial that patent claims were directed to patent-eligible subject matter).

Even though the parties have not provided their specific analyses of all of these recent decisions, the Court has considered each of them in reaching its decision here.

## III.    LEGAL STANDARDS

### A.    Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the

pleadings "[a]fter pleadings are closed – but early enough not to delay trial." When evaluating a motion for judgment on the pleadings, the Court must accept all factual allegations in a complaint as true and view them in the light most favorable to the non-moving party. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008); *see also Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000). This is the same standard that applies to a Rule 12(b)(6) motion to dismiss. *See Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

A Rule 12(c) motion will not be granted "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Rosenau*, 539 F.3d at 221. "The purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered on the competing pleadings and exhibits thereto, and documents incorporated by reference." *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 617 (D. Del. 2008); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (explaining that any documents integral to pleadings may be considered in connection with Rule 12(c) motion). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burlington Coat Factory*, 114 F.3d at 1420. Thus, a court may grant a motion for judgment on the pleadings (like a motion to dismiss) only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio*, 221 F.3d at 482.

## B.    Patentable Subject Matter

Under 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof,

6

may obtain a patent therefor, subject to the conditions and requirements of this title." There are

three exceptions to § 101's broad patent-eligibility principles: "laws of nature, physical

phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). "Whether

a claim recites patent eligible subject matter is a question of law which may contain disputes over

underlying facts." *Berkheimer*, 881 F.3d at 1368.

In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289

(2012), the Supreme Court set out a two-step "framework for distinguishing patents that claim

laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible

applications of those concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355

(2014). First, courts must determine if the claims at issue are directed to a patent-ineligible

concept ("step one"). *See id.* If so, the next step is to look for an "'inventive concept' – i.e., an

element or combination of elements that is sufficient to ensure that the patent in practice amounts

to significantly more than a patent upon the [ineligible concept] itself" ("step two"). *Id.*

(alteration in original). The two steps are "plainly related" and "involve overlapping scrutiny of

the content of the claims." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed.

Cir. 2016).

At step one, "the claims are considered in their entirety to ascertain whether their

character ***as a whole*** is directed to excluded subject matter." *Internet Patents Corp. v. Active

Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015) (emphasis added); *see also Affinity Labs of

Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("*Affinity Labs I*") (stating

first step "calls upon us to look at the 'focus of the claimed advance over the prior art' to

determine if the claim's 'character as a whole' is directed to excluded subject matter").

7

In conducting the step one analysis, courts should not "oversimplif[y]" key inventive concepts or "downplay" an invention's benefits. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337-38 (Fed. Cir. 2016); *see also McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("[C]ourts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims.") (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)).

At step two, courts must "look to both the claim as a whole and the individual claim elements to determine whether the claims contain an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *McRO*, 837 F.3d at 1312 (internal brackets and quotation marks omitted). The "standard" step two inquiry includes consideration of whether claim elements "simply recite 'well-understood, routine, conventional activit[ies].'" *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (quoting *Alice*, 134 S. Ct. at 2359). "Simply appending conventional steps, specified at a high level of generality, [is] not ***enough*** to supply an inventive concept." *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted; emphasis in original).

However, "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Bascom*, 827 F.3d at 1350. In *Bascom*, the Federal Circuit held that "the limitations of the claims, taken individually, recite generic computer, network and Internet components, none of which is inventive by itself," but nonetheless determined that an ***ordered combination*** of these limitations was patent-eligible under step two. *Id.* at 1349.

8

The Federal Circuit recently elaborated on the step two standard, stating that "[t]he question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact. Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368; *see also Aatrix*, 882 F.3d at 1128 ("While the ultimate determination of eligibility under § 101 is a question of law, like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination."); *Automated Tracking*, 2018 WL 935455, at *5 ("We have held that 'whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact.'") (quoting *Berkheimer*, 881 F.3d at 1368).

"Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." *Berkheimer*, 881 F.3d at 1369; *see also Exergen Corp.*, 2018 WL 1193529, at *4 ("Something is not well-understood, routine, and conventional merely because it is disclosed in a prior art reference. There are many obscure references that nonetheless qualify as prior art.").

As part of the step two "inventive concept" inquiry, the Federal Circuit has looked to the claims as well as the specification. *See Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016) ("*Affinity Labs II*") ("[N]either the claim nor the specification reveals any concrete way of employing a customized user interface."). Still, it is not enough just to disclose the improvement in the specification; instead, the Court's task becomes to "analyze

9

the asserted claims and determine whether they *capture these improvements*." *Berkheimer*,881 F.3d at 1369 (emphasis added).  In other words, "[t]o save a patent at step two, an inventive concept must be *evident in the claims*." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) (emphasis added); *see also Alice*, 134 S.Ct. at 2357 ("[W]e must examine the *elements of the claim* to determine whether it contains an 'inventive concept.'") (emphasis added); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves.").

At both steps one and two, it is often useful for the Court to compare the claims at issue with claims that have been considered in the now considerably large body of decisions applying § 101.  *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016).

Finally, as a procedural matter, the Federal Circuit has observed frequently that § 101 disputes may be amenable to resolution on motions for judgment on the pleadings, motions to dismiss, or summary judgment.  *See, e.g.*, *Berkheimer*, 881 F.3d at 1368 ("Whether a claim recites patent eligible subject matter is a question of law which may contain disputes over underlying facts.  Patent eligibility has in many cases been *resolved on motions to dismiss or summary judgment.  Nothing in this decision should be viewed as casting doubt on the propriety of those cases.*  When there is no genuine issue of material fact regarding, whether the claim element or claimed combination is well-understood, routine, conventional to a skilled artisan in the relevant field, this issue can be decided on summary judgment as a matter of law.") (emphasis added); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) (affirming grant of Rule 12(c) motion for judgment on pleadings for lack of patentable subject matter).

10

IV.    **DISCUSSION**

A.    **Step One**

At step one of the *Alice/Mayo* test, the question is whether the asserted claims are

directed to a patent-ineligible concept. "[A]ll inventions at some level embody, use, reflect, rest

upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 132 S. Ct. at 1293.

Thus, "an invention is not rendered ineligible for patent simply because it involves" a patent-

ineligible concept. *Alice*, 134 S. Ct. at 2354. "Indeed, to preclude the patenting of an invention

simply because it touches on something natural would 'eviscerate patent law.'" *Rapid Litig.*

*Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed Cir. 2016) (quoting *Mayo*, 132 S. Ct.

at 1293). "At step one, therefore, it is not enough to merely identify a patent-ineligible concept

underlying the claim; we must determine whether that patent-ineligible concept is what the claim

is 'directed to.'" *Id.*

Applying this analysis, the Court agrees with Defendants that the claims of the '662

patent are directed to the abstract idea of reordering data and generating additional data. (D.I. 29

at 10-12; *see also* Tr. at 70 (KPN seemingly agreeing that '662 patent at its core relates to data

manipulation in form of reordering and generating data))

The Federal Circuit has found other claims reciting similar steps of manipulating data

invalid under § 101. *See Two-Way Media*, 874 F.3d at 1337 (claim requiring "converting,"

"routing," "controlling," "monitoring" and "accumulating records" relate to "manipulat[ing] data

but fail[] to do so in a non-abstract way"); *RecogniCorp*, 855 F.3d at 1326 (claim is "directed to

the abstract idea of encoding and decoding image data"); *Intellectual Ventures I LLC v. Capital*

*One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017) ("[A]t their core, [claims are] directed to

11

the abstract idea of collecting, displaying, and manipulating data."); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) ("[W]ithout additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible."). In *Digitech*, 758 F.3d at 1351, the Federal Circuit stated that a "process that started with data, added an algorithm, and ended with a new form of data was directed to an abstract idea."

On this same reasoning, the claims here – which do not say how data is reordered, how to use reordered data, how to generate additional data, how to use additional data, or even that any data is transmitted – are directed to an abstract idea. Simply "reciting . . . data manipulation steps" without additional limitations, constitutes, at step one, an abstract idea. *Capital One*, 850 F.3d 1332, 1340.

The dependent claims are also abstract. The additional limitations of these claims do not say how the permutations are modified in time or modified based on the data, and but indicate (for Claim 4) that the permutations are stored in a generic table.

The Court is not persuaded by KPN's contrary view. KPN contends that the claims are directed to a specific implementation of a solution to a problem in the computer field rather than an abstract idea. (D.I. 37 at 6-12) But all of the components of the claims are generic devices. As the specification explains, the functions used to generate data in the claimed device "can be implemented in software as well as hardware (for example as an ASIC)." '662 patent at 4:8-10; *see also id.* at 6:14-24 None of those features – functions, software, and hardware – are characterized as anything other than conventional. Generic devices do not make a claim non-abstract (as that concept is applied at step one). *See Alice*, 134 S.Ct. at 2347 (holding that

12

"purely functional and generic" devices do not save abstract claim); *Capital One*, 850 F.3d 1332

(finding apparatus claim abstract as it contained only generic components, e.g., "processor,"

"component that organizes data," and "component that organizes"); *Affinity Labs II*, 838 F.3d

1266 (finding system claim abstract that contained "storage medium" and "wireless cellular

telephone device").

Accordingly, the Court must turn to step two of the analysis.

**B.      Step two**

At step two, the Court looks at "the elements of each claim both individually and 'as an

ordered combination' to determine whether the additional elements 'transform the nature of the

claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355; *see also Mayo*, 566 U.S. at

73 (explaining that steps of claim must amount to more than "well-understood, routine,

conventional activity"). "To save a patent at step two, an inventive concept must be ***evident in***

***the claims***." *RecogniCorp*, 855 F.3d at 1327 (emphasis added)*; Alice*, 134 S.Ct. at 2357 ("[W]e

must examine the ***elements of the claim*** to determine whether it contains an 'inventive

concept.'") (emphasis added).

Defendants argue that the claimed devices are generic devices that perform the customary

computer functions of reordering and generating data. (D.I. 29 at 18)  Defendants further

contend that the patent's intended use of error checking merely restates the express goal of the

patent and does nothing more than limit the technology to a particular field of use. (*Id.* at 18)

Finally, Defendants assert that there is nothing inventive about the data itself that is generated

(blocks consisting of bits) or the process of permutating the data (changing bit position without

reordering the blocks making up the data). (*Id.* at 19)

KPN responds that "[n]othing more is needed to refute Defendants' motion" than the "specification's statements about the purported invention." (D.I. 37 at 18) (citing *MAZ Encryption Techs. LLC v. Blackberry Corp.*, 2016 WL 5661981, at *5 (D. Del. Sept. 29, 2016)) In KPN's view, the patent's statements show the "inventiveness" of the claimed components, both individually and as an ordered combination. (*Id.*) KPN points to a portion of the specification purportedly explaining that the claimed devices disclose a "new, non-conventional way of generating check data that represented a marked improvement over the prior art." *Id.* at 18-19) (citing '662 patent at 2:41-62, 6:30-35).

The Court agrees with Defendants. No "saving inventive concept," *Two-Way Media*, 874 F.3d at 1336, is evident in the claims. Claim 1, the only independent claim of the '662 patent, contains essentially three limitations: a generating device that generates data, and a varying device that varies the original data by permutating the data using a permutating device. '662 patent at 7:4-8:3. These device limitations contain no inventive concept that transforms the abstract idea of reordering and generating data into patent-eligible application of the abstract idea. Instead, claim 1 broadly recites generic functions, which encompass the abstract idea itself, without providing any details. Reciting limitations using such broad functional language without adequately explaining "***how*** the desired result is achieved" is not enough at step two. *See Elec. Power*, 830 F.3d at 1355 (emphasis added).

Even accepting, arguendo, KPN's contention that the ***specification*** discloses an inventive way of checking errors in transmitted data, the patent still fails at step two because that purported inventive concept is ***not captured in the claims***. *See, e.g.*, *Two-Way Media,* 874 F.3d at 1338-39 ("The main problem that Two-Way Media cannot overcome is that the ***claim*** – as opposed to

14

something purportedly described in the specification – is missing an inventive concept."). "The improvements in the specification" are relevant at step two "to the extent they are captured in the claims." *Berkheimer*, 881 F.3d at 1369. Here, any improvements disclosed in the '662 patent are not captured in the claims of the patent.

As KPN observes, the *specification* explains that the "object of the invention" is met "by a method for the transmission of data between a transmitting end and a receiving end of a transmission channel while providing an error check." '662 patent at 2:18, 27-30. According to the *specification*, the method is performed by generating supplementary data at the transmitting end and regenerating the supplementary data at the receiving end using certain functions. *Id.* at 2:31-38. The *specification* then explains how error checking is done: "by comparing the regenerated supplementary data with the transmitted supplementary data." *Id.* at 2:39-41.

These particular features of the purported inventive concept, however, are *not* recited in Claim 1. While the claim recites various device limitations to generate, vary, and permutate data, there is no reference in the claim to a transmission channel, a transmitting end, a receiving end, or even to data transmission. Without such limitations, the other aspects of the purported inventive concept are also absent from the claim: the process of generating supplementary data at the transmitting end of a transmission channel and regenerating the supplementary data at receiving end of the channel, *id.* at 2:30-38; the requirement for "a form of synchronization" to exist between the user data and the supplementary data, *id.* at 2:59-62; and the process of "comparing the regenerated supplementary data with the transmitted supplementary data," *id.* at 2:39-41, which is how error checking is accomplished, according to the patent.

Additionally, none of the capabilities or functions disclosed in the specification are

15

described as anything other than conventional. This applies to: (i) the patent's central concept of generating supplementary data to check for errors in transmitted data, which was already known, *see* '662 patent at 3: 32-56; Fig 1; (ii) the data structure used to generate supplementary data, *see id.* at 3:12-19 (describing conventional data structures); (iii) how the permutation is done, *see id.* at 5:58-65 (simply interchanging bit positions in a conventional manner); (iv) the permutation functions used to vary the data, *see id.* at 5:37-38, 41-42, 6:12-13 (using conventional linear and non-linear functions); and (v) software and hardware used to implement the functions, *see id.* at 4:8-11, 6:14-30; *see also* 3:66-4:1; 4:46-48 (using conventional adder and random number generator known in prior art). That the patent uses terms like "generating device," "varying device," "permutating device," "check data," and "varied data" does not save it because those terms simply refer to generic computer structures and functions. *See Capital One*, 850 F.3d at 1342 ("The mere fact that the inventor applied coined labels to conventional structures does not make the underlying concept inventive."). "Mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea. Rather, the components must involve more than performance of well-understood, routine, conventional activit[ies] previously known to the industry." *Automated Tracking*, 2018 WL 935455, at *5 (internal quotation marks omitted; alteration in original).

The dependent claims recite no additional features that capture an inventive concept. Claim 2 recites a device that is able "to modify the permutation in time." '662 patent at 8:5-6. Claim 3 recites a device that is able "to modify the permutation based on the original data." *Id.* at 8:8-9. The device in Claim 4 includes "a table in which subsequent permutations are stored." *Id.* at 8:11-12. KPN has not persuaded the Court how modifying the permutation based on time

16

or the original data, or storing permutations in a table, go beyond conventional computer operations and qualify for eligibility under § 101.

The cases on which KPN primarily relies in urging the Court to reach a contrary conclusion are unavailing. (*See* D.I. 37 at 1, 6-8, 11-12)  KPN contends that the Federal Circuit's *Amdocs* case is most analogous. (*See* Tr. at 92)  But there, unlike here, the ***claims*** being challenged captured the inventive concept.  In *Amdocs*, 841 F.3d at 1301, the Federal Circuit held that claims relating to solutions for managing accounting and billing data over large, disparate networks recited an inventive concept because they contained "specific enhancing limitation[s] that necessarily incorporate[d] the invention's distributed architecture." *See also id.* at 1300 ("[T]he claim's enhancing limitation necessarily requires that [the] generic components operate in an unconventional manner to achieve an improvement in computer functionality.").  In particular, the Court construed the term "enhance" in a manner that integrated the inventive concept – the systems's distributed architecture that the specification described as an important advance over prior art – into the claim language. *See id.* at 1300-02.[3]  Here, as already explained, the inventive concept is not captured in the claims.

Similarly, in *MAZ Encryption*, 2016 WL 5661981, at *5, this Court held, at step one, that a patent related to data encryption was directed to a technological improvement in the way

---

[3] KPN does not contend that the Court must conduct claim construction before making a decision on the § 101 issues. (Tr. at 66)  KPN previously asserted the '662 patent against Samsung Electronics Co., Ltd. in a case filed December 30, 2014 in the Eastern District of Texas (C.A. No. 2-14-cv-01165-JRG).  That court issued a claim construction opinion. (D.I. 29-1 Ex. D)  KPN disputes that the previous court's constructions are the most favorable constructions available to it and reserves the right to propose different constructions as this case proceeds. (*See* D.I. 37 at 6)  The Court finds that in the instant case claim construction is not a prerequisite for determining the patent's subject matter eligibility. *See Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012).

17

computers operate rather than an abstract idea. While the Court viewed the claim in light of the specification and the record before it, the Court ultimately concluded that the patent's claim – not just the specification – recited features (use of two separate tables) that provided a technical solution to problems in prior art encryption methods. *See id.* at \*5-7.

In sum, evaluating the claims both individually and as an ordered combination, the Court finds that they recite no more than the routine steps of reordering data and generating data using generic components and conventional computer operations. While the '662 patent purports to have met a need the in prior art for "a method which allows data to be checked for errors in a better way, and thus considerably increases the probability of transmission errors being detected," '662 patent, 2:20-23, the claims recite no inventive step to achieve this stated goal. At bottom, even though the '662 patent may in its specification disclose a solution to a technological problem, its claims fail to claim one. *See Alice*, 134 S. Ct. at 2357-58 (explaining that "***claim*** had to supply a 'new and useful' application of the [abstract] idea in order to be patent eligible") (emphasis added). Accordingly, the '662 patent is not patent eligible.[4]

## V.   CONCLUSION

For the reasons stated above, on the record before the Court, the claims of the '662 patent ***are*** directed to an abstract idea and ***are not*** directed to patent-eligible subject matter. Therefore, the Court will grant Defendants' motion. An order follows.

_____

[4]The Court has considered the other issues raised by the parties – including (i) whether the '662 patent claims survive the machine or transformation test (*see* D.I. 37at 10); (ii) whether the claims can be performed in the human mind (*see* D.I. 29 at 12-13; D.I. 37 at 12-13); (iii) preemption concerns (*see* D.I. 29 at 16-17; D.I. 37 at 16; D.I. 45 at 8); and (iv) the relevancy of the Patent Trial and Appeal Board's decision not to institute *inter partes* review on some claims of the '662 patent (*see* D.I. 37 at 19; D.I. 45 at 10) – and has found none of them alters the outcome here. None warrants further discussion.

EXHIBIT 10

1

1                      IN THE UNITED STATES DISTRICT COURT

2                      IN AND FOR THE DISTRICT OF DELAWARE

3
     3G LICENSING, S.A., KONINKLIJKE          )
4    KPN N.V., and ORANGE S.A,                )
                                              )
5              Plaintiffs,                    )  C.A. No.
     v.                                       )  17-083-GBW
6                                             )
     HTC CORPORATION,                         )
7                                             )
               Defendant.
8

9
                                  - - - -
10
                          Wilmington, Delaware
11                        Tuesday, October 10, 2023
                          *Trial Volume 1*
12
                                  - - - -
13

14
     BEFORE:  HONORABLE GREGORY B. WILLIAMS
15           UNITED STATES DISTRICT COURT JUDGE

16
                                  - - - -
17

18

19

20

21

22

23

24

25                          Michele L. Rolfe, RPR, CRR

2

1   APPEARANCES:

2

        FARNAN LLP
3         BY: MICHAEL J. FARNAN, ESQ.

          -and-
4         SUSMAN GODFREY
        BY: ANDRES HEALY, ESQ.
5           LEXIE WHITE, ESQ.
          HUNTER VANCE, ESQ.
6         For Plaintiff

7

        SHAW KELLER LLP
8         BY: KAREN KELLER, ESQ.
          NATHAN R. HOESCHEN, ESQ.
9

          -and-
10

        WHITE & CASE
11        BY: YAR R. CHAIKOVSKY, ESQ.
          PHILIP OU, ESQ.
12         RADHESH DEVENDRAN, ESQ.
        SHASHANK CHITTI, ESQ.
13        For Defendant

14

15

16

17

18

19

20

21

22

23

24

25

---

3

1               - - - - -

2            P R O C E E D I N G S

3      (REPORTER'S NOTE: The following hearing was held in

4  Courtroom 6B beginning at 11:00 a.m.)

5      THE COURT: All right. You may be seated.

6      All right. So first thing is to remind the

7  parties to -- you guys e-mailed the objections and the other

8  stuff that you e-mailed to Neil directly as opposed to the

9  civil e-mail address.

10      So going forward, be sure -- Neil is going to

11  make sure you have the civil e-mail address. Make sure you

12  e-mail it to that, because the clerks need to start working

13  on that early, it can't wait until Neil comes in.

14      As well as I understand there was only one copy

15  of the slides provided, so make sure two paper copies of the

16  slides are provided so that multiple folks can work on them

17  at the same time.

18      All right. I see that the parties reached an

19  agreement on the description of 3G Licensing and Orange.

20  Has that been incorporated into the voir dire?

21      MR. VANCE: Yes, Your Honor.

22      THE COURT: And the preliminary jury

23  instructions?

24      MR. VANCE: Yes, Your Honor.

25      THE COURT: Okay. Thank you.

---

4

1      All right. So with respect to the objections

2  that were not able to be resolved, let's turn to them. I'll

3  go through what I have so far. And then, for the remainder,

4  I'll need the parties to let me know what they are, and I'll

5  hear from you with respect to your respective positions,

6  because -- all right.

7      So the first one that I have is objection by HTC

8  to slide 2 of 3G Licensing's slides in their opening, and so

9  that objection is denied. The objection to slide 8 is

10  denied. The objections to slides 20-23 is denied. The

11  objection to slide 37 is sustained.

12      So slide 37 should be taken out.

13      MR. HEALY: Your Honor, may I ask a question?

14      THE COURT: Yes.

15      MR. HEALY: So we had an agreement with them

16  that we could use these words. We just want to understand

17  what Your Honor understands as far as what we can do with

18  that. Specifically, I think this is in the MIL, we

19  specifically said -- I mean, these are literally the exact

20  words we can use; they agreed we could use it because it

21  accurately describes, as the parties agreed, the Court's

22  ruling.

23      And so, again, obviously not trying to reargue

24  what Your Honor just held, but how can we use that -- or we

25  just want some guidance from Your Honor as to how we can do

---

5

1  that.

2      THE COURT: You can't use it in your opening,

3  that's for sure.

4      MR. HEALY: Okay.

5      THE COURT: I think the -- I mean, you're trying

6  to use a quote from an earlier ruling for what purpose?

7      MR. HEALY: Yes, Your Honor. So just to be

8  clear, because I don't want to misconstrue anything. The

9  quote that's in there is from the pretrial order, it's what

10  we agreed we could say. But it is, I think, a paraphrasing,

11  at least, of what the Court said.

12      And so what we want to be able to do is tell the

13  jury these are the issues you're here to decide, as Judge

14  Stark held. You know, if you are able to decide whether,

15  you know, we would have given a FRAND rate as part of the

16  hypothetical negotiation, but the Court has already held

17  that as a matter -- I mean, again, we -- they had a FRAND

18  defense, the court entered summary judgment in our favor on

19  the FRAND defense holding that -- you know, effectively

20  there's no FRAND obligation for purposes of what we're going

21  to be talking about at trial.

22      They can argue that we would have still given

23  them the FRAND rate, but this is relevant evidence as far

24  as, you know, what the actual obligation is. I mean, we won

25  summary judgment on this, we're entitled to be able to tell

---

118

1    You can't even make a native video call between different
2    service providers.  So if you have a T-Mobile that has
3    native video calling and you try to call an AT&T phone,
4    first of all, it has to have native video calling, but
5    second of all, you can't even do it.  It won't work, can't
6    call a different service provider.
7            The only way it works is both phones have to be
8    on the -- that's why this feature is not valuable, no one
9    uses it, it's rarely used, both phones have to be on the
10   same service provider.  So if you want to use native video
11   calling on a T-Mobile phone, you'd have to call someone else
12   with a native video calling on a T-Mobile, that's what the
13   evidence will show.
14           Same thing, if you have native video calling on
15   AT&T, you'd call someone who has native video calling
16   on an AT&T phone, that's the only way this works.
17           And it won't work with incompatible phones.  So
18   what you're showing here and what the evidence will show,
19   this Pixel 2 on the right -- on the left, excuse me, I got
20   my left and right wrong.  There's a Pixel 2 on my left, your
21   left, and that Pixel 2, made by Google, that thing can do
22   native video calling on the T-Mobile network.  I think
23   that's what the evidence is going to show, that it is
24   capable of doing it.  Again, I'm not evidence, but let's
25   see.

119

1            That M9 on the T-Mobile network made by HTC, it
2    can't.  It doesn't do video calling.  That's what the
3    evidence will show.  And so you couldn't, again, make calls
4    between those two phones even though they are on the same
5    service provider because the HTC M9 does not do native video
6    calling.  In fact, what you would need to succeed, in this
7    instance, as you can see in -- this is an example of -- as
8    you pulled up the M9, there would be no video camera option.
9    There would be a chat option.  You can make a voice call,
10   but you can't make a video call, that's what this image is
11   about.  That's what the evidence will show.
12           So what you need instead to make a native video
13   call, for example, one example, it's not the only example,
14   two Pixel 2s, because, I think the evidence will show that
15   the Google Pixel 2 has that feature and you're able to use
16   that feature.  And so now you may be able to make that
17   native video calling.  Again, goes to noninfringement, but
18   it also goes to value, whose using this?
19           We're not accusing Zoom, we're not accusing
20   WhatsApp, they're not accusing, we're accusing native
21   carrier video calling.  That's why we're here, that's why
22   you're here for the coming week.  There's a dispute about
23   this native video calling, whether we actually do it and if
24   we even do it, which we don't think we do, what's it worth?
25           Again, I'm going to show you the difference of

120

1    opinion of noninfringement on this '091.
2            The '091 patent, and again, this is a little bit
3    of a -- I got to walk you through a little slowly on here.
4    Right, it's filed, remember, turn of the century.  Flip
5    phones might have been to the day, at best, at that time
6    period.  You make the first calls.  As the claims require,
7    if you look at Element B up here, "Element B, the claims
8    require a transmitter configured to transmit data to carry
9    at least a first and second media to remote videophone
10   during the first call."
11           So the claims, remember, you have to meet every
12   element, are telling you they have a first call with two
13   medias.  A first media and a second media, right?  One could
14   be audio, one could be video, sure.  That's exactly what's
15   happening in this claim.
16           You do get a discontinuation signal that may put
17   the call on hold, that may release the call.  But then
18   there's a second call.  As was shown by counsel for 3G, that
19   second call has to be different media, it's a call
20   initiating a second call that's made up of different media.
21   It's not the same media, it's not the first or second media
22   of the first call, that's what they are pointing to.  That's
23   what you heard 3G's counsel point to, the audio of the first
24   call.
25           The claim construction, as you saw from the

121

1    Court, as you see in the second call on the bottom left,
2    different media, not the same media.  They're accusing
3    downgrading an audio/video call to video, which was known in
4    the art, we're going to hear more about that, as infringing
5    this claim.  That's not what this patent is about.  It's
6    about initiating a second call.
7            And you can see HTC's products here.  When they
8    make a call with two media, a video call, for those that do
9    work with the carrier video calling, a limited subset, when
10   you switch to audio-only, which you can do, you hit a button
11   and you go audio-only, you don't get a different media.  An
12   audio call, it's a downgrade.  An audio call or audio of
13   that audio/video call continues.  There's no second call.
14   There's no initiating a second call.  There's no if
15   answered.  The Court has instructed that I have to establish
16   a second call if answered.  It's the same call.  You keep
17   talking.
18           In fact, the counter keeps going on the phone
19   call.  You can see you're 2 minutes and 9 seconds because
20   the same call continued.  You just removed the video
21   component.  That's not what the '091 patent is about.  Got
22   to initiate a different call with different media.  So in
23   the end you can see the difference here is on the HTC
24   phones, one call.  For example, the '091, whether I call a
25   separate call or a call that includes different media, it

122

1   has to have different media.

2   I just want to remind you, beyond me saying it,

3   what we saw from counsel for 3G, they highlighted only what

4   was in yellow, right.  We showed you on slide 26, I just

5   showed you, that it's a separate call or a call that

6   includes different media, circling a different media.

7   Now they said somehow that we're going to point

8   to this last element and say, oh, they are going to say it's

9   a call that doesn't support second media.  That's not right.

10  That's not right.  That's what they're pointing to.  They're

11  trying to effectively erase out the different media

12  limitation the Court put in.  The claim already had the

13  second call not supporting the second media in it.  There's

14  the additional element that the Court construed of

15  establishing a call with different media.

16  They got to meet all of the elements, they got

17  to hit bingo.  Madisetti method, sloppy.

18  Similarly here, right, we showed you this, same

19  thing we showed the second call, that's that same media

20  continuing, they scratched off the video, that voice and

21  that's what the evidence is going to show, that same media

22  from the first call to the second call.  It's the same voice

23  media, there won't be any evidence that the voice media

24  changes.

25  I thought it was also interesting, they also

123

1   showed you figure 2 of the '091 patent while they were

2   showing you their presentation.  I think as you listen to

3   the evidence, listen to the descriptions of figure 2, I'm

4   just going to go through this really briefly and then I got

5   to move on, because when we're talking about figure 2 of the

6   patent, column 7, for example, tells you that voice calls,

7   right, one call, voice call corresponds to single lines in

8   the figure, and video calls, I'm sure video audio data calls

9   are double lines.  Now I want to show you why that's

10  important.

11  Follow along with me.  Voice calls are a single

12  line, video data calls are double lines, okay.  And then the

13  patent goes on to say that figure 2, which was used by

14  counsel for 3G, this call made, lines 9-15, illustrates a

15  call flow path switching from video to voice mode.  The two

16  calls are identified in the same way, the "same way" meaning

17  video, two lines; audio, one line.  By use of single lines

18  for the voice call and double lines for the video call.

19  If the caller selects voice mode, the calling

20  for the videophone, different media, releases the video

21  call, goes away, makes a new voice call.  I don't care

22  whether it's a separate call or not, different media, got to

23  establish a second call with different media.  That's what

24  the patent is describing.

25  They pointed to figure 2, I'm pointing to you

124

1   what the patent describes figure 2.  And just so we can

2   double down about the evidence will show, this is figure 2

3   marked up correctly, not the way you just saw it from 3G's

4   counsel.  Double -- double line video in yellow.  That --

5   that release is double line, hard to see in this from the

6   ELMO, but that release, double line.  That release, double

7   line.  That's all video.  That's not how she marked it up.

8   Then the single line is audio.  So you have a

9   video call, which has voice and audio, as I just showed you

10  in the description.  Then you got an audio call.

11  Eventually, that gets answered.  That's -- if you want to

12  mark this up correctly, one call, two calls.  That's not how

13  she represented it, and I don't think that's how

14  Dr. Madisetti is going to represent it when he walks through

15  his patent.

16  Why?  And the reason why is because when they

17  make this misrepresentation, the evidence will show, of

18  figure 2, they have to do that.  Because when they look at

19  the call flow diagrams of the service providers, there's not

20  two calls.  It's downgrading a video call to an audio call.

21  No different media.  The evidence will show that.  Not just

22  from Verizon, the evidence is going to show AT&T.  That's a

23  downgrade of a video call.

24  And then I'm going to show you even the best one

25  of the three, frankly, T-Mobile, downgrade.  And this one

125

1   might be hard to see.  User wants to downgrade to audio

2   call.  And this is really good because this is, again, her

3   slides, right.

4   When you get -- this is a -- you'll hear a lot

5   about this in the coming week, Dr. Madisetti will talk about

6   it first.  When you downgrade, you get a SIP reinvite

7   message with audio media, that's that same audio media,

8   actually.  You're going to keep it.  And the voice media is

9   being set to zero.

10  So here it's the audio, and it's being sent

11  along, and the invoice media part is set to zero.  It's

12  downgrading to audio.  Same audio, not different media, not

13  establishing a separate call if answered.

14  My last comment on this will be, you'll also

15  hear about other documents that show that downgrading, like

16  the 3GPP standard, Dr. Jeffay will talk about it, the

17  evidence will show downgrading was known.  And so ask

18  yourselves why are we here?  Why are we here?

19  If we could go back to the slides.

20  Apologies.

21  Now, one last comment on the '091.  Everyone

22  agrees the Qualcomm chip is kind of important.  I already

23  showed you that Mr. Jones looked at the secret sauce, the

24  programming that tells you how the processor works.  Again,

25  Dr. Madisetti did look at code, but he looked at the code

126

1  that Mr. Jones looked at almost totally, not totally but
2  almost totally.
3          It's important.  And you heard this from counsel
4  for 3G.  3G's lawyers, they went and took the deposition --
5  they didn't take the deposition of any of the carriers, they
6  took the deposition of Qualcomm, they knew that was kind of
7  important.
8          And what happened?  Qualcomm said there's one
9  call, just like I'm telling you.  Qualcomm said there's a
10  media component that includes audio, it includes video.
11  Why?  Because as you just heard, the evidence is going to
12  show it's a downgrade.
13          And, in fact, Qualcomm -- what's important is
14  Qualcomm -- I mean it's 3G's lawyers asking the questions,
15  they could have asked any questions they wanted to is what
16  the evidence will show.  They had the ability to ask all
17  these questions.  They could have asked follow-up questions.
18          I think the response you're going to hear from
19  this evidence is from Dr. Madisetti.  This is before the
20  claim construction of the Court from last Friday.  I think I
21  heard that from counsel for 3G.  Well, Dr. Madisetti's
22  opinions came out before the Court's claim construction last
23  Friday.  So did everybody's in this case.  That's a red
24  herring.
25          This is the testimony, the guy who worked for

127

1  20 years at Qualcomm is telling you how this product works.
2  And he's being asked questions by counsel for 3G.  And he's
3  being asked "can you describe me what downgrading" -- and
4  now they refer to it as "downgrading," I don't believe you
5  heard them refer to it as downgrading during their opening
6  statement.
7          And he says, "A downgrade here means we remove
8  video," kind of like I told you, "we keep the voice
9  component, same media, not a different media, no initiation
10  of a second call."
11          Now, I'm going to play the video for you,
12  40-second pause there.  Why?  3G's lawyers didn't know what
13  to do with it.  They got an answer they didn't like.  They
14  were trying to think of what the next question should be.
15          And so what do you get?  You get a question that
16  said, "So if I understand you correctly, there are two
17  calls.  Why?"  They know they need the two calls to show
18  infringement.  They know they need it.  This is them.  It's
19  not really even just the testimony.  What's more important
20  is almost what 3G's lawyers are doing, and what they are
21  doing today here in court instead.
22          And their best argument is, well, the Court just
23  construed it.  Their expert construed these claims and
24  applied these claims before this Court's claim construction.
25          And the answer (sic) was:  "So if I understand

128

1  you correctly, there are two calls and only one?"  He said,
2  "No, one call."  And it's always one call.  One call with
3  two components, exactly what I'm telling you.  One call with
4  two components, one is voice, another video.
5          And, in fact, don't take my word for it.  What
6  the evidence is going to show, I'm going to have you listen
7  to Mr. Cheng, who is the lead design team lead for this
8  software.
9          (Video clip played for the jury.)
10          When the video "telephoney" call is established,
11  we always have both the voice and the video -- you know, the
12  components.
13  Q.      Okay.  So can you describe for me what then
14  downgrading a call to voice means?
15  A.      A downgrade here means we remove the video component,
16  we only keep the voice component.
17          (Video clip ended.)
18          MR. CHAIKOVSKY:  And so here you see the pause,
19  doesn't know what to ask, what should the next question be,
20  can't figure it out.  And then he injects the two call
21  question to try to get the right answer.
22          Still waiting.
23          (Video clip played for the jury.)
24  Q.      So if I understand your testimony correctly, there
25  are two calls and only one remains after the --

129

1  A.      No, it is the one call.
2  Q.      Okay.
3  A.      It is always one call.
4  Q.      Okay.
5  A.      One call with two components.  One is from a media
6  perspective.  One call with two competents.  One is voice.
7  Another one is video.
8          (Video clip ended.)
9          MR. CHAIKOVSKY:  There's another pause here
10  because he doesn't know what to do with that because that
11  doesn't meet infringement.
12          (Video clip played.)
13  Q.      Looking at my --
14          (Video clip ended.)
15          MR. CHAIKOVSKY:  And the important thing is,
16  when you hear that testimony again as evidence, and what the
17  evidence will show, 3G has no idea whether Mr. Cheng looked
18  at the '091 patent or not.  This litigation was on for
19  six years.  Those are big assumptions.  Again, the Madisetti
20  method:  Assume.
21          Mr. Jones confirmed that the source code only
22  has one call.  He reviewed the code.  As I said, at Qualcomm
23  Center.  He was at Mr. Cheng's deposition.  And he's going
24  to testify the code shows only one call.
25          So at the end of the '091, as you can see, the

130

1  only person that says it's two calls, Dr. Madisetti.
2  Everybody else, the patent, Qualcomm, experts, carrier, I
3  showed you the downgrading, it's one call, it's not two
4  calls.  It's not initiating a second call, no infringement.
5          I'm running out of time here so I'm going to
6  speed up a little bit.  You heard from the video that you
7  get to decide the issue of infringement and consider items
8  that have never been seen before.
9          We're going to have Dr. Wicker come testify for
10  you on invalidity of the '091.  If Dr. Wicker could stand
11  up.  Dr. Wicker is a professor and lecturer of computer
12  engineering at Cornell in Ithaca.  Electrical engineering
13  degree, BS at my alma mater, the University of Southern
14  California.  And so -- go Trojans.
15          Now, he'll speak to you about the invalidity of
16  the '091 patent, especially given the broad reading that you
17  heard that 3G is applying.  And he'll focus on this Shachar
18  reference, that '736 patent.  You can see that bottom thing,
19  that's about 1995, five years prior to the '091.  And he'll
20  tell you that the claims of the '091 were not the first to
21  deal with 3G claims and they were already well known.
22          There will be other state-of-the-art described,
23  some of that actually the Patent Office considered, like
24  that bottom reference starts, with a D, I can't pronounce.
25  But he will be focusing on Shachar and Nagao.

131

1          And what the evidence will show -- and we know
2  our burden.  Our burden is higher, clear and convincing
3  evidence -- the patent is invalid.  The claims that are
4  asserted are invalid.
5          '818, I can go through this one a little bit
6  quicker.  You heard it's a SIM card, now, that has this kind
7  of switch that works on two systems.  Now, SIM card, to the
8  extent some of you may not be familiar, is a subscriber
9  identity module card.  They are inside the phones.  I
10  actually had one with me, trying to see if I can locate it,
11  right.
12          It's those little cards, right, that's the SIM
13  card.  Little card that goes inside the phone, you put it in
14  the slot.  Sometimes you keep it and move it around.
15          Now, the alleged invention here is a switch, you
16  can see the picture in the patent.  That's figure 7 in the
17  patent, it's a switch.  So we're going to show the phone --
18  the claims require a phone, a removable SIM card, and this
19  switch in the SIM card.
20          The phones are known.  The specific GSM standard
21  in this patent was known.  The removable SIM cards were
22  known.  And I'm not sure, I think switches were -- generic
23  switches were known.  So we'll see.  And you'll be asked
24  whether this was known conventional technology, and we say
25  the answer is yes.

132

1          You can see same analogy actually that counsel
2  used.  When you fly to a different country, for example.
3  And by the way, you wouldn't be using this almost -- today
4  unless you were flying to a different country.  You can have
5  a second line, so you kind of -- you'd have one line in the
6  U.S. with Verizon, counsel for 3G showed you, you'd have
7  another line for Vodaphone.
8          Now there's two theories they have.  They have a
9  Google theory and a Verizon theory.  The issue there, the
10  accused products are phones made for Google and phones made
11  for Verizon, and there's like a separate pile of SIM cards
12  that they are accusing.
13          They have to show there's a phone with this SIM
14  card in there for infringement.  Again, they don't do it by
15  a preponderance of the evidence.
16          The phones for the Google Fi system, they are
17  not sold as a removable SIM card, no direct infringement.
18  They are not even alleging direct infringement.  They are
19  alleging inducement.
20          And, again, I just want to show you that the
21  order here, the instructions.  They have to show that HTC
22  actively and knowingly aided and abetted the acts that are
23  the direct infringement, number one, and two and three and
24  four, all four.  That's their burden by a preponderance of
25  the evidence.

133

1          And four is that the direct infringer infringes.
2  They got to show that there's actually a direct infringer,
3  and that's not HTC.  It's got to be someone else.  It's got
4  to be Google.  It's got to be a user.  They got to show
5  that.  I don't think they will.
6          And then they have to show that we knowingly
7  aided that person to knowingly do direct infringement.  Not
8  just we helped them build a phone: that we helped them
9  infringe.  That's what the law is.  And what the evidence is
10  going to show is that Google sends specifications to HTC of
11  how to build the phone.  It's their Android software too.
12  So for the Google theory, they send us the software and
13  everything, and we build it to HTC -- to Google's
14  instructions and specifications.  Not the other way around.
15          We then send it, as you can see, with no SIM
16  card to Google, and it's sold.  And there will be no
17  evidence that Google sells these phones with the removal of
18  SIM card, which is required by the claims.  Google sells
19  their phones without SIM card.  No evidence in this case
20  that the evidence will show that there was SIM card.  There
21  can't be infringement.
22          As to the Verizon phones, this Court's
23  construction -- just maybe take notes on this because I
24  won't have time, it's important.  You have this phone -- you
25  see it in Claim 18 -- it's a mobile station with a modified

134

1    subscriber data module.  Got to meet all the elements, as
2    I've already said.  They can't meet that element.  Why?  The
3    phones sold to Verizon are sold with a bunch of different
4    SIM cards.  Well, there's a -- a bunch of the SIM cards are
5    made by a company called Gemalto.  They won't be here
6    either, as you would surmise.  Those are disabled upon sale.
7    They don't work.  They got to be enabled after a sale.
8    Okay?  No one is going to actually show you a specific HTC
9    phone sold with a Gemalto card.  Again, the Madisetti
10   method.  Assumptions.
11           As to other cards, they rely on draft documents,
12   letters of intent, again, not enough for a preponderance of
13   evidence.  Failure of proof, we call it.  In fact,
14   Dr. Madisetti has got 45 different SIM cards and 12
15   different phones.  You won't see one instance of evidence
16   presented to you during this week of a specific SIM card --
17   at least he didn't provide any to us -- of a specific SIM
18   card matched to any of these phones.  It's sad.  It's just
19   let's assume there's 45 SIM cards and maybe they come in one
20   of these phones.
21           A lot of those SIM cards don't work with these
22   phones because they're for machine to machine.  So that's
23   already a mistake.  A lot of those SIM cards don't work on
24   the Verizon network.  They don't have a V in their model
25   number.  Well, that's another mistake.  A lot of those SIM

135

1    cards aren't even used in HTC phones, one more mistake.  And
2    you'll hear this from Dr. Jeffay.  I already told you that
3    the Gemalto SIM cards are disabled.  So you're kind of left
4    with ten SIM cards, but even for those ten, they never again
5    matched up to any of these phones.  Yeah, they can rely on
6    circumstantial evidence, but they got to do it by a
7    preponderance of the evidence.  This is a grab bag of here's
8    a bunch of SIM cards and let's hope you agree that one of
9    them's in these phones.  And so we think the evidence will
10   show there's no infringement.
11           Now, HTC, last witness -- well, actually one
12   more, Dr. Kakaes.
13           Dr. Kakaes, can you stand up?
14           He will testify about the invalidity of the
15   '818.  And that's the argument we will rely on, focusing on,
16   as you can see, the specific GSM 11.11 standard that you
17   have there.  It's 1996.  He'll talk about that and show that
18   they weren't the first and, oh, by the way, this is
19   conventional known technology.  And by conventional known,
20   you see right here, that's a specific standard.  This is
21   actually the patent itself.
22           So the patent itself, that '818 patent, tells
23   you that GSM systems were known, that mobile phones were
24   known, that SIMs were known.  Look at that last paragraph.
25   Dual SIMs, what they're saying the invention is, those were

136

1    known, okay.  They may not have had that switch.  Switches
2    were known.  Again, not special technology, and what's the
3    value?
4            Last, Mr. Bakewell, if you could stand up.
5            Mr. Bakewell will be talking about the value.
6    He has an MBA with a concentration in finance and is a
7    graduate fellow from the University of Maryland at College
8    Park.  He'll talk about that hypothetical negotiation.  And
9    that happens with Orange because at the time of this
10   hypothetical -- I know it's tough because it's a construct
11   of patent law, and it's a weird one.  We'd rather not talk
12   about it because we don't think you get there, right?  If
13   patents are invalid or patents are noninfringed, we don't
14   even talk about value.
15           We have to talk about this week what the
16   evidence will discuss because we're going to have a witness
17   talk about it in a world where the patents are soon to be
18   valid and infringed.  That's the world you have to assume in
19   this patent law in these cases, and that's what the Court
20   will instruct you.  The parties then have a negotiation back
21   when it was allegedly -- the alleged first infringement.  So
22   back there in 2012, 2013, they sit at a table, and at the
23   time Orange owned the patents.  And so you have Orange and
24   HTC talking.  And as I already showed you, when they talk,
25   they're going to talk about how this stuff was filed turn of

137

1    century.  By the way, one of the patents expired.  The other
2    one is about to expire.
3            Remember I showed you all those portfolio
4    licenses, not just for the '818 and '091 patent, no more
5    than $0.02 a unit, yet that's not what you're going to hear
6    the math for here.  Despite them having these licenses in
7    2012, 2013, not today, they're going to ask for more.  And
8    we could have a fair dispute maybe about this next one.
9    They want to increase it to $0.04 because there's one
10   agreement that we'll be talking about in the evidence.
11   Maybe they can get a little bit higher with that agreement.
12   We disagree.  But I'll give them that.
13           This is where it gets crazy and why we're here.
14   This is post-litigation, all of a sudden, let's increase it
15   by 3 more cents, and I'll show you why that's important.
16   They increase it to $0.03 because HTC is fighting this
17   lawsuit.  You can't do that.  That's against the laws of the
18   hypothetical negotiation.  We assume the patent's valid and
19   infringed.  That's an improper theory.
20           On top of that, 3G's lawyers then told their
21   expert to assume.  They're the ones that are injecting some
22   FRAND issue into the case in order to increase the pot, go
23   to the casino, drive to Atlantic City, put it on double zero
24   and get a 25 times increase.  But they're not entitle- --
25   that's not all their licensing.  Their licenses -- what the

138

1  evidence will show is their licenses were $0.02, maybe they
2  got $0.04, but they, in order to get some value out of this,
3  want to go 25 times.
4          And one last comment I've got is they said, oh,
5  there were -- Mr. Muus has reached out like three times and
6  we didn't respond.
7          You're going to see a lot of communications
8  between the parties.  This is going to be documents that
9  you're going to see, and there's e-mailing going back and
10  forth between these parties, and it's not three unanswered
11  communications.  So that actually is what the evidence will
12  show.
13          So you'll find that the patents aren't valuable,
14  I think.  That's what HTC believes.  You obviously get to
15  make up your own mind.  We think the patents aren't
16  infringed.  We think the patents are valid.  It's up to you.
17  We think the patents are not valuable.  Thank you for your
18  time, and talk to you later.
19          THE COURT:  All right.  Ladies and gentlemen of
20  the jury, at this time we're going to give you the lunch
21  break.  The Deputy will take you back to enjoy your lunch.
22  We'll break for about 50 minutes, come back at 2:30 p.m. and
23  continue with the testimony.
24          (Whereupon, the jury left the room at 1:39 p.m.)
25          THE COURT:  All right.  You may be seated.

139

1          All right.  Anything I need to hear before we --
2          MS. WHITE:  Briefly, Your Honor.  This morning
3  Your Honor precluded us in opening from advising the jury
4  about the agreed language that both sides agreed was
5  appropriate in light of the ruling on the FRAND issue.
6  Mr. Chaikovsky -- in the face of that ruling where we were
7  muzzled to tell the jury what the Court had already ruled,
8  Mr. Chaikovsky told the jury that we told our damage expert
9  to assume that the patents were not FRAND.  That strikes me
10  as highly improper and possibly warranting a curative
11  instruction.
12          The other thing I would raise is I had
13  understood we were supposed to exchange slides that we were
14  going to show.  Mr. Chaikovsky put a number of slides on the
15  ELMO that were purporting to be our slides.  We changed them
16  because we were trying to address and narrow the issues to
17  the Court, so he was showing the jury old versions of our
18  slides.  I just think it might be helpful to understand what
19  Your Honor's expectations are of the parties when they're
20  exchanging things like demonstratives to be used.
21          THE COURT:  They should be updated.  So if
22  there's a ruling that -- and somebody has to change their
23  slide, you know, don't use the old slide against them if
24  it's been updated.
25          MR. CHAIKOVSKY:  These were not updated slides.

140

1  I guess what she's telling you, which I was unaware, they
2  changed their slides.  I used the slides that they disclosed
3  to us.  And they were not changed as a result of any orders
4  of this court and, again, not intentionally, Your Honor.
5          THE COURT:  Right.  So --
6          MR. CHAIKOVSKY:  I was using slides that she
7  used.
8          MS. WHITE:  And we did disclose to them that we
9  had modified those slides in response to their concerns as
10  part of the meet-and-confer process.
11          One of the reasons Mr. Chaikovsky isn't aware of
12  that is he has not sent anyone with authority to these
13  meet-and-confers and he doesn't participate in them himself.
14  So when we made that change, it may not honestly have gotten
15  back to him.  But that would be one way to address it.
16          My primary concern is that the jury not be told
17  old versions of our slides were our slides.  I think that's
18  confusing when they just saw me present something else.  And
19  in addition --
20          THE COURT:  Well, I think that's -- you know,
21  that's -- the Court can't police if you decide -- once you
22  produce your slides and you decide to change them based on
23  something that's other than a court ruling --
24          MS. WHITE:  Which --
25          THE COURT:  I mean, the parties have to -- you

141

1  know, you should make sure that they have it --
2          MS. WHITE:  We did.
3          THE COURT:  -- and tell them.  So, I mean, I
4  can't get into -- things that are changed because of a court
5  ruling, that's one thing, but things that change because --
6          MS. WHITE:  Understood.
7          THE COURT:  -- you decided to change it, you
8  know, that's hard for the Court to police.
9          MS. WHITE:  Understood, Your Honor.
10          THE COURT:  The parties -- I would expect the
11  parties to use -- if somebody says that they've changed the
12  slide, to use the updated slide.  But if for some reason
13  there's a disconnect and that doesn't happen, I mean, it's
14  nothing that I can do about that.
15          MS. WHITE:  Understood, Your Honor.
16          I do -- I am concerned that now the jury is
17  under the misimpression that we instructed the witnesses to
18  make FRAND assumptions which are actually the result of
19  rulings.  And so --
20          THE COURT:  So in terms of the language that
21  plaintiff wants -- wanted to use, given that the defendants
22  have opened the door to that, you can use that language with
23  the witness, a demonstrative with one of your witnesses.
24          MS. WHITE:  Thank you, Your Honor.
25          MR. CHAIKOVSKY:  Your Honor, she brought into

142

1　her opening the FRAND discount.

2　　　　THE COURT:  Well, it's at issue now, so I'm

3　going to let think them use it, so they can use the

4　demonstrative with their witness.

5　　　　MR. HEALY:  Your Honor, just one point.  Your

6　Honor ruled or ordered HTC to provide us with very specific

7　information about these physical products.  We did not

8　receive all that information.  There's about 31 physical

9　products that they've disclosed.  We've received very

10　limited information for six, and they have not provided any

11　of the specific model numbers.  I raised this with Mr. Ou

12　via e-mail during openings, and he said that they are not

13　able to provide the specific internal product codes and

14　that, if they are able to get it from HTC, they'll get it to

15　us.  But they said they can't do it.

16　　　　THE COURT:  So if they don't get it, then we're

17　not going to let them use it because I told you guys to

18　produce the information and -- all right.

19　　　　MR. HEALY:  And so I'm clear, Your Honor.

20　　　　THE COURT:  Let me hear from him.

21　　　　MR. OU:  Your Honor, I don't think that the

22　explanation that Mr. Healy gave is accurate.  I sent them

23　over, I believe, a 16-paragraph declaration that I drafted

24　over two hours this morning.

25　　　　It has the specific IMEI number for every single

143

1　phone.  I told them where I got it from.  I sent them the

2　receipt.  I told them exactly what I did with them, when I

3　did it with them, how you can look up on the T-Mobile

4　website and find that it is verifiable.

5　　　　What I was not able to give Mr. Healy is that,

6　for example, a HTC -- this Pixel 2.  There may be four -- I

7　think there's four internal codes that are all Pixel 2s and

8　it could be hashtag -- we'll just say 1, 2, 3, 4.  Whether

9　it's 1, 2, 3, or 4 makes absolutely no difference to

10　Dr. Madisetti's theory.  But with this IMEI number, which is

11　a 16-digit number, very much more specific to verify that

12　this phone was not altered with, that's the information we

13　have.

14　　　　So I can find out whether it's A, B, C, or D.

15　It doesn't matter for Dr. Madisetti.  We gave them beyond

16　more information than what they are looking for.

17　　　　THE COURT:  Okay.

18　　　　MR. OU:  And, Your Honor, I'm happy to submit to

19　you my declaration that I put together.  I think we've gone

20　above and beyond to address their concerns that these are

21　somehow phones that we tampered with to unfairly impeach

22　Dr. Madisetti, that's not what's happening here, Your Honor.

23　　　　THE COURT:  All right.  Let me see -- make sure

24　I have a copy of the declaration, I'll take a look at it.

25　　　　MR. HEALY:  Could I just have two minutes, Your

144

1　Honor?

2　　　　THE COURT:  Yes.

3　　　　MR. HEALY:  So what I want to specify is

4　portions of that are simply incorrect.  Dr. Madisetti and

5　their own expert has said, for example, using Mr. Ou's

6　example, you know, let's say you have a Pixel.  Number one,

7　there's a lot of different versions but let's just say

8　there's three versions.  Their expert has said, well, I

9　agree that version 1 has phone calling, but I disagree that

10　version 2 has phone calling, I need to know versions because

11　that's what their expert says.

12　　　　Our expert, Dr. Madisetti, we go into the level

13　of this detail and if I don't have it, I can't distinguish

14　functionality from functionality.  Mr. Ou has pointed to the

15　IMEI's.  In the e-mail that he sent me about half an hour

16　ago, he said, "based on the IMEI information, we cannot

17　confirm which specific internal product codes without

18　checking with HTC."

19　　　　So that's a -- I mean, it's a red herring, it

20　doesn't give me any of the information I need.  And so,

21　again, I'm not asking Your Honor to do or strike anything at

22　that point.  I just need to understand that I'm going to get

23　the specific model numbers that I need and I need to

24　understand that if I don't get that information, what they

25　are going to be able to do because I'm going to need to be

145

1　able to respond to that?

2　　　　THE COURT:  All right.  So the specific

3　information that 3G is requesting, I understand that you're

4　saying you may need to consult with HTC, but can you get

5　that additional information to provide it to them?

6　　　　MR. OU:  Yes, Your Honor.

7　　　　THE COURT:  All right.  Again, you have some

8　time, I'll give you some additional time.  Get them the

9　additional information so that they can understand and be

10　able to adjust.

11　　　　MR. OU:  Thank you, Your Honor.  We will get the

12　information and in our letter brief will explain why it's

13　sufficient, Your Honor, thank you.

14　　　　MR. HEALY:  And the last point, Your Honor,

15　again, I don't want Your Honor to rule on anything, I just

16　sort of need to understand what I practically need to do.

17　　　　So, again, we have this -- the information that

18　he provided, which is in his declaration, is for six of

19　these physical products.  I have got nothing for the others.

20　　　　THE COURT:  Right.

21　　　　MR. HEALY:  I would like to understand whether

22　those are going to be --

23　　　　THE COURT:  So whatever products you're going to

24　use, you got to give him the information.

25　　　　MR. HEALY:  And then the other point is, they

146

1    have products that they have said they have opened, frankly,
2    they have said -- any ways, they also have products in
3    sealed boxes.  They have told us that we cannot open the
4    sealed boxes but that they still might open those sealed
5    boxes and use it in front of the jury if we somehow dispute
6    that the open things represent the products.  That strikes
7    me as unfair.
8             THE COURT:  Well, the -- because you're going to
9    use these products, the plaintiff -- now that we know you're
10   going to use them, should have an opportunity to fire them
11   up and do whatever they want to do with them.  So allow them
12   access to these products with their expert so that they can
13   do and examine and inspect them and do what they need to do
14   as well.
15            MR. OU:  Yes, Your Honor.  And just to be clear,
16   so that we're on the same page --
17            THE COURT:  And that should happen before any of
18   this takes place.
19            MR. OU:  Absolutely, Your Honor.  And just to be
20   clear:  I have a phone, I have two of them that are already
21   opened and we've given them the information.  The only
22   reason why I have a third one that is unopened right now is
23   because I'm concerned that Dr. Madisetti is going to say
24   well, the ones that are opened, I don't know what happened
25   with them and I only have one that's been unopened where you

147

1    can't say that.
2             Now, I'm happy to let them open it so long as
3    they are not going to use the fact that it's opened now by
4    them --
5             THE COURT:  Counsel will stipulate that they
6    opened it and that --
7             MR. OU:  Then no problem, Your Honor.
8             THE COURT:  So that won't be an issue.
9             MR. HEALY:  No problem.
10            So the very last point, your Honor, is in the
11   declaration in which apparently you're going to receive,
12   Mr. Ou confirms that they have factory reset every single
13   one of these devices, many of them, multiple times.  One of
14   the devices they took to Taiwan and had their client load
15   new software on it.  And they told us that they intend to
16   factory reset all of these devices again today at 6:00 p.m.
17            I don't think they should be -- we can have a
18   fight about what the factory reset means now for the
19   briefing but I would like them to be frozen so that they do
20   not continue to reset these devices in a way that's
21   obviously prejudicial to our ability to prove our case.
22            THE COURT:  However the products exist now, they
23   should remain that way and these folks should have access to
24   them and be able to inspect them with their expert and
25   prepare their case just like you've been able to prepare.

148

1             MR. HEALY:  And then this is -- I'm sorry, go
2    ahead.
3             MR. OU:  Absolutely, Your Honor.  The factory
4    reset is to put the phone in its state when it is initially
5    out of the box.  So --
6             THE COURT:  But he doesn't want --
7             MR. OU:  Yeah, I understand.
8             THE COURT:  He wants the products as they exist
9    right now so --
10            MR. OU:  Understood.  Yes, Your Honor.
11            THE COURT:  So that's how it should be.
12            MR. HEALY:  I have forgotten my last request for
13   Your Honor, so I will...
14            THE COURT:  All right.  So we're adjourned until
15   2:30 p.m., so counsel come back at like 2:27 p.m. so we can
16   get the jury at 2:30 p.m.
17            MR. HEALY:  I apologize, Your Honor, it just
18   popped in my head, if you'll just indulge me for one minute.
19            THE COURT:  What did you say?
20            MR. HEALY:  I said it just came back to what my
21   request was.
22            THE COURT:  Okay.
23            MR. HEALY:  Would it be possible for
24   Dr. Madisetti -- to the extent these exhibits come in at
25   all, is it allowable for Dr. Madisetti to address the

149

1    declaration and explain why he doesn't believe it works or
2    doesn't work?
3             Obviously this is information we've just gotten
4    an hour ago, so it's not in a report but obviously it's
5    going to be the focal point of evidence and I feel like we
6    don't need to wait --
7             MS. KELLER:  Your Honor, it's not evidence;
8    we're impeaching.
9             THE COURT:  Right.  They are just using it as a
10   demonstrative for impeachment, it's not coming in to
11   evidence as an exhibit.
12            MS. KELLER:  And I think you'll see this in our
13   briefing, Your Honor.
14            THE COURT:  So, I mean, Dr. Madisetti will get
15   to testify -- you'll get -- you know, elicit whatever
16   testimony you want him to in rebuttal.
17            MR. HEALY:  Sure.
18            THE COURT:  And so that's the way it'll come in
19   orally, you know, you will have -- he will orally get to
20   testify in rebuttal.  You're saying that you want a
21   supplemental expert report, right?
22            MR. HEALY:  No, no, I don't.  I don't want to
23   address that or any of that, Your Honor, but I don't want a
24   supplemental report at all.
25            My point is and what we talked about earlier is,

238

1          (Recess taken.)

2          (Whereupon, the jury entered the room at

3  4:48 p.m.)

4          MR. OU:  Good afternoon, Mr. Muus.  And good

5  afternoon.  For the jury, my name is Phil Ou and I'm a

6  lawyer for HTC.  I appreciate your patience and we're almost

7  at the end of the day, so...

8          CROSS-EXAMINATION

9  BY MR. OU:

10  Q.     Mr. Muus, it's been a few years since we last spoke,

11  right?

12  A.     Yes, that's right.

13  Q.     I want to start with something you said on your

14  direct examination.  Do you remember when counsel asked you

15  whether or not you were aware of an order from the Court

16  relating to FRAND?

17  A.     Yes, I remember that.

18  Q.     And I believe you said you were aware of that order,

19  right?

20  A.     Yes.

21  Q.     Mr. Muus, this is from the Court's order that your

22  counsel represented.  And what he was referencing was what's

23  right above what I have highlighted, I believe he asked you

24  whether or not you understood that, "defendants will be

25  unable to argue that any of the asserted patents are

239

1  standard essential and FRAND-encumbered": is that right?

2  A.     Yes, I believe that's fine.

3  Q.     And do you see what's after that, in the parenthesis,

4  it says, ("and the Court will not ask the jury to make any

5  finding on this issue")?

6          Do you see that?

7  A.     I'm sorry?  Repeat?

8  Q.     Sure, right after that sentence, in parenthesis, it

9  says ("and the Court will not ask the jury to make any

10  finding on this issue").

11          Do you see that?

12  A.     Well, it says, "The Court's decision does not mean

13  that the plaintiffs has affirmatively proven that the

14  asserted patents are not standard-essential and are not

15  FRAND-encumbered."

16  Q.     Sorry.  Yes, I was going to get there.  Let me just

17  go back.  So you see where it's highlighted --

18  A.     Yes.

19  Q.     -- right above that --

20          MR. FARNAN:  Your Honor, objection.  We don't

21  have an issue with covering the area.  The problem is there

22  was a dispute, so we have our agreement in the pretrial

23  order and this is what that agreement resolved and I read

24  right from the pretrial order, this is going to a underlined

25  document.  We'll go back and go through the Court's opinions

240

1  on a lot of stuff, right, the jury can see this, but it's

2  just starting a bad precedence.  I think we should get back

3  to the pretrial order.

4          THE COURT:  So in the future, let's do it

5  outside the presence of the jury, the objection.

6          MR. FARNAN:  I'm sorry.

7          THE COURT:  But I think this is fine for this

8  purpose, so you may continue, Mr. Ou.

9          MR. OU:  Thank you, Your Honor.

10  BY MR. OU:

11  Q.     Mr. Muus, right above the highlighting there's a

12  parenthesis and it says, "And the Court will not ask the

13  jury to make any finding on this issue."

14          Do you see that?

15  A.     Yes, that's what I see.

16  Q.     So, just to be clear, and this is really for the jury

17  to understand, the issue of whether or not these patents are

18  standard-essential or not, that's for the jury to decide, we

19  all agree on that, right?

20  A.     I guess.

21  Q.     And last question.  Now, what I've highlighted is

22  what your counsel didn't ask you about.  Do you see the last

23  sentence that says, "Further, contrary to plaintiffs'

24  suggestion at the hearing, the Court's decision does not

25  mean that the plaintiffs have affirmatively proven that the

241

1  asserted patents are not standard-essential and are not

2  FRAND-encumbered."

3          Do you see that?

4  A.     I see that.

5  Q.     And then the sentence right above that, the first one

6  I highlighted is, "The Court's ruling does not however,

7  prohibit defendants from introducing FRAND-related evidence

8  to establish the proper damages award."

9          Do you see that?

10  A.     Yes, I see that sentence.

11  Q.     Mr. Muus, do you know what that means when it says,

12  "it does not prohibit defendants from introducing

13  FRAND-related evidence to establish the proper damages

14  award"?

15          THE COURT:  So, so let's -- the Court will

16  instruct the jury on what questions they have to answer.  So

17  let's move on from this topic.

18          MR. OU:  Yes, Your Honor.

19  BY MR. OU:

20  Q.     Mr. Muus, before your counsel finished direct

21  examination, I believe you testified that you, on behalf of

22  Sisvel, after this period of time of negotiation and

23  litigation with HTC, would never recommend to Orange to

24  license to HTC on FRAND terms: is that what you said?

25  A.     I think what I said is that under the circumstances

**242**

1  of what we know now, the whole package, that would be right,
2  yes.
3  Q.   So put another way:  Let's say that Orange, today,
4  had a right to license the patents and HTC came knocking on
5  Orange's door and said, hey, I want to take a license now to
6  the '091 and '818 patent.  We want to take it for $0.02 a
7  patent.  You would tell them no, I don't recommend that you
8  do that, right?
9  A.   Yes, I think that would be right.
10  Q.   $0.02 per patent would be a FRAND rate, though.  You
11  agree with me, right?
12  A.   I'm not sure about that either.
13  Q.   Okay.  Didn't you just show a slide that the FRAND
14  rate for this portfolio was about $0.02 a patent?
15  A.   I'm not sure.  Which agreement are you talking about
16  exactly?
17  Q.   Okay.  Let's go to JTX038.  I believe it's the next
18  page.
19  A.   Should we go to the previous binder?
20  Q.   Sure.  You should have two binders with you.
21  A.   It's not in this one.
22  Q.   Sir, do you still have your binder?
23  A.   Yes, I have it here.
24  Q.   Let's actually go to JTX069, please.
25  A.   Okay.

**243**

1  Q.   Mr. Muus, this is a document that you were asked
2  about on your direct, right?
3  A.   Yes, that's right.
4  Q.   Okay.  I think the slide was -- it was page 4?
5  A.   Yes.
6  Q.   Okay.  So on page 4, it says, "3G Licensing," and
7  then it has a standard rate and a compliant rate for 3G UMTS
8  and a standard rate and a compliant rate for 4G LTE, right?
9  A.   Yes, that's right.
10  Q.   And these are FRAND rates, right?
11  A.   Yes.
12  Q.   We'll use standard rate just for simplicity, okay?
13  A.   Okay.
14  Q.   I think you said that if HTC wanted a license to the
15  portfolio, they would need both a 3G UMTS and 4G LTE for
16  their products to be covered, assuming their products would
17  use both of those, right?
18  A.   Yes, that's right.
19  Q.   So it would be $0.55, that's 20 plus 35, right?
20  A.   Yes, that's right.
21  Q.   So the rate would be $0.55, that's not just for one
22  of the asserted patents, though, right?
23  A.   No, that's for all the patents that 3G Licensing had
24  in that portfolio.
25  Q.   Right, it's not for one, it's not for two, that's for

**244**

1  the entire portfolio that 3G Licensing owns, right?
2  A.   Yes, that's right.
3  Q.   And that's 200 patents, is that right, sir?
4  A.   Well, it's about 200 patents, it's, at least for LTE,
5  it's 18 families.  But I think it's important to see that if
6  you talk about 200 patents, you're talking about a worldwide
7  portfolio.
8  Q.   200 patents, though, right, sir?
9  A.   Yeah, worldwide, but that would include patents in
10  the U.S. but also, for example, a patent in France.
11  Q.   Okay.  So still, you are paying $0.55 for about 200
12  patents.  We agree on that, right, sir?
13  A.   Yes, that's about right.
14  Q.   So rough math, right, $0.55 divided by 200 patents,
15  that's less than a penny per patent, you agree, right?
16  A.   That's the math, but that's not how we would offer
17  this license.
18  Q.   Okay.  Let's just use, because you said 18 families,
19  right?
20  A.   Well, for LTE, yes.
21  Q.   Okay.  Between 3G UMTS and 4G LTE, how many families
22  are we talking about?
23  A.   You mean for both fields of use?
24  Q.   Yes, sir.
25  A.   I think if you take everything together, it's a bit

**245**

1  over 20 or 25 patents, I'm not -- that's my ballpark figure.
2  Q.   Ballpark 25 families, right?
3  A.   Right.
4  Q.   Try to keep the math sample.  So we've got about
5  $0.50, that's the sum of the two, and about 25 families.
6  Can we agree that's about $0.02 per family?
7  A.   Yes, that's what the math comes out to.
8  Q.   Okay.  So $0.02 for the family for the '091, $0.02
9  for the family for the '818, fair?
10  A.   No, I don't think you can see it like that.  So what
11  you see here is how we offer a license to an entire
12  portfolio.  Sisvel or 3G Licensing doesn't license their
13  patents one by one.
14       We're not going to have 55 licensing discussions
15  and 55 -- or what is it, 20, 25 licensing discussions and 25
16  licenses.  That doesn't make sense.
17  Q.   Right.  3G Licensing and Sisvel, they don't write
18  license patents on a patent-per-patent basis, right?
19  A.   That's correct.
20  Q.   It's a one-stop shop, right?
21  A.   Well, the pool is the one-stop shop, this is just a
22  portfolio of one participant to the pool.
23  Q.   Okay.  So I want to be very clear on what you mean by
24  that.  What you mean by that is you've gone and sued HTC,
25  and you said, "HTC, you need a license on the '091 and the

246

1    '818 patent," right?

2    A.    Yes.

3    Q.    That's what you're saying in this lawsuit, right?

4    A.    Yes.

5    Q.    You haven't said in this lawsuit that HTC needs a

6    license on any of the other 198 patents in the portfolio,

7    you agree with that, right?

8    A.    Well --

9    Q.    Only two patents at issue in this case, right, sir?

10   A.    There's only two patents at issue in this case,

11   that's right.

12   Q.    So only two patents.  The 198 other patents are not

13   at issue in this case, right?

14   A.    They are not in -- I'm not really sure what "at

15   issue" means, but they are not in the case, I think.

16   Q.    3G Licensing did not file a lawsuit on any of the

17   other 198 patents in the portfolio, you agree, right?

18   A.    Not against HTC, no.

19   Q.    Okay.  And so if HTC said, "I want to resolve this

20   lawsuit.  I'm tired of paying my lawyers, you paying your

21   lawyers.  I want to license the two patents that you sued

22   on," your policy is to not grant a license to just those two

23   patents because you want HTC to pay for the entire

24   portfolio; isn't that right?

25   A.    Yes, that's right.

247

1    Q.    And you've never offered HTC a license to just the

2    two patents to resolve this lawsuit; isn't that right?

3    A.    No, I don't think so.  But I'm not 100 percent sure.

4    Q.    Okay.  At what point in time in the eight-year

5    history did 3G Licensing or Sisvel ever go to HTC and say,

6    "You know what, okay, we'll give you a license to just the

7    '091 and '818 and then we'll go from there"; did that ever

8    happen?

9    A.    No, I don't think so.

10   Q.    Okay.  So in the eight-year history, you have never

11   made an offer to HTC that would have resolved this lawsuit;

12   you agree with me, right?

13   A.    No, I don't agree.  I mean, this license that you see

14   on this slide right here would have resolved this

15   litigation.

16   Q.    It would have, but it would have forced HTC to also

17   pay for 198 patents that are not at issue in this case; you

18   agree, right?

19   A.    Yes, but there were still patents that they were

20   using, that we believed were essential and were in their

21   products.  So why would we say, "Well, we're just going to

22   solve this problem here and we're just going to pretend that

23   this bigger problem over there doesn't exist"?  That doesn't

24   make sense.

25   Q.    Sir, there's only two patents that 3G Licensing sued

248

1    on in this case, right?

2    A.    That's right.

3    Q.    Actually, that's not true.

4    A.    I mean, that are at issue here today.

5    Q.    There's only two patents at issue in this trial right

6    now; isn't that right, sir?

7    A.    That's right.

8    Q.    Okay.  So I think you just said that, well, there's

9    other patents in this portfolio that HTC is using that they

10   need to pay for, right?

11   A.    Yes.

12   Q.    You believe that HTC uses every single one of the

13   patents in the portfolio, that's why they are

14   standard-essential, right?

15   A.    That's how standard-essential licensing works.

16   Q.    Okay.  But if HTC disagrees, that means HTC doesn't

17   believe these patents are standard-essential because HTC

18   doesn't use them; isn't that right, sir?

19   A.    I think that's how this dispute got started.

20   Q.    Okay.  And that happens, right, sir, you're not

21   always right; isn't that right?

22   A.    I would hope so, but I don't think I'm always right,

23   no.

24   Q.    A court has not said that all 200 of those patents

25   are standard-essential, right?

249

1    A.    No.

2    Q.    In fact, Sisvel and 3G Licensing have realized that

3    at least some of those patents are not standard-essential;

4    isn't that right, sir?

5    A.    I'm sorry, could you repeat?

6    Q.    3G Licensing and Sisvel have determined that at least

7    some of the patents in the portfolio are not

8    standard-essential, right, sir?

9    A.    I'm not sure about that.

10   Q.    Didn't you file a lawsuit against HTC on another

11   patent that is supposed to be standard-essential?

12   A.    Yes.

13   Q.    Okay.  Does 3G Licensing still believe that after

14   six years of litigation, and then dropping the patent, that

15   it's still standard-essential, have you made that

16   determination?

17   A.    Um, we haven't made that determination, no.

18   Q.    Did your lawyers make that determination?

19         MR. FARNAN:  Objection, Your Honor, he's going

20   into legal conclusions and lawyers and stuff outside the

21   record.

22         MR. OU:  I'll withdraw the question, Your Honor.

23   BY MR. OU:

24   Q.    One question and then I'll move on.

25         You agree with me, sir, that it would be

250

1    incorrect for the jury to assume or conclude that every

2    patent among those 200 is standard-essential and HTC needs a

3    license to it, right?

4    A.      We would believe that they are, even though I haven't

5    looked at all those patents right now.  But we would believe

6    that this patent portfolio would be necessary for HTC to

7    take into license.

8    Q.      You believe then it would be reasonable for HTC to

9    disagree with you, right, sir?

10   A.      I don't think so.  I think that the goal of these

11   FRAND negotiations is that they come to a license.

12   Q.      If they agree that the patents are

13   standard-essential, right, sir?

14   A.      If the patents are essential and remain essential.

15   Q.      And no one has determined whether or not they are

16   actually standard-essential, right, sir?

17   A.      Well, I think the Court would be pretty upset if I

18   would ask them 200 patents to look at.

19   Q.      Okay.  The '091 and the '818 patent, though, are

20   those the strongest patents in the portfolio?

21   A.      We don't look at portfolios that way.

22   Q.      You don't make that determination, right?

23   A.      No.

24   Q.      You don't value one patent more than the other in a

25   portfolio because they are all standard-essential from your

251

1    perspective: isn't that right, sir?

2    A.      That depends on how you define the term "valuation."

3    Q.      Okay.  When you go into a negotiation -- when you go

4    into a negotiation, sir, and you're trying to get a licensee

5    to take a portfolio license, you put your best foot forward

6    first, right, sir?

7    A.      Well, we give a couple of exemplary patents.  So what

8    we like to do, especially in these pool license situations,

9    is that we would like to give at least a patent per patent

10   owner, but there's obviously much more in that portfolio.

11   Q.      Okay.  Let's go back in time a little bit, okay, sir.

12   You spent a lot of time on your direct talking about the

13   history of the licensing negotiations with HTC, right?

14   A.      Yes.

15   Q.      The first letter that you sent to HTC -- that Sisvel

16   sent to HTC was in May 2015, right, sir?

17   A.      Yes.

18   Q.      And I think on direct you testified that that letter

19   identified the '091 and '818 patents, that's what you said,

20   right, sir?

21   A.      Yes.

22   Q.      Okay.  The letter itself actually didn't list the

23   '091 and '818 patent, did it?

24   A.      In the letter there's a link, and if you click that

25   link you go to a PDF online, and there's all the

252

1    information.

2    Q.      Okay.  So in the letter itself, which you sent by

3    mail?

4    A.      Yes.

5    Q.      You can't click a link in a letter by mail, you agree

6    with me, right?

7    A.      Yes, it's not a very difficult link.  It's a very

8    short one.  We did that on purpose.

9    Q.      Sir, you don't need to fight me on everything, okay,

10   we can just agree, it's a paper letter, right?

11   A.      Yes, it's a paper letter.

12   Q.      In the paper letter, '091 and '818 are not written on

13   it, right, sir?

14   A.      That's right.

15   Q.      Okay.  We can go to the link and there's a list of

16   patents, right?

17   A.      Yes.

18   Q.      And that's what you said on direct, right?

19   A.      Yes.

20   Q.      And in that list, it lists the '091 and the '818

21   patent, right?

22   A.      That's right.

23   Q.      It also lists close to 200 patents: is that right,

24   sir?

25   A.      Yes, it was a pool offering.

253

1    Q.      Okay.  So you send a letter and it's got a list of

2    200 patents?

3    A.      That's right.

4    Q.      All right.  Now, did you on behalf of 3G Licensing in

5    that letter tell HTC specifically, Hey, you got to watch

6    out, these two patents, you really need them.  If you don't

7    take a license, we're going to sue you on these because we

8    think you use them.

9            Did you communicate that to HTC?

10   A.      Well, I think --

11   Q.      Did you communicate that to HTC, sir, those two

12   patents specifically, that's what I'm asking about?

13   A.      Well, you're asking me what's in that letter, so we

14   could also go to that letter, what I'm actually saying --

15   what we're actually saying.

16   Q.      Okay.  Answer my question, sir.  In the letter, does

17   Sisvel tell HTC that it needs to take a license specifically

18   to the '091 patent and the '818 patent?

19   A.      Yes, I do in the letter we say I think you should

20   take a license to the patents that exist and if you want to

21   have the exact language about what consequences are of not

22   taking license we need to go to that letter because I don't

23   know that by heart.

24   Q.      Okay.  In the letter, the letter does not

25   specifically call out the '091 patent or the '818 patent

254

1  aside from it being in a list of 200; isn't that right, sir;
2  yes or no?
3  A.     Yes or no -- I mean, what we put in that letter is
4  that we think that they need to take a license to in each of
5  patents, not just two, we think that each of these patents
6  deserves a license, that's the whole function of the letter
7  and of the pool.
8  Q.     Right.  So let's say that -- so you send the letter
9  and then I think you said that you had to send a couple of
10 letters before HTC started having discussions, we'll get
11 into that, right?
12 A.     What it's the question?
13 Q.     Okay.  Eventually you have a meeting, right, sir?
14 A.     I'm sorry.
15 Q.     Eventually you have a meeting, right, sir?
16 A.     Yes, we do in February 2016.
17 Q.     In advance of that meeting, you selected six claim
18 charts, six patent or patent families to give to HTC as
19 examples of why you that HTC must take a license to the
20 portfolio, right, sir?
21 A.     Yes, that's what we did.
22 Q.     And among those six you pick six out of that 200 the
23 '091 patent wasn't in the six?
24 A.     That's right.
25 Q.     The '818 patent wasn't in the six, right?

255

1  A.     That's also right.
2  Q.     Those six patents that were in the list, they are not
3  at issue in this lawsuit, right?
4  A.     That's correct.
5  Q.     You've never sued HTC on those six patents ever,
6  right, sir?
7  A.     Those six, no.
8  Q.     Okay.  So the first meeting that you have with HTC
9  where you're putting your cards on the table and you say,
10 hey, HTC, you need to take a license to all 200 of these,
11 all 200 and you pick six to put out, those six do not
12 include the '091 or '818, right?
13 A.     Those six patents were not even owned by 3G Licensing
14 it's by multiple canes we're negotiating a license for a
15 group of companies and we selected one of the I didn't go
16 licensing and the '091 and eight were not part of that
17 group.
18 Q.     Sir when your counsel gets back up he can redirect
19 you.
20        MR. OU:  Your Honor can, can you instruct the
21 witness to answer my questions yes or no.
22        THE COURT:  Okay.  You have to give him a yes or
23 no question.  Your question didn't call for a yes or no
24 answer.
25        MR. OU:  Understood, Your Honor.

256

1                THE COURT:  All right.
2  BY MR. OU:
3  Q.     Mr. Muus, those six patents that you introduced at
4  that meeting did not include the '091 or the '818, you would
5  agree with me, right?
6  A.     Yes, that's right.
7  Q.     Okay.  And those six patents, you have not sued HTC
8  for infringement of those six patents, right, sir?
9  A.     No, we haven't.
10 Q.     Okay.  Now, you had that meeting, I think it was in
11 February, you had another meeting in April, right, Mr. Muus?
12 A.     That's right.
13 Q.     At that next meeting did you bring up the '091
14 patent?
15 A.     No, we didn't.
16 Q.     Did you bring up the '818 patent?
17 A.     No.
18 Q.     Okay.  When HTC asked for more technical information,
19 wanted to better understand why is it Sisvel, why are you
20 telling me I need to pay for 200 patents,  did you see, hey,
21 you should really take a look at this '091, it's really
22 valuable technology, did you sir?
23 A.     Well they didn't finish our initial technical review
24 so we didn't think that was appropriate.
25 Q.     Did you ever tell HTC before filing a lawsuit that

257

1  you should take a license to the whole portfolio and call
2  out the '091 specifically?
3  A.     No.
4  Q.     Did you do that, sir?
5  A.     No.
6  Q.     So in that 19 months that you talked about where you
7  said HTC is an unwilling licensee, HTC is not taking us
8  seriously, the patent that 3G Licensing, your damages expert
9  is going to show that that's the majority of the damages in
10 this case that he wants, that one patent, you never once
11 raised it in the 19 months?
12 A.     That's not true we also sent them the patent
13 brochure.
14 Q.     The patent brochure that list all 200?
15 A.     No, that's different.  The list of patents the patent
16 prowhich sure an over sue view of each patent in the
17 portfolio each portfolio family showing which claim of the
18 patent we believe is essential and we cite ever technical
19 specification drawing, table in the standard until where the
20 engineer needs to look to understand what the relevance of
21 that claim is to the standard and to make it complete we
22 even include the ETSI declaration so that they can just find
23 it very easily with a reference number how it was declared
24 essential.
25 Q.     I --

258

1   A.   So that over rule, if I could finish my question.

2   Q.   Go ahead?

3   A.   And we've got rulings in Germany that as well that

4   the judge there thinks that's enough.   For us and we believe

5   for engineers that's perfectly the same thing as a claim

6   chart and HTC never responded to that information.

7   Q.   Okay.  Let me break that down because I want to make

8   sure the jury understands exactly what you're saying.

9   You're saying so you have a list of about 200 patents,

10  right, sir?

11  A.   I don't know the number exactly, I need to see the

12  document, but let's say for argument's sake yes.

13  Q.   Let's say for argument's sake 200, you provide what

14  you're calling a claim chart but that's supposed to cover

15  all of the patents in your portfolio that you think are

16  standard-essential, right?

17  A.   Yes, for the ones that we identified.

18  Q.   And so in that you never once singled out the '091

19  patent, right, sir?

20  A.   No we singled out a lot of patents.

21  Q.   No, no I'm asking you did you ever just single out

22  the '091 patent in the same way that you picked six you

23  picked your six best you went to that meeting it didn't

24  include the '091 was there ever a time you specifically

25  picked out the '091 patent from the portfolio pay attention

259

1   to this?

2   A.   Not that I'm wouldn't happen.

3   Q.   It wouldn't make sense pick out '091 but you picked

4   out six others?

5   A.   That's how we got started, yes.

6   Q.   So I just want to make sure, 19 months never once

7   '091 patent you need to take a license to this patent

8   specifically, separate and aside from the rest, you agree

9   with me, right, sir?

10  A.   We didn't say that they needed to take a separate

11  license, no.

12  Q.   Okay.  And even today I don't think you're going to

13  fight me on this one if HTC went to you and said we want to

14  take a license to the '091 and the '818 patent we want to

15  resolve this litigation, these are the only two patents that

16  you have alleged that we infringe, you're not even going to

17  go do a deal with them, right, sir, because you want to

18  force them to take a license to all 200 so you can get more

19  money: isn't that right, sir?

20  A.   I'm not sure about that if they would come to me

21  today we would certainly sit down and see what we can fix,

22  of course.

23  Q.   You wouldn't be charging them $0.02 per patent,

24  though, right, sir?

25  A.   No, that's unlikely.

260

1   Q.   Let's talk a little bit about the history of the

2   negotiations, okay.

3        Can we pull up opening slide two?

4        Now, Mr. Muus, I think you said that you went to

5   Taiwan to HTC's headquarters, do you remember seeing this

6   slide during opening?

7   A.   Yes.

8   Q.   This is HTC's building in Taiwan in Taiwan it?

9   A.   It was a while ago.

10  Q.   It's aal nice white building?

11  A.   I think when I first went there it was brand new.

12  Q.   Okay.  This is the headquarters that you had your

13  first two meetings at, sir, right?

14  A.   I need to look it up, like I said.  I went to their

15  headquarters I remember big white entrance hall I don't know

16  what it looks from the outside because if you're standing in

17  the streets, I'm not there to take pictures of buildings.

18  Q.   Sure.

19        Do you remember, sir, this is in Taipei City?

20  A.   Yes, New Taipei City.

21  Q.   New Taipei City?

22  A.   Yeah.

23  Q.   When you first sent your letters to HTC, did you send

24  them to their office in New Taipei City?

25  A.   I need to check the letters.

261

1   Q.   Let's check the letters.  Why don't we go to JTX070.

2   A.   070.

3   Q.   It's on the screen we can blow it up a little bit.

4   This is the first letter?

5   A.   I'm sorry, I don't have the Taoyuan City so this is

6   the first letter that Sisvel UK sent to HTC.

7   Q.   Yes, that's right.

8   Q.   This is what you say is the first time sis is cell

9   told HTC it needs to take a license, right?

10  A.   Yes.

11  Q.   And the address that's up here, that's the Taoyuan

12  City, right, sir?

13  A.   Yes.

14  Q.   That's not that headquarters that we were just

15  looking at, right, sir?

16  A.   I don't know, no, that's not the same address, that's

17  right.

18  Q.   Okay.  Let's go to the next letter you sent, Sisvel

19  UK and that is PTX132.

20  A.   Okay.

21  Q.   This is a second letter that Sisvel UK sent to HTC,

22  July 2015, right, sir?

23  A.   Yes, that's right.

24  Q.   This is a letter that counsel for 3G showed in

25  opening where she said this was a third time we had to come

262

1  after them we had to give them a warning, do you remember
2  that sir?
3  **A.**     Yes.
4  **Q.**     Again, was that sent to Taipei city, new Taipei city?
5  **A.**     No it wasn't.
6  **Q.**     That wasn't sent to where the legal team was and
7  where you had the meet iffings was, it wasn't right sir?
8  **A.**     I don't know if the legal team wasn't there.
9  **Q.**     You met the legal team in New Taipei City?
10  **A.**    Job if it's their office I don't know we also sent by
11  fax and registered letter both of them.
12  **Q.**    Setting aside, okay.
13  **A.**    I'm sorry.
14  **Q.**    Setting aside whether you actually sent it to the
15  right place, eventually in August, I think, that's when the
16  communications started happening, right, sir?
17  **A.**    Yes, before we also sent that e-mail.
18  **Q.**    Sure, that e-mail was from a colleague of yours,
19  Salena Achi --
20  **A.**    Yes.
21  **Q.**    -- from Sisvel Hong Kong?
22  **A.**    That's right.
23  **Q.**    Let's go to your binder, sir, the one I gave you, go
24  to PTX278, let's not publish it yet because this is a new
25  exhibit.

263

1              Let me know when you are there, sir?
2  **A.**     278?
3  **Q.**     Yes, sir.  Are you there?
4  **A.**     Yes, I have in in front of me.
5  **Q.**     Do you recognize PTX278 as an e-mail thread?
6  **A.**     Yes.
7  **Q.**     Under the PTO, I don't believe I need to admit I just
8  want to make sure we can publish the exhibit we don't need
9  to move it into evidence under the PTO.
10             THE COURT:  All right.  Any --
11             MR. OU:  I this there's an agreement.
12             MR. FARNAN:   No objection, it goes in, no need
13  for foundation, he can use the exhibit.
14             THE COURT:  All right.
15             MR. OU:  Your Honor, may I admit the exhibit,
16  Your Honor.
17             THE COURT:  All right.  No objection?
18             MR. FARNAN:   No objection, Your Honor.
19             THE COURT:  All right.  PTX278 is admitted.
20  BY MR. OU:
21  **Q.**     Okay.  PTX278, Mr. Muus, I'll represent to you that
22  it's an e-mail thread that's part of the longer e-mail
23  thread that we looked at earlier.
24  **A.**     Yeah, I recognize it.
25  **Q.**     Okay.  I got this in my notes so it will be easier

264

1  for me to follow along, so bear with me.
2              Mr. Muus, do you see at the bottom of this page,
3  this is HTC's first offer or counteroffer, you might not
4  consider it a real offer, but this is the first time that
5  they made a financial proposal to Sisvel 3G Licensing,
6  right?
7  **A.**     Yes, after a long time.
8  **Q.**     Right.  And on your direct, you were focused in
9  on the -- tenth of a cent is -- basically was the offer,
10  right, sir?
11  **A.**    Yes.
12  **Q.**    Now, looking below that, do you see it says, "the
13  above offer is FRAND compliant and fair"?
14  **A.**    That's what HTC says, yes.
15  **Q.**    Okay.  And then do you see the next sentence that
16  says, "As you know, the Sisvel Orange portfolio represents
17  less than 0.3 percent of the patents declared essential to
18  the LTE standard."
19             Do you see that, sir?
20  **A.**    Yeah, I see that.
21  **Q.**    Do you disagree with that, sir?
22  **A.**    I would not agree with that, no.
23  **Q.**    You wouldn't agree with that?
24  **A.**    I wouldn't agree with that, no.
25  **Q.**    What would you say is the percentage of patents

265

1  declared essential to LTE standard that Sisvel Orange
2  portfolio represents?
3  **A.**     I would have to go back in time.  I mean, the ETSI
4  declaration grows every month, so --
5  **Q.**     Give me best guess, sir.
6  **A.**     My best guess -- what I can say is that we made a
7  calculation at the time that the entire portfolio of the
8  pool would be about 4.2 percent, if I remember correctly.
9  It must be in the same e-mail thread.
10  **Q.**    4.2 percent?
11  **A.**    Yes.
12  **Q.**    So you believe that your pool accounted for about
13  4 percent of the -- all the LTE patents that have been --
14  all the patents that have been declared standard-essential;
15  is that right, sir?
16  **A.**    At that time, yes.
17  **Q.**    Okay.  4.2 percent, I apologize, it's late, but, you
18  know, a little bit of math, 0.3 percent, 4.2 percent, that's
19  14 times as much, right, three times 14 is 42?
20  **A.**    I'm not very good at calculus.
21  **Q.**    3 times 14, 42?  We can do the rough, let's just say
22  it's about ten times as much.
23  **A.**    Yeah, yeah, that's 1.2 plus three, yeah.
24  **Q.**    Okay.
25  **A.**    Yeah.

282

1    Tomorrow morning please report to the jury room

2    between 9:10 a.m. and 9:20 a.m., so that we can get started

3    at 9:30 a.m.

4    Today was a little different, tomorrow we'll try

5    to stay more on schedule in terms of 2 hours so that you can

6    get a break at 11:30 a.m. and then go until 1 o'clock and

7    then you have your lunch at one as opposed to a little later

8    today.

9    And that's it.  We'll see you in the morning,

10   thanks again for your time.

11   (Whereupon, the jury left the room at 5:45 p.m.)

12   Ou Ou Your Honor, can I confirm since the witness is on the

13   stand he's not allowed to talk to counsel ability his

14   testimony.

15   THE COURT:  That's right they have Delaware

16   counsel to advice him.

17   All right.  Counsel, you have the submissions

18   that we gave deadlines for tonight, we expect you to meet

19   those deadlines and remember with respect to the joint

20   submission for 6:00 a.m., make sure that that's -- well for

21   all those things, make sure that it goes to the civil e-mail

22   and that with respect to the joint submission that is there

23   are the paper copy is on the podium and at least two paper

24   copies are there.

25   With respect to any demonstratives or exhibits

283

1    that are at issue.

2    All right.  We're adjourned for the evening.

3    (Recess taken.)

4    (Whereupon, the following proceeding concluded

5    at 5:46 p.m.)

6    I hereby certify the foregoing is a true

7    and accurate transcript from my stenographic notes in the

8    proceeding.

9    /s/ Michele L. Rolfe, RPR, CRR

     U.S. District Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                   IN THE UNITED STATES DISTRICT COURT

3                   IN AND FOR THE DISTRICT OF DELAWARE

4
    3G LICENSING, S.A., KONINKLIJKE        )
5   KPN N.V., and ORANGE S.A,             )
                                          )
6            Plaintiffs,        )   C.A. No.
    v.                          )   17-083-GBW
7                               )
    HTC CORPORATION,            )
8                               )
             Defendant.
9

10
                          - - - -
11
                     Wilmington, Delaware
12                   Wednesday, October 11, 2023
                     *Trial Volume 2*
13
                          - - - -
14

15
    BEFORE:  HONORABLE GREGORY B. WILLIAMS
16           UNITED STATES DISTRICT COURT JUDGE

17
                          - - - -
18

19

20

21

22

23

24

25

285

Michele L. Rolfe, RPR, CRR

1

2  APPEARANCES:

3       FARNAN LLP
        BY: MICHAEL J. FARNAN, ESQ.
4
        -and-
5       SUSMAN GODFREY
        BY:  ANDRES HEALY, ESQ.
6            LEXIE WHITE, ESQ.
             HUNTER VANCE, ESQ.
7            For Plaintiff

8
        SHAW KELLER LLP
9       BY: KAREN KELLER, ESQ.
             NATHAN R. HOESCHEN, ESQ.
10
        -and-
11
        WHITE & CASE
12      BY: YAR R. CHAIKOVSKY, ESQ.
             PHILIP OU, ESQ.
13           RADHESH DEVENDRAN, ESQ.
             SHASHANK CHITTI, ESQ.
14           For Defendant

15

16

17

18

19

20

21

22

23

24

25

---

286

1

2              - - - - -

3          P R O C E E D I N G S

4      (REPORTER'S NOTE:  The following hearing was held in

5  Courtroom 6B beginning at 11:00 a.m.)

6

7  Michele L. Rolfe, RPR, CRR

8

9          THE COURT:  Good morning.  You may be seated.

10         First thing first is the use of the

11  demonstratives, I'm going to allow the demonstratives to be

12  used consistent with what I said yesterday.  They can be

13  used for impeachment purposes.

14         With respect to -- and they can be used for

15  impeachment purposes and in terms of whether they can be

16  used on direct with Dr. Madisetti, I didn't see anything

17  where there was any provision that he had something in his

18  expert report that would allow him to talk about it in the

19  direct.  So they have to open the door first for him to be

20  able to talk about it even on cross and/or redirect.  So he

21  can't just go beyond the scope of his report.

22         All right.  So that takes care of that.

23         MR. FARNAN:  Your Honor, may I just ask one

24  question on that issue?

25         THE COURT:  Yes.

---

287

1          MR. FARNAN:  In preserving our objection, would

2  Your Honor give a limiting instruction because it's

3  confusing for the jury whether it proves noninfringement or

4  it just goes to his contradiction, and so we would ask for a

5  limiting instruction that you only consider this

6  demonstration --

7          THE COURT:  For impeachment purposes.

8          MR. FARNAN:  And that's it.  It doesn't go to

9  the merits of the case or the proof of noninfringement.

10         THE COURT:  I'll give a limiting instruction

11  that they should consider the demonstrative evidence for

12  impeachment purposes only.

13         MR. FARNAN:  And I'm not too sure that the jury

14  understands impeachment so if we could also phrase it that

15  this isn't substantive evidence and doesn't -- or you can --

16         THE COURT:  I will give a limiting instruction

17  that they are to consider it for impeachment purposes only.

18  Impeachment means to test the accuracy of his testimony?

19         MR. FARNAN:  Yes.

20         THE COURT:  Is that fine?

21         MR. FARNAN:  Yes, thank you, Your Honor.

22         THE COURT:  Okay.

23         Any concerns with the limiting instruction?

24         Okay.  All right.  So both sides agree on the

25  limiting instruction.

---

288

1          All right.  With respect to the objections to

2  Madisetti slides, I'll give the rulings for the ones I have

3  gotten through so far.

4          With respect to HTC's objections to Madisetti

5  slide 17, 18, 114, those are overruled.

6          With respect to Madisetti slides 21, 23,

7  overruled.

8          24, overruled.

9          84, overruled.

10         That's where I was able to get to.

11         So now I'm at Madisetti slides 115, 116, 118,

12  145-149 and 162.

13         So let me hear from the parties on those.

14         MR. DEVENDRAN:  Good morning, Your Honor.  Just

15  one question with respect to slides 17, 18 and 114, I

16  believe there was an issue or a dispute between the parties

17  as to the understanding of Your Honor's claim construction

18  order of initiating a second call.

19         From what plaintiff's response states, it sounds

20  like they are interpreting our construction as still

21  covering the answer message, which we understood Your

22  Honor -- your statements at the hearing and your

23  construction requiring the language, if answered, that the

24  answer is not supposed to be included and that's why we

25  raised the objections in the first place.









[redacted]

[redacted]

[redacted]

[redacted]

473



477



Page 481 to 484 of 602















513



20    (Whereupon, courtroom was unsealed.)

21    THE COURT:  All right.  You may continue.

22  BY MR. CHAIKOVSKY:

23    Q.    Dr. Madisetti, do you agree that each of the asserted

24  claims of the '091 require a first call and a second call,

25  true?

---

514

1    A.    As claimed.

2    Q.    That's a yes or no.

3          They require a first call and a second call; yes

4  or no?

5    A.    Yes, as in this claim.

6    Q.    Okay.  I'm going to ask it to you one more time and

7  we're going to have an issue if I don't get a yes or no,

8  because this is exactly what I was worried about.

9          Dr. Madisetti, do you agree that each of the

10  asserted claims of the '091 patent require a first call and

11  a second call: yes or no?

12    A.    Yes, but as in the claim.

13          MR. CHAIKOVSKY:  Again, Your Honor, you know, he

14  can answer that question, we know why we're here and we're

15  going to have this happen for the remainder of the

16  afternoon.

17          THE COURT:  Dr. Madisetti, you're on

18  cross-examination, he's asking you yes-or-no questions.

19  Please answer yes or no.  Your counsel will have a chance to

20  redirect.

21  BY MR. CHAIKOVSKY:

22    Q.    Do you need me to repeat the question, sir?

23    A.    Yeah, mm-hmm.

24    Q.    Okay.  Dr. Madisetti, you agree that each of the

25  asserted claims of the '091 patent require a first call and

---

515

1  a second call, true?

2    A.    Yes.

3    Q.    And the Court in this case construed a first call to

4  mean an in-progress mixed-media telecommunication call,

5  true?

6    A.    I would have to look at the Court's construction to

7  be precise.

8    Q.    Do you have any reason to doubt my representation

9  that that was the Court's construction, sir?

10    A.    If you present it, then, yes.

11    Q.    Okay.  So in order for there to be infringement, you

12  must identify then an in-progress mixed-media

13  telecommunication call, correct?

14    A.    Yes.

15    Q.    And the Court construed call, just the word "call,"

16  as "a communication of audio and/or video data between

17  mobile stations," correct?

18    A.    Yes.

19    Q.    So the first call -- so the first call must include

20  both audio and video media in the claims, correct?

21    A.    The first call includes audio as a media and video as

22  a media.

23    Q.    So that means the answer is yes.  So let's ask the

24  question again.  And the -- so the first call must include

25  both audio and video media, true?

---

516

1    A.    That's not how I would state that.  I say that the

2  first call has media which is audio, and has media which is

3  video -- a second media which is video.

4    Q.    The first call is required to have a first media and

5  second media, true?

6    A.    Yes.

7    Q.    And the first media, for example, can be audio, true?

8    A.    Yes.

9    Q.    And the second media in the claims is video, true?

10    A.    Yes.

11    Q.    Now, you testified for a long time on direct,

12  correct?

13    A.    Yes.

14    Q.    You testified that an example of a mixed-media call

15  is a video call in which both voice and video media are

16  being transmitted, correct?

17    A.    Yes, it has two media: video and audio.

18    Q.    You didn't identify any other examples of mixed-media

19  calls that would meet the Court's construction of call, did

20  you?

21    A.    I did identify the second call.

22    Q.    Okay.

23    A.    Which is the audio call.

24    Q.    You didn't identify any other examples of mixed-media

25  calls that would meet the Court's construction of a first

---

517

1  call, did you, sir?
2  A.     I did.
3  Q.     You identified something other than a
4  telecommunication -- a call that has audio and video, sir,
5  for the first call?
6  A.     That's what I did, yes.
7  Q.     So you identified for the first call a call having
8  audio and video media, true?
9  A.     Audio media and video media.
10  Q.     Again, so I'm not sure where our disconnect here is,
11  so I want to make sure we're connecting correctly because
12  you seem to be disagreeing with me.
13  A.     No.
14  Q.     Okay.  Well, then just say "yes," sir.  We've already
15  gone through this.  When you testified in your direct
16  testimony, you testified about a first call.  You testified
17  about a first call that has audio media and video media,
18  true?
19  A.     Yes.
20  Q.     And for purposes of infringement, you're pointing to
21  a video call as that first call, correct?
22  A.     A video call that has video and audio.
23  Q.     You used the phrase "video call" to refer to that
24  during your direct testimony and, in fact, pointed to
25  various documents that called it a "video call"; did you

518

1  not, sir?
2  A.     Yes, that's the video call with video media and audio
3  media.
4         MR. CHAIKOVSKY:  Again, I'm going to be looking
5  for that "yes" or "no," Your Honor, because I don't have
6  time for him to elaborate.  If he needs to be redirected, he
7  can be redirected.  My questions are pretty clear.
8         THE COURT:  All right.  You can continue.
9  BY MR. CHAIKOVSKY:
10  Q.     I'm going to ask one more time.  For purposes of
11  infringement, you are pointing to a video call as the first
12  call, correct?
13  A.     Yes, as I explained.
14         THE COURT:  Dr. Madisetti, please just -- he's
15  asking you yes-or-no questions.  Just please answer "yes" or
16  "no" and leave the further supplementation for redirect.
17         THE WITNESS:  Yes, Your Honor.
18  BY MR. CHAIKOVSKY:
19  Q.     We've already established you've testified quite a
20  few times before, have you not, Dr. Madisetti?
21  A.     Yes.
22  Q.     You know the rules, right?
23  A.     Yes.
24  Q.     Okay.  And by the way, in your testimony about a
25  video call, it's not just any video call.  You're saying HTC

519

1  phones infringe because they support video calling offered
2  by carrier networks, correct?
3  A.     Yes.
4  Q.     More specifically, you provide three infringement
5  theories.  I think I've counted them.  I was listening
6  closely.  One infringement theory was for AT&T carrier video
7  calling, correct?
8  A.     Yes.
9  Q.     And a second one, second theory was for T-Mobile
10  carrier video calling, correct?
11  A.     Yes.
12  Q.     And then the final one I think I heard was for
13  Verizon carrier video calling, correct?
14  A.     Yes, there's one more for the noncarrier phones, so
15  there are four.
16  Q.     Okay.  And that fourth one that you're establishing,
17  that's the one where you're pointing to the network goes
18  from packet switching to circuit switching, correct?
19  A.     Yes, and also for phones that use the same chipsets
20  as the carrier phones, so then that would be the fifth
21  theory.
22  Q.     Okay.  So it's your belief that you've got carrier
23  video calling on AT&T, Verizon, and T-Mobile; okay?
24  A.     Yes.
25  Q.     Sir, I want to ask you, prior to this litigation --

520

1  this is kind of an aside.  Prior to this litigation -- I
2  know it's a long time ago -- I think you were asked during
3  your deposition, had you ever used carrier video calling
4  before, before this litigation?
5  A.     I don't remember.  I don't think so.
6  Q.     Right.  It's not a feature many people use, sir, is
7  it?  Did you provide any opinions on that?
8  A.     I don't have any opinions on that.  The damages
9  expert will describe that.
10  Q.     I've never used carrier video calling, and
11  you didn't testify that you've used carrier video calling
12  during this case, did you?
13  A.     I don't believe I did.
14  Q.     Right.  But you're accusing it of infringement, sir,
15  are you not; yes or no?
16  A.     Yes.
17  Q.     And that's because your method, the Madisetti method,
18  allows you to accuse things of infringement by looking at
19  carrier documents and chips, correct?  That's what you're
20  using to analyze whether there's infringement or not, true?
21  A.     Yes.
22  Q.     And so at least for the carrier video calling
23  theories -- we'll get the other ones later, but for the
24  carrier video calling theories, when you walked through the
25  elements of the claims, however many you want to call that,

521

1  the only evidence you showed for each of them is evidence
2  from AT&T, T-Mobile, Verizon, and Qualcomm, true?
3  **A.**  No.  I added the deposition testimony.
4  **Q.**  Okay.  And the deposition?
5  **A.**  Of HTC corporate witnesses.
6  **Q.**  Okay.  But you didn't provide any one piece of
7  evidence demonstrating that a software application, or an
8  app, would meet the element of the claims, true?
9  **A.**  I also -- sorry, I also addressed source code that --
10  in my reports.
11  **Q.**  That's the Qualcomm source code?
12  **A.**  Yes.
13  **Q.**  But you didn't provide one piece of evidence
14  demonstrating that an app like Zoom would meet the claims,
15  correct?
16  **A.**  I did not offer an opinion on that, you're right.
17  **Q.**  So you didn't offer, sir, any opinion to this jury --
18  I just want to make that clear -- that Skype infringes the
19  '091 patent, true?
20  **A.**  Yes, that's true.
21  **Q.**  And you didn't offer any opinion to this jury that
22  Zoom infringes the '091 patent, true?
23  **A.**  I did not.
24  **Q.**  And you didn't offer any opinion, sir, that FaceTime,
25  which many of us use, infringes the '091 patent, true?

522

1  **A.**  I did not.
2  **Q.**  And you didn't offer an opinion, sir, that WhatsApp
3  infringes the '091 patent, did you, sir?
4  **A.**  I did not.
5  **Q.**  And you didn't offer an opinion that Microsoft Teams
6  infringes the '091 patent, did you, sir?
7  **A.**  I did not.
8  **Q.**  And you didn't offer an opinion that any Google
9  software -- whether meets, hangout, or otherwise --
10  infringes the '091 patent, did you, sir?
11  **A.**  I did not offer specifically any opinions of Google
12  software.
13  **Q.**  So if -- if you do a video call using that software,
14  you have not accused that feature of infringing the '091
15  patent, true?
16  **A.**  I have not offered an opinion on those products, yes,
17  I did not.
18  **Q.**  All you're accusing of infringement with respect to
19  your carrier calling theories or your video calling theories
20  by carrier networks is the native video calling features
21  offered by T-Mobile, Verizon, and AT&T, true?
22  **A.**  Yes, by "native" if you mean HD and -- as specified
23  in the requirements, yes.
24  **Q.**  Right.  And that's the feature that you haven't used
25  before, true, sir?

523

1  **A.**  I haven't used it, but I'm a nerd.
2  **Q.**  You're aware, are you not, sir, that at one time your
3  client 3G was accusing Google Hangouts of infringing the
4  '091 patent, true?
5  **A.**  I don't know.
6  **Q.**  So you don't know that they abandoned their claims
7  against Google Hangouts: yes or no?
8  **A.**  I don't know.
9  **Q.**  You didn't offer this jury, sir, anywhere during your
10  three hours of testimony or whatever it was, any direct
11  evidence that the accused products have ever been used to
12  conduct carrier video calling, true?
13  **A.**  I believe I did, because the carriers require it.
14  **Q.**  I'm asking direct evidence.  Did you show one
15  instance, sir, of it actually happening?  Did you show one
16  instance of it actually occurring?
17  **A.**  I did not.  I did not need to.
18  **Q.**  I'm not asking you whether you need or not, sir.  I'm
19  asking you whether you showed this jury one instance of it
20  actually transpiring: yes or no?
21  **A.**  Actual instance, no, I have not showed a
22  demonstration.
23      MR. CHAIKOVSKY:  I'm going to, again, Your
24  Honor...
25      THE COURT:  Well, you asked him to characterize

524

1  direct evidence, so I think his answer is appropriate.
2      MR. CHAIKOVSKY:  Okay.  Thank you, Your Honor.
3  BY MR. CHAIKOVSKY:
4  **Q.**  And I just want to round this out a little bit.  And
5  for the jury, you didn't provide any evidence -- any
6  evidence of how many people in the United States actually
7  use carrier video calling, true?
8  **A.**  I did not.
9  **Q.**  Sir, now let's talk about the Madisetti method.  You
10  based your review on certain evidence, true?
11  **A.**  I couldn't hear that.
12  **Q.**  You based your review on certain evidence, true?
13  **A.**  Yes.
14  **Q.**  And you provided reports in this case that listed out
15  the information you considered, correct?
16  **A.**  Yes.
17  **Q.**  And there was a list you provided with your opening
18  report, correct?
19  **A.**  Yes.
20  **Q.**  And there was a list you provided with your reply
21  report, correct?
22  **A.**  Yes.
23  **Q.**  And you considered all of that information
24  thoroughly, correct?
25  **A.**  Yes.

525

1  Q.      And that evidence includes carrier documents, as you
2  mentioned, true?
3  A.      Yes.
4  Q.      As well as documents produced by 3GL and HTC, true?
5  A.      Yes.
6  Q.      And the evidence you considered also includes the
7  deposition transcripts of various witnesses, true?
8  A.      Yes.
9  Q.      Including depositions of Qualcomm engineers, true?
10  A.      Yes.
11  Q.      And you also considered the depositions of HTC
12  witnesses, true?
13  A.      Yes.
14  Q.      And you considered all the exhibits to each of those
15  depositions that you reviewed, true?
16  A.      Yes.
17  Q.      You also considered several websites, correct?
18  A.      Yes.
19  Q.      Including HTC web pages, true?
20  A.      Yes, I did a thorough job.
21  Q.      As well as carrier web pages?
22  A.      Yes.
23  Q.      You considered Dr. Jeffay and Dr. John's expert
24  reports, true?
25  A.      Yes.

526

1  Q.      In fact, you considered 3G expert opinions,
2  Mr. Lindsay and Dr. Cohen, true?
3  A.      I spoke to Lindsay: I don't think I reviewed their
4  reports.
5  Q.      Sir, you looked at all that information, true?
6  A.      Yes.
7  Q.      You never once purchased the accused product, did
8  you, sir?
9  A.      I did not.
10  Q.      You never once tested an accused product, did you,
11  sir?
12  A.      I did not.
13  Q.      You want this jury to find by a preponderance of the
14  evidence that infringement occurs in the '091 patent without
15  ever having looked at the accused product, true?
16  A.      I looked at it yesterday, but you don't need to.
17  Q.      Again, a yes or no, okay?  When you issued your
18  expert reports in this case, had you looked at any of the
19  accused products, sir?
20  A.      No.
21  Q.      Thank you, sir.
22          Well, let's talk a little bit more about the
23  Madisetti method.  There was source code made available for
24  inspection in this case, true?
25  A.      Yes, after my first report.

527

1  Q.      Sir, that source code was available prior to your
2  first report, sir, do you not know that?
3  A.      I did not.  No, I believe it -- I'm not sure, but I
4  believe much of it was produced after the first report.
5  Q.      Sir, the source code was available for you to
6  review -- if you don't know, that's fine, but I'm going to
7  represent to you that the source code was available for you
8  to review prior to your opening report: you just weren't
9  aware of that, huh?
10  A.      I don't recall one way or the other.  My
11  understanding was that the Qualcomm source code was
12  available after the first report.
13  Q.      That's only when you reviewed it, after the first
14  report, it was available -- sir, it was available for review
15  for you prior to your first report and you didn't review it,
16  true?
17  A.      I reviewed it.  I reviewed the printouts.
18  Q.      Let me ask you this again, just to make it clear for
19  the record and for the jury:  You did not review any
20  Qualcomm source code prior to your opening report, true?
21  A.      Yes.
22  Q.      And how much time did you spend approximately prior
23  to your rebuttal report reviewing Qualcomm source code, sir?
24  A.      I don't remember.  Probably 100-hours.
25  Q.      Okay.  And you understand that Qualcomm made source

528

1  code available on a computer at a ProSearch facility, true?
2  A.      Yes.
3  Q.      And you never once stepped foot in that ProSearch
4  facility did you, sir, true?
5  A.      I did before on other cases but not for this.
6  Q.      I'm only asking you about this case, sir.  You didn't
7  step foot in that ProSearch facility for this case?
8  A.      That's right.
9  Q.      But you have in other cases, true?
10  A.      Yes.
11  Q.      Okay.  You only analyzed select portions of code that
12  were provided to you by 3G's counsel, true?
13  A.      I reviewed all the code that was printed out.
14  Q.      And that was code provided to you by 3G's counsel,
15  true?
16  A.      Yes.
17  Q.      And based on your testimony today, you don't know
18  what source code was available before you prepared your
19  opening report, because you never went to ProSearch to
20  inspect the source code in the computer: correct?
21  A.      I didn't go there.
22  Q.      Right.  So you have no idea what source code was
23  available prior to your opening report, true?
24  A.      Not for this case, I didn't know.  I did review it
25  for my reply report.

529

1   Q.    Sir, would you agree with me that based on your
2   carrier documents that we saw during your direct testimony,
3   that what you're accusing of infringement with respect to
4   those carriers, they would refer to as "downgrading" a video
5   call to an audio call, true?
6   A.    Yes, in some cases.
7   Q.    Each one of those carriers has referred to what
8   you're accusing of infringement as "downgrading" a video
9   call to an audio call, true?
10  A.    Yes.
11  Q.    Okay.  And, sir, are you aware that downgrading video
12  calls to audio calls was known prior to the '091 patent?
13  A.    Not in the claim manner.
14  Q.    Okay.  But downgrading audio to video calls, sir, was
15  known: yes or no?
16  A.    I don't believe so.
17  Q.    Okay.  Sir, have you seen the 3GPP standard?  I
18  believe you reviewed it in the materials considered because
19  you reviewed every expert's report.
20  A.    Yes.
21  Q.    Right.  And you can see that this 3GPP standard was
22  dated in 1999 and released before the '091 patent.
23        Do you see that, sir?
24  A.    It states 1999.
25  Q.    Do you have any reason to doubt that date, sir?

530

1   A.    It's not a standard, sir.
2   Q.    Okay.  That's fine.  Let's refer to it as 3GPP.  You
3   okay if we refer to this as a 3GPP ETSI technical report?
4   A.    It's a technical requirements, it's not a standard,
5   it's TRO so I would disagree with that.
6   Q.    Okay.  I'll use your language.  There's a 3GPP
7   technical requirement published in 1999, true?
8   A.    Yes.
9   Q.    And you reviewed it, true?
10  A.    Yes, I wrote about it in my report.
11  Q.    That's right, sir.
12        MR. HEALY:  Your Honor, may we have a quick
13  sidebar?
14        THE COURT:  Yes.
15        (Whereupon, a discussion was held at sidebar as
16  follows:)
17        MR. HEALY:  Your Honor, I guess I'm a little
18  concerned.  This is not one of the invalidating prior art
19  reference.  I hear a lot of suggest it is.  It is not a
20  reference that asserting invalidating prior art.  I think
21  it's improper to now be sitting us with a brand new
22  reference suggesting to the jury it's somehow prior art.
23        THE COURT:  Well, this is just going to the
24  general state-of-the-art.  He's saying that downgrading
25  wasn't known in the art and now they are impeaching him.

531

1         MR. HEALY:  Well, as long as it states that but
2   what I fear is now go into -- let's go look at this, that's
3   an invalidation theory, he's not the invalidity expert.
4         THE COURT:  Well, he's testifying -- he
5   testified that it wasn't something that was known in the
6   art.
7         MR. HEALY:  Sure.
8         THE COURT:  And now he's impeaching him with it,
9   so I think this is fine.  If he gets into something further,
10  you can raise it again.
11        MR. HEALY:  I mean, I guess I just have a
12  problem with asking these open-ended questions.  Can I ask
13  their noninfringing experts, do you think it infringes?
14  They say no, I can show them whatever it is, I don't think
15  it's fair.  If this is just background art, that's fine, but
16  I don't think that's where we're going with this.
17        THE COURT:  All right.  Let's let him continue
18  so I'll overrule the objection.
19        (Whereupon, the discussion held at sidebar
20  concluded.)
21  BY MR. CHAIKOVSKY:
22  Q.    Continuing where we left off, just a reminder, you
23  reviewed this document, sir?
24  A.    I did.
25  Q.    Right.  And that's, just for the record, it's DTX215,

532

1   sir.
2         Do you see that?
3   A.    Yes.
4         MR. CHAIKOVSKY:  I just want to move DTX215 into
5   the record, sir, Your Honor.
6         THE COURT:  DTX15 admitted.
7         (Exhibit admitted.)
8   BY MR. CHAIKOVSKY:
9   Q.    If we look at page 14, of this document, sir, now
10  it's referring to service degradation.
11        Do you see that?
12  A.    Yes.
13  Q.    And it says, "During a multimedia call, the available
14  bandwidth deceases..."
15        Do you see that?
16  A.    Yes.
17  Q.    "... due to handover to congested area..."
18        Right?
19  A.    Yes.
20  Q.    Do you see that?
21  A.    Yes.
22  Q.    "...there may be a need for modification of a call
23  type."
24        Right?
25  A.    That's what it says in 6.1.2.1.

533

1  Q.   Right.  And you testified in your direct that one of

2  the benefits of the '091 patent was modifying a call from a

3  video call to an audio call due to bandwidth concerns, true?

4  A.   I didn't use the word "modifying."

5  Q.   Okay.  Whatever word you want to use, sir, the video

6  call changed to an audio call, and one of the reasons that

7  happens, according to you, in the '091, was due to bandwidth

8  concerns; that was your testimony?

9  A.   Yes.

10 Q.   Okay.  And here, this 3GPP technical report was

11 saying that a multimedia call might have issues with

12 bandwidth, true?

13 A.   Yes.

14 Q.   And in fact, in the next paragraph, it's saying,

15 "H.3.2.4..."

16       Now that is a standard, true, sir?

17 A.   Yes.

18 Q.   "...can cope with the change of transmission speed

19 due to bandwidth concerns..." right, sir?

20 A.   Yes.

21 Q.   "... but if available data rate is below 28.8

22 kilowatts per second..."

23       That's a speed of transmission, right, sir?

24 A.   Yes.

25 Q.   And so all of a sudden, if my rate of speed goes

534

1  below a certain rate, that's what the document is telling

2  me, right?

3  A.   Yes.

4  Q.   The network should initiate a modification

5  downgrading the call to speech, right, that's what it says?

6  A.   That's what it says.

7  Q.   So this document, predating the '091, is telling you

8  to modify a video call to a speech call in light of

9  bandwidth concerns, true?

10 A.   It says what it says, yes, in the language that it

11 says it, but it says it's for future study.

12 Q.   I'm not asking you that, I'm asking this disclosure

13 of this paragraph, sir, that disclosure, which occurred in

14 1999, before the '091 patent, yes or no, sir, is disclosing

15 that due to bandwidth concerns, you can modify a multimedia

16 call from video to a voice call, true?

17 A.   Yes, as stated.

18 Q.   Thank you, sir.

19       Now, Dr. Madisetti, the Court construed

20 initiating a second call, "a sending signaling sufficient to

21 establish a second call if answered," true?

22 A.   Yes.

23 Q.   Which means there must be a second call that's

24 capable of being answered, correct?

25 A.   I mean, I would just defer to the construction.

535

1  Q.   Okay.  So I just want to be clear here on this

2  construction.  So you think this construction doesn't

3  require for infringement purposes that you show that the

4  call be capable of being answered, is that true, sir; yes or

5  no?

6  A.   I'm just saying I just used the language of the

7  claim.

8  Q.   Well, you must have an understanding if you applied

9  it, sir; yes or no?

10 A.   Of what?

11 Q.   You have an understanding of the Court's

12 construction, true?

13 A.   Yes.

14 Q.   And I'm asking you:  Does that understanding include

15 that there must be a second call that is capable of being

16 answered; yes or no?

17 A.   The construction says that it "sends signaling

18 sufficient to establish a second call if answered."  So the

19 signaling should be sufficient to establish second call if

20 answered, the signaling should be answered.

21 Q.   I'm asking you, when you just look at the description

22 of initiating a second call -- sorry, I apologize, just a

23 second -- or, actually, excuse me.

24       Just initiating a second call, let's focus on

25 initiating a second call.  Focusing on that, it says,

536

1  "sending signaling sufficient to establish a second call if

2  answered," true?

3  A.   That's the Court's construction.

4  Q.   Right.  And what I'm asking you and I just want a

5  yes-or-no answer and if you can't answer it, that's fine,

6  we'll move on; doesn't that mean to you, sir, that there

7  must be a second call that's capable of being answered; yes

8  or no?

9  A.   No, it says the signaling should be sufficient to

10 establish a second call if the signaling is answered.

11 Q.   Okay.  So in your view, when you apply the Court's

12 construction, you don't require that the second call be

13 capable of being answered, true?

14 A.   As I said, I defer to my answer.

15 Q.   Well, I'm not sure what that answer was.  I mean,

16 maybe the jury understands it, but I didn't.

17 A.   The answer is clear and the Court has clearly

18 construed it that sends signaling sufficient to establish a

19 second call if answered.  The signaling has to be answered.

20 Q.   And there's only really one way of interpreting

21 the -- I shouldn't say that.  It's a yes-or-no question as

22 to whether you believe that in your mind, just yours, I'm

23 asking for your opinion, whether you believe that requires a

24 capability of being answered; yes or no?

25       You can say no, that's fine.

537

1    A.    Not by -- not by what you said.  I would defer to the
2    entire claim construction.
3    Q.    Okay.  So that entire claim construction, the
4    entire -- strike that.
5          I want to be very clear.  Strike -- strike
6    everything I have said.
7          That entire claim construction of the Court does
8    not require the capability of being answered, according to
9    you, correct?
10   A.    That's not what I said.  I said the signaling should
11   be sufficient -- send signaling sufficient to establish a
12   second call if answered.  So the signaling should be
13   answered.
14   Q.    So your interpretation is that the signaling should
15   be answered, not the second call, true?
16   A.    I don't have an opinion on the latter question.
17   Q.    Okay.  So you, in offering your direct testimony for
18   hours, did not offer any opinions about whether there's a
19   second call being capable of being answered, true?
20   A.    I disagree.  I showed that there is a second call, and
21   the signaling that was sufficient to establish a second call
22   was answered.  I referred to the ACK, I referred to the 200
23   OK messages.
24   Q.    We're getting to the nub of the issue, sir.  Again,
25   you're requiring that the signaling be answered, true?

538

1    A.    Um...
2    Q.    That's what you said?
3    A.    I'm referring, as an example, of how -- what would
4    meet the Court's construction.  For example, if you send
5    signaling sufficient to establish a second call, if
6    answered, would mean that it's an answer that responds to
7    the signaling.
8    Q.    So let's put that in a way the jury could understand.
9    You're interpreting the Court's construction as saying the
10   signaling has to be answered, true?
11   A.    Send signaling sufficient to establish a second call
12   if answered, that's how I would understand that.
13   Q.    I'm going to ask you one more time.  That
14   construction, sir, you can look -- does it require that a
15   second call exist in the claims, Claim 1 of the '091, that
16   must be capable of being answered: yes or no?
17   A.    I don't have a yes-or-no answer for that.  I don't
18   understand the question.
19   Q.    So you didn't provide any opinions in your direct
20   testimony as to whether in the accused products there exists
21   a second call that is capable of being answered: is that
22   true?
23   A.    I applied the Court's construction, so I did not
24   apply this other construction that you're proposing.
25   Q.    We can debate whether it's the correct construction.

539

1    I just want to be clear and the record to be clear, and I'm
2    entitled to this.  In your direct testimony, you did not
3    provide an opinion that there exists a second call that is
4    capable of being answered in the accused products; yes or
5    no, sir?
6    A.    I said there's no yes-or-no answer for that.  I said
7    I applied the Court's construction alone.
8    Q.    It is either yes or no, sir.  You either provided
9    that opinion or didn't provide that opinion.
10   A.    I didn't provide opinions other than the Court's
11   construction, so I did not offer -- use that construction.
12   Q.    Okay.  So the answer is that you did not identify a
13   second call that's capable of being answered, true?
14   A.    Again, I don't have a yes-or-no answer for that.  I
15   said I applied the Court's construction, that's what I opine
16   now.
17         You can't answer my question?
18   A.    No, I don't understand that.
19   Q.    You don't understand what it means to answer the
20   second call, true, sir?
21   A.    Again, I looked at the construction of the claim of
22   the term, and I applied the Court's construction.
23   Q.    Dr. Madisetti, you have answered a lot of calls in
24   your life, right?
25   A.    I'm not sure you're applying the Court's

540

1    construction.  I have applied the Court's construction.
2    Q.    Okay.  When you answer a call, you usually get some
3    notification, true?
4    A.    Again, I don't have any information.  All I'm saying
5    is I applied the Court's construction.
6    Q.    And you generally have to do something in order to
7    answer a call, like if I were to call you, you would have to
8    actually initiate an answer, right, sir?
9    A.    It is possible, it depends on the case.  But it's not
10   necessary: it may be done automatically.
11   Q.    That's your opinion, sir?
12   A.    Yes.
13   Q.    By picking up a phone receiver or pushing a button or
14   swiping a phone screen, right, that would be ways of
15   answering a call, true?
16   A.    Again, in different context, yes, that's an example,
17   but not limiting.
18   Q.    The only description in the '091 patent of answering
19   a call is with user involvement, sir, true?
20   A.    As I said, the specification speaks for itself.  I
21   disagree.  I believe that the Court has construed that both
22   manual and automatic would be covered.
23   Q.    Did you identify in your direct testimony for the
24   jury any instance in the specification of a call being
25   answered without user involvement, sir?

541

1   A.      I believe the specification describes that and the
2   Court has construed it.  So I applied the Court's
3   construction.  As you can see here directly on this page,
4   the claims of the '091 cover both manual and/or automatic
5   embodiments.
6   Q.      Sir, I realize you've testified a lot of times and
7   you're really good at being an expert witness.  I'm asking
8   you a very clear question.  I'm asking you, on your direct
9   testimony that we all sat through, did you provide any
10  evidence that anywhere in the specification of the '091
11  patent there is a description of answering a call other
12  than with user involvement?
13  A.      Again, I don't remember the full specification, but I
14  believe that my reference to figures 1, 2, and 9 and others,
15  and even figure 4 in my report, cover instances of both
16  manual and automatic embodiments.
17  Q.      You didn't answer my question because you don't want
18  to answer the question, sir, of answering a call.  I'm
19  talking about answering a call, sir.  Is there a description
20  in any of those figures of answering a call as described in
21  the specification of the '091 patent other than through the
22  use of user involvement?
23  A.      I would disagree.  I believe there is.
24  Q.      Okay.  You want to point me where the words are
25  answering a call in the '091 patent without user

542

1   involvement, where is that in the specification, sir?
2   A.      I'll have to look through it.  I don't remember the
3   entire specification.
4   Q.      You didn't think it was important to know that, did
5   you?
6   A.      The Court has construed it to cover both manual and
7   automatic, and I applied the Court's construction.
8   Q.      We could have a debate about what the constructions
9   are and what -- and Dr. Jeffay will get up here and tell you
10  what the Court's construction means, and I know you have
11  your own opinions.  I'm just asking for yes-or-no answers,
12  sir.
13          Dr. Madisetti, the claims require a first call,
14  correct?
15  A.      Yes.
16  Q.      I'm going to skip that for order of time.  Just for
17  HTC phones to infringe, they need to support, in your
18  opinion, carrier video calling, true?
19  A.      They need to have the functionality of supporting
20  that is embodied in the Qualcomm chips.
21  Q.      All right.  Let's talk further about that Madisetti
22  method.  You already confirmed that you've never made a
23  video call, carrier video call, true?
24  A.      I did not.
25  Q.      So you didn't make a carrier video call on any HTC

543

1   device, true?
2   A.      I did not.  Not for this case.
3   Q.      You could have purchased an HTC phone during this
4   case, true?
5   A.      I did purchase other HTC cases -- HTC phones, but I
6   did not do it for the purpose of this case.
7   Q.      I'm only asking about this case.  Can we have that
8   understanding that my questions relate to this case, not
9   your many other cases where you're an expert, sir, can we
10  have that understanding: yes or no?
11  A.      Yes.
12  Q.      Okay.  But you have used, as you said, HTC phones
13  previously, true?
14  A.      Yes.
15  Q.      And so you could have tried making a carrier video
16  call with these phones in this case, true?
17  A.      If I felt it was necessary, yes.
18  Q.      In fact, you testified in this case you didn't even
19  try to make a carrier video call with your own device when
20  you prepared your opinions in this case, do you recall that?
21  A.      I think I do.  I did not.
22  Q.      Right.  But it's still your opinion that HTC phones
23  are capable of making carrier video calls, true?
24  A.      It's my opinion that, as sold, the functionality of
25  making video calls is present in the Qualcomm chipsets and

544

1   confirmed by AT&T and other carrier specifications.
2   Q.      And you accuse HTC phones of infringing, at least in
3   part, because you believe they're capable of performing
4   video calling set forth in T-Mobile's carrier requirements,
5   true?
6   A.      That they have the functionality in them as sold.  It
7   could be enabled or it could be disabled, for example, using
8   the software that I discussed, but the functionality is
9   there.
10  Q.      Let's talk about that enabling or disabling issue,
11  since you testified about that on direct.  And you kind of
12  equated it to cruise control, right, sir?
13  A.      Yes.
14  Q.      Do you recall that?
15          There's a disagreement in this case.  You're
16  calling it cruise control, right, and you equated the
17  enabled disabling to cruise control, right?
18  A.      As an example, but it could also mean that you use
19  software to not provide the ability to turn on HTC calling.
20  Q.      Well --
21  A.      Even though the functionality is there.
22  Q.      You understand that our experts will get up and I
23  think they'll find a better analogy being like you got a
24  telephone line without the telephone, right.  If you don't
25  have the telephone, you can't make a call, it's not enabled.

545

1  So the fact that a telephone line exists, it exists, that
2  structure is there, but you can't make a call without having
3  the telephone, that's what enables you to make a telephone
4  call, true?
5  **A.**    That's a bad example.  I disagree.
6  **Q.**    You disagree, I understand, but our experts will get
7  up and say that's how you should read the claims, do you
8  understand that, sir?
9  **A.**    I don't know what they will say, but I clearly said
10  that the chipset has the functionality.
11  **Q.**    That's your opinion, sir.  We'll get into that;
12  Mr. Jones will, too.
13          THE COURT:  Mr. Chaikovsky, at the appropriate
14  time, let's let the juror and the court reporter have their
15  afternoon break.
16          MR. CHAIKOVSKY:  This is a fine moment, thank
17  you.
18          THE COURT:  Okay.
19          (Whereupon, the jury left the room at 4:01 p.m.)
20          THE COURT:  All right.  Dr. Madisetti, you may
21  step down.
22          THE WITNESS:  Thank you, Your Honor.
23          THE COURT:  All right.  You may be seated.
24          All right.  So I'm going to deal with the
25  Lindsay slides.

546

1          All right.  With respect to Lindsay slides 16,
2  19, 25, and 38, I'm going to deny the objection right now as
3  premature.  My understanding from counsel for 3G is that
4  Lindsay will testify to comparability, but in the event that
5  Lindsay fails to testify as to comparability, then you can
6  re-raise the objection and we'll sustain it.
7          With respect to Lindsay slide 42, the objection
8  is sustained because the references do not support that
9  Lindsay has previously disclosed up to ten times higher.
10  The only thing -- the only references that I saw was two to
11  six times.
12          With respect to -- so that controls slide 45 as
13  well.
14          With respect to Lindsay slides 56 and 63, those
15  objections are overruled.
16          So that leaves us with Lindsay slides 6 and 54.
17  So my understanding is that HTC does not object to the lower
18  base but requests the Court to order 3G to disclose why.
19          MR. OU:  Your Honor, if I may?  Since we lodged
20  the objection, counsel has provided an explanation, at least
21  orally, as to why Mr. Lindsay's base has changed.  It has to
22  do with Dr. Madisetti and certain infringement opinions that
23  he withdrew since yesterday before testifying, so we have
24  our answer now.
25          THE COURT:  I'm sorry?

547

1          MR. OU:  We have our answer now, Your Honor.
2          THE COURT:  Okay.  So you withdraw the
3  objection?
4          MR. OU:  Yes, Your Honor.
5          THE COURT:  All right.  So that deals with -- so
6  that completes the objections with respect to Lindsay.
7          MR. OU:  Your Honor, if I may, one very quick
8  point of clarification.  Your Honor, with respect to the
9  slides that we were just looking at, 6 and 54, at least from
10  HTC's perspective, if Mr. Lindsay is unable to testify to
11  the technical comparability of the asserted patents to the
12  agreement that they're relying on, that would impact, for
13  example, slide 6 and other slides; it would go to the
14  ultimate opinion, but I just wanted to flag that for Your
15  Honor.  If that does happen, I think we will have a problem
16  with some of the other slides, but I'm happy to address it
17  then.
18          THE COURT:  Okay.  And then now -- so the only
19  thing remaining on the list for today has to deal with -- I
20  guess this is 3G's objection to testimony about 3G's gross
21  margin or loss, these deposition designations.  I guess this
22  is HTC who's attempting to use deposition designations.
23  Page 27, line 21 to page 28, line 21, and 59, line 8, to
24  59:10 and 59:12 to 59:16.  Is this 3G's -- it's unclear to
25  me who's -- who's attempting to introduce this.  Is this...

548

1          MR. OU:  Your Honor, it's HTC's deposition
2  designations of the witness.
3          THE COURT:  Right, right.  So 3G is making the
4  objection.
5          MR. OU:  Yes, Your Honor.
6          THE COURT:  All right.  Yeah, so the objection
7  is sustained.  The -- you know, their gross margin or loss,
8  their overall gross margin or loss is -- I just think the
9  probative value is substantially outweighed by the danger
10  of -- by the prejudice -- the unfair prejudice that may
11  result on confusion of the jury.  Evidence of 3G's losses or
12  profits overall are minimally relevant to the value of the
13  patents at issue.
14          Evidence of 3G's total revenue does not reflect
15  the value of any one or two patents.  So that's why that
16  testimony is -- that objection is sustained.
17          All right.  So we have ten minutes left, Neil?
18  So we got about seven minutes left.  All right.  So we will
19  convene in about seven minutes.
20          (Recess taken.)
21          THE COURT:  All right.  Have a seat until the
22  jury comes in.
23          (Whereupon, the jury entered the room at
24  4:17 p.m.)
25          THE COURT:  You may continue.

549

1   BY MR. CHAIKOVSKY:

2   Q.      All right.  Now, Dr. Madisetti, I actually want to

3   show you how a video carrier phone calls on a Google

4   Pixel 2, okay?

5   A.      Okay.

6           MR. CHAIKOVSKY:  All right.  And, Your Honor, in

7   order to make this efficient, I want to actually get the

8   help of some of my colleagues in establishing, you know, a

9   call between two phones and how it would look; is that okay?

10          THE COURT:  Okay.

11          MR. CHAIKOVSKY:  And then just do it as we did

12  like with the opening.  I want Dr. Madisetti to be able to

13  see the call making the phone call so he -- the witness can

14  see it --

15          THE COURT:  Okay.

16          MR. CHAIKOVSKY:  -- and then have the recipient

17  here so the jury can see the recipient of such a call.

18          THE COURT:  All right.

19          MR. CHAIKOVSKY:  All right?  So that -- Mr. Shen

20  Ye and Shashank Chitti will be our beautiful actors for the

21  afternoon with show-and-tell.  Okay.  So first, you know,

22  that's a Google -- those are both Google Pixels 2.

23          If -- if -- Mr. Ye, if you could just tell me

24  what demonstrative that is on the back of it, just so I have

25  it for the record.  It's got a --

550

1           MR. YE:  This is DDX 53.

2           MR. CHAIKOVSKY:  So DDX 53, for the record, is

3   in Mr. Ye's hand, and then in Mr. Shashank Chitti's hand

4   is -- what is the model?  DDX --

5           MR. CHITTI:  DDX 34.

6           MR. CHAIKOVSKY:  34.

7   BY MR. CHAIKOVSKY:

8   Q.      And those are -- I'm going to represent to you,

9   Dr. Madisetti, those are both Pixel -- Google Pixel 2s,

10  okay?

11  A.      Yes, I used them yesterday.

12  Q.      Yeah.  You analyzed them last night, correct?

13  A.      Yeah, I did a video call.

14  Q.      Right.  Okay.  And I'm going to ask Mr. Ye to make a

15  carrier video call on the Google Pixel 2 to Mr. Chitti so

16  that Dr. Madisetti can see it and the jury can see the

17  recipient of that call.

18          (Demonstration.)

19  BY MR. CHAIKOVSKY:

20  Q.      And that call is ongoing, you can see that, and the

21  timer is going, right?  You can see how the timer is going.

22          And then Mr. Ye can switch it to audio only,

23  right?  And the timer keeps going.  It didn't reset to zero,

24  did it, sir?  And we can do it one more time.

25  A.      Okay.  The timer is on.

551

1   Q.      And let's actually do it one more so you can pay

2   attention for this call.  Let's stop.  Let's initiate the

3   first video call, okay?  And Mr. Chitti is going to receive

4   that call on this Google Pixel 2.

5           (Demonstration.)

6   BY MR. CHAIKOVSKY:

7   Q.      And the timer is going right now, and the video call

8   is going.  It's a carrier video call.  We're not using Zoom

9   or WhatsApp.

10          And then Mr. Ye is going to hit "audio only."

11  He's going to downgrade it.  It's no separate call.  The

12  timer keeps going, doesn't it, sir?

13  A.      It's a new call, and the timer keeps going.  It's a

14  local timer.

15  Q.      It's a timer, and that timer is the same timer.

16  A.      Yes.

17  Q.      And the audio that they can speak to you on that

18  call, that's the same audio?

19  A.      No, it's a separate call.

20  Q.      It's the same -- okay.  I'm actually going to do it

21  one time where they speak to each other.

22          MR. CHAIKOVSKY:  You guys call each other, you

23  guys talk to each other, and you guys keep talking to each

24  other after he hits "audio only."

25          (Demonstration.)

552

1   BY MR. CHAIKOVSKY:

2   Q.      Yeah.  And in that process, did Mr. Chitti answer a

3   call, the second call?  In your interpretation of what a

4   second call is, did Mr. Chitti answer a second call?

5   A.      He answered a second call, yes.

6   Q.      Okay.  He -- in your mind, he answered a second call.

7   He didn't do anything except for hold that phone: he

8   answered the video call.  In your mind, he answered a second

9   call?

10  A.      Well, he talked -- he talked on the call, but the --

11  it satisfied all the requirements of the claim, as I said.

12  Q.      And that's, sir, because you don't require that the

13  second call be answered: is that true, sir?

14  A.      I applied the Court's construction.

15  Q.      Okay.  We can see that actually the media didn't

16  change, sir: isn't that right?  The audio media is the audio

17  media of that video call, is it not, sir?

18  A.      I disagree.  It used new resources.  It was a

19  separate media that's placed on a separate set of resources.

20  Q.      We'll let the jury decide.  It used one piece of

21  media, you say that that's a different media?

22  A.      No, it did not use the one piece.  The code as well

23  as the documents from the carrier show it's a new call with

24  new headers, with new resources, and the old call was

25  discontinued or terminated.

553

1   **Q.**   I just want the jury to understand that we spent
2   time, two hours this afternoon, going over direct testimony
3   of infringement of what you're saying is two calls, and this
4   is a live example of what you're claiming under the '091
5   patent is two calls: yes or no?
6   **A.**   I say my evidence shows two calls.  This is too
7   superficial to make a -- offer a technical opinion.
8   **Q.**   It's too superficial because you never analyzed an
9   HTC or a Google device you're accusing of infringement,
10  true?
11  **A.**   I did analyze.
12  **Q.**   You didn't analyze it prior to last night, sir.
13  **A.**   I didn't use one, but I analyzed the code.  I
14  analyzed the detailed documents of how it works.
15  **Q.**   Okay.  Do you know what processor is in that Pixel 2,
16  sir?
17  **A.**   It would be, I believe -- I would have to look at --
18  it's in my report.  It's a -- I believe it's a Qualcomm
19  chipset.
20  **Q.**   Do you know which Qualcomm processor?
21  **A.**   I'd have to look at it.  They are four letters.
22  **Q.**   If I represent to you, sir, that -- hold on one
23  second.
24          MR. CHAIKOVSKY:  Yeah, if I -- has someone got
25  the other demonstrative, which is -- I think it's DDX 34?

554

1   Okay.  Mr. Chitti has got --
2           MR. CHITTI:  33.
3           MR. CHAIKOVSKY:  Is it 33?
4           MR. CHITTI:  Right.
5           MR. CHAIKOVSKY:  It's 33?
6           MR. CHITTI:  The Pixel is 33.
7           MR. CHAIKOVSKY:  Okay.
8           MR. CHITTI:  The U11.
9   BY MR. CHAIKOVSKY:
10  **Q.**   The U11.  So now you've got an accused U11 in
11  Mr. Chitti's hand.  That's DDX 33, okay, sir?
12  **A.**   Yeah.
13  **Q.**   And prior to yesterday, you've never -- you didn't
14  buy one of those for this case either, true?
15  **A.**   I did not.
16  **Q.**   Right.  And in your direct testimony, you provided
17  evidence that these two devices have the exact same
18  processor, sir, did you not?
19  **A.**   They have the same functionality except that it's not
20  enabled on that U11.
21  **Q.**   I didn't ask you that question, sir, did I?
22          MR. CHAIKOVSKY:  Your Honor, I'm going to again
23  ask a yes-or-no.  He can redirect himself.
24          THE COURT:  Dr. Madisetti, please answer his
25  questions.

555

1           THE WITNESS:  Okay.
2           THE COURT:  If he asked you a yes-or-no
3   question, please answer "yes" or "no."
4           THE WITNESS:  Sure.
5           THE COURT:  Again, your -- counsel for 3G will
6   have a chance to redirect.
7           THE WITNESS:  Yes, Your Honor.
8   BY MR. CHAIKOVSKY:
9   **Q.**   So we're clear on that instruction, right, sir?
10  **A.**   Yeah, I thought you said "processing."
11  **Q.**   Okay.  The U11, which is DDX 33, and the Pixel 2,
12  which are both DDX 53 and 34, they have the same processor,
13  true?
14  **A.**   Yes.
15  **Q.**   Okay.
16          MR. CHAIKOVSKY:  And, Mr. Chitti, on that U11,
17  can you please try and show the jury -- and you can also
18  show Dr. Madisetti -- that you cannot make a video call on
19  that device?
20          (Demonstration.)
21          MR. CHAIKOVSKY:  There's no video, Mr. Chitti.
22  BY MR. CHAIKOVSKY:
23  **Q.**   Do you see any video, Dr. Madisetti, on that U11?
24  **A.**   I don't.
25  **Q.**   So -- so it's not capable, right?

556

1   **A.**   It has the functionality.  It is capable.
2   **Q.**   That's your testimony, sir.
3           And you're accusing units of infringement that
4   no user can use to make video calling, such as DDX 33, true?
5   **A.**   Again, I would disagree with that.  It has the
6   functionality.
7   **Q.**   I didn't ask you that question, again, sir.  I'm
8   going to ask one more time.
9           You're accusing of infringement, items such as
10  DDX 33, that cannot actually make a video call, a user can't
11  make a video call with that phone, true?
12  **A.**   They cannot make a video call as that phone that we
13  see.
14  **Q.**   Okay.  As purchased at the store, this U11, the user
15  would not be able to make a video call on that DDX 33, that
16  U11, true?
17  **A.**   Again, I don't know the history of that phone, but
18  that phone, as demonstrated yesterday, has -- cannot make a
19  video call.
20  **Q.**   And it has the same Qualcomm processor as the
21  Pixel 2?
22  **A.**   The same Qualcomm processor as the Pixel 2.
23  **Q.**   Right.  And we demonstrated that actually can make a
24  video call in this courtroom, true?
25  **A.**   Yes.

557

1    Q.    Okay.  So, sir, you realize that it's 3G's burden to

2  prove infringement by a preponderance of evidence, no?

3    A.    Yes, I did.

4    Q.    And you realize, just like I showed in opening, even

5  if the scales are 50/50, right on board, HTC wins, you

6  realize that, sir, yes?

7    A.    Yes.

8    Q.    Okay.  And your testimony on direct was, if you got a

9  Qualcomm processor, all the phones that had Qualcomm

10  processor are going to be capable of performing carrier

11  video calling, that was your testimony; yes or no, sir?

12    A.    Yes, it is.

13    Q.    And yet that U11, sitting here in this court, which

14  I'll represent to you which was bought on the Internet, that

15  U11, and it's DDX 33, it can't make a video call or receive

16  a video call, true?

17    A.    Again, as configured, it can't.

18    Q.    Again, I'm asking you:  That device cannot make a

19  video call or receive one?

20    A.    That device cannot.

21         MR. CHAIKOVSKY:  Okay.  I think our models can

22  stand down.

23         THE WITNESS:  Thank you.

24  BY MR. CHAIKOVSKY:

25    Q.    Now, let's go further in the Madisetti method.

558

1         You agreed on your direct testimony that the --

2  that you made a mistake, right?  The M9 for T-Mobile doesn't

3  have carrier video calling, true?

4    A.    I didn't call it a mistake; I found an exception.

5    Q.    That exception didn't exist in your opening report,

6  did it, sir, you accused that device of infringement, sir,

7  didn't you?

8    A.    Yes, but I corrected it.

9    Q.    You corrected it today, in court, for the first time?

10    A.    I -- that's what I think, so, yes.  That was the only

11  exception I found.

12    Q.    So you realize your original opinion was wrong in

13  that instance, true?

14    A.    It was an omission.  I don't believe it's wrong.

15    Q.    In fact, Dr. Jeffay told you that it couldn't do it,

16  but yet you didn't agree until today, true?

17    A.    For that particular phone, yes, I didn't find the

18  exception before.

19         MR. CHAIKOVSKY:  I mean, he -- I -- do I have to

20  ask every question with yes or no as opposed to true or

21  correct because I'll do that if he wants to keep

22  elaborating.

23         THE COURT:  Make sure you ask him a yes-or-no

24  question.

25         MR. CHAIKOVSKY:  Okay.  I will do that from now

559

1  on, sir, given your willingness to interject.

2  BY MR. CHAIKOVSKY:

3    Q.    And so that M9, T-Mobile, it's got a certain Qualcomm

4  processor, true?

5    A.    Yes.

6    Q.    And in fact, you've accused other devices of

7  infringement that have that same Qualcomm processor, true;

8  yes or no?

9    A.    Yes.

10    Q.    And so there's another instance, using your own

11  evidence, that you can't tell whether something infringes

12  just based on the Qualcomm processor alone, true?

13    A.    No, I can.  Because they all infringe except that

14  exception.

15    Q.    Well, that exception exists: let's walk through this

16  carefully.

17         That M9 on T-Mobile does not infringe, true?

18    A.    Yes, because it was given an exception.

19         THE COURT:  Doctor --

20         THE WITNESS:  Oh, yeah, true, yes.  Sorry for

21  that, yes, true.

22  BY MR. CHAIKOVSKY:

23    Q.    Again, so that M9 on that T-Mobile does not infringe,

24  true; yes or no?

25    A.    Yes.

560

1    Q.    And that's because you found that it can't -- well,

2  strike that.

3         And it has a certain Qualcomm processor; yes or

4  no?

5    A.    Yes.

6    Q.    And there are other products that you have accused of

7  infringing that have that same Qualcomm processor; yes or

8  no?

9    A.    Yes.

10    Q.    And one of your pillars, of two pillars you testified

11  on direct with respect to your infringement, was carrier

12  documents and the Qualcomm processors, true?

13    A.    Yes.

14    Q.    Okay.  And what I'm saying is there's clearly a

15  device with a Qualcomm processor that you believe today does

16  not infringe, true?  The M9 on T-Mobile, true?

17    A.    Yes.

18    Q.    And there are other devices that have that exact same

19  Qualcomm processor that you accused of infringement, true?

20    A.    Yes.

21    Q.    And you never looked at those devices.  You never

22  opened them up.  You never tested them.  You never tried

23  them for purposes of this case, true?

24    A.    Yes.

25    Q.    So, sir, isn't it possible, sir, more likely than

561

1    A.    not, maybe even scales, that those devices also can't
2    perform carrier video calling because they have the exact
3    same Qualcomm processor?
4    A.    No.
5    Q.    Okay.  We'll have the jury decide.
6          And that includes seven other models of the MN9
7    to have that exact same Qualcomm processor: do you
8    understand that, sir?
9    A.    I do.
10   Q.    And two Bolt models you accuse of infringement, have
11   that exact name Qualcomm processor: you understand that,
12   sir, true?
13   A.    Yes.
14   Q.    I'm going to pivot to another area, sir.  One place,
15   Dr. Madisetti, you looked to see if a HTC phone supports HTC
16   video calling is HTC's website: yes or no?
17   A.    Yes.
18   Q.    In fact, you previously said that video calling
19   functionality is demonstrated by portions of HTC website:
20   yes or no?
21   A.    Yes.
22   Q.    And the video calling that you accuse of infringement
23   is video calling offered by T-Mobile, Verizon and AT&T, at
24   least with respect to carrier video calling: yes or no?
25   A.    Yes.

562

1    Q.    All right.
2          MR. CHAIKOVSKY:  And I have just been given the
3    slow down so apologies if I'm going too fast for everyone,
4    including yourself, apologies.
5    BY MR. CHAIKOVSKY:
6    Q.    And you said before that carriers require device
7    manufactures such as HTC to comply with their requirements
8    such as requirements for video calling: yes or no?
9    A.    Yes.
10   Q.    And you testified that if a particular requirement
11   wasn't met, such noncompliance would have been documented
12   with the relevant carrier, which would need to prove such
13   noncompliance, true: yes or no?
14   A.    Yes.
15   Q.    In fact, we have one example that you testified to on
16   direct, correct?
17   A.    Yes.
18   Q.    So the carriers would know which devices do not
19   comply with their video calling requirements: yes or no?
20   A.    Yes, if there's an exception.
21   Q.    So T-Mobile would know whether a device supports
22   T-Mobile video calling: yes or no?
23   A.    Um, yes.
24   Q.    Okay.  And AT&T would know whether a device supports
25   AT&T carrier video calling: yes or no?

563

1    A.    Um, yes.
2    Q.    Same with Verizon.  Verizon would know whether a
3    device supports Verizon video calling, right?
4    A.    Yes.
5    Q.    One of the devices you accuse of infringement for
6    complying with T-Mobile video calling carrier requirements
7    is the HTC M9, correct?
8    A.    Yes.
9    Q.    And you can find the technical specifications for the
10   M9 on T-Mobile's website, true?
11   A.    You'll have to show me, but I think I did, but...
12   Q.    You reviewed the T-Mobile website technical specs for
13   the M9 before this, true?
14   A.    I believe so.
15   Q.    If we could -- you can take a look, Dr. Madisetti, at
16   DTX205.  I think, don't -- I can't promise, I think it might
17   be tab 14 of your binder, of your cross binder.
18         THE COURT:  It's just a tab that says "DTX209."
19         MR. CHAIKOVSKY:  There is one.
20         THE COURT:  Volume 1.
21   BY MR. CHAIKOVSKY:
22   Q.    If you could just look at DTX209 tab, that would be
23   great, Dr. Madisetti.
24   A.    209.
25   Q.    209.

564

1    A.    Is it volume 1 or volume 2.
2          THE COURT:  Yes, volume 1.
3    A.    Yes, I am there.
4    BY MR. CHAIKOVSKY:
5    Q.    Okay.  This is one of the T-Mobile technical
6    specifications you reviewed, correct?
7          MR. HEALY:  Sidebar, Your Honor.
8          THE COURT:  All right.
9          (Whereupon, a discussion was held at sidebar as
10   follows:)
11         MR. HEALY:  Your Honor, this document was
12   subject to your MIL vehicle striking it for late
13   disclosures.  You told them they couldn't introduce it into
14   evidence: they could only ask their experts because it
15   wasn't in their report.
16         MR. CHAIKOVSKY:  This is during your testimony.
17   I'm just using it on cross to impeach this witness: those
18   documents show that T-Mobile says it doesn't do carrier
19   video calling.
20         MR. HEALY:  You struck it.  You said it was a
21   discovery violation.  You recognized their pattern of
22   willful disobedience.
23         MR. CHAIKOVSKY:  That was Dr. Jeffay.  He can
24   use it, just not publish it to jury.  I'm using it for
25   impeachment, sir.

565

1     MR. HEALY:  We move to strike it all together,
2  Your Honor, and the exception that Your Honor noted was they
3  could mention and discuss the topic of Dr. Jeffay, but they
4  could not introduce the indictment into evidence for any
5  purpose.
6     MR. CHAIKOVSKY:  That was for Dr. Jeffay only.
7  We can get the MIL order.
8     MR. HEALY:  You can get the MIL order.  You
9  excluded the document.
10     THE COURT:  But now he's using it for
11  impeachment purposes, so I certainly didn't exclude it for
12  impeachment purposes because I wouldn't know what -- whether
13  it was for impeachment or not.
14     MR. HEALY:  Okay.  I --
15     THE COURT:  So, yeah, so that -- whatever I did
16  previously did not include it for impeachment purposes.
17     MR. HEALY:  I mean, just so I can understand,
18  Your Honor, can we use any evidence at all for impeachment?
19  I mean, there has to be limits here.  You moved for
20  prejudice of not having this document, it's been removed, we
21  asked for it to be excluded, you said yes, now they
22  characterize anything as --
23     THE COURT:  But the HTC One (M9) issue is now at
24  issue.  He changed his report.
25     MR. HEALY:  --

566

1     THE COURT:  He testified inconsistent with his
2  opening report.
3     MR. HEALY:  No.
4     THE COURT:  Today, he just said he came --
5     MR. HEALY:  In his rebuttal --
6     THE COURT:  He said he made an exception.
7     MR. HEALY:  In his rebuttal report, he cited the
8  exception and noted the exception, so, I mean, there's
9  nothing inconsistent --
10     MR. CHAIKOVSKY:  He did not admit it did not
11  infringe.  He just did it today.
12     MR. HEALY:  I'm trying to talk to the Judge.
13     THE COURT:  Yeah, let him talk to me.
14     MR. HEALY:  Again, Your Honor, I'm not going to
15  argue with you, but what we would like to know is the
16  boundaries, because we're moving for late disclosed
17  evidence.  We get a MIL excluding it, it's have a very
18  specific order prejudice to us, prejudiced for late
19  disclosure, use it for limited purpose.
20     Without introducing the document, they could
21  show it, reference it with their expert.  Your Honor said
22  they could do that, I'm not contesting that, but I don't
23  understand how they can get late discovery violations simply
24  by saying it's impeachment evidence.  We're going to waive
25  it as impeachment evidence.

567

1     THE COURT:  So with this document, I'm going to
2  let you ask him the question without publishing it to the
3  jury.
4     MR. HEALY:  Thank you, Your Honor.
5     MR. CHAIKOVSKY:  If --
6     THE COURT:  I'm going to let you ask the
7  question without publishing it to the jury.
8     (Whereupon, the discussion held at sidebar
9  concluded.)
10  BY MR. CHAIKOVSKY:
11  Q.    Dr. Madisetti, we're looking at DTX209, right?
12  A.    Yes.
13     (Reporter clarification.)
14     MR. CHAIKOVSKY:  209.
15  BY MR. CHAIKOVSKY:
16  Q.    This is a technical specification for HTC M9,
17  correct?
18  A.    Yes, for the T-Mobile.
19  Q.    That's right, for T-Mobile, sorry.
20     In the document, if you look at page 1 of the
21  document, there's a heading, and in that heading it says
22  "T-Mobile video calling, no."
23     Do you see that, sir?
24  A.    I do.
25  Q.    But, yet, despite this document saying no with

568

1  respect to the M9, you're relying on -- instead of these
2  specifications from the carriers, such as DTX209, you're
3  relying on carrier call flow requirements for your
4  infringement theories, correct?
5  A.    Yes.
6  Q.    And these technical specifications that you have,
7  like DTX209, are published for customers like the jury and
8  myself so they can understand what features these phones
9  have, true?
10  A.    Yes.
11  Q.    And so it would make sense that T-Mobile is telling
12  customers, such as this jury and myself, that that phone,
13  when they buy it, will not have T-Mobile -- will not have
14  T-Mobile video calling, true?
15  A.    Yes.
16  Q.    And so just like we've heard, you could not make a
17  carrier video call on the M9 on the T-Mobile network, true?
18  A.    Yes.
19  Q.    Let's take a look, I think it's DTX206 in your
20  binder.  Tell me when you're there.
21  A.    Yes, I'm there.
22  Q.    That's another T-Mobile technical specification that
23  you analyzed, correct?
24  A.    Yes.
25  Q.    That's another thing, you analyzed these documents

569

1  yourself, right?

2  A.     Yes.

3  Q.     And you analyzed it in response to Dr. Jeffay

4  analyzing it, true?

5  A.     Again, I don't recall specifically when, but I did

6  look through these documents.

7  Q.     If I represent to you that Dr. Jeffay analyzed it

8  first, you have no reason to doubt me, sir, do you?

9  A.     Again, I don't recall specifically event, I believe I

10  reviewed all these documents.

11  Q.     Okay.  But, again, if I represent to you --

12  Dr. Jeffay will be here to testify.  If he says, "I'm the

13  one who found these things because Dr. Madisetti didn't find

14  it in his opening report," you have no reason to doubt me,

15  do you?

16  A.     Again, I don't know what to say, yeah.

17  Q.     These specifications that we just -- these last two

18  that we went over, they are not attached to your opening

19  report, are they, sir?

20  A.     I don't remember.  I don't believe so.  I don't

21  remember.

22  Q.     They are in your reply report, sir, right?

23  A.     Again, I believe so, but I don't remember for sure.

24  Q.     And this DTX206, that's a technical specification

25  from T-Mobile for the U11 life that you accuse of

570

1  infringement, true?

2  A.     Yes.

3  Q.     And this same technical specification published by

4  T-Mobile for members of the jury and myself and other

5  customers, it says "T-Mobile video calling, no": yes or no?

6  A.     Yes, it says that.

7  Q.     All right.  Let's look at one more document.  DTX207.

8  A.     Okay, I'm there.

9  Q.     That's a T-Mobile specification for the M8, true?

10  A.     Yes.

11  Q.     And that's another device you accused of

12  infringement, true?

13  A.     Yes.

14  Q.     And Dr. Jeffay uses it in his report to assist his

15  noninfringement opinion, true?

16  A.     I believe so.

17  Q.     And this one also says "T-Mobile video calling, no";

18  yes or no?

19  A.     That's what it says.

20  Q.     You don't think T-Mobile is lying to its customers of

21  whether it can conduct video calling or not, do you, sir?

22  A.     I do not.

23  Q.     If we go to DTX208.  And just tell me when you're

24  there, sir.

25  A.     I'm there.

571

1  Q.     Okay.  That's another T-Mobile technical

2  specification for the HTC One 8 -- M8 -- excuse me.  That's

3  another -- strike that.

4         That's another T-Mobile technical specification

5  for the HTC One (M8) that you accused of infringement: yes

6  or no?

7  A.     Yes.

8  Q.     And that's another one that Dr. Jeffay says supports

9  his opinion of noninfringement; yes or no?

10  A.     Again, I believe so.  But as I said, I don't remember

11  this specific model.

12  Q.     And you just don't recall because you're working on

13  too many cases, sir: is that true?

14  A.     No, no, as I said, there's so many models.

15  Q.     Now, it's a technical specification for the HTC One

16  (M8) for Windows, true?

17  A.     Yes.

18  Q.     And it's another document that T-Mobile has told the

19  world:  Video calling, no, true?

20  A.     Yes, that's what the document states.

21  Q.     You have to reason to doubt, again, that T-Mobile

22  would lie to its customers of whether that device could do

23  carrier video calling, do you, sir?

24  A.     I don't.

25  Q.     Let's go to DTX210.  Tell me when you're there.

572

1  A.     I'm there.

2  Q.     That's a T-Mobile technical specification for the M7

3  that you accuse of infringement: yes or no?

4  A.     Yes.

5  Q.     And, again, Dr. Jeffay uses this document to support

6  his noninfringement opinions: yes or no?

7  A.     Yes, I believe so.

8  Q.     And this document also says "T-Mobile video calling,

9  no," right?

10  A.     Yes.

11  Q.     And, again, you have to reason to doubt that T-Mobile

12  is telling its customers, members of the jury, myself, that

13  that phone could not be used for carrier video calling,

14  true?

15  A.     I don't believe T-Mobile is lying.

16  Q.     Okay.  So that phone as sold would not be able to be

17  used by a customer for carrier video calling, true?

18  A.     Not as -- for the T-Mobile version.

19  Q.     So according to all these website technical

20  specifications that we just went through, according to

21  T-Mobile, these devices as sold would not be able to be used

22  by a customer to conduct carrier video calling, true?

23  A.     That version could not be used for video calling,

24  that's how I would state that.

25  Q.     And that's, again, just to remind the members of the

601

1   haven't already, to file the final versions of the proposed
2   jury instructions and verdict sheet, I believe I told you to
3   do it tomorrow.  And make sure, as we go through trial, you
4   guys are conferring to make sure, when we get to the end,
5   that we have one copy of all the exhibits that have been
6   admitted to go back with the jury.
7           And the plan would be to have -- hopefully that
8   we can get the evidence complete -- the evidence
9   presentation is completed by the end of the day on Friday so
10  that when we come back on Monday, we just have your closing
11  arguments and the jury instructions and then the jury will
12  deliberate.  So that's what I'm shooting towards.  All
13  right.
14          All right, same rules apply in terms of the
15  submissions and paper copies.  We will be adjourned until
16  the morning.
17          MR. CHAIKOVSKY:  Your Honor, can I ask one
18  question?  Remind me -- and I know I can ask Ms. Keller --
19  for JMOLs, that's an oral -- at the end of the case, an oral
20  process or any written submissions.
21          THE COURT:  You can make them orally.  Make them
22  orally.  I'll hear it -- I'm going to hear them orally.  If
23  you want to, you know, file something, you can, but I'm
24  going to hear them orally and deal with them.
25          MR. CHAIKOVSKY:  Okay.  And then at the end of

602

1   the case, that's going to be filing, obviously, just in
2   written form.
3           THE COURT:  Right.  Right.  Yeah.
4           MR. CHAIKOVSKY:  Okay.
5           THE COURT:  All right.
6           MR. CHAIKOVSKY:  Thank you.
7           THE COURT:  All right.  We'll see counsel at
8   9:00 a.m.
9           (Recess taken.)
10          (Whereupon, the following proceeding concluded
11  at 5:35 p.m.)
12          I hereby certify the foregoing is a true
13  and accurate transcript from my stenographic notes in the
14  proceeding.
15              /s/ Michele L. Rolfe, RPR, CRR
                U.S. District Court
16
17
18
19
20
21
22
23
24
25

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3
     3G LICENSING, S.A., KONINKLIJKE          )
 4   KPN N.V., and ORANGE S.A,                )
                                              )
 5             Plaintiffs,                    )   C.A. No.
     v.                                       )   17-083-GBW
 6                                            )
     HTC CORPORATION,                         )
 7                                            )
               Defendant.
 8

 9
                              - - - -
10
                         Wilmington, Delaware
11                       Thursday, October 12, 2023
                         Trial Volume 3
12
                              - - - -
13

14
     BEFORE:   HONORABLE GREGORY B. WILLIAMS
15             UNITED STATES DISTRICT COURT JUDGE

16
                              - - - -
17

18

19

20

21

22

23

24

25                            Michele L. Rolfe, RPR, CRR
```

604

1 APPEARANCES:

2     FARNAN LLP
      BY: MICHAEL J. FARNAN, ESQ.
3
        -and-
4     SUSMAN GODFREY
      BY:  ANDRES HEALY, ESQ.
5        LEXIE WHITE, ESQ.
         HUNTER VANCE, ESQ.
6        For Plaintiff

7
      SHAW KELLER LLP
8     BY: KAREN KELLER, ESQ.
         NATHAN R. HOESCHEN, ESQ.
9
        -and-
10
      WHITE & CASE
11    BY: YAR R. CHAIKOVSKY, ESQ.
         PHILIP OU, ESQ.
12       RADHESH DEVENDRAN, ESQ.
         SHASHANK CHITTI, ESQ.
13       For Defendant

14
15
16
17
18
19
20
21
22
23
24
25

605

1                  - - - - -

2            P R O C E E D I N G S

3     (REPORTER'S NOTE: The following trial was held in
4 Courtroom 6B beginning at 9:00 a.m.)
5            THE COURT: Let me start by giving you the time.
6            So yesterday 3G used a total of 3 hours and
7 42 minutes. So, 3G, you have 5 hours and -- I'm sorry --
8 yeah, you have 5 hours and 22 minutes remaining.
9            Yesterday HTC used a total of 2 hours and
10 54 minutes. HTC, you have 5 hours and 37 minutes remaining.
11           All right. Turning to the plaintiffs'
12 objections to Mr. Jones's slides 37, 38, 39, 42, 44, and 46,
13 those objections are overruled.
14           With respect to plaintiffs' objection to Shen
15 Ye's demonstrative DDX090, that's sustained.
16           That's all I had on my list.
17           MR. HEALY: Your Honor, I guess there's one
18 other preliminary issue. Counsel said that they intend to
19 go into prosecution history with Dr. Madisetti about the
20 '818 patent. We don't believe that's proper. We had this
21 MIL about it that Your Honor said you'd address at trial.
22 But it goes into disclaimer arguments, it goes into issues
23 that the Federal Circuit and, frankly, Your Honor has held
24 are not appropriate to talk about because it goes to claim
25 construction and that's not an issue that the jury is

606

1 supposed to decide: that's an issue that Your Honor will
2 decide or has decided. So we don't believe that they should
3 be allowed to go into these sort of arguments with
4 Dr. Madisetti.
5            THE COURT: All right. Let me hear from...
6            MR. CHAIKOVSKY: Your Honor, if counsel had
7 asked one more question, I think all I'm planning to do is
8 move it into evidence because he considered it. That's it.
9 The file history should be in evidence.
10           THE COURT: So you just want to admit it into
11 evidence?
12           MR. CHAIKOVSKY: That's it.
13           THE COURT: Okay. All right. All right. So --
14           MR. CHAIKOVSKY: Your Honor, just for speed,
15 could we put a copy of JTX -- I think it's 4, the file
16 history, just up in front of him?
17           THE COURT: Yes. We have the time.
18           All right. So we will reconvene at 9:25 so that
19 we can get the jury in at 9:30, begin on time. All right.
20           (Recess taken.)
21           MR. FARNAN: Your Honor, I'm sorry. Can we
22 just -- there's one issue just based on the last comments we
23 wanted to raise before the jury came in. So if we could
24 interrupt.
25           THE COURT: I'm sorry?

607

1            MR. FARNAN: We want to raise one issue with
2 respect to the prosecution history. Do it now before the
3 jury comes in. Is that --
4            THE COURT: Okay.
5            MR. FARNAN: The only issue is we had concerns
6 what they were going to use the prosecution history for, and
7 all we heard now they're just going to admit it into
8 evidence, they're not going to question the witness about
9 it. So we don't know what they're going to do with it.
10 And, you know, evidence is admissible to one point and maybe
11 not another, and this is not an exhibit. It's not like an
12 office action. They want the whole thing in. So we're
13 concerned that they're going to do something in closing like
14 argue claim construction, or -- we'd like a proffer of what
15 they're going to do. I mean, you don't just put the whole
16 thing in and don't ask the witness a question. So if
17 they -- what's it in the record for?
18           THE COURT: He considered it, so they don't --
19 it's part of the record because he considered it in his
20 expert report.
21           MR. FARNAN: And that's fine if that's all
22 they're going to do. But they're --
23           THE COURT: That's all that he said he was going
24 to do. That's all he said he was going to ask is --
25           MR. FARNAN: But our concern is --















916

1  spoke.  I sort of flagged that by our count, they have about
2  an hour and a half left including closings, and so they have
3  disclosed six witnesses, and he's told me he's going to get
4  me an updated count within the next two hours of who they're
5  actually going to call.
6         THE COURT:  Okay.  So let me -- let me hear from
7  HTC about a plan for tomorrow.
8         MR. OU:  Thank you, Your Honor.  Obviously we'll
9  confer and we'll let 3G know, but we understand they're
10  going to call our face-of-the-company witness, Mr. Ye.
11  We'll probably have a short presentation from him depending
12  on what they ask.  And then the next witness, we're going to
13  plan to have Mr. Bakewell, who is our damages expert --
14         THE COURT:  Okay.
15         MR. OU:  -- Dr. Wicker, who is an invalidity for
16  the '091 patent.  And before that, we were hoping to have
17  gotten through more of those witnesses today, actually, Your
18  Honor.  The planned order was Dr. Jeffay, Mr. Jones,
19  followed by Dr. Kakaes.
20         THE COURT:  All right.  Well, you understand the
21  time you have left, so I assume tonight you'll be making
22  some strategic decisions as to how you use your remaining
23  time.
24         MR. OU:  Yes, Your Honor, absolutely.
25         THE COURT:  All right.  All right.  So you'll

917

1  update the Court about your plan in the morning before we
2  get started.
3         MR. OU:  Yes, Your Honor.  And just so that the
4  Court is aware, you know, the parties conferred about
5  witnesses and order and times because we do have -- the
6  reason -- Dr. Wicker and Mr. Bakewell, they need to leave
7  tomorrow morning because they have another trial to attend,
8  and so that's why we had to shift the order, Your Honor.
9  But we've made them aware of that, Your Honor, so...
10         THE COURT:  Okay.  All right.  So...
11         MR. HEALY:  I mean, I'll say, Your Honor, we
12  were under the impression that they were going to go today.
13  Obviously counsel made choices about what time they used
14  today.
15         THE COURT:  I understand.
16         MR. HEALY:  I mean, presenting their testimony
17  in our case-in-chief is not something we want to do.
18         THE COURT:  But -- okay.  But --
19         MR. HEALY:  I just need, Your Honor, some
20  guidance.  So I think, you know, for --
21         THE COURT:  In terms of what time do they have
22  to leave?
23         MR. OU:  I'll confer with them, Your Honor.  I
24  don't know exactly.
25         THE COURT:  So talk about it.  Hopefully you

918

1  guys can reach agreement.  It's not unusual in -- you know,
2  in these cases for witnesses to be taken out of turn at the
3  time people have to leave.  That's understood, so hopefully,
4  you know, as a matter of professional courtesy, you guys
5  will reach agreement.
6         MR. HEALY:  Understood, Your Honor.
7         THE COURT:  All right.  So counsel should plan
8  on -- you know, we'll have the charge conference tomorrow
9  after the end of the evidence presentation.  We'll have the
10  charge conference tomorrow.  So you guys should be planning
11  on that as well.
12         MR. OU:  Your Honor, may I ask one quick
13  question, clarification on the charge conference?
14         THE COURT:  Yes.
15         MR. OU:  The parties filed their joint proposed
16  final jury instructions this afternoon --
17         THE COURT:  Yes.
18         MR. OU:  -- at noon.  I think there's just a few
19  disputes.  There is one that was added quite late, and we
20  put a footnote that, you know, we wanted to address it at
21  the charge conference.  We just wanted to see, Your Honor,
22  if -- would you like us to just address it then?  Could we
23  submit just like a case or something to Your Honor in
24  advance?
25         THE COURT:  You can submit something in advance,

919

1  yes.  Yes.
2         MR. OU:  Okay.  We'll do that, Your Honor.
3  Thank you.
4         THE COURT:  All right.  If it's the case, you
5  know, just give me one -- you know, give me the case with,
6  you know, a couple of paragraphs of why -- you know, what's
7  the importance.
8         MR. OU:  Understood, Your Honor.
9         THE COURT:  All right.  And you guys can do the
10  same.
11         MR. HEALY:  Thank you, Your Honor.
12         THE COURT:  All right.  We'll meet with counsel
13  same time tomorrow, 9 a.m.
14         (Whereupon, the following proceeding concluded
15  at 5:45 p.m.)
16         I hereby certify the foregoing is a true
17  and accurate transcript from my stenographic notes in the
18  proceeding.
19                    /s/ Michele L. Rolfe, RPR, CRR
                      U.S. District Court

1

2                    IN THE UNITED STATES DISTRICT COURT

3                    IN AND FOR THE DISTRICT OF DELAWARE

4
     3G LICENSING, S.A., KONINKLIJKE        )
5    KPN N.V., and ORANGE S.A,              )
                                            )
6            Plaintiffs,                    )   C.A. No.
     v.                                     )   17-083-GBW
7                                           )
     HTC CORPORATION,                       )
8                                           )
             Defendant.
9

10                              - - - -

11                       Wilmington, Delaware
                         Friday, October 13, 2023
12                       *Trial Volume 4*

13                              - - - -

14

15   BEFORE:   HONORABLE GREGORY B. WILLIAMS
               UNITED STATES DISTRICT COURT JUDGE
16

17                              - - - -

18

19

20

21

22

23

24

25
                              Michele L. Rolfe, RPR, CRR

921

APPEARANCES:

      FARNAN LLP
      BY: MICHAEL J. FARNAN, ESQ.

        -and-
      SUSMAN GODFREY
      BY: ANDRES HEALY, ESQ.
        LEXIE WHITE, ESQ.
        HUNTER VANCE, ESQ.
        For Plaintiff

      SHAW KELLER LLP
      BY: KAREN KELLER, ESQ.
        NATHAN R. HOESCHEN, ESQ.

        -and-

      WHITE & CASE
      BY: YAR R. CHAIKOVSKY, ESQ.
        PHILIP OU, ESQ.
        RADHESH DEVENDRAN, ESQ.
        SHASHANK CHITTI, ESQ.
        For Defendant

---

922

- - - - -

P R O C E E D I N G S

    (REPORTER'S NOTE: The following trial was held in Courtroom 6B beginning at 9:00 a.m.)
Michele L. Rolfe, RPR, CRR
Judge William

    THE COURT: All right. Good morning. All right. You may be seated.

    All right. I received the joint submission this morning, let's deal with that first. With respect to the Dr. Jeffay slides 12-15, the objection is overruled.

    With respect with Dr. Jeffay slides 40-44, my understanding is 43 to 44 has already been dropped.

    MR. OU: Yes, Your Honor.

    THE COURT: Let's talk about 41 to 42, and the objections to slides 41 and 42 are overruled.

    All right. So time remaining. Yesterday 3G used 3 hours and 9 minutes -- I'm sorry, yesterday 3G used 2 hours and 13 minutes, so 3G has 3 hours and 9 minutes remaining.

    HTC used 4 hours and 20 minutes, and HTC has an hour and 17 minutes remaining.

    All right. We talked last night about expected plan for today. I understand we'll have the redirect of

---

923

Mr. Lindsay, followed by Mr. Ye being called by plaintiff, and then a deposition clip.

    MR. HEALY: Sorry, Your Honor, so it will be -- a little bit different order. It will be the finishing up of Mr. Lindsay, then we'll play two depo clips, as far as we understand it currently, it's about 15 minutes total time for Your Honor.

    THE COURT: Okay.

    MR. HEALY: And then we will close with Mr. Ye. And then there may be another depo clip, but it's undecided at this point.

    THE COURT: Okay. All right. HTC.

    MR. OU: Yes, Your Honor, so in terms of Mr. Ye, I believe at least -- there was a previous discussion about whether or not he goes up twice, once in their case and once in our case. It was originally agreed that we'll just have him go at once, they can cross him, when we redirect him, they'll do his redirect at that time and they obviously, you know, cross -- that's for efficiency purposes, Your Honor.

    THE COURT: Okay. Makes sense to me. All right.

    And then Mr. Bakewell and Dr. Wicker.

    MR. OU: Yes, sir.

    THE COURT: There was some discussion about those being taken out of turn, did you guys reach agreement

---

924

on that?

    MR. OU: Yes, Your Honor. Do you want me to just give you the full -- our plan for the day?

    THE COURT: Yes.

    MR. OU: So after Mr. Ye goes, Mr. Bakewell will testify. We are not presenting our invalidity experts, so that's Dr. Wicker and Dr. Kakaes. So it will go Mr. Bakewell, we'll have a short play of the Qualcomm witness, the video, and then Dr. Jeffay and Mr. Jones.

    THE COURT: Okay. All right.

    MR. HEALY: Assuming we have time for all of that, Your Honor, which... they've also agreed in writing that they are dropping their validity defenses, those have been withdrawn and, as a result, we sent our validity expert home.

    And just so for Your Honor's benefit, we will be moving for JMOL on those defenses. And they are going to be removed from the jury instructions and the verdict form, and we're happy to send Your Honor an updated version of that this morning.

    THE COURT: If they are dropping them -- are you dropping them?

    MR. OU: Your Honor, we are not presenting our invalidity defenses with those invalidity experts. I think what Mr. Healy was referring to was a dispute that we

925

1    e-mailed about last night, Your Honor.

2           In the jury instructions and the verdict form,

3    there was a dispute about subject matter eligibility 101 for

4    the '818 patent. I'm not sure, Your Honor, if you've seen

5    the arguments there but, basically, step 2 could be a

6    factual issue, some courts have held.

7           And because we're not presenting our invalidity

8    experts, they are not going to testify about that. I

9    informed Mr. Healy that yesterday they sent Dr. Cohen home.

10   I then informed him that, however, we still preserve that

11   invalidity issue on 101, because we don't believe that it

12   needs to necessarily have a factual dispute. But we're,

13   obviously, not going to present any experts about it.

14          MR. HEALY: And just to be clear, Your Honor, I

15   appreciate that clarification. What I was actually

16   explaining was something more simple. The current form of

17   the verdict form that Your Honor has and the jury

18   instructions that Your Honor has list their validity

19   questions and it has validity instructions. They've agreed

20   those were going to be removed and will not be presented to

21   the jury as a validity question. So we'll send Your Honor

22   updated materials.

23          THE COURT: Okay.

24          MR. HEALY: But from our perspective then --

25   that was my point.

926

1           THE COURT: Right. And then with respect to --

2    if you're not presenting any evidence on the invalidity,

3    then I would suspect that the parties could stipulate to the

4    JMOL, so no need to waste sort of time doing that.

5           MR. HEALY: I hope so, Your Honor.

6           THE COURT: All right. The Court likes

7    cooperation, the more time we can streamline, that'll bode

8    well. Given the parties are cooperating, I am considering

9    giving both sides an additional 30 minutes for closings.

10          MR. OU: Your Honor, just on the instructions,

11   we're working through it to send to Your Honor an updated

12   one.

13          THE COURT: Okay. That's not a problem. I'm

14   considering it, I encourage you to continue to corporate.

15   All right.

16          MR. OU: Your Honor, one more housekeeping

17   issue.

18          THE COURT: Yes.

19          MR. OU: There was an exhibit yesterday that was

20   moved into evidence, it's JTX80. The version that was moved

21   into evidence was in black and white, and we have a color

22   version, Your Honor, that we're going to be using today.

23   We've marked it as JTX80 C, so that I guess both will be in

24   the record.

25          THE COURT: Okay. Just show it to -- make sure

927

1    they see it and...

2           MR. HEALY: This was our idea, so, yes, we don't

3    have a problem with it.

4           Our only point was we shouldn't use the same

5    exhibit number just for the record purposes because it's a

6    different document, so...

7           THE COURT: All right. See what happens when

8    people talk, you know, we got two wars going on around the

9    world. If people would just talk, we can get rid of this

10   stuff.

11          All right. We'll reconvene at 9:30 a.m.

12          (Recess taken.)

13          THE COURT: All right. You may be seated until

14   the jury comes in.

15          (Whereupon, the jury entered the room at

16   9:34 p.m.)

17          THE COURT: All right. Members of the jury,

18   we're going to move forward with day four. All right.

19          CONTINUED REDIRECT EXAMINATION

20   BY MR. VANCE:

21   Q.     Thank you, Your Honor. Good morning, Mr. Lindsay.

22   A.     Good morning.

23   Q.     You recall yesterday Mr. Ou asked you some questions

24   suggesting that perhaps you hadn't limited your damages

25   numbers to just the products that Dr. Madisetti has accused

928

1    of infringement?

2    A.     Yes, I recall.

3    Q.     Mr. Ou represented to you that Dr. Madisetti said

4    he's only accusing the Google Pixel products that are

5    actually sold to Google, right?

6    A.     That's right.

7    Q.     And Mr. Ou suggested that maybe you included in your

8    damages summary some Pixel phones that weren't just sold to

9    Google?

10   A.     That's right.

11   Q.     And he suggested then that you somehow included

12   products in your damages numbers that aren't actually

13   accused of infringement?

14   A.     Correct.

15   Q.     Is that true; is that what happened?

16   A.     No.

17   Q.     Let me ask you, did you include any sales for the

18   Google Pixel phones that were not sold to Google?

19   A.     No, I did not.

20   Q.     Did HTC even make sales of the Pixel to companies

21   other than Google?

22   A.     No, I don't believe they did.

23   Q.     How do you know that?

24   A.     The sales data they provided.

25          MR. VANCE: Can we pull up JTX11.

929

1    BY MR. VANCE:

2    Q.    What's this document, Mr. Lindsay?

3    A.    This is a summary of one of the detailed sales

4    spreadsheets they provided.  And it has the product number

5    on the left, the customer the next column over, and then the

6    units that were sold for each respective year.

7    Q.    This is a document summarizing the raw spreadsheets

8    of sales data that HTC provided?

9    A.    That's right.

10   Q.    These are spreadsheets with tens, maybe more than

11   tens of thousands of rows of sales?

12   A.    Yes, that's correct.

13   Q.    And this provides the aggregate?

14   A.    Yes.

15   Q.    On the left, that product column, these don't look

16   like -- the product names that we see when we go to HTC's

17   website, what are we looking at?

18   A.    Yeah, these here are the internal product names.  As

19   we mentioned yesterday, we have to cross-reference those to

20   the more public-facing names that we're familiar with.

21   Q.    Well, Mr. Lindsay, let's see who HTC sold the Pixel

22   phone to.

23   A.    Okay.

24   Q.    I'll represent to you that the internal name for the

25   Google Pixel 1 is the S1.  All right?

930

1            MR. VANCE:  Mr. Watson, can we search for S1 in

2    the sales data, please.  Make sure we have them all.

3    BY MR. VANCE:

4    Q.    Who did HTC sell the S1 product to, Mr. Lindsay?

5    A.    Google.

6    Q.    Did they sell it to any company other than Google?

7    A.    No, they did not.

8    Q.    All right.  Let's look at the Pixel 2, and I'll

9    represent to you that the internal name for the Google

10   Pixel 2 is S2.

11           MR. VANCE:  Mr. Watson, can we search for S2.

12   BY MR. VANCE:

13   Q.    Mr. Lindsay, who did HTC sell the Pixel 2 to?

14   A.    Google.

15   Q.    Did HTC sell the Pixel 2 to any company other than

16   Google?

17   A.    No.

18   Q.    Let's look at the Pixel XL, Mr. Lindsay, and I'll

19   represent the internal product name for that product is M1.

20           MR. VANCE:  Mr. Watson, can we search for M1?

21   BY MR. VANCE:

22   Q.    Mr. Lindsay, who did HTC sell the Pixel Plus to,

23   Pixel XL?

24   A.    Google.

25   Q.    Did HTC sell the Pixel XL to any company other than

931

1    Google?

2    A.    No.

3    Q.    So it's not possible that you could have included in

4    your damages numbers sales of the Pixel product to companies

5    other than Google, right?

6    A.    That's right.

7    Q.    But given the suggestion that's been made to the jury

8    that you may have included products that aren't actually

9    accused of infringement, I'd like to give you the

10   opportunity to explain your methodology and how you went

11   about identifying the product to include in your sales

12   numbers, all right?

13   A.    All right.

14           MR. VANCE:  Let's switch to the ELMO,

15   Mr. Watson.

16   BY MR. VANCE:

17   Q.    Can you see that all right, Mr. Lindsay?

18   A.    Yes.

19   Q.    What is this document?

20   A.    This is a schedule from my reply report which details

21   certain HTC sales.  And this particular schedule relates to

22   the '818 patent.

23   Q.    You prepared quite a few schedules in your opening

24   and reply reports, didn't you, Mr. Lindsay?

25   A.    Yes, I did.

932

1    Q.    This is one, we'll look at this one.  Is it

2    representative of your methodology that you used for all of

3    the sales data that you reviewed and analyzed in this case?

4    A.    Yes.

5    Q.    And just like we saw in JTX11, your schedules list

6    the models of the HTC product by internal product name,

7    right?

8    A.    That's correct.

9    Q.    And what do we see in this next column, Mr. Lindsay?

10   A.    That column is an indication if it was accused of

11   infringing the '818 patent or not.

12   Q.    And what does the X indicate in this column?

13   A.    The X indicates that it was, in fact, accused of

14   infringing.

15   Q.    What's it mean if there's no X in this column?

16   A.    It's not accused and I did not include it in the

17   royalty base.

18   Q.    You didn't include in your damages analysis any units

19   that were not identified by Dr. Madisetti as accused of

20   infringement, right?

21   A.    That is correct.

22   Q.    I also see years on the schedule.  Can you explain

23   what these mean?

24   A.    Sure.  I limited the damage -- or the royalty base,

25   the damages calculation for each patent to the respective

933

1  damages period for --

2  Q.    Let's talk about those respective damages periods,

3  Mr. Lindsay, so that it's clear.  For the '091 patent what

4  date range did you use for determining the relevant sales to

5  accuse of infringement?

6  A.    For the '091 patent, I believe that was April 2012

7  through December 2018.

8  Q.    You didn't include any sales outside of that range,

9  did you, Mr. Lindsay?

10  A.    That's correct, I did not.

11  Q.    Were you here earlier this week when Dr. Madisetti

12  was asked some questions about, for instance, KDDI and sales

13  made on the 3G network after it shut down in 2023 or 2022?

14  A.    I don't know if I was in here for that part.

15  Q.    May have been sealed for that portion.  That's okay.

16        Let's talk about the '818 patent, Mr. Lindsay.

17  A.    Sure.

18  Q.    What's the relevant damages period that you used for

19  '818 patent?

20  A.    The damages period was March 2013 through

21  January 2018.

22  Q.    Do you remember why you stopped in January 2018?

23  A.    I believe that's when the '818 patent expired.

24  Q.    You didn't include any sales in your damages summary

25  after the date that the '818 patent expired, right?

934

1  A.    That's correct, I did not.

2  Q.    One more question on this, Mr. Lindsay.  For those

3  Google Pixel phones, specifically, did you make any other

4  revision to the dates range that you used to identify the

5  relevant sales accused of infringement?

6  A.    Yes, for those phones, I only included units that

7  were sold after the filing of the complaint, which I believe

8  was January 30th, 2017.

9  Q.    You didn't include any sales in your sales data for

10  the Google Pixel products that were sold before

11  January 30th, 2017?

12  A.    I did not include those in the royalty base.

13  Q.    So to confirm, Mr. Lindsay, you didn't include any

14  sales in your royalty base in the numbers that you presented

15  to the jury that Dr. Madisetti did not identify to you as

16  being accused of infringement, right?

17  A.    That's right.

18  Q.    Thanks, Mr. Lindsay.

19        Mr. Ou also asked you during your

20  cross-examination whether Orange believed that the '091

21  patent was essential at the date of the hypothetical

22  negotiation: do you remember that?

23  A.    Yes, I do.

24  Q.    And you told him, no, Orange did not believe at the

25  date of the hypothetical negotiation that the '091 patent

935

1  was essential: do you remember that answer?

2  A.    Yes.

3  Q.    You told Mr. Ou at that time Orange hadn't even

4  declared the patent as potentially essential to ETSI: do you

5  remember?

6  A.    That's right.

7  Q.    And Mr. Ou suggested, well, have we seen any evidence

8  presented in this trial that shows that fact?

9  A.    Yes, I recall.

10  Q.    And he suggested that there isn't any evidence that

11  Orange at the date of the hypothetical negotiation didn't

12  even yet believe, hadn't even yet declared the '091 patent

13  as potentially essential to ETSI: do you remember that?

14  A.    Yes.

15  Q.    Well, let's look at the evidence, Mr. Lindsay.

16        MR. VANCE:  Can we pull up PTX142.

17  BY MR. VANCE:

18  Q.    You've seen this document before, Mr. Lindsay, right?

19  A.    I have.

20  Q.    This is the actual '091 declaration that Orange made

21  to ETSI.

22  A.    That's my understanding.

23  Q.    Ms. Brillouet testified about this exact document

24  earlier this week.  This is where Orange said, We think this

25  patent may be essential.  This is the document, right,

936

1  Mr. Lindsay?

2  A.    That's my understanding, yes.

3  Q.    If we can look down under the signature, Mr. Lindsay,

4  what's the date on this document?

5  A.    September 19th, 2013.

6  Q.    When would the hypothetical negotiation have occurred

7  for the '091 patent?

8  A.    April 2012.

9  Q.    At the time of the hypothetical negotiation, Orange

10  hadn't even declared the '091 patent as potentially

11  essential, had it, Mr. Lindsay?

12  A.    It had not.

13  Q.    Have you seen any evidence in all your time in this

14  case that Orange would ever agree to give someone the

15  discounted FRAND rate on a patent they hadn't even yet

16  declared as potentially essential?

17  A.    No, I haven't.

18        MR. VANCE:  You can pull this down.  Thanks,

19  Mr. Watson.

20  BY MR. VANCE:

21  Q.    Mr. Ou also asked you questions about the assumption

22  of invalidity and infringement and suggested that maybe that

23  means that the hypothetical negotiation somehow would be on

24  FRAND terms: do you remember those questions?

25  A.    Yes, I remember.

937

1   Q.      Let's be clear, Mr. Lindsay.  At the hypothetical
2   negotiation, we do assume the patents are valid and we
3   assume they are infringed, right?
4   A.      That's right.
5   Q.      Do you assume at the hypothetical negotiation that
6   the patent is essential?
7   A.      No.
8   Q.      Do you assume at the hypothetical negotiation that
9   the patent would be licensed on FRAND terms?
10  A.      No.
11  Q.      Does assuming that a patent is infringed mean that
12  the patent is essential?
13  A.      No, it does not.
14  Q.      A patent can be infringed and yet still not be
15  essential?
16  A.      Absolutely.
17  Q.      So does the assumption of validity and infringement
18  tell us anything at all about whether the patent is
19  essential or on FRAND terms at the hypothetical negotiation?
20  A.      No, it does not.
21  Q.      Mr. Ou also asked you a few questions about sales and
22  kind of suggested, well, maybe it's HTC America, not
23  Corporation, making these sales to the United States: do you
24  remember that?
25  A.      I do.

938

1           MR. VANCE:  Can we pull up slide 57 from
2   Mr. Lindsay's presentation.
3   BY MR. VANCE:
4   Q.      Do you remember this testimony, Mr. Lindsay?
5   A.      I do.
6   Q.      This is the testimony of HTC's corporate
7   representative -- HTC Corporations's corporate
8   representative Hsiu-Fen Lai.  You've read this testimony,
9   right?
10  A.      I did.
11  Q.      Can you read this testimony again for the jury,
12  please?
13  A.      Sure.  It starts with, "It should be said that the
14  information we have provided are all of the information
15  about sales to the United States."
16          When asked, "Each of these rows represents a
17  sale made by HTC Corporation, correct?"
18          "It's HTC's sales to America."
19          "Do you mean HTC Corporation sales to America?"
20          She answered, "Yes."
21  Q.      Ms. Lai testified all of the information provided is
22  about sales to the U.S.?
23  A.      Yes.
24  Q.      Everything we have is U.S. sales?
25  A.      Correct.

939

1   Q.      And I said that wasn't quite my question.  And I
2   asked Ms. Lai again, "Let's be clear.  Every one of the rows
3   in the spreadsheets HTC provided is a sale made by HTC
4   Corporation, not America."
5           And she says, "Well, it's HTC's sale to
6   America."
7           "Not my question.  Once again, I want to be very
8   clear in this deposition.  Do you mean HTC Corporation sales
9   to America?
10          "Yes."
11  Q.      That's what she said, right, Mr. Lindsay?
12  A.      That's right.
13  Q.      Ms. Lai always refers to some rows and spreadsheets
14  that she's talking about.  Do you see that?
15  A.      I do.
16  Q.      These are the spreadsheet rows that she says
17  represent HTC Corporation's sales to America, right?
18  A.      That's right.
19  Q.      And you've reviewed her deposition --
20  A.      I have.
21  Q.      -- in preparation, correct?
22          Can you confirm for the jury that the
23  spreadsheets that Ms. Lai was talking about in that
24  deposition, they're exhibits there, are the very same
25  spreadsheets that you relied on in preparing your damages

940

1   summary to the jury?
2   A.      They are.
3           MR. VANCE:  All right.  Let's turn to slide 58
4   of Mr. Lindsay's deck.
5   BY MR. VANCE:
6   Q.      Can you please tell the jury one more time and
7   restate your opinion about what reasonable royalty damages
8   should be in this case if they find the patents to be valid
9   and they find the patents to be infringed?
10  A.      Sure.  Under the '818 patent, royalty damages in my
11  opinion range between $1,100,140 to $2,156,274.  For the
12  '091 patent, my opinion is that damages range between
13  $4,883,812 to $9,572,272.
14          MR. VANCE:  Thank you, Mr. Lindsay.
15          Pass the witness.
16          MR. OU:  No questions, Your Honor.
17          THE COURT:  All right.  Mr. Lindsay, you may
18  step down.
19          THE WITNESS:  Thank you.
20          MR. HEALY:  Your Honor, at this point we'll call
21  Ms. Lynn Yu via deposition.
22          THE COURT:  All right.
23          (Video deposition was played for the jury as
24  follows:)
25  Q.      What is your current employer?

941

1   A.      HTC Corporation.

2   Q.      What is your position at HTC Corporation?

3   A.      I'm the senior director of the legal department.

4   Q.      You understand you are testifying today on behalf of

5   HTC Corporation?

6   A.      Yes, I understand.

7   Q.      HTC made an offer for 3G Licensing's patent

8   portfolio, correct?

9   A.      According to my memory, for the patents that Sisvel

10  purchased from Orange, we offered a counteroffer.

11  Q.      In the counteroffer that you referred to, that was

12  for $0.001 per unit for all the patents in the Orange

13  portfolio: is that correct?

14  A.      As far as I can remember, for the portfolio purchased

15  from Orange, yes, our offer was 0.001 U.S. dollars.

16  Q.      Other than that offer for $0.001, did HTC make

17  another offer for the 3G Licensing-Orange portfolio?

18  A.      According to my knowledge -- excuse me -- as far as I

19  can remember now, other than this 0.001 U.S. dollar offer,

20  we did not make any other offers as for the 3G

21  Licensing-Orange portfolio.

22  Q.      In general, HTC is willing to enter license

23  agreements that are based on running royalties, correct?

24  A.      In agreements that HTC has signed, there are those

25  where it is done by running royalties.  So as what I have

942

1   answered before, after comprehensive consideration, if

2   running royalty is an appropriate model, we would accept

3   that.

4   Q.      Has HTC ever entered a license agreement or paid

5   royalties based on the price of a component inside of an HTC

6   product?

7   A.      As far as I can remember, in agreements where the

8   running royalty is adopted, there isn't anywhere the royalty

9   is based upon the price of a component inside of an HTC

10  product.

11          (End of video deposition.)

12          MR. HEALY:  Your Honor, I have the clip reports.

13  May I approach to give these to Your Honor?

14          THE COURT:  Yes.

15          All right.  3G, please call your next witness.

16          MR. HEALY:  Your Honor, we would call Mr. Howard

17  Chen via deposition designations.  Before we start, Your

18  Honor, I don't know if it would be beneficial to give the

19  jury instructions on translation, just to clarify.

20          THE COURT:  Is this something that has to be

21  translated, is translated in the video?

22          MR. HEALY:  It's already translated.  I just

23  wanted to make it clear to the jury that's why there's no

24  mouth moving when there's people talking.

25          THE COURT:  All right.  Thank you.

943

1          (Video deposition was played for the jury as

2   follows:)

3   Q.      Mr. Cheng, how are you today?

4   A.      Very good, thank you.

5   Q.      Mr. Chen, do you understand today that you are

6   testifying as a corporate representative for HTC

7   Corporation?

8   A.      Yes.

9   Q.      Mr. Chen, do you currently work for HTC?

10  A.      Yes.

11  Q.      And what is your title, Mr. Chen?

12  A.      I'm now a director.

13          MR. VANCE:  Madam court reporter, if you would

14  hand the witness what we've marked as Exhibit 34.

15  BY MR. VANCE:

16  Q.      What do you understand this document to be, Mr. Chen?

17  A.      If we want to sell cell phones to AT&T, this document

18  lists the requirements that our cell phones need to comply

19  with in order to sell the cell phones to AT&T.  And based on

20  this document, we will fill in whether or not our cell

21  phones satisfies these items that are listed.  So we will

22  fill in either satisfy or not support.

23  Q.      Am I understanding you correctly that there's -- the

24  first document that's filled out in which HTC will identify

25  which of the requirements its phone does not support, and

944

1   then based on that document, AT&T would generate a testing

2   plan that you will then test the device for?

3   A.      Yes.

4   Q.      Is the process the same for T-Mobile?

5   A.      Yes.

6   Q.      Mr. Chen, with respect to the AT&T or the T-Mobile

7   requirements, is it an expectation that to the extent a

8   particular HTC cellular device does not comply with a

9   particular requirement, that that will be noted on the

10  compliance document that's provided to that carrier?

11  A.      In principle, yes.

12  Q.      Mr. Chen, are you familiar with something called

13  Google Fi?

14  A.      I'm familiar with it.

15  Q.      What do you understand Google Fi to be, Mr. Chen?

16  A.      This is a telecommunication service provided by

17  Google.  What's special about it is that it can switch

18  between different networks so that you can use services from

19  different networks.  However, they are all included in the

20  Google plan.

21  Q.      Does HTC have any cellular devices in the Google Fi

22  program?

23  A.      The Pixel, Pixel XL, and Pixel 2 cell phones that HTC

24  makes for Google can support Google Fi service.

25  Q.      And when did the Pixel first begin to support the

945

1   Google Fi service?

2   A.   When Pixel was launched.  I think it was 2016.

3   Q.   Mr. Chen, are the IMSI values unique?  And by that, I

4   mean, can multiple devices have the same IMSI value on them?

5   A.   An IMSI is unique.

6   Q.   And, Mr. Chen, can an HTC cellular device connect to

7   a cellular network if it doesn't have an IMSI value?

8   A.   What does connect mean here?  We may need to clarify

9   this.  Does it mean being able to use the full service of

10  the network or simply connect to the network.

11  Q.   That's a great question, Mr. Chen.  Use the full

12  service of the network, is what I mean by connect?

13  A.   Each cell phone needs to have a SIM card and use the

14  IMSI on the SIM card to access the full service of the

15  network.

16  Q.   Do you know when HTC first started including SIM

17  cards in cellular devices that it was selling to Verizon?

18  A.   I think it was at the time when we sold the first

19  cell phone to Verizon.

20  Q.   And the Pixel and the Pixel XL that were sold for use

21  in the Project Fi program, those devices have to utilize a

22  Project Fi SIM card; is that right?

23  A.   According to my understanding, Pixel and Pixel XL are

24  sold without a SIM card.  If a user wishes to use Google

25  Fi's service, the user needs to apply for using this service

946

1   from Google.

2   Q.   But in order for a device to be utilized in a Google

3   Fi program, it has to eventually include a Google Fi SIM

4   card; is that right?

5   A.   Yes.

6   Q.   And when HTC is manufacturing a Pixel or a Pixel XL

7   for Google, it has to include on those devices the Google Fi

8   app; is that right?

9   A.   It should be said this way:  Google provides the

10  software for HTC to install the Pixel and Pixel XL during

11  manufacturing.  So HTC installs the softwares provided by

12  Google, and according to my understanding, the Google Fi app

13  is included in the software provided by Google.

14  Q.   And did you say earlier that the Google Project Fi

15  enables the device to connect to the network of multiple

16  United States carriers?

17  A.   My understanding is that Google Fi can be used on

18  T-Mobile, Sprint, and USCC's networks.  So these three

19  networks.

20  Q.   In order to allow a device to connect to each of

21  those three networks, the Project Fi SIM card includes one

22  IMSI value associated with the T-Mobile network, one IMSI

23  value associated with the Sprint network, and one IMSI value

24  associated with the USCC network; is that right?

25  A.   You can say so, yes.

947

1   Q.   And when a Pixel is being utilized in a Project Fi

2   program, it will switch between those IMSI values based on

3   which would provide the strongest network connection.  Is

4   that how it operates?

5   A.   For this part, we don't have a clear idea about how

6   the switching is actually done.  We only know that this Fi

7   application can indeed switch between IMSIs.

8   Q.   And, Mr. Chen, you should have in front of you a

9   document marked Exhibit 41.  The bottom right-hand corner

10  will say HTC 3G 00163517?

11  A.   Yes.  Yes.

12  Q.   What were the circumstances in which you saw this

13  document?

14  A.   Because I participated in the Pixel and Pixel XL

15  projects, and at that time, my supervisor mentioned that our

16  device needed to support Project Fi, and next we received

17  this Project Fi requirement document from Google.  That --

18  those were the circumstances.

19  Q.   Do you know when you first received this document,

20  Mr. Chen?

21  A.   I think it was some time between 2015 and 2016.  I

22  don't have a clear recollection anymore.

23  Q.   Was it before HTC began selling the Pixel and the

24  Pixel XL to Google for use in the Google Project Fi program?

25  A.   We received this document before Pixel and Pixel XL

948

1   was launched in the market.

2   Q.   And, Mr. Chen, you should have in front of you

3   another document marked Exhibit 42, HTC 3G 00163526.

4        Do you see that?

5   A.   Yes.

6   Q.   And have you seen this document before, Mr. Chen?

7   A.   Yes.

8   Q.   And what were the circumstances of you seeing this

9   document, Mr. Chen?

10  A.   I am not very sure -- oh, yes, at that time, I took a

11  business trip to Google, and during meetings with Google,

12  they mentioned that there are some test items HTC needs to

13  perform for the Google Fi project.  So they provided these

14  test documents to us so that we can perform the tests for

15  the Google Fi products.

16  Q.   Do you know around what timeframe that was, Mr. Chen?

17  A.   May or June of 2016.

18  Q.   Was that before HTC began to release the Pixel and

19  Pixel XL for use on the Project Fi program?

20  A.   This question is a little bit weird because HTC only

21  sold Pixel and Pixel XL to Google.  So the connection with

22  Google Fi -- that is, these two should not be linked

23  together.

24  Q.   Can you just explain what you mean by that, Mr. Chen?

25  A.   That is HTC manufactured Pixel and Pixel XL.  As for

949

1  Google Fi, our understanding was that when these phones were
2  launched in the market, they need to be able to support
3  Google Fi.  However, there is no direct relationship between
4  the two.  And also that Pixel and Pixel XL was not launched
5  to the market specifically for Google Fi.
6  Q.     But did I -- did I understand you correctly before
7  that each Pixel and Pixel XL that HTC manufactured and
8  provided to Google included the Google Fi application on the
9  phone itself?
10 A.     Yes.
11        (End of video deposition.)
12        MR. HEALY:  Your Honor, I just want to move into
13 evidence a few of the documents that we heard in the
14 deposition.  Move into evidence PTX106, which was
15 Exhibit 34, as referenced in the deposition.
16        THE COURT:  All right.
17        MR. OU:  No objection, Your Honor.
18        THE COURT:  PTX106 is admitted.
19        (Exhibit admitted.)
20        MR. HEALY:  PTX100, which was Exhibit 42 to
21 Mr. Chen's deposition.
22        MR. OU:  No objection, Your Honor.
23        THE COURT:  PTX100 is admitted.
24        (Exhibit admitted.)
25        MR. HEALY:  And I just want to note for the

950

1  record this one was already admitted, but Exhibit 4 to
2  Mr. Chen's deposition was PTX99 for purposes of this trial.
3        THE COURT:  All right.  It's already been
4  admitted.
5        MR. HEALY:  Thank you, Your Honor.
6        THE COURT:  All right.
7        All right.  Do we have the allocation for that?
8        MR. VANCE:  Yes, Your Honor, may I approach?
9        THE COURT:  Yes.
10       All right.  3G, you may call your next witness.
11       MS. WHITE:  Your Honor, plaintiff calls HTC's
12 corporate representative Mr. Shen Ye.
13       Your Honor, may we have permission to approach
14 with binders?
15       THE COURT:  Yes.
16       SHEN YE, having been called on the part and
17 behalf of the plaintiff as a witness, having first affirmed
18 to tell the truth, testified as follows:
19          DIRECT EXAMINATION
20 BY MS. WHITE:
21 Q.     Good morning.
22 A.     Good morning.
23 Q.     My name is Lexie White.  You and I met for the first
24 time in the courtroom, correct?
25 A.     Yes.

951

1  Q.     And you understand that I'm here representing Orange
2  and 3G and you're here as HTC's corporate representative,
3  correct?
4  A.     Yes.
5  Q.     I want to ask you some questions about some of the
6  issues that have come up in the case.  But, first, I want to
7  ask you about your involvement in the communications that we
8  heard about between 3G Licensing and HTC before this lawsuit
9  was filed.
10        It's my understanding that you had no
11 involvement in those communications: is that right?
12 A.     Correct, I didn't.
13 Q.     You weren't responsible for reviewing the notice
14 letters that Mr. Muus told the jury about, correct?
15 A.     Correct.
16 Q.     You weren't part of the meetings that Mr. Muus
17 testified that he had with HTC to discuss licensing these
18 patents: is that right?
19 A.     Yes.
20 Q.     And you weren't involved in formulating HTC's offer
21 of one-tenth of one penny to license these patents and 200
22 others: is that right?
23 A.     Yes, that's correct.
24 Q.     In fact, do I understand correctly that your current
25 employer who pays your salary is HTC Europe?

952

1  A.     Yes, correct.
2  Q.     And you -- you didn't even have a role with respect
3  to HTC Corporation, the defendant in this case, until around
4  2020: is that right?
5  A.     Yes, in 2020, I had -- I -- I started working
6  directly for HTC Corporation.
7  Q.     Okay.  And because you weren't involved in any of the
8  back-and-forth that the jury heard about, you're not here to
9  dispute any of Mr. Muus's testimony about what was sent to
10 HTC and what HTC said in response: is that right?
11 A.     I wasn't directly involved in those.
12 Q.     And you're not here to dispute any of his testimony,
13 correct?
14 A.     Um, yeah, I wasn't involved to be able to -- to
15 dispute that.
16 Q.     Okay.  But you are here as HTC's corporate
17 representative, right?
18 A.     Yes, correct.
19 Q.     And as HTC's corporate representative, can you tell
20 me, does HTC consider intellectual property to be important?
21 A.     We consider intellectual property to be very
22 important.
23 Q.     And HTC protects its own intellectual property,
24 correct?
25 A.     Yes, we do protect our own.

953

1    JURORS:  I can't hear him.

2    THE COURT:  Okay.  Speak up.

3    THE WITNESS:  Sorry.  I'll speak up.

4    Yes, we do protect our intellectual property.

5    BY MS. WHITE:

6    Q.    Okay.  Does HTC respect the patents of other

7    companies, like my client?

8    A.    We respect intellectual property as a whole, whether

9    it's ours or someone else's.

10   Q.    Okay.  And you know that if you're found to have

11   infringed a patent, that can have consequences, right?

12   A.    If you're found to infringe a patent, yes, I would

13   assume that there may be consequences.

14   Q.    And one of those consequences is that HTC could have

15   to pay for what it used, pay for its use of the patented

16   technology, correct?

17   A.    I think it would depend on the case, but if -- on a

18   high level, sure.

19   Q.    And as HTC's corporate representative for this trial,

20   do you understand that you can infringe a patent without

21   knowing about the patent?

22   A.    I'm not a legal expert in patents.

23   Q.    Is that new information for you?

24   A.    Um, I wouldn't know it as a complete fact.

25   Q.    Okay.  You were here when the patent video was

954

1    played, right?

2    A.    Yes.

3    Q.    You heard that a patent is like a deed to a piece of

4    property, correct?

5    A.    Yes, I heard that analogy.

6    Q.    And you understand that you can trespass on a piece

7    of property without knowing it's someone else's property,

8    right?

9    A.    Um, sure.

10   Q.    Okay.  And although it's not necessary to prove

11   direct infringement, do you understand that in this case my

12   client also alleges separately that HTC knew about these

13   property lines, that it was made aware of the Orange patents

14   that pertained to HTC's LTE products: are you aware of that

15   allegation?

16   A.    I'm aware of the allegation.

17   Q.    And are you also familiar with the fact that some

18   companies choose to intentionally keep themselves unaware of

19   patents that they are notified about so that they can later

20   claim they were not on notice of the infringement; are you

21   familiar with that concept?

22   A.    Um, sure, I can understand that concept.

23   Q.    Whether -- and the fact is that you haven't read very

24   many patents since you've been at HTC, correct?

25   A.    I don't generally deal with patents, so there's no

955

1    reason for me to ever read them.

2    Q.    And it's also true that HTC generally has a rule that

3    its employees don't go reading other people's patents; is

4    that right?

5    A.    No, I think it's more of we are usually very -- we

6    treat IP very seriously, and if there's no need for anyone

7    to read a patent, we generally wouldn't.

8    Q.    Is it true that you generally have a rule that you

9    don't go reading other people's patents at HTC?

10   A.    I think it's just more out of just making sure we're

11   careful when it comes to something as important as IP that

12   we don't just go browsing for no reason.

13   Q.    If someone sends you a patent, do you understand as

14   an employee of HTC that you're not supposed to go reading

15   that patent?

16   A.    I have never been told that directly, no.

17   Q.    Okay.  But you do understand that HTC generally has a

18   rule that you don't go reading other people's patents: yes

19   or no?

20   A.    I don't know that as a general rule, no.

21   Q.    Okay.  That's not what you said at your deposition,

22   is it, sir?

23   A.    It's more of a -- I --

24   Q.    It's just a question.  I'll try to --

25   A.    Sure.  Sure.

956

1    Q.    -- be more clear.

2    A.    I think --

3    Q.    Is that what you said at your deposition, that HTC

4    generally has a rule that you don't go reading other

5    people's patents?  Can you answer that with a "yes" or "no"?

6    A.    Um, sure.  It's close, yes.

7    Q.    I'll try one more time.  Does HTC have a rule that

8    you don't go reading other people's patents: yes or no?

9    A.    There is no general rule.

10   MS. WHITE:  Okay.  Can we play clip 3, lines --

11   page 45, lines 11-15 from your deposition.

12   (Video clip played.)

13   Q.    How many patents do you think you've read in your

14   life, Mr. Ye?

15   A.    In my life of work here at HTC, we take IP very

16   seriously.  So we generally have a rule that we don't go

17   reading other people's patents.

18   (Video clip ended.)

19   BY MS. WHITE:

20   Q.    Now, you heard Mr. Muus testify that he wrote to HTC

21   in May of 2015 about the Orange patents, right?

22   A.    Yes.

23   Q.    You heard him explain that no one at HTC responded to

24   him?

25   A.    Yes.

957

1  Q.    You heard him testify that he wrote to HTC about the
2  patents again in June of 2015, correct?
3  A.    Yes.
4  Q.    And you heard him testify that, again, no one
5  responded to him?
6  A.    Yes, I did.
7  Q.    As HTC's corporate representative, can you explain to
8  the jury why HTC thought it was unnecessary even to respond
9  to 3G Licensing in May or June of 2015?
10 A.    I don't think it would be that it was unnecessary to
11 respond, but if we get -- if we get any claims saying that
12 we may infringe on intellectual property, we take that very
13 seriously and we will spend time to do due diligence on it.
14 Q.    So is that why HTC didn't respond for three months?
15 It was spending time to do due diligence on what it had
16 received in May of 2015?
17 A.    I wouldn't know specifically for this case, but just
18 in general we take stuff like this very seriously, so that's
19 all I can expect.
20 Q.    Did you hear the suggestion from your lawyers in
21 cross-examination that HTC never received those notice
22 letters in May or June of 2015 because they were sent to the
23 wrong mailing address?  Did you hear that suggestion made?
24 A.    I heard that suggestion as more of a timely, like,
25 a -- what time we would have received it.

958

1  Q.    Is it your position as HTC's corporate representative
2  that you received the letters in May of 2015 and June of
3  2015 or that you did not?
4  A.    I wouldn't know the exact date it was received.
5  Q.    But you don't contend that those letters in May and
6  June of 2015 were not received, correct?
7  A.    I wouldn't know otherwise.
8  Q.    Let's pull up -- can you look in your binder?  It's
9  in the front cover.  Actually, can you look at tab 11?
10       Do you see an e-mail chain between Mr. Vince
11 Wang of HTC and Sisvel?
12 A.    Let me have a quick look.  From Selina Ki at Sisvel
13 to Vince Wang at HTC, yes.
14       MS. WHITE:  Your Honor, I move to admit PTX250.
15       MS. KELLER:  No objection, Your Honor.
16       THE COURT:  PTX250 is admitted.
17       (Exhibit admitted.)
18       MS. WHITE:  Can we put up the document, please.
19 And can you go to the last e-mail in the chain, Mr. Watson.
20       THE WITNESS:  The one that spans, like, two,
21 three pages?
22 BY MS. WHITE:
23 Q.    Yes.  Do you see --
24 A.    Yes.
25 Q.    -- where it says Selina Ki to Mr. Vince Wang on

959

1  June 1st, 2015?
2  A.    Yes, I do.
3  Q.    And Sisvel writes to HTC's Mr. Wang, "Please find the
4  enclosed notice letter that we sent you on May 20th, 2015"?
5  A.    Yes, I do.
6  Q.    So this was an e-mail copy following up on the
7  hardcopy letter that HTC's counsel suggested was sent to the
8  wrong mailing address, right?
9  A.    I actually don't remember which specific one that
10 Mr. Ou said was the wrong mailing address.
11 Q.    Okay.  But no one can claim that we got the mailing
12 address wrong for Mr. Wang of HTC because this was e-mailed,
13 correct?
14 A.    Yes, correct.
15 Q.    And you can see that it was e-mailed on June 1st,
16 2015?
17 A.    Yes.
18 Q.    And do you see below that Sisvel writes, "The LTE
19 pool patents are found on Sisvel's website..."  and provides
20 the web link?
21       MS. WHITE:  Go down a little bit, Mr. Watson.
22 BY MS. WHITE:
23 Q.    In the second paragraph here, do you see where it
24 says, "The LTE pool patents are found on Sisvel's website"
25 and provides the web link?

960

1  A.    Yes.
2  Q.    That's the link to the patents and the claim charts
3  that Mr. Muus testified about on day one of this trial,
4  right?
5  A.    I remember that testimony, yes.
6  Q.    Then if we could go up to the response, the next
7  e-mail in the chain.  HTC didn't respond to Sisvel, so
8  Sisvel e-mailed Mr. Wang again on July -- or July 22nd,
9  2015:  "I'm writing to follow up on my previous
10 communication.  I hope you had a chance to review the notice
11 letter and information pack I enclosed in my previous
12 e-mail.  In order to discuss our offer to license HTC under
13 our LTE portfolio further, I would like to invite you to
14 have a meeting with us in mid-August."
15       Do you see that?
16 A.    Yes, I do.
17 Q.    Then if we could go up one more.  Above that we see
18 another e-mail from Sisvel to Mr. Wang dated July 2015,
19 July 29th, and here it says, "Thank you for your time just
20 now.  It was nice speaking with you."  Then she says, "I've
21 enclosed our standard draft of nondisclosure."
22       It wasn't an accident that HTC picked up the
23 phone instead of responding in writing, was it?
24 A.    I -- I wouldn't be able to speak to that.
25 Q.    Okay.  Do you believe that HTC picked up the phone

989

1    BY MS. WHITE:
2    Q.      At the top do you see -- and we started to read this,
3    but let's start over.  It says:  "This master purchase
4    agreement is made between AT&T Mobility..."?
5    A.      Yes.
6    Q.      Which has an address in Atlanta, Georgia, correct?
7    A.      Yes.
8    Q.      And the other party to this contract is listed as HTC
9    Corporation?
10   A.      Yes.
11   Q.      That's not HTC America, right, that's HTC
12   Corporation?
13   A.      Correct.
14   Q.      And HTC Corporation is described as the supplier?
15   A.      Yes.
16           MS. WHITE:  If we can zoom out, Mr. Watson, and
17   go down to scope of agreement.
18   BY MS. WHITE:
19   Q.      Do you see it says, "AT&T has appointed supplier" --
20   that's HTC Corporation, as we just saw -- "one of its
21   strategic suppliers that will provide products and services
22   to AT&T under this agreement."
23           Did I read that correctly?
24   A.      Yeah.
25   Q.      And it says, "Supplier shall provide to AT&T products

990

1    pursuant to and in conformance to orders submitted by AT&T"?
2    A.      Sure.
3    Q.      Let's also look at tab 7 in your binder.  Do you see
4    JTX22?
5    A.      Yes, I do.
6    Q.      Do you see this is a purchase agreement between HTC
7    Corporation and T-Mobile, which is a company formally known
8    as VoiceStream Wireless corporation, do you see that?
9    A.      I see it, but I haven't seen this before either.
10           MS. WHITE:  Your Honor, I move to admit JTX22
11   for the same reason.
12           MS. KELLER:  No objection, Your Honor.
13           THE COURT:  All right, JTX22 is admitted.
14           (Exhibit admitted.)
15           MS. WHITE:  Your Honor, could we put up JTX --
16   or thank you, Mr. Watson.
17   BY MS. WHITE:
18   Q.      And here again, at the top, VoiceStream is described
19   as a Delaware corporation.  And first, you understand
20   VoiceStream was renamed T-Mobile in July of 2022?
21   A.      That one I didn't know.
22   Q.      That's new information for you?
23   A.      Yes.
24   Q.      Well, I'll represent to you VoiceStream was renamed
25   T-Mobile.  And we can see at the top, it describes

991

1    VoiceStream Wireless corporation as one party to this
2    contract, and the other party, again, is described as High
3    Tech Computer Corporation, a Taiwan ROC corporation, which
4    is defined as seller under this agreement, do you see that?
5    A.      Sure, but this is in 2002, before we established HTC
6    Americas.
7    Q.      This is not with HTC America, again, right?
8    A.      Yes, but it didn't exist back then, I believe.
9    Q.      Right.  So you see -- HTC Corporation, the defendant
10   in this case, existed then, right?
11   A.      Yes, it was five years old.
12   Q.      Yes.  So you see that this is a contract that, unlike
13   what your counsel suggested, is actually between the U.S.
14   customer and HTC Corporation.  That's what we're looking at
15   on the screen?
16   A.      Yes, but HTC Americas didn't exist back then.
17   Q.      And this contract isn't with HTC America, is it?
18   A.      Yes, sure.
19   Q.      Okay.  So let's go to page 5 of the PDF.  And where
20   it says "1.6 shipment"?
21   A.      Yes, I do.
22   Q.      Can you see --
23           MS. WHITE:  Can you highlight the language,
24   Mr. Watson, that says, "All products shall be delivered by
25   seller."

992

1    BY MS. WHITE:
2    Q.      Which we just saw defined was HTC Corporation, the
3    defendant in this case, "to delivery location," do you see
4    that?
5    A.      Yes, I do.
6    Q.      Let's look at tab 9 in your binder.  Do you see
7    JTX16?
8    A.      Yes, I do.
9    Q.      That's a purchase and sale agreement between Verizon
10   Wireless and HTC Corporation?
11   A.      Yes, I see that.
12           MS. WHITE:  Your Honor, I move to admit JTX16.
13           MS. KELLER:  No objection.
14           THE COURT:  JTX16 is admitted.
15           (Exhibit admitted.)
16   BY MS. WHITE:
17   Q.      And here, again, like the other two agreements that
18   we saw, we see -- if you could move to page 1 of the
19   document, after the table of contents.
20   A.      Mm-hmm.
21   Q.      Like the other two agreements we saw, we see this is
22   between HTC Corporation, the defendant in this case --
23   A.      Yes.
24   Q.      -- and Verizon Wireless with a place of business in
25   New Jersey?

993

1    A.    Yes.

2    Q.    Do you see that?

3          So once again, we see the contracting parties

4    are HTC Corporation, the defendant in this case, and Verizon

5    Wireless, the U.S. customer, correct?

6    A.    Yes.

7          MS. WHITE:  And if we could zoom out,

8    Mr. Watson, and go to the first "whereas" clause.

9    BY MS. WHITE:

10   Q.    It says, "Whereas supplier" -- that's HTC

11   Corporation -- "has offered to sell Verizon Wireless the

12   cellular wireless communication devices and accessories

13   described herein at the prices set forth herein during the

14   term of the agreement."

15         Do you see that?

16   A.    Yes, I do.

17   Q.    And why don't we go to page 2 of the document under

18   section 3.

19   A.    Okay.

20   Q.    It says "products."  And I believe the second

21   sentence says, "Supplier shall supply the products described

22   in Exhibit B."

23   A.    Yes, I see it.

24   Q.    And, again, the supplier is HTC Corporation, correct?

25   A.    Based on the previous page, yes.

994

1    Q.    And the customer there is Verizon, which is

2    identified with a U.S. address, correct?

3    A.    Yes.

4    Q.    Let's look at tab 10, the company that you wanted to

5    talk about, HTC America.  Do you see JTX21?

6    A.    I do.

7    Q.    Do you see this is a distributor agreement between

8    HTC Corporation and HTC America?

9    A.    So I'm just reading it really quickly.  It looks like

10   it, but, yeah, I haven't seen this before either.

11         MS. WHITE:  Your Honor, I move to admit JTX21

12   for the same reason.

13         MS. KELLER:  No objection, Your Honor.

14         THE COURT:  JTX21 is admitted.

15         (Exhibit admitted.)

16   BY MS. WHITE:

17   Q.    Now, we heard it suggested yesterday -- and I believe

18   you were suggesting the same thing a minute ago -- that

19   there is some sort of corporate formality issue here that

20   prevents HTC Corporation from being liable for patents it

21   used, and I believe the suggestion was that HTC America is

22   selling products to U.S. customers and HTC Corporation, the

23   defendant in this case, isn't making any U.S. sales; do you

24   remember that suggestion?

25   A.    Yes.

995

1    Q.    Okay.  Let's look at the documents.  On the first

2    page, the agreement says it's between HTC Corporation,

3    hereafter "the corporation," and HTC America, hereafter

4    "distributor."

5          Do you see that?

6    A.    Yes, I do.

7    Q.    And below that, it says, "Whereas in the ordinary

8    course of business, corporation enters" -- that's HTC

9    Corporation, right?

10   A.    Mm-hmm.

11   Q.    -- "enters into an agreement with its U.S. customers

12   for the provision" -- and "customers" is defined there as

13   its "U.S. customers."  Do you see that?

14   A.    Yes.

15   Q.    So this is HTC Corporation "enters into an agreement

16   with its U.S. customers for the provision of

17   corporation's" -- again, that's the defendant in this

18   case -- "corporation's products."

19   A.    Yes.

20   Q.    Do you see that?

21         MS. WHITE:  You can go up a little bit higher,

22   Mr. Watson.  That's where that first "whereas" clause ends.

23   And then go up a little bit higher, Mr. Watson.  A little

24   bit higher.  Sorry, sorry.  That "whereas" clause.

25   BY MS. WHITE:

996

1    Q.    There it says -- it addresses this argument about who

2    is really providing the products to the customers.  It says,

3    "In accordance with the purchase agreement, corporation,"

4    which we know is the defendant in this case, HTC

5    Corporation, "is the ultimate provider of products to

6    customers," which we just saw was defined as U.S. customers,

7    right?

8    A.    Right.

9    Q.    And that's exactly what we saw in the contracts

10   between the defendant in this case, HTC Corporation, and its

11   U.S. customers, including AT&T, Verizon, and T-Mobile,

12   correct?

13   A.    In the contract you highlighted.  I don't know if

14   there are any others.

15   Q.    Okay.  So while we heard your counsel suggest the

16   opposite to this jury, your internal documents do state

17   clearly that HTC Corporation is the ultimate provider of

18   products to U.S. customers.

19   A.    Based on what's written here, yes.

20   Q.    And HTC Corporation is the entity that is contracting

21   with those U.S. customers, correct?

22   A.    Based on those agreements, it seems to be.

23   Q.    Okay.  Let me ask you -- we discussed that you work

24   in virtual reality.  Does HTC have any patents on its

25   virtual reality products?

997

1    A.    Yes, we do.

2    Q.    Okay.  And does HTC want people to respect its patent

3    rights?

4    A.    Um, yes, of course.

5    Q.    That's important to protecting the value of your

6    intellectual property at HTC; can we agree?

7    A.    It is important to protect our intellectual property.

8    Q.    And that's one way that you can fund development or

9    research, correct?  From the revenue that you generate from

10   licensing your portfolio, you can fund research and

11   development, correct?

12   A.    I don't know if we licensed it out, so I wouldn't be

13   able to comment on that.

14   Q.    Okay.  Is it true that when HTC is licensing its

15   patents that it believes that fairness is an important

16   component of licensing negotiations?

17   A.    I would say fairness is important for any

18   negotiations we have.

19   Q.    Okay.  And HTC believes that when it develops

20   technology and it gets that technology patented, it's the

21   responsibility of other parties that might use it to take a

22   license, right?

23   A.    In an arbitrary scenario, sure.

24   Q.    Okay.  But when HTC is approached by other companies

25   about their patents, HTC tells those companies, It will cost

998

1    you too much to sue us to enforce your rights; doesn't it?

2    A.    I have no idea.  That's new to me.

3          MS. WHITE:  Let's pull back up PTX115.  PTX115.

4    Oh, sorry.  Go to the last page.  Up one, I'm sorry.

5    Right -- the page you're just on.  No, I'm sorry.  It

6    should be the second-to-last page.  Go up one more.  There

7    you go.  Stop there.  Thanks.

8    BY MS. WHITE:

9    Q.    This is, as we established, HTC's internal

10   presentation and licensing offer to Huawei.  So right after

11   HTC told Huawei what it was willing to offer for Huawei's

12   patents, this is the message that HTC delivered.  It says,

13   "cost of litigation."  Do you see that?

14   A.    I see it written here, yes.

15   Q.    And HTC says, "The total cost of attorneys' fees" --

16   do you see that?

17   A.    Yes.

18   Q.    -- "discovery, collection, review, travel, business

19   disruption, other costs of litigation is high."

20         Do you see where HTC said that?

21   A.    I see that.

22   Q.    And then it says, "Even assuming that Huawei has more

23   or better patents than us, the effective benefit during

24   litigation is minimal."

25         Do you see it says, "Some courts set a mandatory

999

1    maximum number of claims that a party can assert.  We've

2    also seen that some courts impose time limits"?

3          And so HTC is telling Huawei, You can't

4    practically stand up for yourself in litigation.  Even if

5    you don't like our offer, you should just give up, take your

6    lumps and go home; is that right?

7    A.    No, I believe it's similar to what Mr. Lindsay said,

8    it's a component that you have to consider in terms of

9    negotiations in a real-world scenario.

10   Q.    And HTC tells people that.  Once it delivers its

11   message about what it's willing to pay, HTC says, You can't

12   afford to come and chase us down.

13         My question is:  Is that what HTC was really

14   counting on here when it offered one-tenth of one penny for

15   these and 200 other Orange patents, that Orange and 3GL

16   wouldn't go to the extraordinary cost and time and effort

17   and disruption to stand up for themselves in court?

18   A.    As you said, I'm not a party of any IP negotiation.

19   I wouldn't know what the mindset is when delivering

20   information like this.

21   Q.    You can't tell us one way or the other?

22   A.    No, I couldn't.

23         MS. WHITE:  I'll pass the witness, Your Honor.

24         THE COURT:  All right.  Cross-examination.

25               CROSS-EXAMINATION

1000

1    BY MS. KELLER:

2    Q.    Good morning, ladies of the jury.  Counsel just

3    called Mr. Ye, HTC's corporate representative, as an adverse

4    witness in their case-in-chief.  So for efficiency purposes,

5    HTC is now going to redirect Mr. Ye but also provide the

6    direct examination for HTC's case-in-chief so that Mr. Ye

7    doesn't have to get down and then come back up to the stand.

8          Good morning, Mr. Ye.

9    A.    Good morning.

10   Q.    You've been here all week.  I think we heard that

11   earlier, right?

12   A.    Yes.

13   Q.    And where did you fly in from for trial?

14   A.    I flew in from Taipei.

15   Q.    And Taipei -- it took you how long to get from Taipei

16   to --

17   A.    I think the whole trip was 28 hours over three

18   flights and sat down, yeah.  It was a long trip.

19   Q.    What is your role right now at HTC Corporation?

20   A.    Right now I am global head of products at HTC.

21   Q.    You're not a lawyer?

22   A.    I'm not a lawyer.

23   Q.    You've never participated in licensing negotiations,

24   right?

25   A.    No, I haven't.

**1001**

1   Q.   You're not an expert in FRAND?

2   A.   No, I'm not.

3   Q.   I think, in fact, at your deposition you said that

4   the only reason you knew about it was because you had read

5   an article on the Internet about it or something?

6   A.   Yeah.

7   Q.   Prior to this litigation, you had never seen the

8   letters you were shown on the screen by Ms. White, correct?

9   A.   Correct.

10   Q.   And Ms. White gave you a hypothetical about licensing

11   negotiations between a FRAND and a non-FRAND entity; is

12   that -- do you remember that?

13   A.   Yes.

14   Q.   Are there a lot of factors that you would think would

15   be considered in addition to the ones Ms. White mentioned

16   when licensing patents between entities?

17   A.   Sure.  A lot of those seem to be cross-licensing, so

18   generally they feel like a partnership of some kind.  So,

19   you know, aside from just the patent side, there's also

20   value in brand collaboration, being able to access markets

21   that the other side may not be able to access and, you know,

22   putting both technologies into something that could

23   actually -- is bigger than just one plus one equals two.

24   Q.   And I think Ms. White showed you some Huawei, Sharp,

25   and Ericsson presentations; do you recall that?

**1002**

1   A.   Yes.

2   Q.   Do you have an understanding as to whether Huawei,

3   Sharp, and Ericsson make products?

4   A.   I do understand they make products.

5   Q.   Are they competitors to HTC?

6   A.   In specific business units, yes, especially someone

7   like Huawei.

8   Q.   Before this week, had you heard -- or before this

9   litigation, I should say, had you heard of 3G or Sisvel?

10   A.   No, I haven't.

11   Q.   Do 3G or Sisvel make any products?

12   A.   I don't believe they do.

13   Q.   Do you know that 3G took Ms. Lynn Yu's deposition in

14   this case?

15   A.   I didn't, actually.

16   Q.   Have you seen them play her testimony at this trial

17   for the jury?

18   A.   Yeah, we saw it a little bit earlier.

19   Q.   I want to put up a part of Ms. Yu's transcript.

20        MS. WHITE:  Objection, Your Honor.  I don't

21   believe this is proper.

22        THE COURT:  I think it's redirect, but let's see

23   what the purpose is.

24   BY MS. KELLER:

25   Q.   Mr. Ye, you see here that 3G's lawyers had an

**1003**

1   opportunity to ask questions of Ms. Yu regarding the

2   negotiations and those letters that Ms. White put in front

3   of you, correct?

4   A.   Yes.

5   Q.   In fact, they asked a question:  "Is it practice to

6   review a list of patents that are identified to it in notice

7   letters?"

8        And I think you said you wouldn't know

9   necessarily one way or the other because you were not

10   involved, correct?

11   A.   Correct.

12   Q.   And, in fact, Ms. Yu gave them a very long answer

13   about how they don't have a clear idea about -- they

14   wouldn't not review the patents listed in the list because,

15   "first of all, they don't have a clear idea about what

16   patents specifically that the rights owners would like to go

17   into further technical negotiations or discussions with us.

18   This is because there are so many patents listed in this

19   list of patents.

20        "So for the two sides to conduct negotiations,

21   there needs to be a focus.  So the rights owners would tell

22   us which patents they would like to go into further

23   discussion, that's very important."

24        And she goes on to provide additional

25   information as to why they may or may not look at these

**1004**

1   patents.  So you would agree that it might have been

2   important for the jury to see this information from Ms. Yu,

3   to take into account what she had to say about the

4   negotiations, even though she's not here, that 3G could have

5   provided that information to this jury, correct?

6   A.   Sure, yes.

7   Q.   And, in fact, in looking at the agreements at JTX15,

8   16, 22, and 44, did you see that the agreements all had the

9   name -- another exhibit number on them and the name

10   Newby-House?

11   A.   Yes.

12   Q.   Who is Mr. Newby-House?

13   A.   I believe Mr. Newby-House is the previous corporate

14   representative for this case, but he has since actually left

15   the company.

16   Q.   Do you know or are you aware that 3G took

17   Mr. Newby-House's deposition in this case?

18   A.   I heard that that did happen, yes.

19   Q.   Did they play Mr. Newby-House's deposition in this

20   case?

21   A.   No, they didn't.

22   Q.   Before this trial, had you ever heard of Orange?

23   A.   Yes, actually.  I have actually used them as a

24   carrier in the UK before.

25   Q.   And did it surprise you to see Orange in this

1005

1 courtroom when you came in on Tuesday?

2 A.    I was actually, yeah, I was a little bit surprised.
3 Generally, we have a very good relationship with Orange.
4 You know, we -- we have a -- we attend a mobile conference,
5 which is the biggest mobile conference in the world, every
6 year.

7       And every year we have senior leadership
8 meetings between Orange and our senior leadership.  And even
9 now we have active VR projects with Orange.  So, yeah, we
10 generally have a very good relationship so I was very
11 surprised.

12 Q.    And I think Ms. White had this slide up on the screen
13 for a little while but she asked them to take it down and
14 move to a different page.

15       Just to sum up, can you describe for me why you
16 continue to work for HTC Corporation, why you flew the
17 22 hours from Taipei to come here and testify to this jury?

18 A.    Sure.  I'm here because I want to give a
19 representation of HTC, who we are, especially if you don't
20 know who we are.  I have been at the company for eight and a
21 half years now.

22       Our company is very different now than it was
23 when I joined.  We still have a smartphone business.  Now
24 the majority of our business is virtual reality.

25       One of the things I love about it is how, I

1006

1 think in opening we've shown it's used for, like,
2 firefighter training, to make sure training is incredibly
3 safe.  Used in medical care.

4       And it's -- one of the reasons it drives me is
5 because seeing our products actually better humanity in
6 general, it's -- is very important to me, and that's why I
7 am still at HTC.

8 Q.    And is intellectual property important to HTC?

9 A.    It is very important to HTC.

10 Q.    Can you describe for me the logo for HTC or the VIVE
11 logo that we may have seen in opening statements?

12 A.    Oh, sure, VIVE is our virtual reality brand.  It was
13 created while we were thinking about this new category of
14 products.  It's actually a triangle.  And our CEO came up
15 with it because she had three core pillars of this brand,
16 which is technology and humanity and imagination.  So the,
17 kind of the slogan for it is the conversions of technology
18 and humanity to unleash imagination.

19       And it comes back to we want to have virtual
20 reality better humanity as a whole.

21 Q.    And in order for those pillars to be met,
22 intellectual property is an important part of that?

23 A.    It is very important, yes, we put a lot of -- we put
24 a lot of innovation in it, and that's why we're a market
25 leader in virtual reality.

1007

1       MS. KELLER:  No further questions, Your Honor.

2       THE COURT:  All right.

3       MS. WHITE:  Nothing further, Your Honor.  And
4 the plaintiffs are prepared to rest.

5       THE COURT:  All right.

6       All right.  Mr. Ye, you may step down, thank
7 you, sir.

8       THE WITNESS:  Thank you, Your Honor.

9       THE COURT:  Before we do anything else, let me
10 see counsel at sidebar.

11       (Whereupon, a discussion was held at sidebar as
12 follows:)

13       THE COURT:  So I know that I started looking
14 through the proposed final jury instructions and the verdict
15 form, and I know there's dispute about the Alice step 2
16 issue.  And we had the discussion about HTC not presenting
17 evidence and I'm not really sure about whether you guys have
18 come to agreement as to what that means.

19       I had suggested the stipulation but I just
20 wanted to let both sides know before either side rests that
21 I'm going to be giving a ruling on that issue.  And does
22 that affect either side in terms of when you rest or not?

23       MR. HEALY:  Just to clarify, Your Honor.  We are
24 in agreement that on the verdict form and in the jury
25 instructions, there will be no validity request, no validity

1008

1 issue raised.  We're going to pull that off and send you
2 updated documents.

3       THE COURT:  Okay.

4       MR. HEALY:  There's only one dispute left in the
5 jury instructions, so it's largely agreed.

6       THE COURT:  So you guys agree that the Alice
7 step 2 --

8       MR. HEALY:  So there is a dispute, I think, as
9 to whether that is now going to be resolved.  There's
10 frankly nothing that we can do to introduce evidence.  We
11 sent our expert home.  They sent an e-mail a couple hours
12 after court ended that said we are dropping all of validity
13 defenses.  We sent our expert home, he got on a plane and
14 left.  I can't present any evidence because they told me it
15 was a moot issue.

16       So we can go over that later, I think, but for
17 purposes of today I can't do anything because I took them at
18 their word.

19       MR. OU:  On -- Your Honor, to be clear, what I
20 told Mr. Healy is that we weren't going to present our
21 invalidity experts.  He had asked us to update them because,
22 given the time amount, we made the decision we're not going
23 to present our validity experts.  So we provided -- and then
24 later he asked me, okay, what about the jury instructions,
25 is that in there since we aren't putting on 102, 103

1009

1  references?

2       We said we can take them out.  And then told

3  them, however, because step 2 is an issue that we previously

4  put in, they objected to that.  It was disputed in the jury

5  instructions as well as in the verdict form.  We said, well,

6  we don't have to put that in the verdict form, we just want

7  to preserve that issue in this case we think there's already

8  been evidence submitted in the case regarding just whether

9  or not the '818 patent is routine one nonconventional.

10      So we think there's sufficient evidence for that

11 but it's not an issue that we are asking the jury to decide.

12 We think that under the case law, you can find 101

13 invalidity, right, step 1 as a matter of law.  Step 2, there

14 could be factual issues but there necessarily doesn't have

15 to be.  So our point was we're not waiving the issue of 101,

16 despite us deciding not to present at trial an invalidity

17 expert to testify on it.

18      THE COURT:  Right.  But are you asking -- do you

19 want -- are you asking me to allow the question with respect

20 to step 2 to be presented to the jury?

21      MR. HEALY:  No.

22      MR. OU:  No, we're not.

23      THE COURT:  Okay.

24      MR. HEALY:  And we could have, just -- we can --

25 I'm happy to say we can have this waiver argument and

1010

1  implications of JMOL during JMOL, we'll show our respective

2  documents.

3       THE COURT:  All right.  So that's what I was --

4       MR. HEALY:  I appreciate that, Your Honor.

5       THE COURT:  That's what I was concerned about.

6  So both sides agree that it's not going to be in the verdict

7  form.

8       MR. OU:  Yes, Your Honor.

9       MR. HEALY:  Certainly set aside, are we in

10 agreement all the other validity will have JMOL entered on

11 them.

12      MR. OU:  So, Your Honor, you did raise that,

13 Your Honor.  Invalidity, we never raised an invalidity

14 counterclaim defense, it was an affirmative defense, so we

15 didn't present an invalidity defense.  I don't think that

16 that's appropriate for JMOL because it's never a claim that

17 we brought, Your Honor, invalidity is a defense to their

18 infringement claim.

19      What I mean by that, Your Honor, is to the

20 extent that they are going to, for example, rely on that,

21 the jury can decide invalidity in this case.  It's not an

22 issue that has been decided, so we don't think it's

23 appropriate to decide it as a matter of law because the jury

24 was never presented with it and we're not presenting it now.

25      THE COURT:  Because you didn't present any

1011

1  evidence, that's why they are asking for JMOL, because you

2  didn't present any evidence.  So you wouldn't have any --

3  there wouldn't be any sufficient evidence, there would be no

4  evidence, so there's nothing to test sufficiency or not.

5       MR. OU:  Yeah, Your Honor, just to clarify, my

6  point was that we did not bring an affirmative counterclaim

7  of invalidity, right.

8       THE COURT:  So you're saying you don't have an

9  affirmative counterclaim for invalidity.

10      MR. OU:  We do not, Your Honor, we do not have a

11 counterclaim of invalidity, we never brought counterclaims

12 in this case.

13      THE COURT:  Okay.  So then you're saying

14 invalidity is not in the case.

15      MR. OU:  Yes, invalidity was --

16      MR. HEALY:  Invalidity was in a case we spent

17 hundreds of thousands of dollars, so it's an affirmative

18 defense.  We can certainly move for summary judgment on

19 affirmative defense, we can move for JMOL on affirmative

20 defense.

21      They didn't meet their burden, they waived it,

22 we're going to move to JMOL on it, and we're entitled to

23 JMOL.  And the idea it wasn't at issue in the case, it was

24 on the verdict form, it was in the jury instructions.  Your

25 Honor is looking at it, it's in the case, they just didn't

1012

1  prove their case.

2       THE COURT:  It was an affirmative defense in the

3  answers that you filed.

4       MR. OU:  Yes, Your Honor.

5       THE COURT:  Again, with that, just a suggestion,

6  might be better for a stipulation.

7       MR. OU:  Well, certainly we'll -- we can discuss

8  it.

9       MR. HEALY:  We can discuss it, sure.

10      THE COURT:  All right.

11      (Whereupon, the discussion held at sidebar

12 concluded.)

13      THE COURT:  All right.  So plaintiff, are you

14 prepared to rest?

15      MS. WHITE:  We are, Your Honor.

16      THE COURT:  All right.  At this time, plaintiff

17 has rested its case-in-chief.

18      So now we'll move to the defendant's case.

19      MS. KELLER:  Your Honor, defendant moves for

20 judgment as a matter of law, we understand we'll address

21 those outside of the presence of the jury.

22      THE COURT:  Okay.  All right.

23      All right.  Ladies and gentlemen of the jury,

24 I'm going to have to hear motion or motions from the

25 defendants, so at this time, I'm going to give you the

1013

1 morning break.

2        All right.  So let's take 10 minutes and we'll

3 come back and I'll hear the motion.

4        (Recess taken.)

5        THE COURT:  All right.  You may be seated.

6        All right.  HTC, you may proceed.

7        MR. OU:  Your Honor, HTC moves for judgment as a

8 matter of law under Rule 50(a) on the grounds that a

9 reasonable juror would not have a legally sufficient

10 evidentiary basis to find against HTC on the following

11 issues:

12        Your Honor, first, no willful infringement based

13 on failure to show knowledge and intent, especially in view

14 of the NDA that was submitted in the case.  And no notice

15 and intent shown specifically for the patents-in-suit.

16        No indirect infringement for the same reasons.

17        No infringement of the '091 patent because 3G

18 failed to show that the accused devices has or initiate a

19 second video call, as required by all of the claims under

20 the Court's claim construction.  3G's theory is that all

21 devices containing certain chipsets are flawed and

22 unreliable.

23        No direct infringement of the '818 patent by

24 Google Fi devices due to the lack of removal data stored

25 specifically.  There was no evidence presented that the

1014

1 Google Fi devices manufactured by HTC for Google actually

2 included a Google Fi SIM card, so there is no direct

3 infringement.

4        Similarly, there's no indirect infringement of

5 the '818 patent by Google because there's no evidence

6 that any customers, in other words, there's no underlying

7 direct infringement that was shown and proven in this case.

8        No indirect or direct infringement of the '818

9 patent by Verizon devices because the plaintiffs fail to

10 show that any infringing -- allegedly infringing SIM card

11 was sold with a Verizon device.

12        Next, no damages because 3G failed to properly

13 apportion the damages attributable to the accused features

14 in the accused devices, and apportion the value of the

15 various patents in the portfolio license agreements, if

16 claims are comparable.

17        Further to that, there should be no damages as a

18 result of the Broadcom license, there was no showing of

19 technical comparability to that agreement to the two

20 patents-in-suit and, thus, reliance on that Broadcom

21 agreement to establish damages is unreliable as a matter of

22 law.

23        No damages attributable to the FRAND multiplier

24 because they -- plaintiffs failed to show that a non-FRAND

25 patent is worth five to seven or even five to ten times as

1015

1 much of a FRAND patent.

2        Finally, Your Honor, the '091 patent and the

3 '818 patent are invalid under 101 for the reasons set forth

4 in HTC's earlier motion to dismiss for the '091 patent.  For

5 the '818 patent, there was no showing of -- that the claims

6 were well -- or I'm sorry, the claims were well known and

7 conventional, as shown by the evidence that's presented in

8 the case.

9        MR. HEALY:  I'll confess, Your Honor, I'm not

10 sure if I wrote all those down, either.

11        THE COURT:  Okay.  I'll give you a minute to

12 gather your thoughts.

13        Are you done?

14        MR. OU:  Yes, Your Honor.

15        THE COURT:  All right.

16        MR. HEALY:  Would Your Honor like a response?

17        THE COURT:  Yes.

18        MR. HEALY:  Your Honor, I'm just going to go in

19 the order that I wrote them down, and if Your Honor has any

20 questions or if I miss something, please do let me know.

21        With respect to no willful infringement, counsel

22 referenced the NDA.  The NDA, as we heard testimony here and

23 it sets forth on its face, only applies to communications

24 that at best occurred beginning in August of 2015.  There

25 are notice documents, there's at least three different

1016

1 letters that were sent to HTC prior to that.  That

2 establishes notice, it establishes sufficiency for willful

3 infringement.

4        And, to be clear, we also have, at a minimum,

5 Your Honor, willful infringement beginning as of the filing

6 of the complaint.  And there would certainly exist post-suit --

7 excuse me, post-complaint willfulness here that the jury

8 could find, based on the exchanges that occurred, based on

9 what Ms. White introduced, the complaint, the details in

10 there identifying both specific products, specific claims

11 alleging infringement, and I believe there's an order from

12 Judge Bryson, sitting by designation in this court, where he

13 held that that is more than enough, and perhaps even enough

14 for us to JMOL affirmatively that there was sufficient

15 notice and sufficient -- for specific intent as well.

16        So we would ask the Court to deny the JMOL as to

17 the willful infringement issue.

18        Counsel said no indirect infringement but then

19 addressed it in detail below, so I'll address it in the

20 detailed aspect.

21        No direct '091 infringement, we heard at length

22 from Dr. Madisetti how the opposite was true.  He walked

23 through every claim element, walked through the Court 's

24 constructions, applied the Court's constructions.  As we've

25 heard, HTC has a preference for a portion of Your Honor's

1197

1 construction, the more the merrier for me.

2 THE COURT: Right. Right. I saw enough

3 evidence that they could find that, you know, there's direct

4 sales.

5 MR. OU: Your Honor, if they're going to

6 represent that they're not going to make an agency argument,

7 we don't need to make it more complicated. I just -- I have

8 this concern, because they raised it in the prior case, but

9 we didn't get a jury -- it was not in the final

10 instructions, Your Honor.

11 And so I just don't want to be in a situation

12 where now that this question is gone and there isn't an

13 instruction. But if they are going to say that their

14 argument is based on -- the evidence that was shown, which

15 is HTC Corp. sells directly to a customer in the U.S., then

16 that's fine and we don't need it.

17 MR. HEALY: I mean, as I said, I think we should

18 have another instruction. Again, our primary theory is, you

19 know, direct sale. But as Mr. Ou recognizes, we're also

20 arguing agency. So we should have that instruction.

21 THE COURT: Okay. So why don't you send them

22 the proposed jury instruction -- well, actually, 3G, this is

23 your case, you may want to send the draft and then they will

24 comment.

25 MR. HEALY: Sure, no problem, Your Honor.

1198

1 THE COURT: And then hopefully, you know -- I

2 mean, it's -- there are plenty of agency instructions out

3 there, so this shouldn't be a difficult -- you know, we're

4 not going to have another oral argument in the morning about

5 this.

6 MR. OU: I don't expect to, Your Honor.

7 MR. HEALY: I would just note, Your Honor, I'm

8 looking at the verdict form, there's still a reference to

9 validity in their question 8, which would need to come out.

10 But I think that's the only one I can see.

11 THE COURT: In their question 8?

12 MR. HEALY: Yeah, if you see, it says that the

13 asserted claim is not invalid, which is a moot issue at this

14 point. I'm sure it's just an oversight.

15 THE COURT: Right. So based on my rulings and

16 here, I mean, what I -- for you guys to -- somebody to draft

17 what the final is, share it with the other side, make sure

18 everybody is on the same page, and then resubmit it.

19 MR. OU: Absolutely, Your Honor.

20 THE COURT: So that we have it ready to go on

21 Monday.

22 MR. HEALY: Yes, Your Honor.

23 THE COURT: All right.

24 MR. HEALY: Yes.

25 THE COURT: All right. So that we are clear on

1199

1 everything, let's be prepared to meet at 9:15 a.m. on Monday

2 morning, make sure there's nothing, and so that we can get

3 started with the jury on time at 9:30. I gave the remaining

4 time.

5 And do -- let the Court know whether you want a

6 five-minute warning for your time, I'll do it silently if

7 you want it. And I'll just -- designate who at your table

8 you want me to look at and I'll do that. And if, you know,

9 you keep it at your desk, you know, you can do that as well,

10 but we're going to be keeping time, so stick to those times

11 that you have left.

12 All right. So that's all I have. Anything

13 else?

14 MR. OU: No, Your Honor.

15 MR. HEALY: Nothing from us, Your Honor, thank

16 you.

17 MS. WHITE: Nothing from plaintiffs.

18 THE COURT: All right. Everybody have a good

19 weekend. We'll see you on Monday morning.

20 (Whereupon, the following proceeding concluded

21 at 5:48 p.m.)

22 (Whereupon, the following proceeding concluded

23 at 5:48 p.m.)

24 I hereby certify the foregoing is a true

25 and accurate transcript from my stenographic notes in the

1200

1 proceeding.

2 /s/ Michele L. Rolfe, RPR, CRR

U.S. District Court

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3
    3G LICENSING, S.A., KONINKLIJKE        )
4   KPN N.V., and ORANGE S.A,             )
                                          )
5            Plaintiffs,                  )  C.A. No.
    v.                                    )  17-083-GBW
6                                         )
    HTC CORPORATION,                      )
7                                         )
             Defendant.
8

9
                              - - - -
10
                         Wilmington, Delaware
11                       Monday, October 16, 2023
                         *Trial Volume 5*
12
                              - - - -
13

14
    BEFORE:   HONORABLE GREGORY B. WILLIAMS
15            UNITED STATES DISTRICT COURT JUDGE

16
                              - - - -
17

18

19

20

21

22

23

24

25                          Michele L. Rolfe, RPR, CRR

1202

```
 1   APPEARANCES:
 2        FARNAN LLP
          BY: MICHAEL J. FARNAN, ESQ.
 3
            -and-
 4   SUSMAN GODFREY
          BY:  ANDRES HEALY, ESQ.
 5            LEXIE WHITE, ESQ.
              HUNTER VANCE, ESQ.
 6            For Plaintiff
 7
          SHAW KELLER LLP
 8        BY: KAREN KELLER, ESQ.
              NATHAN R. HOESCHEN, ESQ.
 9
            -and-
10
          WHITE & CASE
11        BY: YAR R. CHAIKOVSKY, ESQ.
              PHILIP OU, ESQ.
12            RADHESH DEVENDRAN, ESQ.
              SHASHANK CHITTI, ESQ.
13            For Defendant
14
15
16
17
18
19
20
21
22
23
24
25
```

1203

```
 1                  - - - - -

 2         P R O C E E D I N G S
 3      (REPORTER'S NOTE:  The following trial was held in
 4   Courtroom 6B beginning at 9:00 a.m.)
 5         THE COURT:  Good morning.  You may be seated.
 6         So before we bring the -- before we get the
 7   jury, I just want to make sure that we didn't have anything
 8   that we need to -- we didn't receive anything, so I assume
 9   there are no issues?
10         MR. OU:  Thank you, Your Honor.  No issues.
11   There was one -- there are some letter briefs filed, but I
12   think it's resolved.  There's just a slight update to the
13   jury -- final jury instructions, Your Honor, so --
14         THE COURT:  Even from what was submitted?
15         MR. OU:  Yes, Your Honor.  I think we filed a --
16   we have a hardcopy from the one submitted.
17         Your Honor, may I approach?
18         THE COURT:  Yes.  Is this the same as the e-mail
19   that was sent at 8:27?
20         MS. KELLER:  Yes, Your Honor.
21         THE COURT:  Okay.  Both sides have reviewed the
22   final verdict form and are in agreement?
23         MR. HEALY:  Your Honor, subject to our
24   objections on Friday, yes.
25         THE COURT:  Right.
```

1204

```
 1         MR. HEALY:  Thank you, Your Honor.
 2         THE COURT:  An agreement that it's what is
 3   consistent with the Court's rulings?
 4         MR. HEALY:  Yes, Your Honor.
 5         THE COURT:  All right.  If the parties -- being
 6   clear on your time.  3G and Orange have 47 minutes.  And HTC
 7   has 32 minutes.  All right.
 8         And do you want a five-minute warning?
 9         MS. WHITE:  No, thank you, Your Honor.
10         THE COURT:  All right.
11         MR. CHAIKOVSKY:  Your Honor, I would.  In fact,
12   could you do ten and five?
13         THE COURT:  Okay.  I can do ten and five.  And
14   I'll just look at Ms. Keller at ten and five.  All right.
15         (Recess taken.)
16         THE COURT:  All right.  You may be seated until
17   the jury comes.
18         (Whereupon, the jury entered the room at
19   9:37 a.m.)
20         THE COURT:  All right.  Good morning --
21         JURORS:  Good morning.
22         THE COURT:  -- members of the jury.  All right.
23   So I hope you all had a great weekend.  We're going to
24   proceed into day five of the trial.  And this morning,
25   you're going to hear the closing arguments from both sides,
```

1205

```
 1   followed by jury -- final jury instructions that I'll give
 2   you, and then you will start your deliberations.  And you
 3   will deliberate as long as it takes and until you reach your
 4   verdict.  All right.
 5         So with that, we will begin.  Plaintiff?
 6         MS. WHITE:  Thank you, Your Honor.  Good
 7   morning.
 8         JURORS:  Good morning.
 9         MS. WHITE:  I told you in the beginning this
10   case was about HTC not respecting my client or its property.
11   Now you've gotten a flavor of it too.  19 months of
12   negotiations, what does HTC say to you?  They never got the
13   letters.  We sent it to the wrong address.  Can't prove we
14   read it.  They never a called a single witness to testify
15   about any of that because it isn't true.  We were being
16   reasonable, HTC said.  We respect patents.  We made a good
17   faith offer.  One-tenth of one penny for these and 200 other
18   patents.  Yet Mr. Ye said he was surprised that
19   Ms. Brillouet would travel across the pond to this courtroom
20   to hold HTC responsible.
21         Who do we think we are?  How many times did we
22   hear, What are we doing here?  You know why we're here.  For
23   a company with a few dozen employees, this is the one place
24   where we can stand equal.  We can't be told to come back
25   later.  We can't be ignored and neither can the facts.
```

1206

1    Do you remember when Mr. Chaikovsky told you in
2  opening that you were going to hear there were a lot more
3  communications after the summer of 2015?  Mr. Muus testified
4  about those communications on the first day of this trial,
5  and they show you exactly why no one from HTC who had
6  anything to do with this was willing to take the stand, look
7  you in the eye, and testify under oath that HTC was a good
8  faith, willing licensee entitled to a FRAND discount.  HTC's
9  own damages expert, the gentleman that HTC hired to testify
10  on its behalf in this case, said he couldn't even support
11  HTC's one-tenth of a penny offer as being anywhere close to
12  a FRAND rate.  His only opinion is that HTC owes 360 times
13  more than what HTC offered.
14    Does HTC respect patents?  You heard that HTC's
15  first response to my clients was an ultimatum.  HTC told
16  Mr. Muus's company to sign a nondisclosure agreement so that
17  HTC could sweep under the rug all the unanswered letters
18  that his company had sent for months about the Orange
19  patents.  The judge told you to use your common sense.  Is
20  that what a company does when they plan to negotiate
21  willingly for a fair and reasonable license to someone
22  else's invention, or is that what a company does when they
23  know their real plan is to drag it out for 19 months and
24  then say, Give them nothing and tell them they'll like it.
25    Why are we here, Mr. Chaikovsky said.  This is

1207

1  old tech.  It's not important anymore, conveniently for HTC,
2  eight years later, because that's how long it's taken us to
3  finally get here.  It's old now because this is an old
4  dispute.  This case is about phones that HTC sold years ago
5  using property that didn't belong to them.  It's not a
6  defense to say, We used your invention and pocketed the
7  money so long ago that your invention isn't important
8  anymore.
9    You saw the evidence of why we're here.  You saw
10  the requirements that HTC's customers sent them.  This is
11  evidence.  These list our patented '091 and '818 technology
12  as a requirement.  It has to be inside the phone, inside the
13  processors, ready to be enabled if and when the carrier
14  wants to enable it.  HTC's customers wanted that control.
15  They wanted the ability to decide whether to push an update
16  to your phone to send you video calling tomorrow.
17    We are here because HTC sold 19.5 million phones
18  to AT&T, Verizon, and T-Mobile that infringed the '091
19  patent and sold close to 4.5 million phones to Verizon and
20  Google that infringed the '818.  And HTC could not have made
21  a single one of those sales without using technology that
22  Orange had patented.
23    They know this is a horrible fact for them, that
24  our patents cover what allowed HTC to sell their phones in
25  the first place, and to their biggest U.S. customers, no

1208

1  less, because that makes our patent very valuable.  It
2  doesn't matter if the technology is used.  It doesn't matter
3  if it's turned on.  It doesn't matter if you love it or hate
4  it.  It has to be there or HTC can't sell the phone.  That's
5  what a requirement is.
6    And think about this.  This is where your common
7  sense is your best tool.  HTC didn't call a single witness
8  to testify that HTC could have sold its phones without using
9  our patents, without meeting the customer requirements that
10  we rely on to show infringement.  That was no accident.
11  Their witnesses already said the opposite.
12    You heard that Mr. Newby-House testified as
13  HTC's corporate representative on this issue that his job
14  was to make sure that anything they built for the U.S.
15  marketplace conformed to the specifications and requirements
16  of the carriers here in the U.S.  You saw if HTC didn't meet
17  a customer's requirement, a carrier requirement, there would
18  be a paper trail.  It would have been noted in the
19  compliance document.  HTC had to give a waiver.  Their
20  technical witnesses couldn't think of a single example where
21  they received a waiver from a carrier's requirement that
22  didn't make it into their compliance documents.
23    Multiple witnesses said this, there would be a
24  paper trail.  We heard how HTC maintains a database of every
25  single waiver, every single compliance document.  How many

1209

1  of those compliance document waivers did you see in this
2  trial?  They know they need to show them to you.  They know
3  this is important.  They know it's a big deal if we have a
4  patent on what they had to do to sell their phones.
5    You saw two.  We showed you the first one.  This
6  is for a phone Dr. Madisetti is not accusing of infringement
7  and has nothing to do with this case, but it also confirms
8  what their witnesses said.  If they actually got a waiver
9  from a carrier's requirement to use the patents, then
10  there's a paper trail.  So what did HTC do in response?
11  They told you something that was incorrect.
12    Do you remember this document, PTX86?
13  Mr. Chaikovsky showed you this and solicited testimony from
14  Dr. Jeffay who said this, PX86, is a spreadsheet.  It shows
15  this device, the HTC M9 on Verizon, doesn't have video
16  calling.  You saw that was wrong.  HTC tells their customers
17  the opposite:  For the HTC One (M9) on Verizon, you will be
18  able to enjoy voice and video calling.
19    There's a reason they didn't bring any of their
20  technical witnesses to testify at this trial, because their
21  lawyers and paid experts are telling you a story that is the
22  opposite of what all the evidence in this case shows and
23  what their witnesses already testified, and that's why we're
24  here.  HTC used Orange's property to sell millions of
25  phones.  Each sale is an act of infringement.  And they

1210

1  should pay for what they used.  It's that simple.
2          Now, I want to go through each question that you
3  will be asked on the verdict form, starting with the '091
4  patent.  You have seen a mountain of evidence over the past
5  week.  Dr. Madisetti went through each claim element one by
6  one for Claims 1, 2, 6, and 7.  We looked at the carrier
7  requirements, the call flows, the chipsets, corporate
8  testimony from HTC, the technical documents.  And here,
9  after six and a half years of disputing us on everything,
10  Dr. Jeffay came into court and told you they don't dispute
11  infringing most elements.  Everything in red here boils down
12  to just two disputes you've heard about all week.
13          The first -- and, first of all, both of these
14  are disagreements with how -- that HTC has with how the
15  Court has already construed the '091 patent for you.  The
16  first, this is the second call that we heard so much about.
17  The second call has to be the separate call in HTC's
18  noninfringement argument.
19          Why do you think they spent so little time with
20  their own noninfringement expert on the stand, Dr. Jeffay?
21  Our expert was on the stand for more than nine hours.  They
22  questioned Dr. Jeffay for just 30 minutes.  Why was he such
23  an afterthought?  Did you catch this part of his testimony?
24  His entire noninfringement expert report, his whole theory
25  in this case, was based on "a second call has to be a

1211

1  separate call" theory that the Court rejected the Friday
2  before this trial started.  And he admitted it in his -- he
3  said his opinion about the second call, that it needs to be
4  a separate call, was not done in light of the Court's
5  construction.
6          What the Court said is exactly what we told you
7  in opening:  The second call includes either a separate
8  call, the part HTC likes, or a call that includes different
9  media from the first call.  So different medias equals
10  different calls, and here we know there's different medias.
11  Everyone agrees that the first call is video and audio, the
12  second call is not video and audio.  It's just audio.
13  That's different media than the first call.  That leaves
14  them with one dispute on the '091.
15          They want you to believe that this claim element
16  at the bottom, "initiate a second call," is not met unless
17  you, the user, hit a button on your phone to answer the
18  second call.  That's their whole argument.  If the user
19  doesn't manually answer the second call, no infringement.
20          They lost that argument two Fridays ago when the
21  Court ruled that the claims of the '091 cover both manual
22  and automatic embodiments.  We all know this is automatic.
23  You're talking on a video call, and through this patented
24  process when bandwidth is low, you're automatically
25  downgraded to an audio-only call.  That's the reason this

1212

1  was so groundbreaking when it was invented two decades ago.
2  It doesn't require the user to manually answer a second
3  call.  It's automatic in response to signaling.  The
4  invention does it for you.
5          So how did HTC respond to losing its
6  noninfringement arguments the Friday before trial?  With
7  theatrics.  They had their lawyers show you a phone with no
8  video.  Then you found out what they didn't tell you.  The
9  morning before that happened, they factory reset the phone.
10  Before they even gave us the phones on the first day of
11  trial, they did another factory reset.  That's two factory
12  resets, each time modifying the software on the device
13  before they wanted you or us to see the phones.  And that's
14  what we know happened.  We don't know what else happened.
15          Mr. Chaikovsky didn't tell you that it was
16  factory reset twice.  He didn't want to let Dr. Madisetti
17  tell you either.  He said, "Answer yes or no, sir."  He
18  didn't want you to know that the phone that they showed you
19  was modified special for this trial.
20          And it is a totally irrelevant sideshow, because
21  the claims of this patent are directed to what functionality
22  is configured in the processor, how the processor is
23  configured.  You can't see how the processor is configured
24  with a theatrical demonstration.  You have to look at what
25  Dr. Madisetti looked at, what's happening inside the phone,

1213

1  what functionality is ready and available for the carrier to
2  enable if they choose to do so.  We showed you that
3  evidence.  There was a reason those phones could not be
4  admitted into evidence.
5          But that wasn't the only time you saw that sort
6  of thing during this trial.  Do you remember this, when
7  Mr. Chaikovsky accused Dr. Madisetti of ignoring the
8  documents?  He showed Dr. Madisetti texts from an AT&T
9  document.  He said, "Paragraph 12 says UE-B answers the
10  call; yes or no, sir?"  Wouldn't let Dr. Madisetti explain
11  or correct him.
12          And why was that?  Because just like with the
13  phones, Mr. Chaikovsky was showing the wrong thing.  He was
14  misrepresenting what AT&T said.  We saw AT&T said those
15  exact words, "answers the call," in number 12 were wrong.
16  They needed to be corrected and replaced with the words
17  "receives the SIP re-INVITE."  And that's the whole point.
18  We saw that sort of thing throughout this trial.
19          We showed you evidence, it is definitive.
20  4 hours and 14 minutes of cross-examination by
21  Mr. Chaikovsky of Dr. Madisetti only underscored they have
22  no legitimate response to this infringement.  We've met our
23  burden of showing infringement is more likely than not, and
24  that's why we would ask, for this question on your verdict
25  form, you should answer yes for each of the asserted '091

1214

1 patent claims.

2            Now, the next question on your verdict form is

3 about the '818.  And for the '818, you have two questions.

4 The first, question 2, is for the Verizon products.

5 Question 3 is for Google Fi.  Let's start with question 2.

6            You were told in opening by Mr. Chaikovsky that

7 Dr. Madisetti had identified 45 SIM cards and 12 different

8 phones.  You were told by Mr. Chaikovsky that we accused SIM

9 cards that didn't have the functionality and that HTC had

10 never sold.  Mr. Chaikovsky told you it's all of these in

11 red.  Dr. Jeffay agreed with that.  He said Dr. Madisetti

12 was accusing all the red SIM card profiles.  We showed you

13 that's not true.

14            Remember when Dr. Jeffay was on

15 cross-examination, and Mr. Healy handed him his own slide

16 and a red pen, and we went to the Verizon documents

17 identifying which SIM cards HTC had purchased and said,

18 "Let's figure it out together."  We had him check off only

19 the ones that we had accused.

20            And lo and behold, none of them are in red.

21 They are all in white.  Precisely the opposite of what

22 Mr. Chaikovsky told you.  And when pressed, Dr. Jeffay

23 admitted there was no conflict with what Dr. Madisetti did

24 and what the actual documents show.

25            For what we actually accuse of infringement, we

1215

1 know from HTC's own employees that they complied with

2 Verizon's requirements.  And the SIM cards all include two

3 IMSIs.  And no matter which SIM card you used -- no matter

4 which accused SIM card you used, with which accused HTC

5 device, we have shown that every single one of them had the

6 dual IMSI app and would infringe.

7            We showed you this for each asserted claim of

8 the '818, including Claim 18, 19, 22, and 23.  And that's

9 why we would ask you to answer yes to the second question on

10 your verdict form.

11            Now, moving to the Google Fi products.  This is

12 question 3 on your verdict form.  HTC says, These are

13 Google's phones.  We didn't do anything to help Google

14 infringe your patents.  That is wrong, as the Court's

15 instruction on inducing infringement, which you will hear,

16 shows.

17            You will hear this instruction.  It lists the

18 four things that we need to prove are more likely than not

19 in order to show inducing infringement with respect to the

20 Google Fi products.  The first and the fourth items focus on

21 whether HTC did something that would cause someone else to

22 directly infringe the '818.

23            Now, what's the direct infringement here?  You

24 heard that Google Fi users using the accused Google devices

25 with the Google Fi SIM infringes the '818, for the very same

1216

1 reasons that the Verizon phones infringe.

2            What did HTC do to knowingly -- actively and

3 knowingly aid, instruct, or act with a specific intent to

4 cause that?  You heard that HTC made the Google devices,

5 worked with Google to develop the application, and actually

6 loaded the application on every Google device they sold.

7            Now, the second and third elements ask whether

8 HTC knew about the patent and that these actions would

9 infringe.  Here we made your job easier, because we are not

10 alleging Google Fi infringement before the date we filed

11 this lawsuit.  And even HTC can't claim that they were

12 unaware of the patent after the lawsuit was filed.  That

13 date, as you can see, is January 30th, 2017.

14            And as you saw during Dr. Madisetti's redirect,

15 the evidence on each element of indirect infringement for

16 the accused Google devices is compelling.  HTC's Mr. Lin

17 admitted that he was the on-site HTC engineer for Google.

18 He went to California.  He was on-site at Google's

19 headquarters.  He had daily meetings with Google.  He helped

20 them develop the Google Fi software.

21            But that's not all.  You saw Mr. Chen had

22 testified HTC then loaded that software onto each and every

23 one of the Google devices.  It then sold those Google

24 devices to Google, knowing that each one would eventually be

25 used in the Google Fi program and would need to eventually

1217

1 include a Google Fi SIM card to be used.

2            And as Mr. Chen admitted, each user had to

3 include a Google Fi SIM with the Google phones to use them

4 in the Google Fi program.  That's what it means to induce

5 someone else, Google or its users, to infringe a patent.

6 And we have shown you that evidence, that induced

7 infringement is more likely than not for each line on

8 question 3.

9            Now, I'm going to jump ahead to question 6 on

10 your verdict form now because it relates to what we're

11 talking about.  It asks you on what date did this all start.

12 And there we'd ask you to insert the date that the lawsuit

13 was filed, which is, again, how we tried to make your job

14 easier, because that's when HTC can no longer claim it was

15 lost in the mail and they were unaware of the '818 patent.

16 So please write down for that question, for question 6, the

17 date when the lawsuit was filed is when we allege HTC began

18 inducing infringement with knowledge of the patent.  That's

19 January 30th, 2017.

20            Now, that answers all of the liability questions

21 on your verdict form.  You may recall hearing Mr. Chaikovsky

22 tell you in opening that he was going to prove these patents

23 were invalid.  What did they show you about that?

24            In the middle of this trial, before your very

25 eyes, they dropped those arguments.  All of the invalidity

1218

1   claims that they've been making to undermine and challenge
2   our patents for the past six and a half years, claims we had
3   to hire experts to prepare reports to respond to, beating
4   back reference after reference to show that we were entitled
5   to these patents in this first place, that our deed to our
6   property was good, that the Patent Office got this one
7   right.
8           You saw right in this courtroom, they believed
9   what they told you in opening so much that they abandoned
10  those claims right in front of you.  And it tells you all
11  you need to know.  Because what this really comes down to,
12  why we're really here, is HTC doesn't want to pay for using
13  our property.
14          And that brings us to the next section on your
15  verdict form, which asks about damages.  Here you have three
16  questions, four, five, and seven.
17          Before we go through these, all throughout this
18  trial you've heard about FRAND versus non-FRAND, you heard
19  about how different these two situations are.
20          You heard a non-FRAND patent is like what was
21  described to you in the patent video.  It's your land, it's
22  your property.  You have the right to exclude others from
23  using your property without your permission.
24          With a FRAND patent, a patent that has a FRAND
25  obligation, it's exactly the opposite.  Anyone who wants to

1219

1   come and pitch a tent on your property, you have to let
2   them, as long as they are in good faith, willing to pay, and
3   offer one of those low FRAND rates we've seen.  A couple of
4   pennies on the dollar.
5           You also heard, before this trial ever started
6   the Court found that HTC did not carry its burden to show
7   that the asserted patents are subject to a FRAND obligation
8   and entered judgment on HTC's FRAND defense.
9           Now, in the face of all of that, HTC and its
10  experts spent a week telling you that you should still give
11  them the FRAND rate.  All of the evidence in this trial
12  refutes that.  Ms. Brillouet testified on day 1, FRAND is a
13  discount.  Orange only offered the discount if its patent
14  was and remains essential.  That's what their declarations
15  to ETSI require.  If it's not essential, Orange was not
16  obligated to and would not offer the FRAND discount.  HTC
17  didn't show you the patent was essential.  They just want a
18  discount.
19          Mr. Muus agreed with Ms. Brillouet.  FRAND
20  suppresses the value.  It is a discounted rate.  The FRAND
21  rate is as much as ten times less than a reasonable royalty
22  rate for a non-FRAND-obligated patent.
23          You even saw Mr. Ye, HTC's representative for
24  this trial, had trouble denying he would do the same.
25  If the shoe were on the other foot, you know HTC wouldn't

1220

1   offer a FRAND rate, if they had no obligation to do so, for
2   a patent on HTC's virtual reality technology, for instance.
3           You also heard that the FRAND discount is for
4   good-faith, willing licensees.  HTC was not acting like a
5   willing FRAND licensee here.  Mr. Muus explained that
6   FRAND -- FRAND rates are for companies who come to the
7   table, negotiate in good faith, voluntarily take a license.
8   Not for companies who drag out negotiations, make
9   unreasonable offers that their own paid experts can't
10  support.
11          It's been eight years since Mr. Muus offered HTC
12  a FRAND rate.  And look where we are.
13          FRAND discounts are not for companies that make
14  you chase them down, make you take it to a jury.  That's
15  what we call an unwilling licensee.  And you heard unwilling
16  licensees are not entitled to the FRAND discount.
17  Ms. Brillouet said only three times in the history of the
18  company have they ever been in this situation, having to
19  take it all the way to a jury.  Companies who do that do not
20  get the good faith discount, they have to pay for the full
21  meal.
22          And here's the bottom line.  If you don't agree
23  that HTC is entitled to a FRAND rate in light of the facts
24  that you've seen and heard over the past week, HTC didn't
25  give you another choice.  HTC's damages experts only

1221

1   calculated a FRAND rate.  Mr. Bakewell actually told you he
2   thought FRAND and non-FRAND would be identical.  That makes
3   no sense.
4           We showed you evidence to support that these
5   worlds are different, quantifiable, third-party,
6   black-and-white evidence of the differences.  The evidence
7   shows that Mr. Lindsay was conservative.  You've seen
8   evidence of ten times higher when the patent is nonSEP,
9   nonstandard-essential, and so not FRAND-encumbered.  That's
10  exactly what Mr. Muus testified he had seen.
11          Did Mr. Bakewell give you anything, any
12  articles, any evidence?  No.  He just wanted you to shut
13  your eyes and pretend we're back in the FRAND world, we're
14  back in 2016, and HTC should get a discount.  It is
15  contradicted by the evidence, by common sense, and it's
16  simply not fair.  It's not right.
17          Because by a virtue of the fact that I am
18  standing here, by virtue of the fact that my client is
19  sitting here, we've already lost.  And they know that.
20  That's what they tell people.  You saw that.  Six and a half
21  years later, no one is leaving this courtroom a winner.
22          My client chose to stand up for themselves, and
23  they need your help.  You have seen nothing in this case
24  that would entitle HTC to a discount.  You've seen evidence
25  that we could have asked for more.  We are asking for $0.49

1222

1 a device for each product that HTC sold using property that
2 didn't belong to them, sales they could not have made
3 without using our patents.  Sales they have never paid my
4 client a penny for.
5            Now, I want to walk through this next part of
6 the verdict form slowly because it's important.  All of the
7 work we have done over the last week and over the last six
8 and a half years comes down to this.  I would be grateful if
9 you would write this part down so that you have it available
10 to consider when you deliberate.
11           The verdict form asks about three accused
12 products, and for each it asks you for a royalty rate, a
13 number of infringing products, and a total sum.
14           The units come from the HTC sales data exhibits
15 that you have seen were admitted into evidence during
16 Mr. Lindsay's testimony.
17           So you have three sets of products.  For each we
18 are asking for $0.49 per device.  And then, for each of
19 those products, you're asked to list the number of
20 infringing units.
21           The first number you've seen, you've heard
22 several times now, that's the accused '091 units.  That
23 number is 19,535,249.
24           The second and third numbers are the accused
25 Verizon and Google devices.  Mr. Lindsay explained that

1223

1 those two products total roughly 4.4 million, 4,400,560.  He
2 also explained that for Google Fi, we're only accusing the
3 Pixel devices sold to Google.  And of those units, only the
4 units sold after the filing of the complaint on
5 January 30th, 2017.
6            And he explained that he was relying on HTC's
7 underlying documents, which you have in evidence, that's
8 Exhibits 11, 18, and 27.  These identify every single sale
9 by product number, customer, and sales period.
10           You even heard -- and you can see here, they
11 identify the HTC's internal names for the three Pixel phones
12 at issue, the S1, the S2, and the M1, and everything else we
13 accuse was a Verizon phone.
14           So we don't consider sales before we filed the
15 complaint, January 30th, 2017.  We don't consider sales
16 after the patent expired, January 19, 2018.  You could do
17 that math yourself, but I'll make it easier for you.  From
18 the total number 4.4 million accused '818 units, you
19 subtract the accused Google devices reflected in those
20 exhibits, and that leaves the number of accused Verizon
21 devices remaining for the second blank, that number is
22 2,551,265.
23           And the remaining devices for the final blank at
24 the bottom there are the accused Google phones.  And that
25 number is 1,849,295.

1224

1            Now, the last step is just multiplication which,
2 again, I have shortcut for you so that you have it when you
3 deliberate.  You multiply the royalty rate times the number
4 of accused products, and you get the numbers all the way on
5 the right.  The first line for the infringing '091 sales
6 using that math is 9,572,272.  The second line for the
7 infringing '818 Verizon sales is 1,250,120.  And then the
8 third line for the infringing Google sales is 906,154.  That
9 is what we would request that you award.
10           The last question on the verdict form asks
11 whether any claim of any patent was infringed willfully.
12 And that kind of brings us back to where I told you this
13 case began.
14           You heard HTC's catch phrase for the trial, "HTC
15 respects intellectual property."  Ask yourself, if that were
16 true, where is HTC?  Where are the people who were actually
17 involved in reviewing these patents?  Why did they send
18 Mr. Shen Ye?  Because he's a likable guy and he knows
19 absolutely nothing about what happened here.
20           Unlike all the other witnesses who had to admit
21 things, as you saw, Mr. Ye is an empty vessel who HTC can
22 tell only what they want him to know, and he can't say
23 anything damaging because he works in virtual reality and he
24 has no idea how HTC treats other companies' patents.  He
25 couldn't even answer if HTC has a policy for willingly

1225

1 licensing the patents that HTC believes it's using to sell
2 its products.
3            HTC tried to suggest that everyone has left the
4 company; that wasn't true.  But Mr. Ye didn't talk to any
5 HTC employees who worked on these patents.  And it tells you
6 all you need to know about why we are really here.  They
7 think this a game.  If they say the letters weren't
8 received, if they don't leave a paper trail showing they
9 knew about the patents, if they instruct their employees not
10 to read patents, to ignore property rights, to keep
11 themselves ignorant, they think you won't see through that.
12           You heard he did know one thing.  He didn't want
13 to say it.  He tried to say the opposite to you.  He knew it
14 was a bad fact that he shouldn't have said.  But having
15 worked at HTC for a few years now, the one rule he knew was
16 don't read patents.  Don't learn where those property lines
17 are.  Ignore the deed.  Bury your head in the sand so you
18 can keep on trespassing.
19           Just like we saw here, don't respond to the
20 letters, don't leave a paper trail, that is willful
21 blindness.  You will hear a jury instruction about that.
22           But here, you also saw that HTC did learn about
23 these patents in the summer of 2015.  You know they got the
24 letters.  They got our e-mails attaching those letters.  The
25 fact that they tried to cover it up, pretend it never

1246

1 need to send a letter to be willful infringement; they

2 didn't send a letter, right.  There's no willful

3 infringement.  And, in fact, he testified, never offered a

4 license.

5          One more analogy, the hotel, the FRAND, we want

6 two rooms if there's infringement, which there's not.  It's

7 like we want to get two rooms in a hotel.  What they are

8 telling you under their damages theory is I got to pay for

9 the whole hotel, okay.  How does that make sense?  That's

10 their damage theory.  Two patents, two rooms, whole hotel.

11          And then ask yourself this, when you get to the

12 damages -- I already mentioned this -- how do you fill this

13 out with reasonable certainty?  They have to apportion.

14 You'll get an instruction from Judge Williams, they have to

15 apportion with reasonable certainty for each one of these

16 products or patents.

17          It's already complex enough for the '818.  She

18 just made that up.  On the '091, you still can't do it.

19 Mr. Bakewell walked you through it.  You can't do it.  You

20 can, at best, use the $0.02.

21          You know -- and I want to apologize for one

22 thing.  3G sent the letter in January 2016.  It was the

23 first time they sent a letter.  I was just -- so they did

24 send one letter.  I misstated that.  I apologize.  They will

25 probably get up and try to correct me.  Little bit of a

1247

1 hurry here.  They did send one letter.

2          One more thing I want to comment on on damages.

3 They showed you this Huawei agreement -- right? -- which

4 said -- right? -- HTC respects IP rights.  That's PTX115.

5 If you applied that analysis where HTC has 405 essential

6 patents, all of our products would be more expensive.  If

7 you do the $0.02, your phones are 500 bucks more a piece.

8 If you do their $0.25, they are $6,000 more a piece because

9 there's 24,000 standard-essential patents in the world.

10 Essential to all standards.  If you did their $0.50, that

11 would be 12,000.  Does anybody want that for phones?

12 Pennies matter.  $0.01 matters.  $0.001 matters when we're

13 talking about this many standard-essential patents.

14          And Mr. Bakewell walked you through that.  This

15 is his testimony walking through that example about

16 standard-essential patents, and there's tens of thousands,

17 and that's the problem.  Royalties can be comical.  We can't

18 have that.

19          So what's happening here is they are going to

20 Atlantic City, as I showed you.  And what we want you to

21 find for HTC is there's no infringement of the '091.

22 There's no infringement of the '818, as I showed you, under

23 either theory.

24          And, frankly, when you get to damages -- first

25 of all, you shouldn't even get there.  But, second of all,

1248

1 did they apportion anything with reasonable certainty?  Did

2 they show you -- and I asked them to get back up and show

3 you Mr. Lindsay's testimony, get back up and show you where

4 he even gave you the ability to apportion both reasonable

5 certainty the numbers for the units sold, if you can.  And

6 the answer is they cannot.

7          So the evidence shows there's no infringement.

8 And the evidence shows that my client here showed that 3G

9 failed to meet its burden of proof.

10          I want to thank you for your time.  It's been a

11 hard week and apologize, but you know, 3G's lawyers, again,

12 will get a chance to respond, and thank you.

13          THE COURT:  Okay.  3G?

14          MR. HEALY:  Start my time, Your Honor.

15          Members of the jury, you heard Ms. White's

16 request to HTC:  Show us.  Show us everything.  If this

17 argument that the carrier requirements don't have to be

18 followed, the requirement doesn't mean requirement, then

19 show us those written waivers.  Show us the waivers that

20 Mr. Lin, Mr. Cheng, and Mr. Newby-House, all of HTC 's

21 technical witnesses said that HTC would have to have, would

22 have in the database, and would have to submit to the

23 carriers if that was true.  Show us.  Show us those

24 documents.

25          Mr. Chaikovsky did not show you a single one.

1249

1 Why not?  Because they don't exist.  They don't exist.  He

2 doesn't have them.  Why?  Because the carriers, they're the

3 ones who are important, they dictate -- remember, this is

4 years ago, this was when phones were locked to networks.

5 You couldn't sell your phones unless the carrier said so.

6          And the carrier said that this functionality was

7 required.  The chipset had to be configured to perform just

8 like we're saying.  That's why they didn't show you a single

9 document.  And now Mr. Chaikovsky says, I ignore this

10 evidence.  I ignore what our own employees said.  I ignore the

11 testimony of the people that we picked to testify, not on

12 behalf of themselves, on behalf of the company to bind the

13 company.

14          The idea that that's not evidence is ridiculous.

15 It's absolutely evidence, it's exceptionally important

16 evidence.  It's evidence that Mr. Chaikovsky doesn't like

17 and that's why he doesn't want you to pay attention to it.

18 But, of course, it's evidence.

19          And that's the reason why not one of those

20 people were brought to trial.  HTC could have brought them.

21 Regardless of whether they were employed or not, HTC could

22 have brought them.  The reason it didn't is because it

23 didn't like what they had to say.

24          It didn't like what they had to say in their

25 deposition, and it didn't like what they would tell you

1250

1  here, they're in court, sitting in that box, and they had to
2  look you in the eye and tell you the truth.
3          They brought Mr. Ye.  No offense to him, because
4  he doesn't know anything.  He told you that.  He works in
5  VR.  He works in London.  He has no involvement in phones,
6  no involvement with carriers.  He doesn't know enough to say
7  something that Mr. Chaikovsky doesn't want him to say.
8          And, ultimately, that's why we're here.  It's
9  been my job to make sure that you actually get shown
10  everything, to make sure that misstatements are corrected,
11  that parlor tricks are brought to your attention.  That's
12  been my job.  And I'm going to tell you, it's been a
13  full-time one.  It's been a busy one.  And, unfortunately,
14  we've got some more work here today.
15          Mr. Bloom, if we could go to slides 26.
16          I'm just going to run very quickly through
17  everything Mr. Chaikovsky said because, unfortunately, a lot
18  of it, once again, is not true.  He told you there's no
19  dispute here that the sales are not made by HTC Corp., they
20  are made by HTC America.  Their own documents show that's
21  not true.  Every single one of the sales agreements is with
22  HTC Corp.
23          Next slide.
24          Mr. Ye.  He saw these documents, I think for the
25  first time here in court, and he agreed with us, "based on

1251

1  those agreements, it seems to be."
2          Next slide.
3          This is what Mrs. Lai said during her
4  deposition.  It's the reason that they didn't want to show
5  you her testimony.  It's the reason they didn't bring her
6  here.  She said that "the sales that we are relying upon,
7  HTC Corporation sales to America?"
8          Answer, "Yes."
9          Mr. Chaikovsky then said, Well, there's no one
10  here from 3GL.  I'd like to introduce you to Mr. Muus who
11  has been here all week, and he was here all week last week.
12  He has a title with 3GL.  His main employer, absolutely,
13  Sisvel, owns 3GL.  Mr. Muus has been here.  He's been
14  sitting in that chair.  He's been representing his client
15  and his employer.
16          I was actually going to get up and pop up and
17  say -- because Mr. Chaikovsky said 3GL never even sent a
18  letter.  He did me a favor and admitted that that was false.
19  Someone on his team reminded him that he had to tell the
20  truth here today.
21          They absolutely sent a letter.  They sent one in
22  January of 2016, that's JTX13, because, again, we want you
23  to know these things.  And that letter accused them of
24  exactly what we're accusing them here this week.  And that
25  was a follow-up letter.  You heard much testimony, you saw

1252

1  Ms. White show you about the prior letters that were sent.
2  Not true.
3          Parlor tricks?  I think we know who is playing
4  the parlor tricks here.  It's not me.  It's not 3GL.  It's
5  not Orange.
6          You heard complaints about the breakdown of the
7  numbers.
8          If we could go to slides 17, please, Mr. Bloom.
9          Here is the breakdown of the numbers.  We didn't
10  want to walk you through it.  It's a lot of information.  We
11  frankly don't have time.  All the numbers add up.  You can
12  see there on the left, it's exactly the numbers Ms. White
13  showed you.
14          If we can go slide 19, Mr. Broom.
15          And here's numbers for Verizon Wireless, again,
16  basic math.  It's things that you can do yourself.  I don't
17  encourage you to do it because it's boring.  But the numbers
18  add up, and now you've seen it, everything is there.  We're
19  not trying to hide anything from you.  We're trying to show
20  you everything.
21          Mr. Chaikovsky next said there's no evidence in
22  the record about the opinions on value, nothing shows that
23  these are valuable inventions.  Again, false.
24          If we can go to Madisetti Slide Number 23,
25  Mr. Bloom.  Madisetti slide, Mr. Bloom.

1253

1          This is what you saw in court.  This is what you
2  saw during the actual trial.  Dr. Madisetti testified about
3  this.  Third-party evidence demonstrating the value that
4  this incurred, demonstrating that downgrading saves
5  300 percent bandwidth.  This is the "no evidence" that
6  Mr. Chaikovsky wants you to believe exists.  It's actual
7  evidence, it's direct evidence.
8          Madisetti slide 329, if we could, Mr. Bloom.
9          That was the '091, here is the '818.  Again, he
10  just told you 15 minutes ago that we had put in evidence
11  nothing to show the value of these inventions.  Again,
12  wrong, again false.
13          We had that in evidence.  During his more than
14  nine hours on the stand, Dr. Madisetti testified about it.
15  And the fact that Mr. Chaikovsky doesn't want to believe
16  something exists that we've all seen doesn't mean it doesn't
17  exist.  Of course we showed this to you, it's important and
18  we wanted you to know.
19          You heard about claim construction.
20          If we could go back to the current slide deck,
21  Mr. Bloom.  It's slide 37.
22          We heard about the claim constructions -- 37,
23  I'm sorry, Mr. Bloom.  Thank you.
24          We heard about the claim constructions.  We
25  heard about the initiating a second call.  Mr. Chaikovsky

1254

1 said, Well, there's no evidence here about the if answered
2 element.  Of course there was.  Dr. Madisetti talked about
3 that at length.
4           Slide 43, Mr. Bloom.
5           He also talked about -- sorry, this is the one.
6           We talked about the other -- the automatic
7 approach.  Was there any evidence about that?  Of course
8 there was as well.  Dr. Madisetti talked about that.
9           Mr. Chaikovsky tried to criticize Dr. Madisetti
10 again for not testing.  I wrote down what he said, "don't
11 have" -- "if you don't have the devices, how can you be
12 right about them?"
13           Slide 29, Mr. Bloom.
14           Well, as we heard during trial, HTC's experts
15 didn't feel the need to test the devices.  There's nothing
16 in their reports about it, that's what Dr. Madisetti said.
17 It's a rule that apparently Mr. Chaikovsky, who said, again,
18 "If you don't have the devices, how can you be right about
19 them," didn't feel the need that his own experts needed
20 them.  I think that tells you everything you need to know.
21           Now, I think the one thing we can agree on --
22 Mr. Bloom, slide 46 -- is Mr. Jones.  Mr. Jones, who stood
23 up there and looked you in the eye, he went and looked at
24 the source code, and Dr. Madisetti and Mr. Jones agreed
25 about what the source code showed.  Now, do they ultimately

1255

1 agree about the effect?  No.  Did it satisfy the claim
2 language?  Of course not.  Mr. Jones is paid by HTC.  He's
3 not going to admit that.  But the technical detail, what it
4 actually shows, what functions are called and what those
5 functions do as a practical perspective, they agreed.  In
6 fact, Mr. Jones agreed with us.
7           He said -- here we go -- he agreed.  And this is
8 the testimony of Dr. Madisetti -- excuse me, the testimony
9 of Mr. Jones, when I asked him, "Is the SIP re-INVITE
10 message," again, that's what Dr. Madisetti pointed to, "Is
11 that used to upgrade a voice call or downgrade a video call
12 to a voice call, first call to a second call?"  What did he
13 say?  "Yes."
14           I then asked him, once that 200 OK message --
15 that's the message we've been talking about all last week.
16 It's the one that initiates the second call, terminates the
17 first call -- "Once that message is sent to the UEB, that's
18 to the other side, the UE waits for acknowledgement before
19 updating the call parameters?"
20           "Did I say that?"
21           "Yes."
22           That acknowledgement, that's the answer.  They
23 want to play word games.  Everyone understands that that's
24 the answer.  Mr. Jones understands that that's the answer.
25 And then what did he say?  He said that that has to occur

1256

1 before those call parameters are updated, before there's a
2 different media, before there's different calls.  That's
3 what Mr. Jones said.  And that's important.  It shows there
4 is no difference here.  Absolutely Mr. Jones agrees, because
5 he's paid to.  He's not going to tell you that we're right.
6 But when you get down to detail, when you get down to the
7 nitty-gritty, there's no difference.  They agreed it works
8 exactly the same.
9           And what's also important, because what they
10 told you is the SIP 200 OK is unimportant.  It's just an
11 automatic response that comes out.  There's no alternative;
12 it's just answering a call.  Mr. Jones said the opposite, a
13 device does not need to respond to a SIP 200 OK message in
14 response to a SIP re-INVITE.  That sounds familiar, which
15 means, that when -- this is actually a downgrade, when
16 you're actually switching from one call to another, it's a
17 deliberate action.  It could say something else and you
18 wouldn't terminate that first call.  It could say something
19 else and you wouldn't get that second call.  It's
20 intentional.  It's programmed.  It's configured to act
21 exactly like we said.
22           You heard about the Qualcomm testimony.  We've
23 talked at length about that.  That testimony was provided
24 before this Court issued its claim constructions.  It was
25 provided by a person who has, as you saw in his deposition

1257

1 video, doesn't really work in this area, didn't write the
2 code itself, and didn't even ask basic questions to people
3 on the team that did.
4           More importantly, it's testimony provided by
5 Qualcomm.  If a verdict is issued by you in this case,
6 that's bad for Qualcomm: it means that they infringe too.
7 And so of course the Qualcomm witness isn't going to admit
8 that.  Of course he isn't.  And of course he's not going to
9 have an opportunity to do so when he doesn't have the
10 benefit of this Court's construction.
11           They said, no one else had ever agreed with us,
12 it's just Dr. Madisetti and island.  Well, we see here that
13 Dr. Jones, at the bottom, does agree with us.  He's not the
14 only one.
15           If we go to slide 39, Mr. Bloom.
16           AT&T agrees with us.
17           If we can go to slide 39, Mr. Bloom.
18           AT&T agrees with us.  It says the same thing.
19 It has documents that said the same thing.  We saw that at
20 length.
21           And I could go on -- and I probably could go on
22 for another 10, 15 minutes just commenting on the things you
23 saw here today.
24           Mr. Chaikovsky accuses us of parlor tricks,
25 accuses us of not wanting to show you what's in the phone.

1258

1  We've already talked about this.  This phone, the Pixel 2,
2  which, again, you saw Dr. Jeffay admit was not supposed to
3  be on that list, different from what Mr. Chaikovsky said
4  today, this phone is sold to other besides Google.  It's
5  sold to Verizon.  It's sold to T-Mobile.  It's sold just on
6  the Internet.  So of course this phone is not going to
7  include a SIM card.  That's a trap.  He knows that.
8          Our allegations, our proofs, our numbers are
9  specific to those specific devices sold only to Google, not
10  this thing that they bought on the Internet a few weeks ago.
11         And so, again, I could go on -- I could go on,
12  but I think you know this.  I think you get it.  I think you
13  understand who here is telling you the truth, who is showing
14  you everything, and who is not.
15         And why is HTC doing this?  Because as Ms. White
16  said, the evidence is overwhelming.  We showed you document
17  after document, our witness was on the stand for more than
18  nine hours.  HTC infringes.  The evidence is clear.  It's
19  far above the 51 percent we needed to show you.
20         And as Ms. White told you, HTC had so little
21  faith in its invalidity case that it dropped it entirely.
22  They got up and told you that was an important thing,
23  something they believed in, gone.  And what's left are
24  damages.  And as Ms. White told you, my clients have
25  traveled a very long road to be here.  They spent an

1259

1  enormous amount of time and an enormous amount of resources,
2  and they want you to hold HTC accountable.  They want to be
3  compensated fairly.  And HTC doesn't want you to do that.
4          Despite everything it said, everything it's
5  done, the parlor tricks, to quote Mr. Chaikovsky, "It's
6  tried here in court," it still wants a discount.  It's
7  demanding a discount.  In other words, having reached the
8  end of the road, this is judgment day, it wants you to let
9  them off the hook.  Don't do that.  Don't let them continue
10  to disrespect us.  Don't let them continue to disrespect my
11  client and their intellectual property, their patents.
12         Mr. Chaikovsky, at the end of the day, is going
13  to call HTC headquarters, and you get to decide what he
14  tells them.  Does he get to tell HTC that it got away with
15  it, it got away with 19 months of delay, another six and a
16  half years of trial, of trying every trick in the book to
17  try and preclude us from holding them accountable?  Because
18  make no mistake, if you award 3GL one penny less than what
19  Ms. White asked for, they will be celebrating at HTC's
20  headquarters.  They will dance out of this courtroom because
21  that's a victory for them.  It's a victory that the evidence
22  shows they don't deserve, but it's a victory.  It's a
23  discount that they don't deserve.  And we ask you, don't
24  give HTC that win.
25         Members of the jury, on behalf of myself, my

1260

1  team, on behalf of Ms. Brillouet and Mr. Muus, on behalf of
2  3GL and Orange, thank you for your time and attention here.
3  Thank you for the work you've done all of last week and the
4  work you have left to do here today.
5          We appreciate it.  We put ourselves in your
6  hands now.  And we have faith in you.  Thank you.
7          THE COURT:  All right.  Members of the jury, I'm
8  going to give you a 10-minute break at this time.  It's
9  going to take about an hour for the jury instructions so
10  I'll give you the break now and then we'll come back and
11  give you the jury instructions.
12         (Whereupon, the jury left the room at
13  11:03 a.m.)
14         MS. KELLER:  Your Honor, there were multiple
15  slides in Ms. White's presentation that included deposition
16  testimony that was used in a demonstrative during trial but
17  not otherwise read to the jury or at times even read by
18  Dr. Madisetti.
19         So it is not actually in the transcript.  It was
20  solely from their demonstratives.  They consistently refer
21  to it as evidence the jury can consider.  There was a
22  process in the pretrial order for designations and counters
23  for just that purpose.  Mr. Healy then got up in rebuttal
24  and specifically accused us of saying it wasn't evidence and
25  that -- or I'm sorry, said that it is evidence when it is

1261

1  not under Rule 703 and Federal Rule of Civil Procedure
2  32(a)(6).
3          And I think the concern we have is this was the
4  dispute over 1.3 jury instructions that the parties
5  submitted letters on, and we tried to accommodate by getting
6  rid of the "or read" language in the instruction, but what
7  we have now is flagrant kind of referral to demonstrative
8  slides where the plaintiff is arguing they are evidence and
9  the deposition testimony is not anywhere else otherwise in
10  the record.
11         So we would just ask for a clarifying
12  instruction to the jury to the effect of the fact that
13  anything -- testimony that was in a demonstrative slide used
14  either today or during a trial is not evidence, the only
15  evidence is whether it is an exhibit or a deposition
16  transcript that was played to the jury during trial.
17         THE COURT:  Okay.
18         MR. HEALY:  Oh, I'm sorry, Your Honor.  Your
19  Honor, I guess I really can't underscore how vehemently I
20  disagree with what you just heard.
21         The pretrial order at section C says
22  specifically -- I can put it on the ELMO so we can all read
23  it together, "The parties are not required to designate
24  deposition testimony relied on by an expert," which is
25  everything you just saw, everything we saw in court -- and

1262

1  cited in the expert's report -- which is, again, everything
2  you just saw, everything we saw all week, everything you saw
3  in closing.  These are demonstratives -- the ones that
4  Ms. White showed are demonstratives that were shown in this
5  process already, so they are 100 percent appropriate to show
6  the jury again.  And I want to be very clear that this -- I
7  mean, this argument doesn't work at all, regardless.  To the
8  extent it would work is if we didn't have it independently
9  admitted into evidence.
10          Could we have slide 2, Mr. Bloom?
11          Thank you.
12          Slide 2.
13          So here's slide 2, Your Honor.  This is the
14  Nigel Newby-House and the point is -- and I'll show you
15  another one too -- is that, to the extent it was on a
16  demonstrative and we were relying on it, Dr. Madisetti read
17  it into the record word for word.  He read it into the
18  record in open court when they were here.  They could have
19  objected.  They could have said, you're incorrect, you read
20  it wrong.  They could have cross-examined him about it.
21  They did none of those things because he read it in word for
22  word with zero iterations or additions or changes, and so
23  it's 100 percent of the record, it's substantive evidence.
24          Can we see the next slide?  Thank you.
25          They complain about our citing Mr. Lin's thing.

1263

1  This is the same one.  It's read into the record by
2  Dr. Madisetti.  Page 90 of his deposition transcript, he
3  said that if HTC did not comply with the carrier
4  requirements, it would be documented.  So this idea that
5  we're trying to pull a fast one, that we're playing fast one
6  lose with the rules is completely wrong, it's false, it's
7  demonstratively false.
8          And I want to sort of just -- first, principles
9  here, Your Honor, what you heard Mr. Chaikovsky tell these
10  jurors is that they should completely disregard the
11  testimony of these employees because they are former
12  employees, allegedly.  Don't pay attention to it.
13          Each and every single one of these witnesses
14  testified as a corporate 30(b)(6) witness for HTC Corp.
15  within the scope of their testimony.  Again, that's
16  demonstrated by the fact you heard zero objections from
17  HTC's counsel during the trial when it was actually being
18  submitted.  So it's binding 30(b)(6) testimony.  It's an
19  admission of a party opponent, not hearsay, that
20  Dr. Madisetti is entitled to then tell the jury.  And their
21  opportunity to respond and correct, if they think it's
22  necessary, which, clearly, they didn't, they can
23  cross-examine Dr. Madisetti.  Or they could have objected
24  and said, you're reading it wrong.  You're doing something
25  falsely.

1264

1          None of those things, and that just underscores
2  here, Your Honor, that we did everything 100 percent
3  properly, 100 percent appropriately.  They're trying to hide
4  evidence by giving the jury -- having you give the jury an
5  incorrect instruction on the law.
6          THE COURT:  So I'm not going to -- this is
7  Instruction 1.3, "evidence defined" in the final jury
8  instructions.  That's the only thing I'm going to read to
9  the jury.
10          MR. HEALY:  That would be perfectly fine for us,
11  Your Honor.
12          THE COURT:  And it should be the jury's memory
13  as to what was played to them, what wasn't.
14          MR. HEALY:  No problem at all, Your Honor.
15  Thank you.
16          THE COURT:  All right.
17          (Whereupon, the jury entered the room at
18  11:21 a.m.)
19          THE COURT:  Okay.  Members of the jury, now it
20  is time for me to instruct you about the law that you must
21  follow in deciding this case.  At this time, I'm going
22  provide you with copies of the final jury instruction for
23  you to read along, if you prefer, as I deliver them.
24          So I will start by explaining your duties and
25  the general rules that apply in every civil case.  Then I

1265

1  will explain some rules that you must use in evaluating
2  particular testimony and evidence.  Then I will explain the
3  positions of the parties and the law you will apply in this
4  case.  At last, I will explain the rules that you must
5  follow during your deliberations in the jury room and the
6  possible verdicts that you may return.
7          Please listen very carefully to everything I
8  say.
9          You will have a written copy of these
10  instructions with you in the jury room for your reference
11  during your deliberations.  You will also have a verdict
12  form, which will list the questions that you must answer to
13  decide this case.
14          Let's talk about your jurors' duties.
15          You have two main duties as jurors.  The first
16  is to decide what the facts are from the evidence that you
17  saw and heard in court.  Deciding what the facts are is your
18  job, not mine, and nothing that I have said or done during
19  this trial was meant to influence your decision about the
20  facts in any way.  You are the sole judges of the facts.
21          Your second duty is to take the law that I give
22  you, apply it to the facts, and decide under the appropriate
23  burden of proof which party should prevail on any given
24  issue.  It is my job to instruct you about the law, and you
25  are bound by the oath that you took at the beginning of the

1266

1  trial to follow the instructions that I give you, even if
2  you personally disagree with them.  This includes the
3  instructions that I gave you before and during the trial and
4  these instructions.  All of the instructions are important,
5  and you should consider them together as a whole.
6         Perform these duties fairly.  Do not guess or
7  speculate, and do not let any bias, sympathy, or prejudice
8  you may feel toward one side or the other influence your
9  decision in any way.
10        Now, let's talk about what evidence is again.
11        You must make your decision based only on the
12 evidence that you saw and heard here in court.  Do not let
13 rumors, suspicions, or anything else that you may have seen
14 or heard outside of court influence your decision in any
15 way.  The evidence in this case includes only what the
16 witnesses said while they were testifying under oath,
17 including deposition transcript testimony that has been
18 played by video, the exhibits that I allowed into evidence,
19 matters I have instructed you to take judicial notice of,
20 and the stipulations to which the lawyers agreed.
21        Certain models, reproductions, charts,
22 summaries, and graphics have been used to illustrate certain
23 evidence and testimony from witnesses.  Unless I have
24 specifically admitted them into evidence, these models,
25 reproductions, charts, summaries, and graphics are not

1267

1  themselves evidence, even if they refer to, identify, or
2  summarize evidence, and you will not have these
3  demonstratives in the jury room.
4         Nothing else is evidence.  The lawyers'
5  statements and arguments are not evidence.  The arguments of
6  the lawyers are offered solely as an aid to help you in your
7  determination of the facts.  Their questions and objections
8  are not evidence.  My legal rulings are not evidence.  You
9  should not be influenced by a lawyer's objection or by my
10 ruling on that objection.  Any of my comments and questions
11 are not evidence.
12        During the trial, I may have let -- I may not --
13 I may have not let you hear the answers to some of the
14 questions that the lawyers asked.  I also may have ruled
15 that you could not see some of the exhibits that the lawyers
16 wanted you to see.  And sometimes I may have ordered you to
17 disregard things that you saw or heard or that I struck from
18 the record.  You must completely ignore all of these things.
19 Do not speculate about what a witness might have said or
20 what an exhibit might have shown.  These things are not
21 evidence.  And you are bound by your oath not to let them
22 influence your decision in any way.  Make your decision
23 based only on the evidence, as I have defined it here, and
24 nothing else.
25        Now, during the preliminary instructions, I told

1268

1  you about "direct evidence" and "circumstantial evidence."
2  I will now remind you what each means.
3         Direct evidence is simply evidence like the
4  testimony of an eyewitness, which, if you believe it,
5  directly proves a fact.  If a witness testified that he saw
6  it raining outside and you believe him, that would be direct
7  evidence that it was raining.
8         Circumstantial evidence is simply a chain of
9  circumstances that indirectly proves a fact.  If someone
10 walked into the courtroom wearing a raincoat covered with
11 drops of water and carrying a wet umbrella, that would be
12 circumstantial evidence from which you could conclude that
13 it was raining.
14        It is your job to decide how much weight to give
15 the direct and circumstantial evidence.  The law makes no
16 distinction between the weight that you should give to
17 either one, nor does it say that one is any better evidence
18 than the other.  You should consider all the evidence, both
19 direct and circumstantial, and give it whatever weight you
20 believe it deserves.
21        Now, you should use your common sense in
22 weighing the evidence.  Consider it in light of your
23 everyday experience with people and events, and give it
24 whatever weight you believe it deserves.  If your experience
25 tells you that certain evidence reasonably leads to a

1269

1  conclusion, you are free to reach that conclusion.
2         Now, a further word about statements of counsel
3  and arguments of counsel.  The attorneys' statements and
4  arguments are not evidence.  Instead, their statements and
5  arguments are intended to help you review the evidence
6  presented.  If you remember the evidence differently from
7  the way it was described by the attorneys, you should rely
8  on your own recollection.
9         Now, certain facts that the parties agree are
10 uncontested have been read to you during this trial.  You
11 must treat these facts as having been proved for purposes of
12 this case.
13        Now, let's talk about the credibility of
14 witnesses.
15        You are the sole judges of each witness's
16 credibility.  You may believe everything a witness says or
17 part of it or none of it.  You should consider each
18 witness's means of knowledge; strength of memory;
19 opportunity to observe: how reasonable or unreasonable the
20 testimony is; whether it is consistent or inconsistent;
21 whether it has been contradicted: the witness's biases,
22 prejudices, or interests; the witness's manner or demeanor
23 on the witness stand, and all circumstances that, according
24 to the evidence, could affect the credibility of the
25 testimony.

1270

1 In determining the weight to give to the
2 testimony of a witness, you should ask yourself whether
3 there is evidence tending to prove that the witness
4 testified falsely about some important fact or whether there
5 was evidence that at some other time the witness said or did
6 something, or failed to say or do something, that was
7 different from the testimony he or she gave at the trial in
8 person or by deposition testimony played by video or read to
9 you.  You have the right to distrust such witness's
10 testimony, and you may reject all or some of the testimony
11 of that witness or give it such credibility as you may think
12 it deserves.
13 Now, let's talk about expert witnesses again.
14 Expert testimony is testimony from a person who
15 has a special skill or knowledge in some science,
16 profession, or business.  This skill or knowledge is not
17 common to the average person but has been acquired by the
18 expert through special study or experience.
19 In weighing expert testimony, you may consider
20 the expert's qualifications, the reasons for the expert's
21 opinions, and the reliability of the information supporting
22 the expert's opinions, as well as the factors I have
23 previously mentioned for weighing testimony of any other
24 witness.  Expert testimony should receive whatever weight
25 and credit you think appropriate, given all the other

1271

1 evidence in the case.  You are free to accept or reject the
2 testimony of experts, just as with any other witness.
3 Now, during the trial, certain testimony was
4 presented to you by the playing of video excerpts from a
5 deposition.  The deposition testimony may have been edited
6 or cut to exclude irrelevant testimony, as the parties have
7 only a limited amount of time to present you with evidence.
8 Some of the witnesses in this case provided deposition
9 testimony in a foreign language, which was immediately
10 translated into English.  Because the parties have only a
11 limited amount of time to present you with evidence, the
12 portion of the video where the witness answers in a foreign
13 language may have been removed such that you only heard the
14 translator's English translation.  You should not attribute
15 any significance to the fact that the deposition videos may
16 appear to have been edited or cut, including to remove a
17 witness's foreign-language answer.
18 Deposition testimony is out-of-court testimony
19 given under oath and is entitled to the same consideration
20 you would give it had the witness personally appeared in
21 court.
22 Now, let's talk about demonstratives again.
23 During the course of the trial, you have seen
24 many exhibits.  Many of these exhibits were admitted as
25 evidence.  You will have these admitted exhibits in the jury

1272

1 room for your deliberations.  The remainder of the
2 exhibits -- including physical products, charts, models,
3 reproductions, PowerPoint presentations, and animations --
4 were offered to help illustrate the testimony of the various
5 witnesses.  These illustrative exhibits, called
6 "demonstrative exhibits," have not been admitted, are not
7 evidence, and should not be considered as evidence.  Rather,
8 it is the underlying testimony of the witness that you heard
9 when you saw the demonstrative exhibits that is the evidence
10 in this case.
11 Now, let's talk about your notes.
12 You may have taken notes during trial to assist
13 your memory.  As I instructed you at the beginning of the
14 case, you should use caution in consulting your notes.
15 There is generally a tendency, I think, to attach undue
16 importance to matters which one has written down.  Some
17 testimony which is considered unimportant at the time
18 presented, and thus not written down, takes on greater
19 importance later in the trial in light of all the evidence
20 presented.  Therefore, your notes are only a tool to aid
21 your own individual memory, and you should not compare notes
22 with other jurors in determining the content of any
23 testimony or in evaluating the importance of any evidence.
24 Your notes are not evidence and are by no means a complete
25 outline of the proceedings or a list of the highlights of

1273

1 the trial.
2 Above all, your memory should be the greatest
3 asset when it comes time to deliberate and render a decision
4 in this case.
5 Now, let's talk about burdens of proof again.
6 In any legal action, facts must be proven by a
7 required standard of evidence, known as the "burden of
8 proof."  In this case, the burden of proof is "preponderance
9 of the evidence."  I told you about this standard of proof
10 during my preliminary instructions to you, and I will now
11 remind you what it means.
12 3G Licensing asserts that HTC has infringed the
13 '091 patent and '818 patent.  3G Licensing has the burden of
14 proving infringement by a preponderance of the evidence.
15 That means 3G Licensing has to prove to you, in light of all
16 the evidence, that what they claim is more likely true than
17 not.  To say it differently, if you were to put the evidence
18 of 3G Licensing and the evidence of HTC on opposite sides of
19 a scale, the evidence supporting 3G Licensing's claims would
20 have to make the scales tip only slightly to its side.  If
21 the scale remains equal or tips in favor of HTC, you must
22 find for HTC.
23 You may have heard of the "beyond a reasonable
24 doubt" burden of proof from criminal cases.  That
25 requirement is the highest burden of proof.  It does not

1306

1  preponderance of the evidence that HTC Corp. willfully

2  infringed any asserted claim of any of the asserted patents;

3  the '091 and the '818 patent?

4         "Yes."

5         Signed and dated by the eight jurors.

6         THE COURT:  All right.  I'll poll the jury.

7         Madam foreperson, is that what the Deputy clerk

8  has read accurately reflect the verdict of the jury?

9         MADAM FOREPERSON: Yes, it does.

10        THE COURT:  Does that accurately reflect your

11 vote?

12        MADAM FOREPERSON:  Yes.

13        THE COURT:  Juror No. 2, does it accurately

14 reflect your vote?

15        JUROR NO. 2:  Yes.

16        THE COURT:  Juror No. 3, does it accurately

17 reflect your vote?

18        JUROR NO. 3:  Yes, Your Honor.

19        THE COURT:  Juror No. , does it accurately

20 reflect your vote?

21        JUROR NO. 4:  Yes.

22        THE COURT:  Juror No. 5, does it accurately

23 reflect your vote?

24        JUROR NOL 5:  Yes.

25        THE COURT:  Juror No. 6, does it accurately

1307

1  reflect your vote?

2         JUROR NO. 6:  Yes.

3         THE COURT:  Juror No. 7, does it accurately

4  reflect your vote?

5         JUROR NO. 7:  Yes.

6         THE COURT:  Juror No. 8, does it accurately

7  reflect your vote?

8         JUROR NO. 8:  Yes, sir.

9         THE COURT:  Thank you, ladies of the jury.

10 Thank you for your time.  The Court appreciates your time

11 and assistance in this matter.  You're free to go.

12        Before you leave, my Deputy is going to have

13 some certificates and other information for you in case you

14 need a note for work.

15        And if you're still around, I'll come in and

16 greet you before you leave.

17        All right.  Take them back to the jury.

18        (Whereupon, the jury left the room at 3:26 p.m.)

19        THE COURT:  All right.  Counsel, you may be

20 seated.  So you have the jury verdict.  The Court suggests

21 that the parties meet and confer and within -- on or before

22 Tuesday, the 24th, file a joint status report just giving

23 the Court indication from each side as to steps forward.

24        All right.  I don't recall offhand whether there

25 are any equitable issues that I need to decide through a

1308

1  bench trial.

2         And then with respect to -- if there are no

3  equitable issues that remain for me to decide, then it's

4  just simply a matter of filing the post-trial briefing

5  scheduling.  So, in any case, a one-pager by next Tuesday

6  would be sufficient just so I can know what to expect in the

7  case.

8         All right.  I want to thank the court reporter,

9  hardest worker in the courtroom, for all of her assistance.

10 And my team for all of their assistance.

11        The parties, both sides, were well represented

12 in the matter.

13        And the Court will look for that joint status

14 report on or before the 24th.

15        Thank you, all.

16        MR. HEALY:   May I ask one question, Your Honor?

17        THE COURT:  Yes.

18        MR. HEALY:   HTC had filed a motion to dismiss

19 last Tuesday, so I think it technically -- our response

20 would be on Tuesday, and I don't know if it's still live and

21 it had to do with dismissing Orange.  It hasn't been

22 withdrawn yet.  If we can get some clarification how to

23 handle that.

24        THE COURT:  Okay.  We've had the trial and

25 Orange was a participant.

1309

1         MR. HEALY:   Agreed.

2         THE COURT:  I would assume it's either

3  withdrawn, if not then I'll rule on it promptly.  So, HTC?

4         MS. KELLER:  With regard to the motion to

5  dismiss?  I think, Your Honor, we still think it's pending,

6  but we want to go back and look at everything again.  We can

7  submit as part of that joint status report -- we can include

8  any response to that motion if we believe it to be still

9  pending in the briefing schedule.

10        Does that make sense?

11        MR. HEALY:   Yeah, I mean substantively we can

12 deal with it.  I just want to make sure I didn't have to

13 respond to it on Tuesday.

14        THE COURT:  No, you don't have to respond.

15        MR. HEALY:   Thank you, Your Honor.

16        THE COURT:  All right.

17        We are adjourned.  Thank you, all.

18        (Whereupon, the following proceeding concluded

19 at 3:30 p.m.)

20        I hereby certify the foregoing is a true

21 and accurate transcript from my stenographic notes in the

22 proceeding.

23              /s/ Michele L. Rolfe, RPR, CRR

                 U.S. District Court

24

25

EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT DIABETES CARE INC. and ABBOTT DIABETES CARE LIMITED, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 21-977 (KAJ) |
| DEXCOM, INC., | ) ) | |
| Defendant. | ) ) | |

## <u>ORDER</u>

At Wilmington this 17th day of January, 2024, confirming the ruling made in open

Court on January 12, 2024,

IT IS HEREBY ORDERED that:

- DexCom's Motion to Exclude Certain Expert Testimony of Catharine

  Lawton (D.I. 558) is GRANTED and Ms. Lawton's proposed testimony

  regarding a reasonable royalty, as set forth in her declaration of September

  7, 2023, is EXCLUDED.

"Any reasonable royalty must seek to measure the value of the patented

technology – must be 'apportion[ed]' to that value – by separating out and excluding

other value in economic products or practices." *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th

1332, 1345 (Fed. Cir. 2023). The Federal Circuit has described that requirement as being

in addition to "ascertaining what the parties would have agreed to in the context of a

patent license negotiation." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337

(Fed. Cir. 2009); *see id.* ("[T]he objective of the Court's concern has been two-fold: determining the correct (or at least approximately correct) value of the patented invention, when it is but one part or feature among many, and" hypothesizing a patent negotiation). In other words, apportionment creates "the royalty base to which the royalty rate will be applied[,]" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018), and a market analysis determines the value parties would hypothetically give for the apportioned value of the patented technology. *See id.* (applying royalty base analysis to "hypothetical negotiation"). Thus, even if the patentee can show that "a product would not be commercially viable without the patented feature," it still must apportion the value between what is and is not patented. *Id.* at 979; *see also Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014) ("Whether 'viewed as valuable, important, or even essential,' the patented feature must be separated.").

Finally, "[t]o be admissible, expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011). An expert may not make "conclusory assertions" with a "great … analytical gap between the data and the opinion proffered[.]" *Virnetx*, 767 F.3d at 1333 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Catharine Lawton's three proffered reasonable royalty opinions do not provide the necessary apportionment.

## A.    Hypothetical Negotiation Approach

After I held the '954 Patent ("factory calibration patent") invalid at summary judgment (D.I. 483 at 1), Abbott filed a supplemental expert report from Ms. Lawton that compared DexCom's G6 to Abbott's FreeStyle Libre ("FSL").  (D.I. 498, Abbott Ex. 4; D.I. 573-2 ¶¶ 50-52.)[1]  Abbott all but admits that that approach did not apportion value to the patented features.  (D.I. 560, DLAW 89-90 (Ms. Lawton admitting that comparing the G6 to the FSL does not offer "a valuation of the patents-in-suit").)

## B.    "Analytical Approach"

In both her original and supplemental expert reports, Ms. Lawton presented an alleged "analytical approach" comparing the G5 and the G6.  (D.I. 573-1 ¶¶ 1019-1075; D.I. 573-2 ¶¶ 35-48.)  At one point, that comparison was justifiable.  (D.I. 482 at 64 ("Lawton … has made a credible pass at isolating the value of the patented features because it is her contention that the entire increase in demand between the G5 and G6 is due to the inventions claimed by the patents-in-suit.").)  But, after I invalidated the factory calibration patent, Ms. Lawton presented her supplemental report using the same method and resulting in the same number.  (D.I. 573-2 ¶ 45-47.)  Lawton had previously called factory calibration one of two primary demand drivers for the G6, the other being the easy-to-use inserter.  (D.I. 392, Ex. 150 ¶¶ 158-168, 1043; D.I. 560 at DLAW 6-9.)  Now, factory calibration must be considered unpatented.  Thus, to isolate the value of the

_____

[1] Ms. Lawton did so in her original report as well.  (D.I. 573-1 ¶ 1483.)

remaining patented feature in the G6, the easy-to-use inserter, Lawton cannot use the G6 as a profit comparator.  It has an unpatented feature – factory calibration – that Ms. Lawton admitted was a key driver of demand.  (D.I. 392, Ex. 150 ¶ 159; D.I. 560 at DLAW 6.)  *See Sprint Commc'ns Co. v. Cequel Commc'ns*, LLC, No. 18-1752-RGA, 2022 WL 1801433, at *1 (D. Del. June 2, 2022) (the comparison must be "apples-to-apples … except for the patented technology to ensure that there are no additional features that need to be apportioned out" (internal quotation marks omitted)).

## C. Alternative Approach

In her third report, filed in response to DexCom's latest expert report, Ms. Lawton assumes that the incremental value of the G6 over the G5 can at least be evenly split between the easy-to-use inserter and factory calibration features of the G6.  (D.I. 573-3 ¶¶ 110-112, 116.)  Yet, this is a "conclusory assertion[]" with a "great … analytical gap between the data and the opinion proffered" if it is based on any data at all.  *Virnetx*, 767 F.3d at 1333 (quoting *Gen. Elec. Co.*, 522 U.S. at 146).  For example, at oral argument, Abbott stated that Ms. Lawton based that opinion in part on the fact that everyone needs to use the inserter but does not need to use factory calibration.  That does nothing to isolate the value of the *particular inserter* present in the G6 – after all, every CGM has an inserter, and every CGM patient has to use one.  Abbott also contended that DexCom's officials said "there is no going backwards" after the G6, but they said so about factory calibration and not the inserter.  (D.I. 560 at DLAW 6.)  The picking of a 50% value does not appear to be based on any analytical method and so does not satisfy the requirement

4

that "the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (citation omitted).

## D.    What's Left

Ms. Lawton's opinion on lost profits and non-infringing alternatives is still in the case and can be used to attack DexCom's case, which includes the opinion of DexCom's expert, Laura Stamm, that estimates the percentage value change attributable to patented features.  (D.I. 573 at 13-14.)

 s/ Kent A.. Jordan                          
Kent A. Jordan, Circuit Judge
Sitting by designation